

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9             Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY   10004

15

16                   September 1, 2022

17                   10:13 AM

18

19

20

21    B E F O R E :

22    HON MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO: F. FERGUSON

1    HEARING re Hearing Using Zoom for government re: Debtors' Ex

2    Parte Motion Pursuant to Section 107 of the Bankruptcy

3    Code Seeking Entry of an Order (1) Authorizing the Debtors

4    to Redact Certain Personally Identifiable Information

5    from the Creditor Matrix, Schedules and Statements, and

6    Related Documents and (II) Granting Related Relief

7    filed by Joshua Sussberg on behalf of Celsius Network LLC.

8    (Doc ## 344, 364, 389, 399, 600, 607, 633, 638, 642, 643)

9

10   HEARING re Hearing Using Zoom for Government RE: Motion to

11   (A) Continue to Operate Their Cash Management System,

12   (B) Honor Certain Prepetition Obligations Related Thereto,

13   (C) Maintain Existing Business Forms, and (D) Continue to

14   Perform Intercompany Transactions, (II) Granting

15   Superpriority Administrative Expense Status to

16   Postpetition Intercompany Balances, and (IIT) Granting

17   Related Relief (Doc## 56, 401, 448, 479, 513, 592, 626,

18   643)

19

20   HEARING re Hearing Using Zoom for Government RE: Debtor's

21   Motion Seeking Entry of (I) an Order (A) Approving Bidding

22   Procedures for the Potential Sale of Certain of the Debtors

23   Assets, (B) Scheduling Certain Dates with Respect

24   Thereto, (C) Approving the Form and Manner of Notice

25   Thereof, (D) Approving Bid Protections, (E) Approving

Page 3

1    Contract Assumption and Assignment Procedures, (II) an Order

2    Authorizing the Debtors to Enter into A

3    Definitive Purchase Agreement, and (IID) Granting Related

4    Relief. (Doc## 188, 192, 357, 409, 430, 445, 626)

5

6    HEARING re Hearing Using Zoom for Government RE: Motion for

7    Relief for aN Exemption From the Automatic Stay.

8    (Document No. 342, 590, 597, 609, 610, 618, 620, 625, 626,

9    655)

10

11    HEARING re Hearing Using Zoom for Government RE: Debtor's

12    Motion to Approve Procedures for De Minimis Asset

13    Transactions (Doc ## 189, 400, 402, 429, 448, 499, 626)

14

15    HEARING re Hearing Using Zoom for Government RE: Motion (I)

16    Authorizing the Debtors to (a) Pay Prepetition Employee

17    Wages, Salaries, Other Compensation, and Reimbursable

18    Expenses and (b) Continue Employce Benefits

19    Programs and (11) Granting Related Relief (Doc## 61, 19,

20    192, 357, 402, 409, 413, 448, 518, 613. 626, 636, 643).

21

22    HEARING re Hearing Using Zoom for Government RE: Application

23    to Employ Akin Gump Strauss Hauer & Feld LLP as Special

24    Litigation Counsel filed by Joshua Sussberg on behalf of

25    Celsius Network LLC. (Doc # 392, 601, 626, 649, 656)

1   HEARING re Hearing Using Zoom for Government RE: Debtors'

2   Application for Entry of an Order Authorizing the Retention

3   and Employment of Kirkland & Ellis LLP and Kirkland & Ellis

4   International LLP as Attorneys for the Debtors and Debtors

5   in Possession Effective as of July 13, 2022. (Doc # 360,

6   364, 374, 389, 561, 601, 626, 628, 629, 637, 638, 643)

7

8   HEARING re Hearing Using Zoom for Government RE: Application

9   to Employ Latham & Watkins LLP as Special Counsel

10  filed by Joshua Sussberg on behalf of Celsius Network LLC.

11  (Doc ## 363, 364, 374, 389, 440, 601, 626, 643, 645, 647)

12

13  HEARING re Hearing Using Zoom for Government RE: Application

14  to Employ Stretto. Inc. as Administrative Advisor to the

15  Debtors and Debtors in Possession Effective as of July 13,

16  2022. (Doc ### 361, 364, 374, 389, 601, 626, 643)

17

18  HEARING re Hearing Using Zoom for Government RE: Application

19  to Employ Alvarez & Marsal North America, LLC as

20  Financial Advisor filed by Joshua Sussberg on behalf of

21  Celsius Network LLC. (Doc ## 410, 601, 643}

22

23  HEARING re Hearing Using Zoom for Government RE: Debtors' Ex

24  Parte Motion Seeking Entry of an Order (1) Authorizing

25  the Debtors to File Under Seal the Names of Certain

1    Confidential Parties in Interest Related to the Debtors'

2    Potential Sale of Certain Assets and (II) Granting Related

3    Relief Notice of Hearing of Debtors Ex Parte Motion

4    Seeking Entry of an Order (1) Authorizing the Debtors to

5    File Under Seal the Names of Certain Confidential

6    Parties in Interest Related to the Debtors Potential Sale of

7    Certain Assets and (II) Granting Related Relief. (Doc#

8    457, 380, 626, 643)

9

10   HEARING re Hearing Using Zoom for Government re: Second

11   Motion to Extend Deadline to File Schedules or Provide

12   Required Information. (Doc# 431, 626, 57, 643)

13

14   HEARING re Hearing Using Zoom for Government RE: Motion

15   Authorizing the Debtors to Prepare a Consolidated List of

16   Creditors in Lieu of Submitting A Separate Mailing Matrix

17   for Each Debtor, (ID Authorizing the Debtors to File

18   A Consolidated List of the Debtors Fifty Largest Unsecured

19   Creditors, (II Authorizing the Debtors to Redact

20   Certain Personally Identifiable Information, (IV) Approving

21   the Form and Manner of Notifying Creditors of

22   Commencement, and (V) Granting Related Relief. (Doc ## 18,

23   55, 357, 445, 626, 643)

24

25

1   HEARING re Doc# 676 Amended Notice of Agenda Amended Agenda

2   for Hearing to Be Held September 1, 2022, at 10:00

3   A.M. (Prevailing Eastern Time)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4          Attorneys for the Debtor

5          1301 Pennsylvania Avenue NW

6          Washington, DC 20004

7

8    BY:  JUDSON BROWN

9

10    KIRKLAND & ELLIS LLP

11          Attorneys for the Debtor

12          300 N. LaSalle

13          Chicago, IL 60654

14

15    BY:  ROSS KWASTENIET

16          HEIDI HOCKBERGER

17

18    KIRKLAND & ELLIS LLP

19          Attorneys for the Debtor

20          601 Lexington Avenue

21          New York, NY 10022

22

23    BY:  SIMON BRIEFEL

24

25

Page 8

```
 1     WHITE & CASE LLP

 2          Attorneys for the Official Committee of Unsecured

 3          Creditors

 4          111 South Wacker Drive, Suite 5100

 5          Chicago, IL 60606

 6

 7     BY:  GREGORY F. PESCE

 8

 9     WHITE & CASE LLP

10          Attorneys for the Official Committee of Unsecured

11          Creditors

12          200 South Biscayne Blvd., Suite 4900

13          Miami, FL 33131

14

15     BY:  TRUDY SMITH

16

17     WHITE CASE LLP

18          Attorneys for the Official Committee of Unsecured

19          Creditors

20          555 South Flower Street, Suite 2700

21          Los Angeles, CA 90071

22

23     BY:  AARON COLODNY

24

25
```

1      TROUTMAN PEPPER HAMILTON SANDERS LLP

2          Attorneys for Ad Hoc Group of Withhold Account Holders

3          4000 Town Center, Suite 1800

4          Southfield, MI 48075

5

6      BY:  DEBORAH KOVSKY-APAP

7

8      DANIEL A. FRISHBERG, Pro Se Movant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All right.  Starting the recording for

3      September 1, 2022 at 10 a.m., calling Celsius Network, Case

4      Number 22-10964.  Is there counsel for Kirkland on the line?

5      All right.  Any counsel from Kirkland?

6              MR. PESCE:  I see at least Judson Brown from K and

7      E is on the line.

8              CLERK:  Right.

9              MR. BROWN:  Hey, Greg.  This is Judson Brown from

10     K and E.  I'm here.  But it doesn't look like my bankruptcy

11     colleagues have joined yet.  I'm sure they will be joining

12     soon.

13             CLERK:  All right.  Do you happen to know if

14     they're going to do like a conference room or if people are

15     joining individually?

16             MR. BROWN:  My understanding is they're joining by

17     conference room, one in Chicago and then a separate one in

18     New York.

19             CLERK:  Okay, that's helpful.  And it's just

20     yourself that's going to be joining, that joined separately?

21             MR. BROWN:  I think so, but I can't guarantee it.

22     I'm in a different office and I think that I am the only one

23     outside of Chicago and New York but I can't promise.

24             CLERK:  I understand.  All right, thank you.

25             MR. BROWN:  Sure.

1          CLERK:  All right.  So the counsel that I have on

2     the roster that is joining from Kirkland is as follows:

3     Simon Briefel, yourself, Mr. Brown, Susan Golden, Heidi

4     Hockberger, Elizabeth Jones, Ross Kwasteniet, my apologies

5     if I got the name wrong, Joshua Sussberg, Jenny Wilson and

6     Alison Wirtz.  And everyone else would be listen only.

7          All right.  Do we have counsel for the Official

8     Committee of Unsecured Creditors on the line?

9          MR. PESCE:  Yes, it's Greg Pesce, White and Case.

10    I'm on and it looks like a couple of colleagues that will be

11    speaking with me today are also on the line and we can

12    identify them if that's helpful.

13         CLERK:  Please do.

14         MR. PESCE:  I'll be giving an opening remarks and

15    then my colleagues, Trudy Smith and Aaron Colodny will be

16    speaking as well and they're on the Zoom as well.

17         THE COURT:  Thank you.

18         MR. COLODNY:  Can you hear me?  I just want to

19    check.  This is Aaron.

20         CLERK:  Yes, Aaron.  Thank you.

21         MR. COLODNY:  Thank you so much.

22         MR. PESCE:  Miss Smith, you should check your

23    audio.

24         MS. SMITH:  Sure.  Can everyone hear me all right?

25         CLERK:  Yes, yes, we can.  Thank you.

1          MS. SMITH:  Perfect, thank you.

2          CLERK:  All right, Mr. Frishberg.

3          MR. FRISHBERG:  I'm here.

4          CLERK:  If you could just give your appearance for

5     the record, just state how you're related in the case.

6          MR. FRISHBERG:  Yes I am the movant.  Basically, I

7     made a motion to the Court for an exemption from the

8     automatic stay.  It is Docket Number 342.

9          CLERK:  Okay.  All right, thank you.  Your

10    appearance is noted.  All right.  Alexandra Barrage, are you

11    going to be speaking this morning?  All right, I'll come

12    back to you.  Okay, it looks like the conference rooms for

13    Kirklands, those are joining.  We might need to give them a

14    minute.  All right, has anyone from Kirkland joined besides

15    Mr. Brown?  All right again, Alexandra, are you going to be

16    speaking this morning?  I know that you joined.  You might

17    have dropped off though.  Just waiting for our participants

18    to join.

19          All right, let's try this again.  Are there -- is

20    there any additional counsel from Kirkland's that have

21    joined?  I believe Ms. Jones has.

22          K.E. TECH:  Yes.  Hi, this is Kirkland's.  I'm

23    setting something up for Elizabeth Jones.

24          CLERK:  Okay.

25          K.E. TECH:  All right.  How do we sound?  Do we

Page 13

1    sound clear?  Everything sounds good to you?

2              CLERK:  Yes it does, yes, it does, thank you.

3              K.E. TECH:  I appreciate it, thank you.

4              CHICAGO KIRKLAND:  We also have Kirkland and Ellis

5    Chicago over here.  Can you hear this room?

6              CLERK:  Yes, I can.  Who is going to be appearing

7    in Chicago?

8              CHICAGO KIRKLAND:  Ross Kwasteniet and Heidi

9    Hockberger.

10             CLERK:  Okay.  Great.  Thank you.  Also is there a

11   K.E. Tech?  Is that Kirkland and Ellis?

12             K.E. TECH:  Yes, I'm not sure which room.

13             CHICAGO KIRKLAND:  Yes.  That's Kirkland and Ellis

14   Chicago as well.

15             MR. BRIEFEL:  Hi.  This is Simon Briefel from

16   Kirkland and Ellis and I also wanted to make an appearance

17   for the hearing today.

18             CLERK:  Thank you, Simon.  All right.  Are there

19   any participants that have joined that have not given their

20   appearance and will be speaking this morning?

21             MS. KOVSKY:  Good morning.  This is Deb Kovsky

22   from Troutman Pepper for the Ad Hoc Group of Withhold

23   Account Holders.

24             CLERK:  Thank you.  Anyone else?  All right,

25   Francis, can you pause the recording for now?  The party

1    that dialed in with the 212-906-1849 number, is that a party

2    from Latham and Watkins?

3            MS. REILLY:  Yes, this is Annemarie Reilly.

4            CLERK:  Okay.  You have a bit of an echo, Ms.

5    Reilly.

6            MS. REILLY:  Is that better?

7            CLERK:  It's still echoing.  I'll re-mute you.

8    All right.  Ms. Reilly, do you want to try speaking again?

9    Are you speaking this morning?  Ms. Reilly, can you unmute

10   and try to speak again?

11           MS. REILLY:  Can you hear me?

12           CLERK:  Yes, I can.  I just wanted to know if

13   you're speaking on the record this morning?

14           MS. REILLY:  I'm here to answer questions, if

15   necessary, but I don't believe I'll need to speak.

16           CLERK:  All right.  Thank you very much.

17           K.E. TECH:  Ms. Hyde, this is Kirkland for

18   Elizabeth Jones.  We have another person that's going to be

19   presenting from a different room.  Right now we're in a

20   waiting room.  Is there a way that you guys can let that

21   room in?  It says 51E on the list?

22           CLERK:  Yes, I just admitted them.

23           K.E. TECH:  Okay.  I'm going to go back over there

24   and change the camera and stuff like that to make sure we

25   can get in.  Thank you.

1          CLERK:  Okay.  Thank you.  Is there a conference

2    room for Kirkland that just joined?  I'll give them a

3    minute.  All right, Ms. Milligan, can you hear me?  Leila?

4          MS. MILLIGAN:  Good afternoon -- good morning.  I

5    can hear you.  Thank you.

6          CLERK:  Yes.  If you could just give your

7    appearance for the record.

8          MS. MILLIGAN:  Leila Milligan with the Texas

9    Attorney General's Office on behalf of the Texas State

10   Securities Board.

11         CLERK:  Thank you.  All right.  Are there any

12   parties that have joined that will be speaking this morning

13   and have not given their appearance?  Mr. Bixler, are you

14   speaking?

15         MR. BIXLER:  I would defer to Kirkland on that.

16   It's Holden Bixler.  I'm with Alvarez and Marsel, financial

17   advisor to the Debtor.

18         CLERK:  Okay.  Thank you.

19         MR. KWASTENIET:  Hi.  It's Ross Kwasteniet from

20   Kirkland.  Can you hear me.

21         CLERK:  You're a bit low, Ross.

22         MR. KWASTENIET:  Okay.  I'll try to speak up or

23   move a microphone closer.  Is that any better?

24         CLERK:  That's a little bit better, but it's still

25   a bit low.

1          MR. KWASTENIET:  Okay.  So Mr. Bixler has

2     submitted a declaration.  If his declaration goes into

3     evidence without opposition, then he won't testify.  But if

4     the Judge or any other party has questions for Mr. Bixler,

5     then, you know, he is online and ready to testify.  We're

6     not planning to call him affirmatively unless somebody has a

7     question about his declaration.

8          CLERK:  All right.  Please make that clear so we

9     can take the oath if necessary.

10          MR. KWASTENIET:  Yes.  Certainly, if we call Mr.

11     Bixler, I would envision we would address swearing in at

12     that time.

13          CLERK:  All right.  Thank you so much.

14          MR. KWASTENIET:  Thank you.

15          CLERK:  All right.  Are there any additional

16     participants have been admitted and are speaking this

17     morning, but have not given their appearance?  All right.

18     There are any participants who will be speaking this morning

19     and have not given their appearance yet?  Good morning, Ms.

20     Cornell, have you joined yet?

21          MS. CORNELL:  Good morning.

22          CLERK:  Good morning.  If you could just give your

23     appearance for the record, please?

24          MS. CORNELL:  Sure.  This is Shara Cornell on

25     behalf of the Office of the United States Trustee.

1         CLERK:  All right.  Are any other --

2         MS. CORNELL:  Can you see my video?

3         CLERK:  I'm looking for you.  I don't believe so.

4         MS. CORNELL:  Okay, if you don't mind, I'm going

5     to try to restart.  I'm just having a couple of technical

6     problems if you don't mind.

7         CLERK:  That's not a problem.

8         MS. CORNELL:  Thank you very much.

9         CLERK:  You're welcome.  All right. Mr. Hurley,

10    have you joined?

11        MR. HURLEY:  I have.  Good morning.  Can you hear

12    me?

13        CLERK:  Yes I can.  If you could just give your

14    appearance for the record, please?

15        MR. HURLEY:  Sure.  Mitch Hurley  with Akin Gump

16    Stauss Hauer and Feld on behalf of the Debtors, in

17    connection with our application to be retained on behalf of

18    the Debtors.

19        CLERK:  All right, thank you.  Is Dean Chapman

20    also going to be joining this morning?

21        MR. HURLEY:  I believe he'll be joining in a few

22    minutes.

23        CLERK:  Thank you.

24        CHICAGO KIRKLAND:  Hello, testing.  This is

25    Chicago.  We're just making sure the microphone works

1    better.

2              CLERK:  Yes, I can hear you.

3              CHICAGO KIRKLAND:  Does this microphone sound

4    better than the previous one?

5              CLERK:  Yes.

6              CHICAGO KIRKLAND:  All right.

7              CLERK:  I can see you now, Shara, if you could

8    unmute and just give your appearance.

9              MS. CORNELL:  This is Shara Cornell on behalf of

10   the Office of the United States Trustee.  Thank you.

11             CLERK:  Thank you.  Are any other parties from the

12   US Trustee's Office going to be joining this morning?

13             MS. CORNELL:  I believe Mark Bruh will be joining.

14             CLERK:  Okay.  All right, thank you.

15             MS. CORNELL:  Thank you.

16             NEW YORK KIRLAND ELLIS:  This is Kirkland Ellis in

17   New York.  Can you guys hear from this room?

18             CLERK:  You're a little bit low.

19             NEW YORK KIRKLAND ELLIS:  Little bit low?

20             CLERK:  Yes.

21             NEW YORK KIRKLAND ELLIS:  Hang on.  Is that any

22   better?

23             CLERK:  It's a little bit better.  You're clear

24   though, you're speaking clearly.

25             NEW YORK KIRKLAND ELLIS:  I'll make sure when the

1    presenter comes up, I'll tell him to speak up a little bit.

2              CLERK:  All right, thank you.

3              NEW YORK KIRKLAND ELLIS:  Okay, thanks.

4              CLERK:  All right.  Are there any participants

5    that have joined that are speaking on the record and have

6    not given their appearance yet?  Again, any parties that are

7    speaking on the record this morning and that have not given

8    their appearance yet?

9              All right.  I'm going to going to go through some

10   of the firms that signed up for the hearing just to see if

11   anyone has joined yet.  Has counsel from Milbank on behalf

12   of the Series B Preferred Shareholders joined?

13             All right.  Have counsel on behalf of the Ad Hoc

14   Group of Custodial Account Holders from Togut, Segal and

15   Segal, have they joined?

16             Has counsel from Jones Day joined?  All right.

17   Again, are there any parties that have joined this morning

18   that will be speaking on the record and have not yet given

19   an appearance?  All right, Mr. Mester, are you going to be

20   speaking this morning?  Mr. Mester, are you going to be

21   speaking on the record this morning?

22             MR. MESTER:  Good morning.  I don't believe that

23   will be necessary today.

24             CLERK:  Okay, thank you.  All right.  Any parties

25   that have joined and are speaking on the record this morning

1    that have not given their appearance yet?

2             MR. ADLER:  Yes, it's David Adler from McCarter

3    English.   I may speak, but it would be very briefly.

4             CLERK:  All right, thank you, Mr. Adler.  Mr.

5    Leblanc, he's joining.  Good morning, Mr. Leblanc.  Are you

6    going to be speaking this morning?

7             MR. LEBLANC:  I think it is unlikely but I might

8    as well register just in case.

9             CLERK:  Please give your appearance.  Thank you..

10            MR. LEBLANC:  Sure.  Andrew Leblanc of Milbank LLP

11   on behalf of Certain Preferred Equity Holders.

12            CLERK:  All right, thank you.  Are any of your co-

13   counsel going to be speaking this morning?

14            MR. LEBLANC:  I don't expect so, though Mr. Dunn,

15   Dennis Dunn will be on the line.

16            CLERK:  Okay.  All right.  I do not see him yet.

17   Thank you.

18            MR. LEBLANC:  Thank you.

19            CLERK:  Okay.  Absolutely.  Okay.  All right.  Is

20   there -- if anyone could from Kirkland could answer this --

21   is there a someone from your firm with a 312 number area

22   code that's trying to dial in?  Hi.  Is anyone from Kirkland

23   on the line?

24            MR. KWASTENIET:  Hi.  It's Ross Kwasteniet from

25   Kirkland.  Can you hear me?

1           CLERK:  Yes, I can.

2           MR. KWASTENIET:  I think that Kirkland would be

3       the likely suspect for a 312 phone number.  That is the

4       Chicago area code.  I'm not aware of anybody else on the

5       Kirkland side who would have a speaking role for today, so

6       it's possible that somebody's trying to dial in to listen to

7       the hearing, but we have all the presenters, you know, here

8       in conference rooms and we've all made our appearances,

9       anybody who's going to speak today.

10           CLERK:  All right, thank you.

11           MR. KWASTENIET:  And I just wanted to check is the

12       audio stronger and clearer?  I received a number of emails

13       from folks saying that they couldn't hear us previously.

14           CLERK:  Yes, very clear.

15           MR. KWASTENIET:  Okay, Thank you.

16           CLERK:  All right.  Mark Bruh, Mark, are you on

17       the line?

18           MR. BRUH:  Yeah, I'm here.  I'm just getting my

19       video and audio set up.

20           CLERK:  Okay.  Your appearance on behalf of the

21       U.S. Trustee is noted.

22           MR. BRUH:  Thank you.

23           CLERK:  Elizabeth Beitler, are you going to be

24       speaking this morning?

25           MS. BIETLER:  No, I should have a listen only

1 line.

2    CLERK:  Okay.  Thank you.  Mr. Ortiz, are you

3 going to be speaking this morning?

4    MR. ORTIZ:  Good morning, Deanna.  Yes, I plan to

5 speak on behalf of the Ad Hoc Group of Custodial Account

6 Holders.

7    CLERK:  Okay.  Thank you.  Is David Little or

8 Brian Kotliar, are either of them going to be joining as

9 well?

10    MR. KOTLIAR:  Hi, good morning, Deanna.  I'm on, I

11 don't plan to speak, but I am also appearing on behalf of

12 the Ad Hoc Group of Custodial Account Holders.

13    CLERK:  Thank you.

14    MR. KOTLIAR:  Thanks.

15    CLERK:  All right, are there any additional

16 parties that have joined that will be speaking this morning

17 on the record and have not given their appearance?

18    MR. CHAPMAN:  This is Dean Chapman from Akin Gump.

19 I may be speaking this morning on behalf of Akin Gump as

20 proposed special litigation counsel.

21    CLERK:  Okay, thank you very much.

22    MS. WILSON:  Good morning.  You also have Jenny

23 Wilson from Kirkland and Ellis, appearing on behalf of

24 Kirkland and Ellis and speaking on privacy matters from a

25 European perspective.

1          CLERK:  Thank you.

2          MS. ADLER:  Susan Adler on behalf of Odette

3     Wohlman.

4          CLERK:  Okay.  Thank you.  Is there anyone else

5     that will be speaking this morning that has not given their

6     appearance yet.  All right.  Again, are there any parties

7     that have joined that are not -- that have not given their

8     appearances yet and will be speaking on the record?

9          All right, let's pause the recording for a moment.

10    All right, everyone, thank you for your patience.  We have a

11    very large number of people that are joining the hearing

12    this morning and we shall be starting in about 10 minutes

13    around 10:10 or so.

14          Just a brief, few brief announcements.  If

15    everyone could state their name each time they speak on the

16    court record.  Also, this is a court proceeding.  Audio and

17    video recording is prohibited.  The only sanctioned

18    recording is that made by the Court.

19          All right.  Is there anyone that has joined the

20    hearing that is speaking this morning and has not given

21    their appearances?

22          All right.  What I'm going to do now is just

23    basically go according to some of the parties that I know

24    will be speaking this morning, going by the ECourt

25    appearance list.  Counsel from Kirkland, can we just confirm

1    in each section who we have on?

2           MR. KWASTENIET:  Yes.  Good morning, Ross

3    Kwasteniet from Kirkland and Ellis and with me in Chicago

4    are my colleagues Alison Wirtz and Heidi Hockberger.

5           CLERK:  All right, thank you.

6           MS. JONES:  Good morning, Elizabeth Jones of

7    Kirkland and Ellis on behalf of the Debtors as well.

8           CLERK:  Thank you.

9           MR. BROWN:  Good morning, Judson Brown from

10   Kirkland and Ellis also on behalf of the Debtors.

11          CLERK:  Any other counsel from Kirkland?  I think

12   Mr. Briefel joined?

13          MR. BRIEFEL:  Yes, can you hear me?

14          CLERK:  Yes, I can.

15          MR. BRIEFEL:  Yes, good morning.  Simon Briefel

16   also on behalf of the Debtors.

17          CLERK:  Is Susan Golden going to be joining this

18   morning.

19          MS. JONES:  Good morning.  Susan is here in the

20   room with me but she will not be speaking.

21          CLERK:  All right, thank you.  Anyone else that's

22   going to be speaking on behalf of Kirkland or from Kirkland?

23          MR. KWASTENIET:  No, that's the full complement of

24   Kirkland presenters for today.

25          CLERK:  All right.  Thank you.  All right.  We'll

1       move on to parties from the U.S. Trustee's Office.  If we

2       just could have a final confirmation as to who was speaking

3       this morning.

4               MS. JONES:  Apologies.  There is one more person

5       from Kirkland and Ellis.  Ms. Jennifer Wilson, she's in our

6       European offices.  She may speak if there are any specific

7       questions related to the GDPR issues, but otherwise, does

8       not intend to appear.

9               CLERK:  Okay.  Thank you.  Yes.  And she did give

10      her appearance previously.  Thank you for specifying that.

11      All right again, now we'll move on to the U.S. Trustee's

12      Office.  I have Mark Bruh and Shara Cornell.  Is that

13      everyone that's speaking?

14              MS. CORNELL:  Yes, Your Honor.  Yes, Deanna.

15              CLERK:  All right.  Counsel from Milbank on behalf

16      of the Series B Preferred Shareholders.

17              MR. LEBLANC:  Yes.  Good morning.  Andrew Leblanc

18      of Milbank and my partner, Dennis Dunn, should be on at some

19      point too.

20              CLERK:  Thank you.  All right.  Counsel from

21      McCarter English.

22              MR. ADLER:  Good morning, Deanna.  It's David

23      Adler from McCarter English.  We may make some brief

24      introductory remarks but  that's it and it will only be me.

25              CLERK:  All right.  Thank you.  Counsel on behalf

1     of Alvarez and Marsal.  I know I have Holden Bixler and Bob

2     Campagna, correct?

3              MR. BIXLER:  Good morning.  It's Holden Bixler

4     with Alvarez Marsal, financial advisor to the Debtor.

5              CLERK:  All right, thank you.  And I have counsel

6     Akin Gump, Dean Chapman and Mitchell Hurley, the Debtor's

7     proposed special litigation counsel.

8              MR. HURLEY:  Yes.  Good morning, again.  Mitch

9     Hurley here.

10             CLERK:  All right, thank you.  Then from White and

11    Case on behalf of the Official Committee of Unsecured

12    Creditors.  If you could just go through the parties we

13    have.

14             MR. PESCE:  Sure, Deanna.  It's Greg Pesce of

15    White and Case.  I'm going to make a brief statement in the

16    beginning and then the substantive pleadings will be covered

17    by Aaron Colodny in our L.A. Office and Trudy Smith in

18    Miami, who should both be on the line as well.

19             MR. COLODNY:  I'm here, Greg, thanks treaties

20    also.  All right, thank you.  All.  All right.

21             MS. SMITH:  Trudy is also on.

22             CLERK:  All right.  Thank you, all.  All right.

23    Is there anyone on the line from Sullivan and Cromwell?  All

24    right.  If they do join, we will admit them.  All right.

25    And then, of course, I took the appearance of Daniel

1    Frishberg who's appearing on his own behalf.  Mr. Frishberg,

2    I just want to make sure you're still there.

3             MR. FRISHBERG:  Yes, I'm still here.

4             CLERK:  All right, thank you very much.  All

5    right.  Counsel from Togut, Segal and Segal.

6             MR. ORTIZ:  Good morning, Ms. Anderson.  It's Kyle

7    Ortiz for the Ad Hoc Group of Custodial Holders.  My

8    colleague Brian Kotliar is on as well.

9             CLERK:  Thank you.  All right.  And then counsel

10   on behalf of the Ad Hoc Group of Withhold Account Holders

11   from Troutman.

12            MS. KOVSKY:  Good morning.  It's Deb Kovsky.  All

13   right, thank you.  And then I have from the Texas State

14   Securities Board, Layla Milligan.

15            MS. MILLIGAN:  Good morning, Layla Milligan.  I

16   just -- I do not anticipate making argument today.  Just

17   wanted to let you know.

18            CLERK:  All right.  Thank you.  And then counsel

19   from Latham and Watkins.

20            MS. REILLY:  Good morning.  This is Annemarie

21   Reilly from Latham and Watkins.  Our declarant, I believe,

22   is still in the waiting room, John Sikora.

23            CLERK:  Okay, I'll check that.  It says that he

24   joined.  Mr. Sikora.  I don't see him.  It says that he

25   joined.  Mr. Sikora, are you there?  Yeah, he's there but

1   he's not responding.  Is he going to be  speaking on the

2   record possibly this morning?

3           MS. REILLY:  Just as the declarant if needed.  I

4   think on his end, it's still showing him in the waiting room

5   but we'll try and figure it out.

6           MAN 1:  Deanna, it's our understanding that with

7   respect to the Latham retention application, there's one

8   overarching objection relating to how all advisors sealed

9   certain information which we'll be addressing, I believe,

10  just as a legal argument.  And I don't believe that there

11  are any other objections to the Latham retention

12  application.  So from the Debtor's perspective, I think it

13  highly unlikely that Mr. Sikora would need to speak.

14          CLERK:  Okay, thank you.  All right.  Are there

15  any additional parties that are speaking this morning?

16  Speaking on the record that would like to speak that have

17  not given their appearance yet?

18          MR. UBIERNA:  Yes, Deanna, good morning.  I'm a

19  creditor and I wish to be heard.

20          CLERK:  Okay, so the Judge will ask for

21  participants to raise their hands when they want to speak.

22  So just raise your hands and in an orderly fashion, he will

23  ask you to unmute and then you can speak on the record.

24          MR. UBIERNA:  Okay.

25          CLERK:  He'll give you a cue as to when that is.

1    All right.  Judge, would you like to get started?

2            THE COURT:  Yes, I would, Deanna, and good morning

3    to everyone.  We are on the record in Celsius Network LLC,

4    22-10964.  Before we begin with the agenda, I do want to

5    make some brief comments.

6            So we've received over 800 registrations for

7    today's Zoom hearing.  An amended supplemental notice of

8    hearing, ECF Docket Number 631 was filed on the court docket

9    stating the following regarding today's hearing:

10            "When parties sign into Zoom for government and

11    add their names, they must type in the first and last name

12    that will be used to identify them at the hearing.  Parties

13    that type in only their first name, a nickname, or initials

14    will not be admitted to the hearing."

15            Several parties have signed into today's hearing

16    using a first name, nickname, initials or designation other

17    than their first and/or middle name and last name.  I'm

18    including among this list someone who signed in using

19    "Hellraiser 98" or something else that is inappropriate.

20    Some parties have signed in only as iPhone or using a

21    similar designation.  Since these parties have not followed

22    the instructions in the notice or followed the instructions

23    given at the previous court hearing in Celsius, they will

24    not be admitted in today's hearing.  Parties that do not

25    comply with court instructions cited in future notices will

1   not be admitted to future hearings.

2          In addition, please note that when making an

3   ECourt appearance, you must include the email address that

4   you will be checking in with to obtain your Outlook

5   invitation.  Several parties have signed up for ECourt

6   appearances and given a nonworking or incomplete email

7   address.  If you do not sign up with a working email

8   address, you will not receive an Outlook invitation for the

9   hearings.

10          All right, as Deanna indicated for anyone

11   appearing today, particularly without lawyers, who wishes to

12   be heard, at the bottom of your Zoom screen is a raised hand

13   icon.  If you press on that, I will be able to identify that

14   you wish to speak and I will recognize -- I will try as best

15   I can to recognize people in the order in which they raise

16   their hands.

17          Let me also emphasize that there is an agenda for

18   today's hearing and indeed a little while ago I received an

19   amended agenda for the hearing today.  I will start with

20   some -- the opportunity for the Debtor, the Creditors

21   Committee -- Debtors' counsel, Creditors Committee counsel,

22   the Ad Hoc Committee counsel -- there are two Ad Hoc

23   Committees -- if they wish to make some opening remarks, I

24   will let them speak as well.  But we do have a long agenda

25   and I want to get through it.  So I'm telling you now, I may

1    not be able to recognize everyone else who wishes to speak.

2    If you didn't file pleadings in connection with the motions,

3    I'm not, I may well not here you with respect to the

4    specific motions that are being heard.

5              As I indicated at the last hearing in this case, I

6    do want to provide an opportunity for people to be able to

7    voice their concerns and issues.  The Court still is

8    receiving a large number of communications from pro se

9    creditors and those are being filed on the docket.  The

10   Court is reviewing them.  So I'm certainly aware of the many

11   concerns that people raised in this case.

12             I believe the counsel for the Creditors Committee

13   and for the Debtor as well, have set up mechanisms for

14   interested parties, creditors to raise issues with the, with

15   the counsel for the two committees as well.  I hope that

16   process is going smoothly at this point.

17             With that, let me turn first to the Debtor's

18   counsel to ask for an update on where things are and any

19   other preliminary comments you want to make.  So each time

20   someone appears, you need to identify yourself for the

21   record so that we can get an accurate record of the hearing.

22             MR. KWASTENIET:  Very good.  Thank you, Your

23   Honor.  Good morning.  It's Ross Kwasteniet from Kirkland

24   and Ellis on behalf of the Debtors.  We were having some

25   technical glitches earlier today, so I just want to ask at

1    the outset whether you can see me and more importantly, hear

2    me at this time?

3              THE COURT:  I see you and hear you quite clearly.

4              MR. KWASTENIET:  Great.  Thank you, Your Honor.

5    With your permission and accepting your invitation, I'd like

6    to start today by just giving Your Honor a brief but, I

7    think, hopefully helpful background on certain of the events

8    that have transpired since we were last before you on

9    October the 16th.

10             Several days after our last hearing, the Debtors

11   and over 1000 creditors and members of the UCC and their

12   advisors all participated in what was an initial 341

13   meeting.  It was an initial meeting because the Debtor's

14   schedules and statements have not yet been filed and the

15   exact timing of the filing of those will be taken up later

16   in today's hearing.  But nonetheless, I think there was a

17   view that in light of, you know, the high level of interest

18   in the case, that it would be useful and productive to

19   nonetheless move forward on a 341 basis and allow

20   representatives of the Creditors Committee, Miss Cornell and

21   the U.S. Trustee's Office and also individual creditors to

22   ask questions that they had at that time, again, reserving

23   rights and with a full disclosure and expectation that there

24   will be a subsequent 341 or continued 341 after the

25   schedules and statements are on file.

1         So Your Honor with respect to the 341 meeting that

2    was held the morning of August 19, the Debtor's CEO, Alex

3    Mashinsky was sworn in as was the Debtor's CFO, Chris

4    Ferraro.  And both of those gentlemen remained on the line

5    for what ended up being a little over three hours and there

6    were a few technical difficulties where we had to pause and

7    sort of reconnect and clear background noise on the line.

8    But Mr. Ferraro ended up testifying under oath and responded

9    to questions from the U.S. Trustee's Office, the Creditors

10   Committee and many dozen individual creditors and was under

11   oath and testified for, according to my records, a little

12   over three hours on that date.

13         Your Honor, also on August the 23rd, the Debtors

14   met in person with the United -- with the Creditors

15   Committee and their advisers and certain of the principals

16   of the Creditors Committee.  And the main topic of that

17   meeting was really the path forward for these Chapter 11

18   cases, including ideas for how to potentially reorganize the

19   business, all with, of course, the overriding objective of

20   returning as much value and as much cryptocurrency to

21   holders as soon as possible in a manner that would be as

22   fair as possible.

23         Your Honor, since that meeting on August the 23rd,

24   the UCC advisors and the Debtor's advisors have engaged in

25   what I'll call deeper dive diligence related to securities,

1    tax, regulatory, and other issues that would need to be

2    addressed in connection with certain potential go-forward

3    plans.  And those discussions remain ongoing and we're, you

4    know, cautiously optimistic about an ability to continue to

5    make progress, but we are not just waiting around for

6    another day to figure out how we're getting out of here.

7              In addition to everything else that's going on, we

8    have been focused on and have devoted substantial time to

9    thinking about and starting to work on the path forward and

10   the path out and the path to deliver value back to our

11   constituents.

12             Also on August the 23rd, the Debtors filed

13   complaints against a former employee named Jason Stone and a

14   former counterparty company called Prime Trust seeking the

15   return of substantial value for these estates.  Those

16   complaints will be adjudicated at a later time, but we view

17   that as an important step to go out and augment, supplement,

18   add to the value that we ultimately look forward to being

19   able to return to creditors in these cases.

20             Your Honor, also last night at Docket Number 670,

21   the Debtors filed a motion to return certain cryptocurrency

22   held in what we refer to as custody and withhold accounts.

23   There's a lot more detail set forth in that pleading.

24   Ultimately, if granted, Your Honor, we expect that that

25   would result in the return of substantially all

Page 35

1      cryptocurrency on deposit in the custody and withheld

2      programs held by tens of thousands of individuals.

3             Your Honor, the way that we approached this relief

4      was essentially in stages.  And so this motion represents

5      the first stage in terms of a proposed release of funds that

6      are in custody or withhold.  And specifically, we've

7      identified two key subsets of customers.  One subset are

8      customers who have only ever had assets in the withheld or

9      custody program.  And importantly, as distinct from the

10     Debtor's earn and borrow programs where we believe the terms

11     of use unambiguously provide that title to assets

12     transferred in connection with those programs goes to the

13     Debtor and the Debtors have full rights of ownership and

14     have, in fact, historically exercised full rights of

15     ownership.  Assets that are in the custody and withheld

16     program, the terms are the reverse and provide that title

17     remains with the customer.

18             We've run into an issue that we're still analyzing

19     and we flagged and we've had a lot of discussions with the

20     Creditors Committee and also the Ad Hoc Committees that have

21     formed for the custody and withheld groups, which is that

22     not all the assets in custody and withheld have always been

23     there.  Some assets that presently sit in those programs

24     originated in the earn or borrow program where we believe

25     the Debtors had title.  Then they migrated into the custody

1      or withheld program where we believe we don't have title.

2              And so as we look about and look at and think

3      about the consequences of those movements, all of which

4      coincidentally happened within the 90 days before filing --

5              THE COURT:  That was -- if I could stop you, Mr.

6      Kwasteniet, that actually is my question because the

7      petition date was July 13, 2022.  Ninety days before that is

8      April 14, 2022.  And indeed, I was going to inquire about

9      when -- from your prior filings, I see that the custody

10     program was established in April 2022.  But it wasn't clear

11     when and it also wasn't clear when transfers were made.

12             MR. KWASTENIET:  Your Honor.  I believe, according

13     to our records, that the custody program came into being on

14     or around the 15th, so call it 89 days before, which has

15     garnered no small amount of speculation and conspiracy

16     theories online.  We'll get into all of the background

17     around the establishment of the custody program, but suffice

18     it to say, I see -- I have seen no linkage between the date

19     that that was created and then the date of the ultimate

20     filing.  But if that needs to be a topic, we hit for a later

21     day or is relevant, that's fine.  It just so happens, Your

22     Honor, that substantially all, we believe all of the

23     transfers that may have come from earn or borrow into

24     custody or withheld were within the 90-day look back period.

25     And we believe prima facie, those transfers satisfy the

1      elements of preferential transfer.  Whether or not there's

2      applicable defenses, there's a lot to be determined there.

3      But for purposes of a first step, Your Honor, we believe

4      that the people who have only ever had their assets in

5      custody or withheld, right, where there wasn't a potential

6      avoidable transfer from some other program where the

7      Debtor's held title and then no longer held title, we

8      believe that those assets can and should go back to the

9      customers based on the clear terms of use.

10             THE COURT:  May I ask you this, I think you

11     previously -- you or one of your colleagues previously told

12     me there was approximately $180 million in value in the

13     custody accounts.  Can you break down how much is it that is

14     proposed to be released to the custody account holders?  How

15     much of the 180 million?

16             MR. KWASTENIET:  Your Honor, the $180 million was

17     our guess at the market value as of the petition date.

18     Crypto prices have moved in a little bit and I believe --

19     and I'm going to check with my colleagues, I believe that

20     value today is more like 200, 210, 215 million.  So it's

21     gone up a little bit as the price of the underlying

22     cryptocurrencies have run up.  We believe that the value of

23     what we'll call the pure custody holders assets that were

24     only ever in custody was approximately $48 million, Your

25     Honor.  And then the value of -- and here, we've drawn a

1    line or we're proposing to draw a line on assets that were

2    transferred in.  Okay?  And as we look at, you know, the

3    preference statute, there is a threshold or a minimum, like

4    Debtor can't seek to avoid a transfer below a certain dollar

5    amount and accordingly, it's one of these that's indexed to

6    inflation and changes, but we believe the current limitation

7    is 7,700 or $7575.

8          And so we've run analysis doing our calculations

9    on the value of the transfers into custody within the 90

10   days.  And we believe that there are approximately 30 --

11   there's $11 million of assets that were transferred in by

12   customers who transferred in less than that 75-75 cap.  And

13   that in terms of the number of those holders, it's in the

14   tens of thousands of holders.

15         So we believe, Your Honor, that the relief that

16   we're requesting, no surprise there's a relative handful of

17   holders who transferred in very large dollar amounts from

18   earn into custody.  We are not seeking authority in this

19   motion to release claims or release coins where we may have

20   the ability to assert a preference action with respect to

21   those.  So this is a sort of a low hanging fruit request if

22   you will, Your Honor, people who were never in the program

23   to begin with and we think title was always there; people

24   who transferred in but transferred in below the preference

25   floor where we don't think that we would have an avoidable

1    preference action; and, again, this covers the majority,

2    significant majority of the customers in the custody and

3    withheld programs but reserves for further analysis whether

4    or not we can and should assert avoidance actions with

5    respect to transfers in in excess of that preference cap.

6    And that analysis is ongoing at this time.

7            THE COURT:  And I saw on the docket that

8    yesterday, the Togut firm filed a declare -- a complaint for

9    declaratory judgment on behalf of custody holders.  Can you

10   just -- obviously, that's not on the docket -- on the agenda

11   for hearing today, but I saw that last night.

12           MR. KWASTENIET:  Yes.  And I'm happy to speak to

13   it and I know that Mr. Ortiz and his colleagues are on the

14   line and they're better able to speak to it.  I will say

15   that we have had a very open dialogue with counsel to the Ad

16   Hoc Committees.  We have received proposals from them.  We

17   have shared, you know, analysis.  We've had very candid

18   discussions.  They knew several days ago where we were

19   likely coming out, at least in terms of what I'll call this

20   Phase 1 request.  There may be other requests.  We're not

21   foreclosing the possibility that we'll be back before you

22   seeking to release all of it, maybe subject to clawback

23   claims.  We're just not there yet.  But yes, we understand

24   that I believe Mr. Ortiz will tell you that while he

25   appreciates the relief we're requesting, he wishes and

1    thinks it should go further to all holders within the

2    custody account.  And I believe that Deb, Deb Kovsky from

3    the Troutman firm would tell you that she believes it should

4    also apply to all holders within the withheld account even

5    if the amounts they transferred exceeded the preference

6    threshold.

7            We're not there right now.  We're open to further

8    discussions.  Maybe there's, you know, an ability to release

9    things subject to clawback.  I don't love that because that

10   inherently weakens my ability to later make good on a

11   preference judgment if we get a preference judgment.  It's

12   easy to collect if the funds are in our possession.  It's

13   much harder, of course, to collect if they've been dispersed

14   already.  But those are issues for another day.  And I will

15   also note, Your Honor, that our very motion itself, while

16   important to give Your Honor and everybody listening the

17   context for it because it is a significant development, that

18   motion is also not up for hearing until October 6th.  And I

19   imagine that we're going to have many conversations with the

20   parties, including further conversations with the U.S.

21   Trustee, the UCC, and the Ad Hoc Committees about the relief

22   that we're requesting in that motion.

23           THE COURT:  If I understand what you're saying

24   there would assuming that what you're proposing is released,

25   there would still be about value and it's a moving target in

1     the number but about 160 million that would remain in the

2     custody accounts.

3             MR. KWASTENIET:  Yes, that's about right, Your

4     Honor.  And again, recognizing that that number will

5     fluctuate, we're giving dollar values to fixed coin

6     obligations.  And so the numbers fluctuate a little bit, but

7     that's essentially correct, Your Honor.

8             THE COURT:  Okay.  So I'll let you continue with

9     your remarks.  There were there are three raised hands.  As

10    I said at the outset, I was going to let the counsel for the

11    Ad Hoc Committees speak in their preliminary remarks.  I

12    want to let Mr. Herman know that I will recognize him but I

13    probably, even though his hand was raised first, I'm going

14    to permit counsel for the Ad Hoc Committees to speak before

15    I call on Mr. Herman, but I assure you I will give you the

16    opportunity to speak.

17            So, Mr. Kwasteniet, is there anything else you

18    want to tell me in this preliminary remarks?

19            MR. KWASTENIET:  Your Honor, I did have a few

20    other points I wanted to talk about bringing you up to speed

21    on engagement we've had with the Creditors Committee and

22    with the U.S. Trustee's Office.  But that's all I have to

23    say about the motion we filed with respect to custody.  So

24    this may be an appropriate time.  I assume that the folks

25    with hands raised want to weigh in on that topic.  So I'm

1    happy to pause and allow people to weigh in on that motion.

2           THE COURT:  All right, we'll do that, I'll call

3    back on you.  So, Mr. Ortiz.

4           MR. ORTIZ:  Good morning, Your Honor, Kyle Ortiz,

5    Togut, Segal and Segal on behalf of the Ad Hoc Group of

6    Custodial Holders.  Apologies for going out of order.  I

7    know you wanted to go with Committee.  I just thought I'd

8    raise my hand if you wanted to hear from us kind of all on

9    that topic at the same time.

10          THE COURT:  I appreciate Mr. Kwasteniet suggesting

11   that.  I'll hear people on this issue and then I'll call on

12   Mr. Kwasteniet again.  So go, go ahead.

13          MR. ORTIZ:  Sounds good, Your Honor.  And

14   obviously, nothing on this issue is before Your Honor today.

15   So I will only kind of very briefly touch on it so you can

16   appreciate our concern with the approach because there are

17   elements of timing that I think we might want to discuss,

18   particularly given where the Debtors are coming out on

19   title.  So as Your Honor knows, at the last hearing we said

20   we'd give the Debtors time to reach a conclusion on whether

21   the crypto held in custody accounts was property of the

22   estate.  And we're, of course, very happy to learn that in

23   that space, they've concluded that crypto in the custody

24   accounts is not property of the estate, that title to such

25   property remains with custody account holders.

1          Unfortunately, they're unwilling to take that

2     realization to its proper conclusion, Your Honor, which is

3     that they need to release all of the crypto assets to the

4     rightful title holders.

5          Now, the problem we have, Your Honor, with the

6     staged approach is that once they determine that property in

7     the custodial accounts is not property of the estate,

8     they're not at liberty to determine what to do with it for

9     the simple reason that it's not theirs.  A potential

10    preference action in our view does not change that analysis,

11    and we think the case law in the Second Circuit is clear on

12    that point, Your Honor.  The Second Circuit rule is that

13    under Section 541(a)(3), property subject to an avoidance

14    action only becomes property of the estate once recovered in

15    the Section 550 sense of that word.  And the Debtors have

16    not recovered any preferences, Your Honor.  In fact, they've

17    not asserted any preferences, have not even fully determined

18    if there are viable preference claims.  And there's no legal

19    basis to continue to hold what they have determined is other

20    people's property simply because it will be more

21    administratively convenient for them to already have

22    possession of property if they later determine to bring an

23    avoidance action, prevail and recover.  And there's just no

24    legal justification.

25          THE COURT:  Let me just say -- I'm going to

1    interrupt you for this purpose, Mr. Ortiz, because this

2    issue is not ripe for, you know, for any decision today.  I

3    understand the issue you're raising and it undoubtedly will

4    be an issue the Court will have to address.  So just let me,

5    without getting into the nitty gritty of issues, are there

6    any other sort of top line points you want to raise for the

7    discussion this morning because we have a long agenda?

8              MR. ORTIZ:  Yes, Your Honor, and I appreciate the

9    long agenda.  I just wanted to note because the one thing

10   that we might want to preview is coming, is timing.  And I

11   note that in addition to the Second Circuit, there's Tenth

12   Circuit case law that suggests -- that could potentially

13   even violate the due process clause because you're

14   effectively enjoining another party's property rights.

15             So again, we're thrilled that they've reached the

16   conclusion that they've reached on property of the estate

17   and who holds titles, but I think some of the issues that

18   we're going to have, and as Your Honor noted, we did file a

19   complaint last night, is there's a motion on that for a

20   first stage set for October 6th, and then a status

21   conference on other things set for November 1st.  So I just

22   wanted to let Your Honor know that, you know, we will be

23   discussing with the Debtors if there's ways to potentially

24   merge the two issues, the complaint to the motion because

25   they really, in our view, are very much related in ways that

1      we might get to resolution sooner because again, if it's

2      ultimately folks -- the custody holders' property and our

3      view of the world ends up being correct, there's really no

4      basis for that to be held longer than it needs to be.

5              THE COURT:  So let me, let me start.  I have no

6      problem about talking to the Debtor's counsel.  I have no

7      problem about combining the case management, first

8      conference on your adversary with the initial motion they've

9      made for return.  I'll leave it to the two of you or others

10     on this issue to try and agree on the date when that is.  I

11     don't know how long how, how substantial the docket for

12     October 6th will be, but I do think it was appropriate for

13     me to look at that together.  Okay, so let's leave it at

14     that for today.

15             MR. ORTIZ:  Yeah, I would just note real quick

16     that, you know, I'm going to call him very quickly Ross

17     before saying Mr. Kwasteniet, because I'm going to butcher

18     his name and I have a lot of respect for him and I apologize

19     for doing that, but I will, you know, echo that there has

20     been a lot of work back and forth and that we're -- despite

21     where we are on our positions right now, I'm have -- I think

22     that there's a potential consensual path and that we've had

23     a good working relationship and we plan to continue to try

24     to work things in the background so they don't necessarily

25     end up in front of Your Honor.

1          THE COURT:  Look, obviously, even if it hadn't

2     been squarely raised in the discussion we just had, I had

3     was keenly aware of this issue of the 90-day period and what

4     the petition date was and it was not clear to me from

5     anything that I've read so far when earn account assets were

6     transferred into custody accounts and then the potential

7     preference issue.  So it will be something we have to deal

8     with going forward.

9          Ms. Kovsky, do you want to briefly say something?

10          MS. KOVSKY:  Thank you, Your Honor.  Mostly I

11     would echo Mr. --

12          THE COURT:  Please identify yourself each time.

13          MS. KOVSKY:  I'm sorry.  Deb Kovsky for the Ad Hoc

14     Group of Withhold Account Holders.  And I would primarily

15     just echo what Mr. Ortiz said.  And I do want to thank

16     Debtor's counsel, particularly Mr. Kwasteniet and Ms.

17     Hockberger for working closely with the Withhold Group.  We

18     are a very small bucket of creditors or parties and

19     interests compared to custody and we appreciate the

20     attention that the Debtors have paid to these issues.  We of

21     course strongly agree and endorse the Debtor's position that

22     these coins are not property of the estate.  Like Mr. Ortiz,

23     we believe that the first step does not go far enough and

24     we'll be bringing, we anticipate bringing a motion before

25     Your Honor to get that resolved.  We have been sort of

1    watching what the Debtors we're going to do, what the

2    custody group is going to do in order to figure out

3    procedurally how to handle this in the most efficient way to

4    get these common issues before the Court and we'll continue

5    to have those discussions.  One thing that I do want to

6    point out with respect to withhold and this is something

7    that state regulators may need to weigh in on, there is a

8    potential problem with the Debtors holding onto coins in

9    withhold indefinitely because by definition, those withhold

10   accounts are in states where the Debtors are not licensed

11   and not permitted to offer custody services.  So to the

12   extent they are sort of quasi-custodying other people's

13   property and states where they're not licensed to do, that

14   raises an additional concern that will need to be addressed.

15          THE COURT:  Let me just suggest this -- and it may

16   well have been and this is what I want counsel to talk

17   about.  The issues surrounding the assets held in the

18   custody accounts is obviously raising a myriad of issues and

19   it may well be that a hearing should be set just on those

20   issues so we don't have a long agenda.  Obviously, I'm not

21   resolving any of these issues today.  What I would urge is

22   that all parties in interest who have issues about the

23   assets held in the custody accounts confer and see whether

24   you can agree on a hearing date and procedurally how to try

25   and deal with this.  I would, you know, I expressed at the

1    last hearing, I would like to try and get these issues

2    resolved.  Assets that should go back to  customers should

3    go back, if possible, sooner rather than later.  But there

4    are a myriad of issues that are being raised about this and

5    it may be hard for the Court to deal with it in the context

6    of a long agenda with many other items on it.

7           So why don't let's leave it at that for now?  I

8    understand your position.  Ms. Kovsky, and, you know, all of

9    these issues will get their full airing by the Court.

10          Mr. Pesce, do you want to address just on the

11   custody issue?  I'll give you a chance for any other

12   remarks, but I want to sort of close off and give Mr. Herman

13   a chance as well to address the custody account issues and

14   I'll give you a chance to address anything else you want.

15          MR. PESCE:  Yes, Your Honor.  Gregory Pesce, White

16   and Case for the proposed counsel to the Committee.  I'll

17   just speak very, very quickly on the custody issue.  You

18   know in the two weeks since the last hearing, we appreciate

19   the Debtors engaging with us on how they were going to

20   approach this and having extensive dialogue with that.  At

21   this point, the Committee is not taking an official position

22   on the matter, but we will note that this is -- we do

23   believe this is a good first step.  In our view, as has been

24   said in these other hearings, the account holders have

25   claims that every entity, So we don't think this is going to

1      affect overall account holder recoveries.  It's going to

2      provide near term liquidity.  It's intended to cover coins

3      that don't have a preference exposure.  There isn't a whole

4      preference morass that we need to deal with.  And it does so

5      in a way that lets us preserve these potential causes of

6      action.

7              Just to put it on the Court's radar though and for

8      the benefit of our constituency, I know there's so many

9      people listening in today, our work isn't done yet.  Like I

10     said, we just saw the motion yesterday.  We need to study

11     it.  We need to make sure that insiders like Mr. Mashinsky,

12     his wife and others don't benefit from this based on how

13     they have their wallet set up.  I also want to make it clear

14     the Committee has not made a determination about whether it

15     would support pursuing preference actions, if there are any.

16     That's a topic that remains for another day.  We also need

17     to make sure that there's no double dipping based on the

18     statutory cap based on how you mix and match individual

19     accounts.  And then finally, going back to my original

20     point, you know, our general desire to have account holders

21     get liquidity, get their coins back, and how this motion

22     fits in there is part of a broader conversation that's been

23     happening in this case where the account holders have their

24     claims.  We've been very heartened to hear the Debtor's

25     statements about how account holders have claims at every

1    debtor or non-debtor entity.  Obviously, this will come up

2    later at today's hearing about the schedules and statements

3    and when those get filed.  That's going to happen before

4    October 6th or November 1st or whenever the hearing happens.

5    So we're going to be studying that to make sure that this

6    doesn't in some way affect creditor -- overall account

7    holder recoveries.  And we'll work with Mr. Kwasteniet and

8    the other party, Mr. Ortiz, and Troutman to make sure we

9    intervene and represent the account holder.  So I'll leave

10   it at that.  I have a few other things to put on the Court's

11   radar later, but I'll concede the virtual podium now.

12           THE COURT:  All right, thank you.  Mr. Herman.

13           MR. HERMAN:  Thank you for letting me speak, Your

14   Honor.  My name is Emmanuel Herman.  I am a creditor.  And

15   I'm the cofounder of an informal group of hundreds of

16   Celsius customers who have come forward to me and reported

17   that they are U.S. non-accredited investors who had their

18   deposits grandfathered into the Celsius earned product on

19   and after April 15th, which is the date that the custody

20   product was created.  Our group is actively seeking legal

21   counsel as we consider the possibility of forming an Ad Hoc

22   Committee.  We are the very depositors that Togut Segal and

23   Segal described in their adversary complaints that was

24   recently filed as 37B, any existing cryptocurrency in the

25   earned program would continue to remain in the earned

Page 51

1    account and earn rewards as they did before.  Every day I

2    hear stories about how non-accredited investors like us were

3    grandfathered into their earn product by Celsius with far

4    more than they can afford to lose on deposit.  They're

5    terrified that they will get a little of it back and that it

6    will take years to see any recovery.  On April 15th, 2022,

7    Celsius launched the custody product.  At that time, they

8    should have disclosed to us the regulatory reasons for their

9    April 15th terms of service change.  The risk for being in

10   earn and the reason that we could not add additional

11   deposits was that it was not suitable for non-accredited

12   investors.  None of these disclosures were made.

13           The ethical and lawful way for Celsius to handle

14   our situation on April 15th would have been to move all U.S.

15   non-accredited customer assets into custody or to force us

16   to withdraw from the platform on April 15th, 2022.  Instead,

17   Celsius encouraged us to deposit more in the run up to the

18   deadline perhaps because they were already insolvent and the

19   launch of custody and the withdrawal of our coins would only

20   hasten their insolvency and ultimate bankruptcy.  There

21   needs to be -- we need to look into how the decision to

22   grandfather non-accredited investors into the earn product

23   was made as part of discussions around custody and withhold.

24           The custody program itself, Your Honor, seems to

25   have been intended to be a regulatory solution by Celsius.

1    It was implemented after pressure from state regulators and

2    it is primarily modeled after BlockFi's settlement with the

3    SEC.  In fact, if you read the terms and conditions of

4    Celsius custody program, they are copied almost verbatim

5    from BlockFi's wallet terms.

6          So, you know, I keep hearing about people's life

7    savings, college funds, retirement funds, and others who

8    were misled into depositing our funds into this unsuitable

9    product, which in our view, was akin to an unregistered,

10   unlicensed hedge fund and it was improperly marketed and

11   disclosed to us.  It was never suitable to sell us, sell to

12   us to begin with, nor was it legal to sell to us in the

13   first place.  So in our view, the marketing of this product

14   to non-accredited investors was egregious and

15   unconscionable.  If this were any other industry other than

16   crypto, I believe this company and possibly its executives

17   would already be facing criminal charges and that an SEC

18   receiver would have been appointed to clawback the money

19   that was stolen from us via this product.

20          So, you know, I can submit written follow up to

21   the Court.  I don't want to take too much of your time.  I'm

22   sure, Your Honor, you've already seen the representations

23   Alex Mashinsky made when he told depositors that Celsius was

24   safer than a bank.  People deposited money they couldn't

25   afford to lose.  And, you know, I'll just add that as bad

1       news about Celsius emerged, customers with sophistication

2       and resources were able to withdraw enormous sums in the

3       days, weeks and months leading up to the pause while the

4       company was insolvent.  Whereas, those who believed the

5       statements of company leadership such as Alex Mashinsky and

6       his statements were left holding the bag.  So yeah, that's

7       basically our position is we should have either been in

8       custody or, you know, we shouldn't have been there at all.

9       We should have been asked to withdraw.

10              THE COURT:  All right, thank you, Mr. Herman.  If

11      you could lower your hand now because you had your chance.

12      Your hand is still raised.

13              MR. HERMAN:  All right.  Thank you.

14              THE COURT:  Mr. Kwasteniet, do you want to

15      continue with your motion?  I think we've heard what we're

16      going to hear about this issue of the custody accounts.

17              MR. KWASTENIET:  I do, Your Honor.  I just have

18      two very quick points.  One perhaps to head off the need for

19      Mr. LeBlanc to make a comment.  First of all, the Debtors

20      have not made any final conclusion as to where all the

21      customer claims sit and at what legal entities.  We have

22      described in various letters to the U.S. Trustee in response

23      to a request for the appointment of a formal equity

24      committee that customers can certainly read the terms of use

25      as having claims against every entity.  We understand from

1    Mr. LeBlanc's group that they have arguments against that.

2    It's going to be an important issue, maybe one of the most

3    important issues that has to be decided in the case, and I

4    didn't want to leave it just unsaid and uncorrected that we

5    that we formed a formal definitive view on that topic.  It's

6    something that we're still analyzing and discussing with our

7    board and, you know, we'll be making a decision on and

8    taking a position on in due course, but I didn't want to be

9    saddled with a position that I'm not authorized to make or

10   advocate as we sit here today.  It's an important issue and

11   one that's coming down the pipe soon, but I think the

12   description as to the Debtor's position at least was

13   premature, and I wanted to correct that.

14           Your Honor with respect to the concerns raised by

15   Mr. Emmanuel, I understand what he's saying, and in many

16   ways, I'm not surprised that to the extent that there may be

17   an avenue for withdrawal for custody program holders that a

18   lot of people are going to be figuring out, and I assume

19   that Mr. Emmanuel's group is not going to be the last,

20   right, seeking to shoehorn themselves into a group that is,

21   you know, perhaps receiving or the ability to withdraw

22   crypto off the platform.  These are issues that we're aware

23   of and that we're going to look into.  We don't have a

24   position today.  And to be clear, his group, folks, folks

25   who were grandfathered in and who did not make a move into

1    custody, you know, by the relevant date, they're not subject

2    to this motion, but that's not to say that they've been

3    forgotten or will be ignored.  We read every letter that's

4    filed.  We're aware of positions, you know, taken by Mr.

5    Herman and others, you know, sort of similarly situated to

6    him.  But again, that's not an issue for today.

7           Your Honor, the next topic I wanted to move to

8    briefly because we do have an agenda, and so I'll try to

9    speed up my remarks here, is just engagement with the

10   Creditors Committee and with creditors more generally.  Your

11   Honor, we've had multiple in-person meetings with the UCC.

12   We've done countless video and telephonic conferences with

13   the Committee advisors and their members.  We've granted

14   full access to the management team and to the company's

15   advisors.  The U.S. -- the UCC has submitted over 250 unique

16   diligence requests.  We believe we've fully responded to

17   more than 160 of them and we're in the process of responding

18   to everything else in connection with this.  We have

19   disclosed thousands of pages of documents and we've, I think

20   in a relatively unique step, we've given the Committee's

21   crypto advisors electronic access to certain wallets at the

22   company that will allow them to research and analyze

23   historical transaction data.  So there's been a great deal

24   of open and transparency with respect to the sharing of

25   information.

1           To formalize that, the Debtors have entered into

2      and filed on the docket a stipulation to facilitate and

3      effectively streamline Rule 2004 discovery requests by the

4      UCC including the company agreeing to accept process in

5      committing to produce documents on a rolling basis.  We have

6      also negotiated a bespoke reporting protocol that is going

7      to be applied going forward where even though above and

8      beyond the reporting that the bankruptcy code requires in

9      admission of the fact that we have unique issues related not

10     just to cryptocurrency but how our business is structured,

11     that enhanced reporting is appropriate and will be

12     forthcoming and we've agreed to sort of terms and parameters

13     with the Creditors Committee.

14           Finally, Your Honor, we've engaged in extensive

15     discussions with the Creditors Committee and their advisors

16     including a lengthy call yesterday regarding crypto security

17     and the Debtor's processes and protocols.  And in response

18     to conversations with the UCC's advisors and some questions

19     they have raised, we've already made meaningful adjustments

20     or enhancements to the way that the company stores its

21     crypto.  And we're open to further and ongoing changes and I

22     expect, Your Honor, that the issue of crypto security, this

23     is a preliminary conversation we've had with the Office of

24     the United States Trustee, may well culminate in the filing

25     of a declaration that details how it is that we are storing

1      the crypto, changes we've made in connection with the U.S.

2      Trustee to give parties even more comfort and visibility

3      into where these assets are located and how they are being

4      protected.  I believe we spent close to 40 minutes during

5      the first day hearing talking about, you know, this issue of

6      crypto security and how do we make sure it just doesn't, you

7      know, walk out the door?  And suffice it to say, the company

8      had extremely robust protocols in place.  And we've

9      explained all those to the U.S. Trustee and to the

10     especially the Creditors Committee and we're fielding

11     feedback and working with them on whether there are any

12     enhancements to the crypto security process.

13              THE COURT:  Let me just make, let me make a brief

14     comment here and I probably will have more questions when we

15     get to the cash management motion.  But yeah, you know, the

16     record is not particularly comforting about the security of

17     crypto assets and where they're stored.  I mean you just

18     filed an adversary proceeding because you contend that one

19     counterparty has refused to return $17 million in crypto

20     assets.  This -- I'll save further discussion about this.

21     You know I think this ties into the U.S. Trustee's 345

22     arguments as well and I just have to say I'm not satisfied

23     that I know where the Debtor is storing or housing or

24     whatever assets for safekeeping, whether the parties with

25     whom it's doing so are creditworthy, a whole host of things.

1    I'll leave this, but I was going to raise it now because I

2    was going to raise it when we got to the cash management

3    motion.  You know, there's the issue of whether 345 applies

4    to crypto assets?  The U.S. Trustee briefly addresses it in

5    its papers.  You haven't engaged with them about it.  You

6    really didn't.  So I don't think that issue is really ripe.

7    But, you know, you've asked for a waiver, but I'm not sure

8    that you've made -- we will hear this more later -- a

9    satisfactory showing that you're entitled to a waiver

10   because anything stored elsewhere is safe.  And, you know,

11   let me leave it at that.  So I just, I raise it now because

12   it's apropos with your recent remarks.  Go ahead.

13          MR. KWASTENIET:  Fair enough, Your Honor.  And

14   we're happy to take it up in any context.  And this will be

15   an ongoing topic of conversation.  I think we spent more

16   topic -- more time on this topic during the first day

17   hearing than any other and it remains important.  We are

18   going to be working on a supplemental declaration that gets

19   into these issues.  What it is we're doing, why we think

20   it's best practices, where they're housed.  I will note,

21   Your Honor, that we previously filed what we called a budget

22   and coin report that gave detailed information about where

23   crypto was stored.  We've had several helpful conversations

24   with the U.S. Trustee and we've provided them a few

25   different updated or modified versions of that coin report.

1     And I suspect that the next version of the coin report we

2     file will have more information, but we're going to go

3     beyond that and do a detailed declaration on everything

4     we're doing.  And I believe and hope that based on

5     conversations we've had with the Committee that we'll be

6     able to enter into a stipulation approving the steps that we

7     collectively agreed to take with respect to safeguarding the

8     cryptocurrency assets.  And I believe that we are well on

9     our way towards doing that.

10          So, Your Honor, I hear you loud and clear and this

11    is a topic that there will be more to come.  And I under --

12    people are understandably skeptical.  This is the single

13    biggest source of value and it's a new unique asset class

14    that can't be locked up in a bank vault at JPMorgan and it

15    exists on block chains in the cloud.  And what does that

16    mean?  And how do we secure it?  Very different than parking

17    cash at Citibank.  Like that, we understand and have a long

18    history.  How do you safeguard cryptocurrency especially

19    when there are all these market stories about it being

20    hacked or disappeared or invested in the wrong place and

21    it's gone.  We're very sensitive to that and more is coming,

22    Your Honor.  So we hear you loud and clear on that topic.

23          Your Honor, last point on creditor engagement.

24    Kirkland did at the outset of the case, establish an email

25    hotline where we've received several hundred requests or

1    questions from creditors, all of which have been responded

2    to.  And we understand that the UCC has set up similar

3    methods for creditors to reach out and contact.  So we are

4    we're seeing robust engagement and questions coming in from

5    creditors, all of which are being responded to in a timely

6    manner.

7            Your Honor, the one last topic for me before I

8    yield the podium and I do believe that counsel for the UCC

9    has a few opening remarks he'd like to make and then maybe

10   the Ad Hoc Committees and then we can get into the agenda,

11   is I want to touch briefly on our engagement with the United

12   States Trustee's office.

13           Your Honor, the Debtors have devoted a great deal

14   of time to responding to inquiries from the U.S. Trustee's

15   Office.  And we appreciate that in many cases, including

16   with respect to some of the items that are up for hearing

17   today, we've been able to reach resolution and have the

18   support, I believe.  Ms. Cornell can obviously speak for

19   herself, but I believe that we've resolved the U.S.

20   Trustee's concerns with many of the items that are up for

21   hearing today.

22           Your Honor according to our records, we've had

23   virtual meetings or conference calls with U.S. Trustee's

24   Office on at least 20 occasions on different topics, some

25   related to motions, some related to business or operational

1    issues.  We've had no fewer than a hundred unique email

2    threads and conversations on important topics related to

3    these cases.  We've responded to more than 140 specific

4    diligence requests.  And, you know, in response to

5    conversations with the U.S. Trustee's Office, we did file

6    what we thought was a novel, but responsive in this case,

7    budget and coin report.  And we subsequently had numerous

8    conversations about ways to perhaps add to that, improve

9    that, make that more clear.  But we've been trying to think

10   outside the box given the unique nature of the case, how can

11   we report in a way that is more responsive more relevant to

12   our constituencies rather than sort of the traditional

13   reporting package which doesn't necessarily answer all the

14   questions that we know our customer community is going to

15   have?

16            Your Honor, and yet despite the clear record of

17   open and good faith engagement with the U.S. Trustee's

18   Office, we have faced numerous accusations, we believe

19   unfair and without basis, that these cases somehow suffer

20   from a lack of transparency.  Let me be clear, Your Honor,

21   from my standpoint, nothing can be further from the truth.

22   I take these allegations --

23            THE COURT:  Let me just say, what I want to avoid

24   for today, if I give you a chance to get into it, then I'm

25   going to give others a chance to get into it.  I don't, I

1    really don't think that that's something I need to hear

2    today.  If I get motions before me -- I mean I think that

3    this case demands extraordinary transparency and if matters

4    are brought to me where parties don't think that the Debtor

5    is being responsive or the UCC is being responsive, I'll

6    deal with it.  But I would prefer for today, Mr. Kwasteniet,

7    I don't want to open the door where you say this, then

8    somebody's going to feel that they need to respond to it.

9    It would be the unusual case where there's complete

10   agreement between a Debtor and the UCC and the UST's Office

11   on everything.  So I just don't want to get into it back and

12   forth today.  Okay?

13            MR. KWASTENIET:  Fair enough, Your Honor.  I'll

14   just say that from the company's standpoint, we take the

15   issue of responding to questions and providing information

16   very seriously.  It is something we're deeply committed to,

17   have devoted great resources to, and are always open to

18   better ideas, other ways we can report information.  We like

19   to think of ourselves as an open book and available to

20   discussion.  We don't pretend to have a monopoly on ideas.

21   This is a unique case.  We've already come up with and

22   agreed to unique forms of reporting.  I believe that the

23   parties will find us willing to be very accommodating, Your

24   Honor.  And we'd prefer to deal with diligence requests, you

25   know, one off as opposed to being litigated.  That's all

1    I'll say, Your Honor.  It's something that we're deeply

2    committed to.  People may have different views as to how

3    well we're doing or whether we've, you know, done this or

4    that or this or that quick enough.

5              THE COURT:  I don't want to hear -- like could you

6    stop with it?  I don't want to get into a back and forth

7    about he said, she said, that sort of thing.  So continue to

8    engage with the other stakeholders and constituencies and if

9    I have to deal with issues about an actual dispute that

10   can't be resolved consensually between the parties, I will

11   certainly do that.  Okay?

12             MR. KWASTENIET:  Very good, Your Honor.  And I

13   commit to you we will.  And I also understand that counsel

14   for the Official Committee had some opening remarks that he

15   would like to make.  So unless Your Honor has any other

16   questions for me, I'm happy to yield the podium to Mr.

17   Pesce.

18             THE COURT:  Okay.  Mr. Pesce, please go ahead.

19             MR. PESCE:  Thank you, Your Honor.  For the

20   record, Gregory Pesce, White and Case, proposed counsel to

21   the Official Committee of Unsecured Creditors.  Thank you

22   for your time this morning.

23             Since the Committee was appointed, we filed our

24   mission statement.  We talked about our goals and tactics

25   for the case.  And we just wanted to give a quick update to

1      you and the constituency about where we are.  You know at

2      the outset,  I'll just echo your comment that we think

3      transparency, total and complete transparency is very

4      important here.  I don't want to belabor the comments that

5      were just made, but we do appreciate that the Debtor has

6      been responsive to our demands after we put them on notice

7      about the needs for transparency in working with us on the

8      2004 stipulation and the recently filed diligence reporting

9      framework which we've put out as on presentment for a

10     hearing later this month.  Without getting into any

11     specifics, suffice it to say we're going to continue to hold

12     Celsius' feet to the fire and ensure that we have the

13     information and the rest of the constituency has the

14     information to do our work for what is necessary to maximize

15     value.

16             And in a similar vein, we appreciate hearing Your

17     Honor's comments about coin security.  This is something

18     we've been very focused on.  For the for the Court's

19     benefit, I think it's important just to note that we haven't

20     left this issue hanging.  As Mr. Kwasteniet noted, at our

21     request, we've had a lot of discussion about coin security.

22     In fact yesterday, the Committee had its own separate

23     meeting with Mr. Harrington and his team about coin security

24     and our views on the topic.  And we expect we will reach a

25     documented resolution with at least the Debtor in the near

1    future to provide further protection for the coins that the

2    company continues to hold and will continue to engage with

3    the United States Trustee to see if we can find a middle

4    ground that protects the coins, but also avoids any kind of

5    litigation that would consume resources on the matter.

6            In a similar vein -- yes, Your Honor --

7            THE COURT:  Has the Committee adopted bylaws

8    regarding confidentiality of information?  I mean, some of

9    this, there are sealing motions today that I'm going to

10   consider.  And well, let me let me ask that.  Are there any

11   bylaws that have been adapt approved by the Committee

12   assuring confidentiality of any sensitive information that

13   is turned over to you and the Committee?

14           MR. PESCE:  Absolutely.  The day after we were

15   hired, the Committee executed bylaws.  They have

16   confidentiality.  They cover the typical gambit as well as

17   social media and other stuff implicated by the case.  We

18   shared those with Mr. Harrington's team as well as Kirkland

19   and they've not let us know that there's any concern and our

20   members are fully bound by those bylaws on confidentiality.

21           THE COURT:  I would like to see the bylaws that

22   were adopted.

23           MR. PESCE:  Would you like me to just send them to

24   chambers or is there -- I'll just I can just reach out to

25   your clerk and figure out the best way.

1          THE COURT:  Well, I think it's best -- unless is

2     there some reason it shouldn't be posted on ECF?

3          MR. PESCE:  I do not think so, but I will look at

4     them today and I'll let your chambers know if there's any

5     concern.

6          THE COURT:  Unless there's an issue that you want

7     to raise about posting on ECF, I think in the spirit of

8     transparency throughout, I think the all of the stakeholders

9     here should know what rules the Committee is operating

10    under.

11         MR. PESCE:  We will be happy to do that.  I'll

12    file them under ECF later today.

13         THE COURT:  Okay.

14         MR. PESCE:  So building on the theme of

15    transparency, you know, we are focused on not, on not just

16    the security of the coins and knowing what's happening

17    during the post-petition period, but we're also very focused

18    on our investigation of what precipitated the bankruptcy

19    filing.  There was an initial 341 meeting where White and

20    Case questioned the CFO under oath for an hour.  A last we

21    had to yield the podium to the numerous creditors that

22    dialed in.  Mr. Mashinsky was there and we did not have the

23    chance to question him about matters yet, but his time, I

24    expect, will come soon.

25              Since then, we've been keeping at it.  We filed --

1    we have served, rather, over 300 document requests to date.

2    In particular, we have served discovery on the Debtors and

3    six of their top management including Mr. Mashinsky.

4    Subpoenas are now rolling out to third parties that we

5    believe the estate has potential claims and causes of action

6    against, or might have information about valuable causes of

7    action.

8           We're happy to report that at our request, the

9    Debtors signed the 2004 stipulation.  They're working with

10   us on the production and they've committed to producing

11   documents on a rolling basis and, in fact, we expect we're

12   going to get another production.  We've also spoken --

13          THE COURT:  The U.S. Trustee's motion for

14   appointment of an examiner is on the agenda for September

15   14th.  Is the Committee going to take a position on it?

16          MR. PESCE:  We're in dialogue with the Debtors and

17   the United States Trustee.  At this at this time, we do have

18   significant concerns regarding the cost of an examination

19   when we've already started our investigation.  And we've let

20   the U.S. Trustee know of that issue.  We really -- the

21   company doesn't have money to kind of go into hibernation

22   while an examiner does his or her work.  So we really want

23   to guard against the cost and delay attendant to that.  That

24   said, you know, we've let the Trustee, the United States

25   Trustee know that we're open to, you know, a consensual

1        resolution if it would mean a minimal cost and ensuring

2        transparency.  But again, we just don't want the case to

3        kind of go into hibernation, as I'm sure Your Honor is seen

4        in other situations, where there's more money or more time.

5        Our constituency needs to get their coins back as quickly as

6        possible.

7                    THE COURT:  I think that, again, the motion isn't

8        on the calendar for today.  If there is an examiner

9        appointed, there needs to be, for want of a better term now

10        I'll call it a protocol between the Committee, which

11        certainly at first day hearing and again today has spoken

12        about the extensive investigation it's doing.  And there

13        needs to be a protocol if there is an examiner appointed to

14        assure as little duplication of effort as possible.  I think

15        I'll address obviously on the 14th -- hopefully you can

16        reach a resolution with the U.S. Trustee about that.

17        Obviously the Debtor, that's the one power a debtor in

18        possession does not have is to investigate itself.  But the

19        Committee does have that power.  An examiner has that power.

20        If there is going to be an examiner, I agree with you that

21        it needs to go -- there needs to be I think some clear

22        definition of what the Committee will do, what the examiner

23        will do to  avoid duplication of effort and try to keep it

24        moving as quickly as possible.  Those are just some thoughts

25        I raise now because you, again, talked about the extensive

1    investigation that the Committee is undertaking.  Let me

2    leave it at that.  This is for the agenda for September

3    14th.

4            MR. PESCE:  Yes.  We appreciate your guidance

5    there.  We will continue to talk to the Trustee's Office and

6    the Debtor and keep those comments in mind as we get to the

7    14th.

8            THE COURT:  Okay.

9            MR. PESCE:  So other than the investigation, I

10   think there's just two other just points I want to raise.

11   When Mr. Kwasteniet was speaking, he mentioned the meetings

12   that we have had with Celsius and, in fact, last week our

13   Committee co-chairs, White and Case, our advisors, we met in

14   New York City and person with Mr. Mashinsky, Kirkland and

15   their other advisors for our second in-person meeting and

16   our first with Mr. Mashinsky himself.

17           So let me just talk a little bit about the exit

18   strategy here.  You know it goes about saying the Debtor's

19   customers and creditors are individuals that are -- that

20   have invested significant sums with the Debtors and we need

21   to see a resolution as quickly as possible.  The Debtors are

22   burning through cash at a rate that is too high and

23   threatens to compromise creditor recoveries in this case.

24   So we're working to find a resolution that will permit a

25   quick and value-maximizing exit from Chapter 11 because the

Page 70

1    Debtors simply can't afford to linger in Chapter 11.  And it

2    won't be fair for people who have their life savings, their

3    college funds, et cetera tied up in this case for an

4    extended period of time.

5            So the Committee is working to evaluate whether a

6    standalone restructuring is feasible at all.  As part of

7    that process, as I mentioned, we had our meeting with Mr.

8    Mashinsky to consider his views on the topic, but that is

9    not the end of -- that is not the last word by any means.

10    We're interested in hearing from any parties about proposals

11    that those parties think will maximize value and we're

12    particularly focused on proposals that will focus on an in-

13    kind distribution.  Just to echo some of the comments that I

14    made about --

15            THE COURT:  Mr. Rojas, please mute your line.

16            MR. PESCE:  Thank you.  But suffice it to say

17    there's numerous securities and regulatory issues that we're

18    working through to determine feasibility.  We've started to

19    speak to regulators to get their input on this topic because

20    that's going to be very important.  We're also looking in

21    particular on the viability of the mining operation which

22    could, under certain circumstances, be an important part of

23    a reorganization strategy.  To that end, several Committee

24    members and the advisor group are planning to travel to

25    Midland, Texas later this month for a site visit to conduct

Page 71

1    due diligence on the mining operation to more fully assess

2    its value.  And we're looking forward to making that trip

3    given the importance of the mining operation.

4              At the same time though, the Committee has

5    important questions regarding the viability of a standalone

6    restructuring.  We've told the Debtors they need to

7    simultaneously explore other alternatives to ensure we can

8    get a value-maximizing outcome as quickly as we can.  We've

9    told the Debtors that they need to expand the GK8 marketing

10   process, which is a topic for hearing later today, to

11   encompass all of their assets and all potential new

12   investments.

13             We've had promising discussions with the Debtors

14   and we understand they will be supportive of some type of

15   market check.  The timing, structure, and nature of that

16   process, however, is still very much under discussion.  That

17   said, the Committee really wants to see progress on the

18   matter as quickly as possible this month so that the

19   investors that are contacting us directly, all of whom we

20   direct to the Debtors, can have visibility into how they can

21   participate in that process and have a real competitive

22   process.

23             The final, just a quick point, just to echo what

24   Mr. Kwasteniet mentioned about our communications efforts.

25   It goes about saying this is a very unique case.  We're

1      evaluating ways to speak to our constituency that are, that

2      are novel and unique and frankly made me have to learn about

3      aspects of social media and technology that I had no prior

4      awareness of.  To that end, we're undertaking preparations

5      to hold what's called an AMA or ask me anything style town

6      hall.  We expect that's going to happen in mid-September

7      We've also set up a Twitter handle, CelsiusUCC that we use

8      to communicate with, you know, our over 10,000 followers.

9      We expect that we'll solicit questions on the Twitter feed

10     and other social media as well as our case website that's

11     run by Kroll, to make sure that the town hall meeting is as

12     productive as possible.  In a similar vein, Kroll is being,

13     we're proposing to engage them as our information agent.

14     Kroll is working around the clock to address the hundreds of

15     inquiries received to date by phone, by email, by letter to

16     make sure they get a customer-centric versus a Celsius-

17     centric response.  We feel this lets customers be more open

18     with us and get input.  We have FAQs that we've posted based

19     on some of the questions that have come up repeatedly.

20            And in the coming weeks, we should just note,

21     account holders and all unsecured creditors are free to

22     contact us either through the CelsiusUCC Twitter handle, the

23     website or White and Case directly.  Those email addresses

24     are all publicly posted.

25            So in closing, we do appreciate the Debtor's

1    efforts to work with us in our demands.  This is the early

2    stage of the case though and we have a lot of work to do

3    here and we're going to continue to do that in the coming

4    weeks.  So we thank Your Honor for your time and my

5    colleagues, Mr. Colodny and Ms. Smith will be speaking on

6    some other matters later today.  Thank you.

7              THE COURT:  All right.  Thank you very much.  Mr.

8    Kwasteniet.

9              MR. KWASTENIET:  Your Honor if that concludes the

10   opening remarks, which it does from our standpoint, I

11   propose that we move into the agenda.  The first topic is

12   the sealing motion and I would yield the podium to my

13   colleague, Ms. Jones.

14             THE COURT:  Thank you.

15             MS. JONES:  Good morning, Your Honor, Elizabeth

16   jones of Kirkland and Ellis on behalf of the Debtors.  Your

17   Honor, starting with the first item on the agenda is the

18   Debtor's request to redact certain personal identifiable

19   information pursuant to Section 107.

20             Your Honor, this motion was filed at the docket at

21   Number 344 and we're moving forward today on a contested

22   basis as we received an objection from the U.S. Trustee at

23   Docket Number 607.  And as we note in our papers, we believe

24   that the U.S. Trustee's objection to the retention

25   applications filed at Docket Number 601 are more akin to an

1       objection here with requests for our sealing.

2               Your Honor, at the outset, I'd like to take a

3       minute to move the declaration of Mr. Holden Bixler into

4       evidence.  Mr. Bixler's declaration was attached as Exhibit

5       F to the motion filed at Docket Number 344.  And at this

6       time, the Debtors are not currently planning to call to the

7       stand Mr. Bixler to ask him any questions.  And we're not

8       aware of any objection to his declaration or other intents

9       to cross-examine him, but he is here on the line and

10      available should any party have any questions.

11              THE COURT:  Let me ask.  Are there any objections

12      to the Court admitting in evidence for the purpose of this

13      hearing, the Bixler declaration which is Exhibit F to ECF

14      Docket Number 344?  Hearing no objection, it's admitted in

15      evidence.

16              (Exhibit F admitted into evidence)

17              THE COURT:  Okay, go ahead.

18              MS. JONES:  Thank you, Your Honor.  Your Honor,

19      the relief requested in this motion is extremely important

20      to the Debtors.  We won't belabor the point as we set it out

21      fully in our pleadings, but as an initial matter, the

22      Debtors face a very severe risk of harm if their customer

23      home addresses and email addresses are published on the

24      docket.  And perhaps, and even more important to the Debtors

25      as well as those listening in, is that any individuals

1     involved in this case are at risk of significant harm if

2     their home addresses and email addresses are published on

3     the docket.  And with respect to certain citizens protected

4     by the EU and UK GDPR, their names as well.

5          THE COURT:  Let me stop you because in reading the

6     papers, I don't believe anybody has addressed this issue.

7     Bankruptcy Rule 1007(j) provides -- it's on impounding of

8     lists. And it provides on motion of a party in interest and

9     for cause shown, the court may direct the impounding of the

10    list filed under this rule and may refuse to permit

11    inspection by any entity.  The court may permit inspection

12    or use of the list however, by any party in interest on

13    terms prescribed by the court.  Collier addresses Rule

14    1007(j), in 9 Collier, Paragraph 1007.10, 16th Edition 2022.

15    I won't read the entire portion of it.  I'll read part of

16    it.  It says "Federal Rule of Bankruptcy Procedure 1007(j)

17    permits the court on motion of a party in interest or for

18    cause shown to direct the impounding of the list and either

19    to refuse to permit inspection by any entity, or to permit

20    inspection or use of the list only on particular terms

21    prescribed by the court."  And it goes on in the next

22    paragraph, "By its terms, Rule 1007(j) applies to the

23    impounding of lists, but not to the impounding of schedules

24    and statements filed by the debtor.  In general, lists of

25    creditors, which will often include customers and others

Page 76

1    with whom the debtor has dealt, are likely to contain the

2    most sensitive information.  In situations in which

3    schedules or statements contain information that should be

4    kept confidential, however, the court can presumably order

5    similar impounding of the information under Section

6    107(b)(1) or it's general equitable power under Section 105

7    if not under Rule 1007."  As I said, it's a 9 Collier,

8    Paragraph 1007.10.

9            Nobody has addressed that least.  I didn't see it

10   in in any of the papers.  I share -- I will be very candid.

11   I share the U.S. Trustee's concerns about not -- I'm less

12   troubled about addresses and email addresses than I am about

13   the names of the creditors.  And this includes European, you

14   know, people who live outside the United States.  I

15   understand the EU and the UK have more robust privacy rules

16   than we may here, but this case is pending here.  The

17   creditors are creditors of U.S.-based debtors.  And  while

18   I'm sensitive to foreign law and regulation, I'm concerned

19   about not at least listing the names.  So I want you and the

20   U.S. Trustee to consider one thought I've had, but certainly

21   haven't decided it, is to permit sealing of addresses and

22   email addresses but not the names, and it would be impounded

23   and any party in interest with copies to the U.S. -- of

24   unredacted information to the U.S. Trustee to the UCC,

25   perhaps also -- I haven't focused on this at this point, to

1    the Ad Hoc Committees as well.  And making clear that any

2    other party in interest can seek to have access to that

3    information.  And the Court, if it can't be resolved

4    consensually, the Court will obviously have to address it.

5    But none of the briefs that I read sort of headed down this

6    avenue.  I wanted to put this out on the table now for you

7    and Ms. Cornell to address in their comments.  Go ahead.

8              MS. JONES:  Thank you. Your Honor.  As an initial

9    matter with respect to names and as we get into some of the

10   GDPR concerns, we do have one of our partners from our

11   European offices, Ms. Jennifer Wilson, we filed a pro hoc

12   for her at Docket 672 and she can address some of the

13   specific GDPR concerns, especially with impounding and I'm

14   happy to turn it over to her after this.

15             But with respect to customers or other individual

16   names in these cases, if it's a European Individual and it's

17   not filed in the schedules and statements, or not filed in

18   another list, that potentially raises a different issue.

19   And if your suggestion is -- and we can talk to the U.S.

20   Trustee as well, is that any place that that comes up, we go

21   with the impounding under 107(j), I think that's definitely

22   something that can --

23             THE COURT:  1007(j).

24             MS. JONES:  Oh sorry, 1007(j), then that's

25   definitely something that we're happy to discuss with them.

1    But the relief that we're seeking goes beyond just the

2    schedules and statements or creditor matrix.  It's really

3    disclosing those individuals names in any document, but

4    we're happy to enter into those discussions and again, if,

5    you know, if you're amenable to it, I'd like to see the

6    podium to Ms. Wilson to let her address some of the concerns

7    in this particular context of the GDPR, and how impounding

8    that list versus redacting it would basically fall in

9    compliance with that and would prevent the Debtors from

10   accidentally incurring massive amounts of fines by

11   disclosing that information.

12         THE COURT:  What are you proposing to do when

13   people file proofs of claim?  I'm not going to, I'm not

14   going to allow anonymous proofs of claim.  I can tell you

15   right now.

16         MS. JONES:  Yes and, Your Honor, we believe that's

17   a little different because the individual is consenting to

18   the jurisdiction of the Court.  So they are volunteering

19   their name and information on their own basis versus the

20   Debtors publishing and putting that information without

21   their consent because they may not be aware that this is a

22   requirement of the bankruptcy process.  And because of the

23   rules of the GDPR, allow for consent in those circumstances

24   by individuals.  So we do think that where an individual

25   volunteers that information, that they've consented to

1    having their name and we're not seeking to redact that

2    information.

3              THE COURT:  So the problem I see with -- one

4    problem I see with that is if creditors' claims are

5    scheduled as undisputed, they don't have to file a proof of

6    claim.  And I don't like the notion of anonymous claims

7    against the estate and it may be that I'll get the

8    unredacted list, the U.S. Trustee, and the Committee, but,

9    you know, Section 107 is not intended just to make sure that

10   the Court and the Committee and the U.S. Trustee have access

11   to the information.

12             MS. JONES:  And we understand that, Your Honor,

13   and it's also why we provided an avenue in the order for

14   other parties and interests to request first from us.  And

15   if, for whatever reason, we don't think it's appropriate and

16   we say no, that they can come to the Court.  We do

17   understand that that is a little bit more of an additional

18   burden, but in these circumstances where -- and this is a

19   motion again coming up on the 14th that we filed a few days

20   ago, where names and account balances or names and claims

21   filed in one place essentially provides these individuals

22   very, very prone to attacks in the sense that it's as if

23   we're putting their entire account number and balance online

24   available for cyberattacks.  And so we do understand that

25   again, as has been talked about multiple times, that this is

1    a unique case and we're facing unique problems that we don't

2    have in other circumstances.

3              THE COURT:  Yeah.  But if I, if I approve what

4    you're asking for, I've opened -- do you think you're the

5    only one who's going to come in and ask to seal the names of

6    creditors as well as identifying information about them?

7    That what I am  quite hesitant to do.

8              MS. JONES:  And we understand that, Your Honor.

9    We do think that this case is different and distinguishable

10   in the sense that customers and creditors are essentially

11   the same constituents here, where in a lot of other cases,

12   customers, there may be some --

13             THE COURT:  Let me say that I don't -- I haven't

14   bought into the argument that this is confidential

15   commercial information.  To me, the only part of, you know,

16   that, that you've gotten some traction about but there's an

17   absence of evidentiary support, is Section 107(c)(1), undue

18   risk of identity theft or other unlawful injury to the

19   individual or the individual's property.  I'm really not

20   ruling that.  I'm not persuaded by anything you've written

21   that this is confidential commercial information.  I dare

22   say many of -- I don't know how many account holders have

23   accounts in other platforms as well, other than Celsius.

24   And so I don't view this as -- I have difficulty, let's say

25   -- I'm not ruling yet, but I have great difficulty finding

1    that this is confidential commercial information.

2            MS. JONES:  We understand that, Your Honor, and we

3    do explain that in Mr. Bixler's declaration and he is here

4    and happy to answer --

5            THE COURT:  I just told you I'm not persuaded by

6    it.

7            MS. JONES:  We understand, Your Honor.  And we

8    would be happy to file supplemental evidence in support of

9    that.  We have no issue explaining further to the Court if

10   you're looking for that additional evidence.  And we

11   understand your hesitation and the need to limit redaction

12   to that which is absolutely necessary.  And again, we have

13   no problem with that.  But we do think here in these

14   circumstances that the safety of these individuals does

15   overrun.

16           THE COURT:  You've raised the issue about the

17   safety of individuals, but you've not put in any evidence

18   about threats to customers.  You've raised the specter of

19   threats against employees of Celsius.  Let's put that aside

20   for a moment.  But you put in no evidentiary support that

21   would allow me to find 107(c)(1) has been satisfied such

22   that I'm going to prevent identifying the names of your

23   customers.  Certainly, all the letters that the Court

24   receives, they're signed, that got addresses, many of them

25   have addresses.  I haven't seen any creditor show reticence

1    about coming forward and complaining about what did or

2    didn't happen with respect to the debtor.  Is there any

3    other -- anything other than in your papers you want to

4    argue?

5             MS. JONES:  One thing I did want to note, Your

6    Honor, respectfully, we do attach some emails from

7    individual customers saying they are concerned about their

8    safety.  So we have provided that with our papers and in

9    addition with respect to customer names, again, we're only

10   seeking that with respect to the EU an GDPR and I'm happy to

11   have my colleague, Ms. Wilson discuss that point further.

12   With U.S. names, we're not seeking to redact that.  And an

13   additional point is, you know, this information will stay --

14   I apologize, Your Honor, but the last time we looked at the

15   letters, there were approximately over 350 that had been

16   filed and of those, less than 30 had included their home

17   addresses and email addresses attached to that.

18             THE COURT:  All right.  let me hear from your

19   colleague on the EU GDPR restrictions.

20             MS. WILSON:  Good morning, Your Honor.  It's

21   Jennifer Wilson here from Kirkland and Ellis.  So as Ms.

22   Jones has commented, there are various hurdles under the

23   GDPR.  I'm sure you're aware of those and we set those out

24   in our reply.

25             Firstly, there needs to be, there would need to be

1    a lawful basis on which to disclose European or U.K.

2    individuals' names.

3              THE COURT:  The lawful basis is the bankruptcy

4    code.

5              MS. WILSON:  And that's, and that's where we come

6    up with an issue in that the GDPR only acknowledges and

7    recognizes European laws and UK laws as providing a legal

8    obligation to disclose personal data.  And so you're then

9    left with looking at a legitimate interests argument being

10   the legitimate interests of the Debtor and the U.S. Trustee

11   and other interested parties in receiving this information.

12   But as we set out in our, in our reply, you can only really

13   rely on that as a basis if it's absolutely necessary for you

14   to disclose that information in order to satisfy the

15   objective, which would be compliance with the bankruptcy

16   code.

17             And our understanding is as Ms. Jones has set out

18   is that we can still comply with the code while, you know,

19   removing the names from the public docket, but making that

20   information available through other means.  And so, you

21   know, we're faced with -- we're stuck between a rock and a

22   hard place in terms of squaring disclosure of the unredacted

23   information with compliance.

24             THE COURT:  If I order it, you've got to do it and

25   your defense is you've been ordered by a court in the United

1    States to provide that information.  So the -- I must say,

2    the only time when an issue, something of this sort arose

3    before me, was in a Chapter 15 case with the main proceeding

4    and Anguilla of a bank and their regulations prohibited the

5    disclosure of the names of the account holders.  And I

6    permitted in the Chapter 15 case that a code sheet would be

7    used, the U.S. Trustee would be given the names, but that

8    seems to me different because it was in a Chapter 15 case

9    where the main proceeding was in a country that prohibited

10   the creditors in that case from having to disclose their

11   names.  This is a step much further, but I'll ask Ms.

12   Cornell about it.

13        I'm sensitive to -- and I try to be respectful of

14   foreign law, but should that foreign law be given extra

15   territorial effect to override bankruptcy code provisions

16   about what's supposed to be included in schedules?  Do you

17   have any case law that supports where a U.S. court has found

18   that foreign law trumps or overcomes a U.S. law requirement

19   with respected disclosure in a U.S. court proceeding?

20        MS. JONES:  Your Honor, no, we don't have that and

21   we would be happy to file supplemental briefing on that.

22   But I do want to clarify that our position is not that the

23   GDPR trumps it or overrides it, but rather that we are

24   seeking to comply with both provisions through the means

25   provided by the bankruptcy code.

1          THE COURT:  Well, if it over -- look, if foreign

2     law -- if I had to apply foreign law on this issue that

3     would be one thing.  Okay.  But you're not arguing that.

4     You're arguing that I guess 107, 105 somehow gives me the

5     authority to excuse the debtor from at least providing the

6     names of creditors on the schedules.  All right.  Anything

7     else you want to I want to add?  I really do want to hear

8     from Ms. Cornell.  I haven't, I really haven't resolved

9     this.  I'm concerned about this because I'm, you know,

10    mostly in the Chapter 15 context, I see this.  I see issues

11    of this sort arising, but there's a main proceeding pending

12    in another country and that's not, that's not this.

13          MS. WILSON:  Your Honor --

14          MS. JONES:  If I could -- sorry, go ahead, Ms.

15    Wilson.

16          MS. WILSON:  If I could, if I could add one thing,

17    one trend that we're seeing as really real here in Europe is

18    that  particularly high profile cases like this, there is a

19    real threat of individuals bringing private actions for

20    breaches of the GDPR  and given, you know, given the scale

21    of the individuals and the volume of individuals' details

22    that would be disclosed here, we think that that is a risk

23    that cannot be ruled out.

24          THE COURT:  Well, they're going to have to bring

25    your private action in this court before me and I'll be the

1      one who have to deal with it.  All right.  Let me hear from

2      Ms. Cornell.

3              MS. CORNELL:  Good morning, Your Honor.  Shara

4      Cornell on behalf of the Office of the United States

5      Trustee.  How are you?

6              THE COURT:  I'm fine.  Go ahead.

7              MS. CORNELL:  As a preliminary matter, our office

8      agrees with the Court's earlier remarks today.  This case

9      demands extraordinary transparency.  And we share the

10     concerns of the Court.  We agree that the Debtors have not

11     met their burden to demonstrate that this is confidential

12     commercial information.  And should the Court rule that a

13     portion needs to be sealed --

14             THE COURT:  Let me stop you here.

15             MS. CORNELL:  Sure.

16             THE COURT:  What I what I expressed already.  I'm

17     not persuaded it's confidential commercial information.  But

18     that doesn't end the issue.

19             MS. CORNELL:  I understand, Your Honor.  I just

20     want to let Your Honor know that we support this Court's

21     earlier statements.  That if you're not inclined to seal the

22     names of the creditors, we understand that inclination.

23             THE COURT:  I'm not sure what that means.  You may

24     understand my inclination, but disagree with what I might

25     rule.  Does the U.S. Trustee object to any order that would

1    require disclosure of the names of the creditors but

2    "impound" additional information that would have addresses

3    et cetera, and make it subject to essentially the similar

4    procedure that Rule 1007 contemplates?  I need to know what

5    your position is on that.  As I said nobody -- I started by

6    saying neither side had addressed that rule.  Go ahead.

7           MS. CORNELL:  Thank you, Your Honor.  I think at

8    this time I would need the opportunity to review both the

9    bankruptcy code and the bankruptcy rules and Your Honor's

10   comments before responding.

11          THE COURT:  Okay.

12          MS. CORNELL:  Thank you.

13          THE COURT:  Address the EU GDR issue, if you

14   would.

15          MS. CORNELL:  Sure.  These debtors have

16   voluntarily sought relief in this bankruptcy court in the

17   United States.  They've provided no basis whatsoever that

18   while this case was filed in the United States that the GDPR

19   should be applicable.  I think Your Honor's comments are all

20   appropriate.  And we have not seen anything to date that

21   would require the sealing of this information pursuant to

22   the GDPR in this case.

23          THE COURT:  Are you aware of any case law at all

24   dealing with the application of EU GDR regulations on

25   confidentiality and disclosure in court litigation?

1          MS. CORNELL:  I'm not, Your Honor, I'm not.

2          THE COURT:  All right.  There are some hands

3     raised.  I'll try and identify the people in the order in

4     which they raise them.  Mr. Herman.

5          MR. HERMAN:  Yes, Your Honor.  Just a quick thing

6     I wanted to note.  I don't know if this is a limited

7     objection or just something I wanted to note for the Court

8     on this matter.  But essentially, you know, I generally

9     agree with protecting emails, phone numbers, that sort of

10    information.  I do agree that that would lead to phishing

11    and other sort of cybersecurity risks.  I do want to make

12    sure the Court preserves some ability for organized customer

13    groups to communicate with classes of customers.  So I would

14    not support a ruling that essentially gives Celsius and

15    Kirkland and Ellis exclusive rights to communicate with

16    customers.  What I would propose is that the Court protect

17    the information using something along the lines of a court

18    approved constituent relationship management system, so that

19    for example, we could later in the case get a court order to

20    email U.S. customers, for example, and inform them about an

21    Ad Hoc Committee that we're creating.  So if the Court were

22    to simply impound and, you know, just not allow this

23    information to be accessed in any way, it would give Celsius

24    exclusive rights to communicate with customers and control

25    the narrative.  and Celsius has certainly been controlling

1    the narrative, deleting information off of the internet,

2    sometimes deleting, sometimes hiding, shall we say, I'm not

3    actually accusing them of necessarily doing anything that

4    violates the law at this point in that regard, but I think

5    they're definitely close to the edge there.

6           But my broader point is just that there are ways

7    to protect people's information while still preserving --

8    there are public policy reasons that you know that we should

9    be able to get full contact information.  However, I think

10   it would be very detrimental to customers and creditors for

11   that to just be spilled out.  I think the Court would have

12   to very carefully balance like through a motion that sort of

13   access.  And I don't really have that much of an opinion on

14   the names to be honest with you.  I'm going to let the other

15   parties hash that out.

16          THE COURT:  Thank you, Mr. Herman.  Mr. Ubierna.

17          MR. UBIERNA:  Yes, Your Honor.  Thank you.  I want

18   to say that I'm a customer from the European Union.  More

19   specifically, I'm a customer of services from Spain and I am

20   the one hand, I'm concerned about my home address being

21   published.  But on the other hand, I am also concerned about

22   the lack of transparency by services over the last time.  So

23   I think that a balance needs, to be needs to be found.  I

24   agree with what you propose about the names, 81 names also

25   European customers being made public, but not home

Page 90

```
1    addresses.  And I think that the GDPR also allows the use to
2    share the names.  Their right to privacy is not absolute.
3    The right of transparency also applies here in Europe and on
4    many occasions, both ways oppose each other.  So a balance
5    needs to be, needs to be found.  And in the judicial
6    proceedings if it's necessary to publish the name of
7    creditors and the names of other parties, I think that it is
8    necessary and the GDPR would support publishing the names of
9    creditors for transparency.  But if it is necessary to
10   publish the home addresses of creditors, I do not think so.
11   And the GDPR will not permit that, but for such defense
12   against any claims for breaching the GDPR, one thing that
13   the GDPR allows is for when it comes to the processing of
14   personal information, one thing that the articles of the
15   GDPR says is that processing of personal information shall
16   be lawful when it's necessary for compliance with a level of
17   obligation to which the controller is subject.  And if the
18   system is subject to order from this Court, I think that
19   the, that the GDPR and the data protection authorities from
20   any country in Europe will understand that because it is, it
21   is, it is in the code there.  So, I don't know.  I support
22   what you have said.  I don't want to take any more of your
23   time.
24          THE COURT:  Thank you very much, Mr. Ubierna.  Ms.
25   Kovsky.
```

1          MS. KOVSKY:  Thank you, Your Honor. Debb Kovsky

2     for the Ad Hoc Group of Withhold Account Holders.  We did

3     file a statement in the court of this motion at Docket 633.

4     We addressed only the arguments under Section 107(c) since

5     that's what directly applied to our group.  And we thought

6     it would be helpful for Your Honor to hear from the people

7     who would be most affected by the potential publication of

8     their personally identifiable information, their home

9     addresses --

10          THE COURT:  Let me interrupt to ask this question.

11          MS. KOVSKY:  Sure.

12          THE COURT:  If their addresses and email addresses

13     were under -- redacted, do you have that same concern about

14     their names?

15          MS. KOVSKY:  We haven't really addressed that

16     since the Debtors hadn't sought to redact names in the U.S.

17          THE COURT:  I'm asking you that now.

18          MS. KOVSKY:  We've sort of -- I think all the

19     members of my group have resigned themselves to the fact

20     that their names are going to be out there.  We filed a 2019

21     statement.  Their names are of public record and we agree

22     that there has to be some balancing between transparency and

23     protecting the legitimate privacy and safety interests of

24     individual depositors.  I think what Mr. Herman was

25     suggesting is very much along the lines of what the Debtors

Page 92

1       have already proposed, which is what gets filed on the

2       public docket is redacted in the important personally

3       identifiable information that could put people at risk is

4       not made public.  And they have basically themselves

5       impounded those lists so that only people with a legitimate

6       case-related purpose for needing access to them can actually

7       get it.  Which is exactly what Mr. Herman is suggesting.

8       Which I think is what the Debtors have already suggested,

9       which to the Ad Hoc Group makes sense.

10              THE COURT:  If the names are -- if it's anonymous,

11      you know, well I have problems with not including the names.

12      I've said that already.

13              MS. KOVSKY:  And, Your Honor, the Ad Hoc Group

14      does not have an objection to the names being included.  The

15      concern is more putting out email addresses, which of

16      necessity, are the specific email addresses connected with

17      their Celsius accounts.  It gives hackers half the

18      information they need.  We're concerned about home addresses

19      for the reasons stated in our statement.

20              THE COURT:  You have a sympathetic audience on the

21      issue of home addresses and email addresses, okay.  I'm not

22      ruling that, but I understand your position.

23              MS. KOVSKY:  Thank you, Your Honor.

24              THE COURT:  Mr. Ortiz.

25              MR. ORTIZ:  Good morning, again, Your Honor, Kyle

1      Ortiz of Togut Segal and Segal on behalf of the Ad Hoc Group

2      of Custodial Holders.  I'm hearing what Your Honor is

3      saying, so I'll be really quick.  We're not concerned about

4      names.  We did file a joinder at 642, but you know, our

5      concern is mailing addresses and email addresses.  And, you

6      know, reading the tea leaves here, I'm not going to waste

7      your time because I know we have a lot to get through.  I

8      just note you did talk about evidence.  It's kind of hard,

9      you know, tens of thousands to really know if somebody's

10     going to be harmed until after it's happened.  And I know

11     it's not theoretical because it's happened in cases where

12     stalkers have found people.  There have been home invasions.

13     I know that's anecdotal, but it's difficult to -- for the

14     Debtors, I think, to provide evidence on that particular

15     issue, just because of the size of it because you really

16     aren't going to know if there's a harm until after it

17     happens.  So that's all I'll say, Your Honor.  I do think

18     that the addresses and the emails should be put aside under

19     1007(j) or some other mechanism, but we don't have an issue

20     with the names.

21              THE COURT:  All right, thank you.  Ms. Smith.

22              MS. SMITH:  Thank you, Your Honor.  So Trudy Smith

23     on behalf of the Committee from White and Case.  So we did

24     file a joinder to the Debtor's motion at Docket Number 399

25     and I won't belabor the point other than to say that we did

1    support -- we do support the relief of redacting names and

2    email address -- I'm sorry -- email addresses and addresses.

3    With respect to the names issue, that's something we'll

4    definitely evaluate further especially in light of this

5    Court's proposal to the Debtors and the U.S. Trustee to

6    resolve this issue.  But we do recognize the concerns with,

7    you know, the potential for hacking and we talk about that

8    and our joinder, as well as some of the experiences that our

9    Committee members have had with their information being

10   publicly disclosed.  And granted they are participating in

11   this case.  The individual account holders and unsecured

12   creditors didn't choose to be a part of this bankruptcy and

13   certainly didn't know that their information would be made

14   public when they signed up to use Celsius platform.  So

15   we're aware of these issues and we'll consider that in light

16   of Your Honor's recommendation to the Debtors.

17            THE COURT:  Well, it was an issue I raised.  I'm

18   not sure I'd go so far -- perhaps it's a recommendation.

19   I'm obviously trying to steer through a complex area.  I'm

20   very concerned about if I permitted total anonymity of

21   creditors, so their names wouldn't be there no other contact

22   information, I'm really concerned about that particularly if

23   -- well, let me leave it at that.  Okay, let me go on to

24   mispronouncing your name is Yeoman-Taylor.

25            MR. YEOMAN-TAYLOR:  Yes.  Hello.  I'm a creditor

1    in the U.K.  And it's very easy if you have someone's full

2    name to be able to find out where they live and find their

3    contact details.  So perhaps what could be done --

4              THE COURT:  Of course everybody knows who you are

5    now.

6              MR. YEOMAN-TAYLOR:  Perhaps --

7              THE COURT:  Your name is flashing across

8    everybody's screen.

9              MR. TAYLOR:  Yeah.  Perhaps putting their first

10   initial and then the surname might be better.  That's all.

11             THE COURT:  Thank you.  Ms. Milligan.

12             MS. MILLIGAN:  Good morning, Your Honor.  Layla

13   Milligan with the Texas Attorney General's Office on behalf

14   of the State Securities Board.  We will absolutely defer to

15   this Court's good judgment when it comes to sealing or

16   restricting information, especially personally identifiable

17   information.  The only comment I would add is that we would

18   have a distinct interest in the ability to access that

19   information as appropriate on at least from a regulatory

20   standpoint to the extent that we may need information on

21   certain residents of different states or things, that type

22   of information.  So we would just encourage the Court and

23   agree with the Court's comments about allowing access as

24   necessary and appropriate through a process that is clear

25   for those needing information.

1           THE COURT:  If I followed the, you know, 1007(j),

2    which doesn't strictly apply, but as I read, if you look at

3    that rule, the last sentence is the court may permit

4    inspection or use of the list, however, by any party in

5    interest on terms prescribed by the court.  And certainly if

6    you couldn't agree with the other parties in interest to get

7    access to it, you make a motion to me.  I think -- I

8    certainly understand the interest and the importance of the

9    regulator's efforts in connection with Celsius.  So let me

10   leave it at that.

11           MS. MILLIGAN:  Yes, Your Honor.

12           THE COURT:  So at least what I put out there had

13   the method for assuring that parties in interest who had a

14   good reason for wanting to see the information could get

15   access to it.

16           MS. MILLIGAN:  Yes, Your Honor.

17           THE COURT:  Okay.

18           MS. MILLIGAN:  Thank you.

19           THE COURT:  All right.  Thank you.  Ms. Cornell.

20           MS. CORNELL:  Thank you.  Shara Cornell on behalf

21   of the Office of the United States Trustee.  You Honor, I

22   just wanted to underscore one more point for you and this

23   Court.  Since the filing of this motion, the Debtors have

24   filed and added its retention applications to the list of

25   related documents that also requires sealing.  And we don't

1     know how many more motions are going to be included.  In

2     fact, earlier in this hearing alone, we discussed certain

3     customers that maybe having funds returned to them.  Are the

4     recipients of those funds going to be under seal?

5          THE COURT:  Nobody is getting money back that

6     remains anonymous.  I'll just make that crystal clear.

7          MS. CORNELL  You know, the potential preferential

8     transfer recipients, are those going to be anonymous?  I

9     think that it needs to be clear to the creditors out there

10    that there are going to be a lot of mechanisms going on in

11    this court where information may be made public.  And it's

12    not just whether or not the schedules are going to be filed

13    under seal.  It's also the retention applications and

14    whether or not the various professionals have conflicts and

15    there are a lot of parties that they need to, that need to

16    be reviewed and I just want to make sure that everybody on

17    the --

18          THE COURT:  Let me just say for the professionals

19    and applications and confidentiality, I mean, the closest

20    example I have was my opinion in Motors Liquidation where I

21    required disclosure for purposes of evaluating conflicts.

22    And it isn't just a question of me having the information.

23    The way our system works is that the public is entitled to

24    know what the Court is considering for the, you know --

25    there may be exceptions, but I'm not so sure this is one --

Page 98

1    in deciding whether a professional has a conflict that would

2    prevent the Court from approving a retention, people are

3    entitled to know what is the conflict.  So I'm, I feel quite

4    strongly with respect to the retention applications and the

5    sealing of information with respect to that.  If people want

6    to be retained, they should know that they're going to be

7    required to make public disclosure of information that may

8    be relevant to the issue do they have an avoidable conflict,

9    a conflict that that prevents their retention?

10          It shouldn't only be the U.S. Trustee who has

11   access to that information, can file its objection, et

12   cetera.  Ms. Smith, I'm going to recognize you one last time

13   briefly.

14          MS. SMITH:  Thank you, Your Honor.  Briefly, and

15   just to make a recommendation of my own, we would propose

16   maybe deferring the ruling on this issue until the 14th in

17   light of the issues that have been raised and so we can

18   caucus more together about --

19          THE COURT:  Allow me to stop you there because I'm

20   not deciding it today.  I'm adjourning the matter to the

21   14th.  I'm directing the parties who filed anything with

22   respect to this issue to confer.  I've suggested that

23   Bankruptcy Rule 1007(j) provides an appropriate approach to

24   resolving this issue.  While I'm not ruling today, I want to

25   make clear I am -- I have the strongest reservations about

1     not requiring the disclosure of the names.  I think

2     addresses, home addresses, email addresses is a completely

3     different matter.  I'm sensitive, very sensitive to that

4     issue.  So I want to give the parties who addressed this

5     issue in their papers to try and see whether they can reach

6     a consensual resolution of it.  Okay.  So I'm -- we're

7     adjourning this matter to the 14th and speak to each other

8     sooner rather than later to see whether you can have a

9     resolution.  If you have a resolution, somebody file a

10    status letter or something on the docket so I know that

11    you've resolved the issue.  Okay.  Ms. Kovsky, you have your

12    hand raised again.  I've already recognized you once.  So

13    only very, very briefly.  People get one shot.

14            MS. KOVSKY:  Okay.  I appreciate that Your Honor.

15    It's just a request to be excused.  This is the only matter

16    up for hearing today that my group is interested in.

17            THE COURT:  You're absolutely excused.

18            MS. KOVSKY:  Thank you very much, Your Honor.

19            THE COURT:  Okay.  All right.  So let's go on to

20    the next matter on the agenda.  Hopefully everything won't

21    take this much time.  Let's go.

22            MS. JONES:  Thank you, Your Honor.  Your Honor,

23    the next item on the agenda is the Debtor's cash management

24    motion which was filed at Docket Number 21.  Your Honor,

25    earlier this morning we filed a revised proposed third

1     interim order at Docket Number 674.  I know Your Honor had

2     had raised questions earlier today about the U.S. Trustee's

3     objection that they filed at Docket Number 4 -- I'm sorry,

4     apologies -- Docket Number 592 as well as -- oh, I think

5     it's just sorry -- Docket 592, the most recent objection and

6     comment with respect to 345.

7              Your Honor, the Debtors and the U.S. Trustee and

8     the Committee are in discussions with respect to how to best

9     address that.  And we've agreed to have that up for hearing

10    on October 6th.  We will be seeking final relief.  You know

11    we're happy to file what we, you know, resolve in leading up

12    to that, but with respect to the 345 point, we are

13    requesting that that be addressed at a later time.  And with

14    respect to everything else in the third interim order, I'm

15    happy to walk you through the proposed changes.  I know it

16    was filed shortly before the hearing and I apologize for

17    that.  We may not give you enough time to review.  So I did

18    want to walk you through those on the record if you prefer.

19    Otherwise, we request entry of the proposed interim third

20    interim order pending further resolution of the outstanding

21    items.

22              THE COURT:  Let me ask, Ms. Cornell, what's the

23    position of the U.S. Trustee?

24              MS. CORNELL:  Shara Cornell on behalf of the

25    Office of the United States Trustee.  Yes, Your Honor.

1    That's my understanding that the Debtors are only seeking

2    their interim order today and that we're going to continue

3    to work on the 345 issues that we raised in our limited

4    objection with both the Debtors and the Committee and have

5    it before Your Honor for an update at the October 6th

6    hearing.

7             THE COURT:  All right, so you're not objecting to

8    the entry of that proposed interim order?

9             MS. CORNELL:  No, Your Honor.

10            THE COURT:  Okay.  All right.  I looked at the

11   order just before the hearing started.  I raised my concerns

12   to Mr. Kwasteniet at the start about the safety and security

13   of crypto assets.  You know, Ms. Cornell in one of your

14   briefs, you briefly addressed the issue of whether 345

15   applies to crypto assets.  The Debtor did not engage with

16   that issue at all in its filings.  So I'm not resolving that

17   issue.  I think I viewed it as at this stage, at least,

18   assuming that 345 applies, the issue then becomes waiver and

19   has the Debtor, will the Debtor on October 6th, if there is

20   no resolution of the issue, as the Debtor made an

21   appropriate evidentiary showing that would support the Court

22   entering an order waiving the requirements of 345?  I'm not,

23   I'm not reaching that now.  It's an important issue.

24            I think the Debtor recognizes and the Committee

25   recognizes the safety and security of the assets are really

1    crucial.  And as I commented earlier, you know, as recently

2    as the most recent adversary proceedings that the Debtor

3    filed, didn't give me enormous comfort that all of their

4    assets are safe and secure and can be recovered easily.

5           So, I will approve the order on an interim basis

6    and we will put back on the agenda for October 6th.  Thank

7    you very much.  All right, let's go on to the next matter.

8           MS. JONES:  Thank you, Your Honor.  If it's okay

9    with you, I'm going to be handling the uncontested matters

10   on the agenda, 12, 13, 14 now.  I'm happy to address those

11   at the end if you would prefer to stay in order.  But once

12   I'm done with those, I'll be conceding the podium to my

13   colleague Mr. Briefel.

14          THE COURT:  That's fine.  Let's go ahead and do

15   that.

16          MS. JONES:  Okay, thank you, Your Honor.  Again

17   for the record, Elizabeth Jones of Kirkland and Ellis on

18   behalf of the Debtor's.  Item Number 12, Your Honor, is an

19   additional sealing request filed at Docket Number 380.  This

20   request is limited under 107(b) just to steal the names of

21   NDA parties for confidential purposes.  We believe --

22          THE COURT:  Let me stop you.  I understand clearly

23   what that motion is about.  Are there any objections from

24   anybody?  Ms. Cornell, is the U.S. Trustee okay with this?

25          MS. CORNELL:  Yes, Your Honor.  I have no

1    objection to this motion.

2             THE COURT:  That's fine.  Anybody else want to be

3    heard?  I fully understand and appreciate this.  And in

4    other cases, I don't know whether I granted any orders, but

5    I permitted the nondisclosure parties to NDAs who wanted to

6    keep them in the game as bidders.  All right, the motion is

7    granted.

8             MS. JONES:  Thank you, Your Honor.  The next item

9    on the agenda is Number 13, the Debtor's second request for

10   an extension to file their schedules and statements.  Your

11   Honor, we filed a revised proposed order this morning at

12   Docket Number 671 that just slightly adjusted the time frame

13   from an addition 30 days, to an additional 34, the 12th to

14   the 16th.  And prior to filing, it we did clear that with

15   both the U.S. Trustee and the UCC and they were both in

16   agreement that we could seek that additional four days.  So

17   unless Your Honor has any questions, we respectfully request

18   entry of the additional revised proposed order.

19            THE COURT:  It's approved.  It's granted.  I just

20   make this additional comment.  When we get to the de minimus

21   assets issue, what I -- you know it's very hard for the

22   Court and I know the proposed order on de minimus assets

23   seems to be consensual.  I don't know whether the U.S.

24   Trustee is on board with it or not, but, you know, without

25   schedules, I have no clue what's the de minimus asset.  You

1    know this really does link together.  So I'm granting the

2    motion on extending the time on schedules.  But my concern

3    really arose for the later motions about sale of de minimus

4    assets without schedules to know what's what.  Go ahead, go

5    on with your next matter.

6              MS. JONES:  Thank you, Your Honor.  We understand

7    that.  And then the last one that I'll be presenting, Your

8    Honor, is the creditor, the final word on the creditor

9    Matrix motion and that was filed a revised proposed order

10   but understanding that that also relates to some of the

11   sealing requests that have been adjourned to the 14th.  If

12   Your Honor is okay with that, we would just propose

13   adjourning this motion as well so that we can address the

14   sealing request appropriate with your ruling on the 14th.

15             THE COURT:  All right.  Any objections to that,

16   putting this over to the 14th?  Okay.  We'll put it over to

17   the 14.  Thank you very much.

18             MS. JONES:  Thank you, Your Honor.  With that, I

19   would like to cede the podium over to my colleague, Mr.

20   Briefel.

21             THE COURT:  Okay.

22             MR. BRIEFEL:  Thank you.  Good morning, Your

23   Honor.  Simon Briefel of Kirkland and Ellis proposed counsel

24   to the Debtors.  Can you hear me?

25             THE COURT:  I do.

1            MR. BRIEFEL:  Okay, great.  So the next item on

2      the agenda is Item Number 3, which is the bidding procedures

3      motion that we filed at Docket Number 188.  Through this

4      motion, Your Honor, we are seeking an order approving

5      bidding procedures as well as certain dates, deadlines and

6      notices in connection with the bidding procedures for a

7      potential sale of the GK8 business.

8            We described in our papers that the Debtors are

9      exploring a potential sale of the GK8 business and have

10     engaged Centerview to lead a marketing process started

11     prepetition designed to identify potential bidders and to

12     identify the best bid for the assets.

13           The marketing process and the bidding procedures

14     that were proposed to -- that we're proposing to approve

15     under the order, are designed to enable the Debtors to move

16     expeditiously to complete a thorough marketing process to

17     receive bids and to hold an auction, if one is necessary, to

18     determine the highest or otherwise best bid for the assets

19     and maximize value for all of the stakeholders.

20           As we described in our papers, I think there's

21     three dates that we're seeking, mostly three dates that

22     we're seeking to approve under the bidding procedures

23     orders.  The first one is September 21st, which is the

24     deadline for bidders to submit final bids on the assets.

25     The second one is September 23rd as the date for potential

1    auction if one is necessary.  And the third one is October

2    6th as the date for the sale hearing.

3              The motion was initially scheduled for the second

4    day hearing, which was on August 16th, but we had decided to

5    adjourn it light of comments and objections that we had

6    received from parties.  Since that time, we had extensive

7    discussions with counsel for the Committee as well as

8    counsel to certain shareholders of the Debtors represented

9    by Jones Day and Milbank to resolve their comments.  And so

10   I'm happy to report that I believe the order is now

11   presented on an uncontested basis.  We filed a revised order

12   last night at Docket Number 665 which reflects that

13   resolution, but I will point out for Your Honor that we

14   filed a revised order during this hearing and apologies --

15             THE COURT:  That one I didn't see.

16             MR. BRIEFEL:  Say again?

17             THE COURT:  That one I didn't see.

18             MR. BRIEFEL:  Okay, exactly.  So that was an order

19   that we wanted to get on file just to run a last minute

20   change that was signed off by parties with whom we've had

21   discussions and that's a change to the assumption and

22   assigning procedures simply to make clear that we would like

23   authority for the bidding -- excuse me for the assumption

24   procedures to allow us to assume a signed contract to a

25   purchaser that as long as this is allowed under the

1     bankruptcy code or as long as this is allowed by further

2     order of the Court.

3              So Your Honor, I'm happy to walk you through the

4     changes to the order if that would be helpful to you.

5     Otherwise I would respectfully request entry of the order.

6              THE COURT:  All right.  The Committee had filed an

7     objection.  Let me hear from the Committee's counsel whether

8     those issues have been resolved.

9              MR. COLODNY:  Good morning, Your Honor, Aaron

10    Colodny from White and Case.  Can you hear me?

11             THE COURT:  Yes, I can.  Go ahead.

12             MR. COLODNY:  Our issues have been resolved.  I

13    would like to make a couple of quick points.  I think the

14    first was made by my partner, Greg Pesce at the beginning of

15    the hearing which is we fully reserve our rights with

16    respect to the sale of GK8.  And more specifically, we

17    understand the Debtor is going to be undertaking a marketing

18    process with respect to all of their assets and their whole

19    business.  So it might make sense for GK8 to be sold

20    separately.  It might make sense for it to be sold together.

21    And these bidding procedures preserve all optionality with

22    respect to that.

23             We have negotiated for and obtained consultation

24    rights to make sure that we are able to oversee what the

25    Debtor is doing.  And otherwise we agree with the process of

1    having a market check going out and seeing what the assets

2    are worth and bringing money into the estate if that's in

3    the best interests of the estate.

4                THE COURT:  Thank you.  Ms. Cornell.

5                MR. COLODNY:  I have --

6                THE COURT:  I'm sorry do you did you have

7    something else you wanted to add, Mr. Colodny?

8                MR. COLODNY:  I had one point with respect to the

9    cash management motion that I wasn't able to be heard on but

10   I didn't want it to get buried that there is a new budget

11   that's a detached as I think it's on Docket 64 -- 674, Page

12   25 of 45.  And it is different than the one that was filed

13   with the coin report in that the Debtor's found $70 million

14   of receivables from loans that they didn't know.  You know

15   finding --

16               THE COURT:  I don't know whether that's reassuring

17   or not reassuring.

18               MR. KOLODNEY:  That was my point, Your Honor.

19   Finding $70 million is always a good thing, but it's

20   certainly concerning that it wasn't know beforehand.  But

21   we've been working with the Debtor -- but I just wanted to

22   raise that to the Court's attention that there is additional

23   liquidity and it is expected to be received shortly.

24               THE COURT:  Thank you very much.  Ms. Cornell.

25               MS. CORNELL:  Shara Cornell on behalf of the

Page 109

1    Office of the United States Trustee.  I have no further

2    comments with respect to this motion.  The Debtors worked

3    with us early on in the case when this was filed.  So I have

4    no comment at this time.  Thank you.

5           THE COURT:  Is there anybody --

6           MR. KWASTENIET:  Your Honor --

7           THE COURT:  Hold on.  Is there anybody else who

8    wishes to be heard with respect to the bidding procedures?

9    I've already permitted the sealing the parties with NDAs,

10   but other than that, anybody want to be heard?

11          MR. KWASTENIET:  Your Honor, Ross Kwasteniet, if I

12   may just very briefly to the comment about "finding 70

13   million."  The dollar amount was 61 million.  It was known

14   to the company.  It was believed to have been a loan in

15   stable coins which the company views as functionally

16   equivalent to U.S. dollars.  It turns out in the fine print

17   the loan was actually U.S. dollars, not a stable coin that

18   is tied to, pegged to, has the same value as a U.S. dollar.

19   So those funds are expected to come back into the estate in

20   cash as opposed to in coin.  It's a minor technicality.  It

21   happens to like help out the company's cash liquidity

22   standpoint.  So that's good, but this is not, I didn't want

23   to leave you with the impression that we just don't know if

24   60 million is coming or going.  We knew it was coming.  We

25   knew the dates, we knew the counterparty.  The company had

Page 110

1    just notated it from a bookkeeping standpoint as a stable

2    coin, which is functionally equivalent to U.S. dollar.

3    That's all, Your Honor.  I didn't want to leave you with a

4    misconception.

5              THE COURT:  I'm glad there's $61 million dollars

6    in cash coming into the estate.  All right.  The next item

7    on the agenda is Mr. Frishberg's lift stay motion.  Mr.

8    Frishberg, do you want to be here?  The motion is filed as

9    ECF Docket Number 342.

10              MR. FRISHBERG:  Yes, Your Honor.  I would like to

11    be heard.

12              THE COURT:  All right, please go ahead.

13              MR. FRISHBERG:  First of all, as stated, I am

14    Daniel Frishberg and I was a customer of Celsius and I'm

15    currently representing myself in this case.  First of all,

16    Your Honor, I'm sorry that I don't have a suit and tie like

17    the opposing counsel does.  I don't have a suit.

18              THE COURT:  I wouldn't worry about that, Mr.

19    Frishberg.

20              MR. FRISHBERG:  Thank you.  I will do my best to

21    be brief.  There are several reasons why my motion should be

22    granted.  First and foremost, quite simply I should not

23    belong, I should not be a part of these proceedings.  I do

24    not belong in them.  I specifically instructed Celsius to

25    close my earn account before Celsius filed for bankruptcy

1    but they refused to do so, which breached the terms of our

2    contract.  According to the laws of numerous states as well

3    as our financial regulators, the earn account is according

4    to them, considered an unregulated security, which I as an

5    unaccredited investor, should have never had access to.  I

6    should not have been allowed to have that account.  I should

7    --let alone have been forced to have one after Celsius

8    refused to close my account numerous times, which in effect

9    caused me to effectively get my assets stolen and then

10   fraudulent transferred into the bankruptcy estate, which

11   forced me to participate in the Celsius bankruptcy as you

12   can see now, which I clearly should not be a part of and it

13   is a miscarriage of justice.  There is nothing that

14   currently gives Celsius the legal authority to have custody

15   of my assets, let alone transfer me to the bankruptcy

16   estate.  But Celsius did so anyways.  And are now arguing

17   that my assets, since they're now part of the bankruptcy

18   estate, they should remain a part of it.  It's effectively

19   like saying to a man who is innocent, we're going to keep

20   you in prison anyway because you're already here.  That is

21   why Celsius should be in order to return my assets to me

22   like they should have when I instructed them to close my

23   account.  Alternatively, I request -- respectfully request

24   an exemption to the automatic state to be able to see

25   justice in state court.

1           Secondly, Celsius breached its fiduciary duty that

2    they're bound to by the moment it entered and I quote "the

3    vicinity of the zone of insulting" as has been found in

4    Credit Lyonnais Bank, Netherland, NV versus Pathe

5    Communications Corp.  They're currently in breach of their

6    fiduciary duties to me by paying themselves extremely large

7    and lavish salaries and bonuses to the very big detriment of

8    the rapidly dwindling assets of the estate.  Celsius has

9    also breached its fiduciary duties to me by committing acts

10   of fraud, which includes transferring my estate to the

11   bankruptcy estate -- transferring my assets to bankruptcy

12   estate, I'm sorry.  This, in fact, opens up Celsius to a

13   mass amount of liability and brings me the question, how is

14   Celsius spending about $50 million a month on expenses, most

15   of it on payroll in my best interests?

16           Thirdly, Celsius and the unaccredited -- sorry,

17   Unsecured Creditors Committee claims that allowing me to

18   exercise my constitutional right to due process would open

19   up the floodgates.  That claim is ludicrous.  I'm in an

20   extremely unique position due to Celsius clear and vagrant

21   breach of our contract.  To the best of my knowledge, I am

22   the only person who has had their contract with Celsius

23   breached and nullified by Celsius, which would mean that

24   there would be no floodgates as Celsius puts to open.

25   Celsius claims that it requires extraordinary circumstances

1    for an exemption from the automatic state to be granted.  I

2    believe that having my assets effectively stolen and being

3    fraudulent transferred to the bankruptcy estate is an

4    extraordinary circumstance.  Celsius has and is currently

5    ignoring their own terms of service and breached a contract

6    which again, is also extremely unusual and clearly

7    extraordinary.  Allowing Celsius to be shielded from

8    liability and letting them keep what they effectively stole

9    from me would be setting a dangerous precedent.  Celsius

10   should not be allowed to steal something entrusted to them,

11   declare bankruptcy, and then walk away with full immunity

12   and be able to keep what they stole.

13            Finally, Celsius committed fraud by intentionally

14   failing to disclose that they were insolvent and encouraging

15   me to deposit money into Celsius by claiming that they were

16   not insolvent, they were not taking any large risks and that

17   the deposits were safe as well as repeatedly denying that

18   there was any issues with liquidity and claiming that there

19   was no issues with solvency for months leading up to the

20   positive withdraws.  Celsius and Alexander Mashinsky

21   personally made numerous fraudulent misleading statements

22   about how Celsius was generating its yield and the risks or

23   lack thereof.  According to them, there was very little to

24   no risk involved.  On top of all this, Celsius has attempted

25   to remove evidence of their claims by attempting to, as

1    other, as somebody else mentioned by removing/deleting

2    stuff, destroying evidence off of the internet, which in my

3    opinion, is obstructing the process of the Court and

4    obstructing justice itself.  This destruction of evidence

5    amounts to obstruction of justice.

6           Similarly, one of the Debtor's lawyers, Mr.

7    Patrick Nash, in the past, in the past hearing, I believe it

8    was the second day hearing, lied to Your Honor about

9    unaccredited investors such as myself being able to access

10   earn accounts after April 2021.  Since I filed my response

11   effectively stating that that was a lie, he has taken a much

12   smaller role in the bankruptcy.  That is an example of

13   perjury committed by him and I obviously have not had a

14   communication from him since then.

15          And last but not least, Mr. Alexander Mashinsky

16   called accusations that Celsius had liquidity issues and

17   would potentially prevent withdrawals fud, which means fear

18   undoubt and distrust and fud and misinformation less than a

19   day before Celsius closed withdrawals.  As of now, they have

20   not reopened them, which is mostly permanently.  In

21   addition, there are, there is credible evidence due to a

22   study released by Arkham Labs, credible evidence that

23   Alexander Mashinsky, as well as other Celsius executives,

24   sold sell tokens, which is the token of Celsius, they

25   personally owned to Celsius, which was by using depositors

1    money even though Celsius had enough sell tokens to pay out

2    rewards and withdrawals as much they needed to.  This is

3    another blatant conflict of interest and breach of fiduciary

4    duty.  This is effectively a way for us to embezzle money by

5    transferring it away from Celsius depositors, such as

6    myself, to Alexander Mashinsky and other executives.  These

7    are just a few examples of a pattern of lies and fraudulent

8    transactions that were perpetrated by Celsius and its

9    executives and now Celsius requests that this Court shield

10   them from liability.

11            In summary, Celsius would like to keep their ill-

12   gotten gains that they stole from me and to have immunity

13   from a lawsuit.  For those reasons, their objection should

14   be denied.  In conclusion, Your Honor, there's nothing that

15   gives Celsius the legal right to continue to hold onto my

16   assets, but yet they continue to do so.  That is theft plain

17   and simple.  I should not have my assets in the bankruptcy

18   estate since I should not be a part of these proceedings at

19   all due to the breach of contract on their part.  Augmenting

20   and returning stolen assets would set a dangerous precedent

21   is completely nonsense.  Returning my assets would not set

22   any precedent at all as courts routinely release assets from

23   bankruptcy that should not have been a part of those estates

24   in the first place.  I can prove that my assets should not

25   have been a part of the bankruptcy process and I humbly

1    request that Your Honor allows me to do so in state court.

2            Alternatively, I respectfully request that Your

3    Honor order Celsius to set things back to the way that they

4    should have been if Celsius had followed the terms of our

5    contract by closing my account, therefore, releasing the

6    assets back to me, and that you also instructed them to

7    compensate me for all expenses I have incurred in pursuing

8    this matter which include court fees, transportation, et

9    cetera.  If the Court is going to deny this request of mine,

10   I ask that you allow me to pursue this matter in your court

11   room by using adversary proceedings, adversarial

12   proceedings.  I would also humbly request that Your Honor

13   waives all the court fees for me as they are prohibitively

14   expensive since I'm a freshman in college and will help

15   slightly to even things out between me and the Debtors, the

16   UCC and anyone else objecting who have a world class legal

17   teams as well as all the expenses and stuff paid for by the

18   estate.  Thank you, Your Honor, for this opportunity to

19   present my case.

20           THE COURT:  Thank you, Mr. Frishberg.  May I hear

21   from Debtor's counsel please.

22           MS. HOCKBERGER:  Good morning, Your Honor.  Heidi

23   Hockberger of Kirkland and Ellis on behalf of the Debtors.

24   So the Debtors and Kirkland Ellis were sympathetic to Mr.

25   Frishberg's hardship that he's suffering as a result of his

1    engagement with Celsius, but there are thousands of

2    similarly situated customers as Your Honor is well aware.

3    And customers shouldn't be allowed to jump the line ahead of

4    other customers and respectfully Mr. Frishberg is arguing

5    the merits of his claim, not grounds for lifting the stay.

6    And we believe that his lawsuit should again be resolved

7    along with other customer claims and all other litigation

8    claims, which would be in the best interests of all

9    creditors, if not in the best interests of Mr. Frishberg

10   himself.

11           THE COURT:  All right, thank you very much.  May I

12   hear from the Creditors Committee which also filed a

13   joinder.

14           MR. COLODNY:  Hi, Your Honor.  Aaron Colodny on

15   behalf of White and Case again.  We echo the Debtors.  We're

16   very sympathetic to the issues raised by Mr. Frishberg

17   because they are the same type of issues raised by all

18   account holders.  Mr. Frishberg may have a claim against the

19   Debtors, he may have a very large claim against the Debtors,

20   but the proper place to assert that claim is in this Court

21   as he's done.

22           THE COURT:  All right, thank you.  All right.  The

23   Court is going to take the matter under submission and issue

24   a written opinion or order.  I expect it'll be fairly

25   rapidly.  So thank you very much, Mr. Frishberg for

1    appearing and arguing today.  All right.  Let's move on with

2    the agenda, the de minimus asset sale motion, ECF 189.

3           MS. HOCKBERGER:  Yes, thank you, Your Honor.  So

4    next item on the agenda is the Debtor's de minimus asset

5    sale, procedures motion at Docket Number 189.  So following

6    Your Honor's comments at our second day hearing and lengthy

7    discussions with Ms. Cornell and her office, we believe we

8    resolved all objections.  The other revised order filed at

9    Docket Number 664.  So we heard Your Honor moments ago on

10   not knowing what constitutes a de minimus asset unless and

11   until the schedules are filed.  Respectfully, we believe

12   that these helpful comments from Ms. Cornell helped to

13   address some of these concerns.

14          So first, one of the important changes that she

15   requested was limiting the procedures to sales where the

16   sale price is at least 30 percent of the book value of the

17   asset so that there's kind of a floor where the Debtors

18   aren't able to sell assets at sort of a bargain basement

19   price.  And we also reduced the aggregate cap of de minimus

20   asset sales from 25 million to 15 million.  So that the

21   procedures indicate that assets below $300,000 sale price

22   can be sold without court approval for expediency purposes.

23   And then assets between 300,000 and -- oh I apologize I

24   misspoke. So assets below 300,000, there will be notice.

25   And between 300,000 and 4 million, there will also be notice

1    filed on the docket and parties will have an opportunity to

2    object in any in any case.

3              THE COURT:  Let me ask you.  When I look very

4    quickly at the revised order, I can't remember which dollar

5    range, I don't have it right in front of me right now, it

6    was you were going to give notice to the Committee but not

7    to the U.S. Trustee.  I want to be sure that this is

8    agreeable to the U.S. Trustee.  I mean you sort of

9    bifurcated when would the Committee be given notice about

10   it, when would the Committee and the U.S. Trustee be given

11   notice about it?

12             MS. HOCKBERGER:  Yes, Your Honor, in the most

13   recent revised order we filed, we've added the U.S.

14   Trustee's Office to that lower threshold.

15             THE COURT:  Okay.  All right.  Ms. Cornell, do you

16   want to be heard?

17             MS. CORNELL:  Thank you, Your Honor.  Shara

18   Cornell on behalf of the Office of the United States

19   Trustee.  Yes, we we've been working with counsel for the

20   Debtors and counsel for the Committee to resolve these

21   ongoing issues and we were able to come to a resolution

22   whereby we would get noticed.  The threshold was added and

23   we would have a better understanding of the Debtors

24   marketing process.  That was also added to the order so that

25   we can understand the difference between the book value and

Page 120

1    the sale value.  I think that's also important.  I'm happy

2    to answer any questions.

3              THE COURT:  No, that's fine.  I just wanted to be

4    sure you were you were on board with the latest iteration of

5    the order.  Let me hear from Committees' counsel.

6              MR. COLODNY:  Good morning.  Your Honor, Aaron

7    Colodny from White and Case on behalf of the Committee.  I

8    thing that's important, Your Honor, for any sale -- first of

9    all, the Committee will be consulted for any marketing

10   process.  Any sale under $300,000 will also be in

11   consultation with the Committee with notice to the United

12   States Trustee and then any sale over $300,000, but less

13   than $4 million, there will be a notice on the docket.  And

14   we've agreed with the Debtors to what we believe is a robust

15   amount of information they need to provide so that anybody

16   that wishes to object to those sales can and will object.

17   In the last hearing, Your Honor mentioned this isn't office

18   furniture.  It may be office furniture because they're

19   rejecting some leases, but it's also some other I would say

20   investments, equities, bonds, other things the Debtors hold.

21   We think that the consultation with respect to the marketing

22   process provides a safeguard on any action.  The notice also

23   provides a safeguard and we think that this is an efficient

24   way to avoid some of the costs that would otherwise be

25   incurred with selling these minimal assets.

1          THE COURT:  All right.  Does anybody else want to

2     be heard on the de minimus asset sale motion?  I guess it's

3     styled as the de minimus asset sale motion, anybody else

4     want to be heard?  All right.  The Court grants the motion

5     with the revised order.  I expressed earlier my concerns.

6     Until there are schedules, I don't know what the assets of

7     the Debtor are.  I think the provisions on consultation with

8     the Committee are satisfactory way of addressing that issue

9     for now.  So the motion is granted.

10          MS. HOCKBERGER:  Understood.  Thank you, Your

11     Honor.  I'd now like to pass the podium to my colleague, Ms.

12     Alison Wirtz.

13          THE COURT:  Okay.  Ms. Wirtz, I guess the wage

14     motion is next, which is ECF 19.

15          MS. WIRTZ:  Yes, that's correct, Your Honor.  Good

16     afternoon.  Alison Wirtz from Kirkland and Ellis on behalf

17     of the Debtors.  As you may recall, the Debtors initially

18     sought to pay non-insider severance on a final basis under

19     the wages motion.  The Committee and the U.S. Trustee both

20     filed formal objections to the wages motion.  And while we

21     were able to resolve a number of the issues ahead of the

22     second day hearing, we adjourned this narrow issue for

23     today.

24          Following the hearing, discussions continued and

25     we provided additional information to the Committee and the

1    U.S. Trustee including copies of the separation agreements

2    for all former employees that we seek to pay severance.  To

3    supplement the evidentiary record, the Debtors filed

4    declaration of Mr. Robert Campagna, managing director of

5    Alvarez and Marsel at Docket Number 636.  Mr. Campagna is on

6    the line with us this afternoon --

7              THE COURT:  Why don't you offer the declaration

8    into evidence?

9              MS. WIRTZ:  Yes, Your Honor.  I would like to move

10   his declaration into evidence at this time.

11             THE COURT:  ECF docket number?

12             MS. WIRTZ:  636.

13             THE COURT:  All right.  Any objections?  All

14   right.  Campagna declaration is admitted into evidence.

15             (Campagna declaration admitted into evidence)

16             THE COURT:  Go ahead, Ms. Wirtz.

17             MS. WIRTZ:  Thank you, Your Honor.  We believe

18   that we've tailored our request to claims for severance to

19   only those that arose within 180 days of the bankruptcy

20   filing and have capped such payments at $15,150 per former

21   employee which is the statutory cap under 507(a)(4).

22             So we believe these claims are all priority claims

23   and we are just seeking to pay these earlier rather than at

24   the end of the cases.  Paying these obligations is good for

25   employee morale, et cetera, as further discussed in our

1    papers.  One brief item to note, we did receive an objection

2    of Odette Wohlman.  This was filed at Docket Number 613.

3    She is a former U.K. employee.  And in response to that, we

4    clarified that we're seeking to pay her notice pay that

5    she's entitled to under UK law.  This amount is roughly 7212

6    pounds and so it is under the statutory cap.  Ahead of the

7    hearing, we filed a proposed order at Docket Number 663 that

8    covers the severance notice pay and reflects comments from

9    the Committee.  The U.S. Trustee also signed off on the

10   order.  Accordingly, we respectfully request entry of the

11   severance order.

12           THE COURT:  All right.  Ms. Wohlman, have you,

13   have you appeared today?

14           MS. ADLER:  Good morning, Your Honor.  It's Susan

15   Adler attorney for the former employee, Odette Wohlman.  I'm

16   having some issues with my video, so I'd like to appear

17   telephonically.  May I go ahead?

18           THE COURT:  Yes, go ahead.

19           MS. ADLER:  Thank you.  On behalf of Mrs. Wohlman,

20   we filed a limited objection on August 25th, 2022, ECF

21   Document 613.  Ms. Wohlman was terminated in April of 2022

22   while she was undergoing cancer treatments.  She never

23   signed a separation agreement with the Debtors but my

24   understanding is that there was some back and forth between

25   her lawyers in the U.K. as well as Celsius.  She had

Page 124

1    indicated that she was prepared to sign the separation

2    agreement immediately in order to participate in the non-

3    insider severance program, which would have called for a

4    payment of approximately 48,000 pounds, but I was advised by

5    the Debtors that they weren't prepared to provide her with

6    that even if she signed the agreement today, but they were

7    prepared to ahead with the notice pay which is 7212 pounds.

8         Now the Debtors had sought in their motion to make

9    payments to former -- originally in their motion, 19 former

10   employees in the amount of 409,000.  Those -- the employees

11   were not disclosed.  So we didn't know whether Mrs. Wohlman

12   was even included in that payment.  I was able to clarify by

13   email with Debtor's counsel that, you know, that they would

14   provide the notice pay.  Now I understand that the number of

15   former employees has dropped 10, but, you know, as I stated

16   in the objection, Mrs. Wohlman is undergoing cancer

17   treatments and in need of the severance payment and that we

18   would respectfully request that the Court require the

19   Debtors to pay her her severance amount in the proposed

20   agreement, in the proposed agreement and that she'd be able

21   to execute it.

22         THE COURT:  All right.  Does the Debtor want to

23   respond?

24         MS. WIRTZ:  Your Honor, Alison Wirtz from Kirkland

25   and Ellis on behalf of the Debtors.  Just in in response to

1    this, while we are sympathetic to Ms. Wohlman's health

2    situation, she did not sign a separation agreement prior to

3    the petition date.  So therefore, we don't believe she has a

4    valid prepetition severance claim.  However, we still, as

5    Ms. Adler noted, we are still proposing to pay the

6    statutorily required notice pay.

7              THE COURT:  All right.  Well, the motion is

8    granted that the Wohlman objection, limited objection is

9    overruled, but nothing in the Court's ruling deals with any

10   right or claim that Ms. Wohlman may have.  So really the

11   issue is, does her objection support denying the other

12   employees their severance?  And the answer for the Court is

13   no, it does not.  But nothing in my ruling resolves any

14   matter between Ms. Wohlman and the Debtor, Debtors.

15             MS. ADLER:  Thank you, Your Honor.  May I be

16   excused?

17             THE COURT:  Absolutely.

18             MS. WIRTZ:  With that, Your Honor, if I may, I

19   will turn the podium over to my colleague, Mr. Kwasteniet.

20             THE COURT:  Thank you.

21             MR. KWASTENIET:  Thank you, Your Honor, Ross

22   Kwasteniet again from Kirkland and Ellis.  I believe that

23   the only remaining items on the agenda for today are the

24   professional retentions.  The professional retentions were

25   all subject to an omnibus objection by the U.S. Trustee's

1    Office raising, I believe the same or substantially the same

2    issue with respect to each application, namely that with

3    respect to customer names and various other individual names

4    in the schedules, right, of the parties that we searched for

5    conflict purposes.  We redacted names in what we filed

6    pending Your Honor's ruling on the overall sealing motion

7    that was heard earlier today.  So with Your Honor's

8    permission, I think what makes the most sense given that the

9    sealing motion and ability to redact names has been

10   discussed at length and will be continued to the next

11   hearing, that we similarly continue the professional

12   applications and I think we will be prepared to submit them

13   either way with names redacted or nonredacted.  Again, I

14   believe that all other objections other than the sealing of

15   individual names on the schedules have been resolved.  So

16   rather than submit revised retentions today with the names

17   in case Your Honor can be persuaded about redacted names

18   next week or next hearing, we'll hold off with Your Honor's

19   permission and reset those for next week but, again, other

20   than the redaction issue which can go either way and we'll

21   comply with Your Honor's ruling, obviously, I believe the

22   retention applications have been otherwise resolved and are

23   not objected to.

24          THE COURT:  Let me ask Ms. Cornell, other than the

25   sealing issue, are the retention applications resolved?

1          MS. CORNELL:  Shara Cornell and behalf of the

2    United States Trustee.  Yes, Your Honor.  And I would just

3    like to say that we have done extensive communications with

4    all of the Debtor's professionals on these matters.  So

5    thank you.

6          THE COURT:  Ok.

7          MR. KWASTENIET:  Yes, Your Honor, we can get into

8    it next hearing, but the advisors have filed revised

9    supplemental declarations and have agreed to certain

10   modifications to the retention orders.  And we appreciate

11   Ms. Cornell and her office's, you know, hard work with us to

12   get those into shape.

13         Your Honor, in closing, one last comment if I may,

14   and I say this only because my colleague Mr. Nash is not

15   here today.  He is dropping his --

16         THE COURT:  He doesn't have to defend himself.

17         MR. KWASTENIET:  Okay, if I may for 20 seconds,

18   Your Honor.  Just for the record, he's dropping his daughter

19   off at college today for the first time.  He's not hiding

20   out from Mr. Frishberg or anybody else.  I believe that Mr.

21   Nash and Mr. Frishberg had some email correspondence.  I

22   would put that under the category of no good deed goes

23   unpunished and to Your Honor, and to the extent that Your

24   Honor is interested, I wanted to clear that up.

25         THE COURT:  Stop.  I don't want to get into it.

Page 128

1          MR. KWASTENIET:  Fair enough.

2          THE COURT:  Anything else for today?

3          MR. KWASTENIET:  Nothing else for today, Your

4    Honor.  Thank you very much.

5          THE COURT:  All right.  Thank you very much to

6    everybody and we are adjourned.

7          MR. KWASTENIET:  Thank you.

8          (Whereupon these proceedings were concluded at

9    12:47 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 129

1                      I N D E X

2

3                      RULINGS

4                                    Page      Line

5    Motion: Sealing NDAs              103        7

6    Motion: Extended time to file     103       19

7    Motion: De minimus sale           112        4

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 130

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19    Veritext Legal Solutions

20    330 Old Country Road

21    Suite 300

22    Mineola, NY 11501

23

24    Date:  September 6, 2022

25