Page 1

```
 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 22-10964-mg

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7    CELSIUS NETWORK LLC,

 8            Debtor.

 9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10    Adv. Case No. 23-01138-mg

11    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12    CELSIUS NETWORK LIMITED,

13                Plaintiff,

14          v.

15    STAKEHOUND SA,

16                Defendant.

17    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18    Adv. Case No. 23-01202-mg

19    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20    CELSIUS MINING LLC,

21                Plaintiff,

22          v.

23    MAWSON INFRASTRUCTURE GROUP INC. et al.,

24                Defendants.

25    - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

1                    United States Bankruptcy Court

2                    One Bowling Green

3                    New York, NY   10004

4

5                    December 21, 2023

6                    10:06 AM

7

8    B E F O R E :

9    HON MARTIN GLENN

10   U.S. BANKRUPTCY JUDGE

11

12   ECRO:   KAREN

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    HEARING re 22-10964-mg Celsius Network LLC Ch. 11 Hybrid

2    Hearing RE: Joint Motion of the Debtors and the Committee

3    for Entry of an Order (I) Approving the Implementation of

4    the MiningCo Transaction and (II) Granting Related Relief.

5    (Doc## 4050 to 4052, 4077, 4091, 4096 to 4101, 4115 to 4117)

6

7    HEARING re Adversary proceeding: 23-01138-mg Celsius Network

8    Limited v. StakeHound SA Hybrid Hearing re: Motion to

9    Approve Settlement Agreement with StakeHound S.A. and

10   Related Transfers Pursuant to Rule 9019 of the Federal Rules

11   of Bankruptcy Procedure and Section 363(B) of the Bankruptcy

12   Code filed by Mitchell Hurley on behalf of Celsius Network

13   Limited. (Doc. nos. 105, 106, 109 to 111)

14

15   HEARING re Adversary proceeding: 23-01202-mg Celsius Mining

16   LLC v. Mawson Infrastructure Group Inc. et al Hybrid Hearing

17   RE: Debtor's Motion for Entry of An Order (I) Authorizing

18   the Debtors to Redact and File Under Seal Certain Portions

19   of the Adversary Complaint Against Mawson Infrastructure

20   Group Inc., Luna Squares LLC, and Cosmos Infrastructure LLC

21   and (II) Granting Related Relief. (Doc## 2, 4)

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    AKIN GUMP STRAUSS HAUER & FELD LLP

4         Attorneys for Special Litigation Counsel for Celsius

5         One Bryant Park

6         New York, NY 10036

7

8    BY:  MITCHELL HURLEY

9

10   LOCKE LORD LLP

11        Attorneys for StakeHound SA

12        Brookfield Place, 200 Vesey Street, 20th Floor

13        New York, NY 10281

14

15   BY:  STEPHANIE WICKOUSKI

16

17   WHITE & CASE LLP

18        Attorneys for Official Committee Of Unsecured Creditors

19        1221 Avenue of the Americas

20        New York, NY 10020

21

22   BY:  KEITH WOFFORD

23        AARON COLODNY

24

25

1   KING & SPALDING LLP

2        Attorneys for Fireblocks Ltd.

3        1180 Peachtree Street, NE, Suite 1600

4        Atlanta, GA 30309

5

6   BY:  THADDEUS WILSON

7

8   KIRKLAND & ELLIS LLP

9        Attorneys for the Debtor

10        300 N LaSalle

11        Chicago, IL 60657

12

13   BY:  CHRIS KOENIG

14        ROSS M. KWASTENIET

15

16

17   UNITED STATES DEPARTMENT OF JUSTICE

18        Attorneys for the U.S. Trustee

19        Alexander Hamilton Custom House

20        New York, NY 10004

21

22   BY:  MARK BRUH

23

24

25

Page 6

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3         One Bowling Green

4         New York, NY 10004

5

6    BY:  SHARA CLAIRE CORNELL

7

8    MCCARTER ENGLISH, LLP

9         Attorneys for the Ad Hoc Group of Borrowers

10        245 Park Avenue

11        New York, NY 10167

12

13   BY:  LISA BONSALL

14        DAVID J. ADLER

15

16   VENABLE LLP

17        Attorneys for Ignat Tuganov

18        151 West 42nd Street

19        New York, New York 10036

20

21   BY:  JEFFREY S. SABIN

22

23

24

25

Page 7

```
 1    SECURITIES AND EXCHANGE COMMISSION

 2         100 F Street, NE

 3         Washington, DC 20549

 4

 5    BY:  THERESE SCHEUER

 6         WILLIAM UPTEGROVE

 7

 8    OFFIT KURMAN, P.A.

 9         Attorneys for Ad Hoc Group of Earn Account Holders

10         1954 Greenspring Drive, Suite 605

11         Timonium, MD 21093

12

13    BY:  JOYCE A. KUHNS

14

15    ERVIN COHEN JESSUP LLP

16         Attorneys for Creditor Simon Dixon

17         9401 Wilshire Blvd, 12th Floor

18         Beverly Hills, CA 90212

19

20    BY:  CHASE ALEKSANDER STONE

21

22    SIMON DIXON

23    JASON AMERSON

24    CATHY LAU

25    LUCAS HOLCOMB
```

Page 8

```
 1    IMMANUEL HERMAN

 2    KULPREET S. KHANUJA

 3    DANIEL FRISHBERG

 4

 5    ALSO PRESENT TELEPHONICALLY:

 6    ARTUR ABREAU

 7    YOHANNES AFEWORK

 8    EMMANUEL IVAN ALBINO

 9    ANDREW AMULIC

10    JASMINE ARMAND

11    GERT-JAN BARK

12    BRIAN BARNES

13    JASON D. BEAIRD

14    ROBERT BEAULAC

15    CHRIS BECIN

16    ANDREW BEHLMANN

17    ELIZABETH AL. BEITLER

18    JEFFREY BERNSTEIN

19    INGO BEUTLER

20    EDWARD G. BIRCH

21    JOEL BLOCK

22    DUSIN BOROFF

23    PAUL BREUDER

24    GRACE C. BRIER

25    NURALDEEN BRIFKANI
```

1   JOHAN BRONGE

2   JOHN F. CARVALHO

3   VITOR CUNHA

4   SANTOS CACERES

5   ROBERT A. CAMPAGNA

6   ANDREW CARTY

7   ROY CARVER

8   RICKIE CHANGE

9   ROBERT CHRISTIANSEN

10   PAOLO CIAMARONE

11   CHRISTINA CIANCARELLI

12   GEOFFREY CIRKEL

13   JOSHUA CLARK

14   CHRISTOPHER COCO

15   LAFAYETTE A. COOK

16   CARL J. COTE

17   CAMERON CREWS

18   OONA E. CRUSELL

19   DAVID J. DALHART

20   MARY DELGADO

21   CHRIS DESANTIS

22   THOMAS DIFIORE

23   TRISTAN DIAZ

24   SHARON M. DOW

25   SCOTT DUFFY

Page 10

1    JOHN PETER DZARAN

2    JANELL ECKHARDT

3    SIMON ELIMELECH

4    BEN EADES

5    GABRIEL EISENBERGER

6    JAMES ENGEL

7    JASON A. ENGERMAN

8    MICHAEL S. ETKIN

9    DAVID AVERY FAHEY

10   CHRIS FERRARO

11   FLORENCE FLANNIGAN

12   DEBORAH FRANKEL

13   DANIEL FRISHBERG

14   REBECCA GALLAGHER

15   JASLEIGH GEARY

16   DARIUS GHEORGHE

17   BRADLEY GIARDIELLO

18   VINCENT GOETTEN

19   RAMON GONZALES

20   MICHAEL GRAUBERT

21   CAMERON GUTHRIE

22   IMMANUEL HERMANN

23   LUCAS HOLCOMB

24   JASON IOVINE

25   ROBERTO JACOBS

1   ALI JAMSHID FAR

2   STIG JELLESTAD

3   MIKE JOHNSON

4   ELIZABETH HELEN JONES

5   GREG KACZKOWSKI

6   DAVID KAHN

7   DAN KAPLAN

8   YARA KASS-GERGI

9   RAVI KAZA

10  MARTIN KEDZIOR

11  PHILLIP KHEZRI

12  DIMITRY KIRSANOV

13  LEA KLORANE

14  RIKI KOULY

15  DEBORAH KOVSKY-APAP

16  CHRISTOPHER LACKEY

17  JOSEPH LALIA

18  MARK D. LARRABEE

19  DAN LATONA

20  JEAN-PHILIPP LATREILLE

21  CATHY LAU

22  JOSEPH LEHRFELD

23  BRIAN S. LENNON

24  MARK S. LEONARD

25  NICOLE A. LEONARD

1    PIETRO V. LICARI

2    DANIEL B. LOMAX

3    JOSE LOPEZ

4    PATRICIA LOUREIRO

5    JASON LU

6    WHITNEY LUBIN

7    JESSE LUND

8    BECKY MADSEN

9    DAVE K. MALHOTRA

10   WILLIAM C. MANDERSON

11   KEVIN M. MANUS

12   STEPHAN MARKERT

13   JEREMY MARONPOT

14   CHASE MARSH

15   CAROL MAUNDER

16   T.J. MCCARRICK

17   KEITH MCCORMACK

18   JOHN MELLEIN

19   ERIK MENDELSON

20   TOM MERCURI

21   LAYLA MILLIGAN

22   LAYLA MILLIGAN

23   JASON A. NAGI

24   NANCY NGUYEN

25   KEITH NOYES

Page 13

1    RICHARD E. OSWALD

2    SHANE C. OWENS

3    LAWRENCE CHIP PORTER

4    DONALD L. POYNTER

5    MILIN PATEL

6    JEFF PATTON

7    WILLIAN PAREIRA

8    BRETT PERRY

9    GREGORY F. PESCE

10   KHAI PHAM

11   RYAN PHAN

12   RICHARD R. PHILLIPS

13   MATTHEW PRUSAK

14   LALANA PUNDISTO

15   MARC PUNTUS

16   GABRIELLE CHRISTINE REARDON

17   RYAN REPH

18   MARK ROBINSON

19   SHAYA ROCHESTER

20   JONATHAN RODRIGUEZ

21   WAYNE P. ROTHENBERGER

22   ANDREW RUDOLPH

23   JOSEPH E. SARACHEK

24   MICHAEL M. SARKISSIAN

25   THERESE SCHEUER

```
 1   DAVID SCHNEIDER

 2   NOAH M. SCHOTTENSTEIN

 3   SAM SCHREIBER

 4   WILLIAM D. SCHROEDER

 5   DAVID SENES

 6   RAFFAELE SENESE

 7   EZRA SERRUR

 8   NIKOLAS SEVERSON

 9   MATTHEW W. SILVERMAN

10   DON SMITH

11   LUKE SPANGLER

12   KATHERINE S. STADLER

13   COURTNEY BURKS STEADMAN

14   KEITH SUCKNO

15   NIK SURI

16   PHECH GUECH TAING

17   LUCY THOMSON

18   ANHMINH TRAN

19   DAVID TURETSKY

20   ELVIN TURNER

21   VICTOR UBIERNA DE LAS HERAS

22   EZRA VAZQUEZ-D'AMICO

23   VETON VEJSELI

24   CAROLINE WARREN

25   FELICITAS WEILENMANN
```

1    MARTIN WILLIAMS

2    CHRISTOHPER WILSON

3    CORDULA WOLTERS-BOTHE

4    TAK YEUNG

5    ANDREW YOON

6    KAILA ZAHARIS

7    TANZILA ZOMO

8    DAVID BARSE

9    JARNO BERG

10   JOEL BLOCK

11   KYLE BRAY

12   HARSH JIVANI

13   ROBERT KAUFMANN

14   RAKESH PATEL

15   HEIN VAN DER WIELEN

16   DEAN CHAPMAN

17   SCOTT DAVIDSON

18   SEAN ANDREW FEENER

19   NICHOLAS LOMBARDI

20   ELIZABETH SCOTT

21   KATHERINE STADLER

22   MICHAEL STANLEY

23   SOMA BISWAS

24   GRENVILLE DAY

25   DREW DUFFY

1   SCOTT FLAHERTY

2   UDAY GORREPATI

3   BARRY R. KEINER

4   DIETRICH KNAUTH

5   MIKE LEGGE

6   AMELIA POLLARD

7   TIMOTHY REILLY

8   ANUBHAV RICHARDS

9   PETER J. SPROFERA

10  VINCE SULLIVAN

11  MAUDE TIPTON

12  ZACHARY ZABIB

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  All right, we are

4     here in Celsius, 22-10964.  Who is going to proceed for the

5     Debtor?

6              MR. HURLEY:  Good morning, Your Honor.  Mitch

7     Hurley with Akin, special litigation counsel for Celsius.

8              Your Honor, we are here this morning on Celsius'

9     motion for approval of a settlement agreement entered into

10    by Celsius with StakeHound that would resolve Celsius'

11    claims against StakeHound, which have been the subject of

12    substantial litigation activities both here in the adversary

13    proceeding and abroad, as Your Honor is aware.

14             The settlement agreement before Your Honor this

15    morning represents a major achievement in the cases.  We

16    think it's fair to describe it as a true home run for

17    Celsius and its creditors.  We submit that it should be

18    approved and implemented as soon as possible.

19             Your Honor, if the motion is granted and the

20    settlement agreement approved, within days StakeHound will

21    be required to transfer to Celsius virtually all of

22    StakeHound's assets.  That includes more than 27,000 ETH,

23    more than 90,000 DOT tokens, and more than 47.9 million

24    MATIC tokens, which together are worth more than $105

25    million at recent prices.

Page 18

1          And again, if the settlement agreement is

2    approved, all of that will be available less an amount for a

3    loan that I will discuss in a moment for distribution to

4    creditors literally in days.

5          And that's not all.  The settlement agreement also

6    provides Celsius with a substantial interest in StakeHound's

7    claims against Fireblocks that are pending in Israel.  In

8    that action, StakeHound alleges that Fireblocks is liable

9    for having lost passkeys to more than 38,000 ETH back in May

10   of 2021.  Most of that ETH originally was provided by

11   Celsius and ultimately of course by Celsius' customers.

12         This aspect of the settlement agreement provides a

13   path for Celsius' creditors to recover the enormous value

14   that was lost back in 2021 when Fireblocks lost track of

15   those passkeys and perhaps much more.

16         The settlement agreement is the product of hard-

17   fought arm's length bargaining, including a multi-day

18   mediation led by Judge Michael Wiles and enjoys the

19   enthusiastic support of the UCC, whose representatives

20   participated actively in the mediation and in the drafting

21   thereafter of a detailed terms sheet.  And following that,

22   the drafting of the detailed settlement agreement that's

23   before Your Honor today.

24         That the settlement agreement in fact represents a

25   home run for Celsius is plain I think from a few things.

Page 19

```
1              One is that not only do we have the UCC's support

2    and support from other creditor groups that I think were

3    filed yesterday evening, there isn't a single creditor who

4    has risen to object to this settlement.  And the only

5    objector, Your Honor, is Fireblocks; the party that is the

6    target of the litigation that may wind up bringing

7    substantial additional assets back into the estates for

8    distribution to creditors.

9              Another way to understand what a home run this

10   settlement is, Your Honor, is to think about where we were

11   in this case just a few months ago and where we would be

12   today and perhaps for an extended period of time in the

13   future if the settlement agreement is not approved.

14             Prior to entering into the compromise, StakeHound,

15   as Your Honor is aware, contended that the coins at issue

16   and that will be transferred to us if the settlement

17   agreement is approved, belong exclusively to StakeHound and

18   never have to be returned to Celsius.  Those coins have been

19   exclusively in the possession of StakeHound for nearly three

20   years.  And when Celsius demanded their return last Spring,

21   StakeHound refused.

22             StakeHound is a Swiss company whose employees are

23   all located in Europe.  I think it's fair to assume that

24   last Spring StakeHound believed that it and the assets at

25   issue here were out of the reach of this court and of these
```

Page 20

1    estates.

2              StakeHound at that time denied it was subject to

3    this Court's personal jurisdiction.  It refused to enter

4    into a voluntary freezing agreement so we could be sure

5    those coins wouldn't be dissipated. And rather than

6    negotiate with Celsius, StakeHound filed an arbitration in

7    Geneva against StakeHound based on arbitration clauses

8    contained in certain of the parties' agreements.  StakeHound

9    refused to withdraw the arbitration even after Celsius

10   invoked the automatic stay.  And when Celsius commenced this

11   adversary proceeding, StakeHound at first refused to accept

12   service which could have required a many months-long process

13   through the Hague Convention and potentially resulted in a

14   period of time during which, again, the assets could have

15   been dissipated.

16             So that's where things stood as recently as a few

17   months ago.  They had all the assets in their possession.

18   They claim they're their own property.  They had the ability

19   to employ a host of procedural and substantive obstacles to

20   slow and seek to prevent Celsius from preserving and

21   recovering those assets.

22             Now, ultimately through motion practice with which

23   Your Honor is all too familiar, we were able to obtain

24   alternative service on StakeHound and avoid the three-to-six

25   month Hague service process.  We were able to obtain an

Page 21

1     order from this Court determining that the StakeHound Swiss

2     arbitration violated the automatic stay and obtained in

3     effect a stay of the Swiss arbitration.  We were able to

4     obtain StakeHound's concession that in fact is subject to

5     this Court's personal jurisdiction for purposes of the

6     adversary proceeding.  And finally of course we obtained a

7     temporary restraining order, freezing all of Celsius' assets

8     on a temporary basis.

9              But those successes were costly and very time-

10    consuming.  At every turn, as was its right, StakeHound

11    resisted Celsius' efforts vigorously.  Many hundreds of

12    hours and substantial fees were required to get through the

13    procedural motions and to the TRO and to where we were

14    before the settlement was entered into.  And that litigation

15    looked like it was going to be only the beginning.

16             After granting the TRO, Your Honor set a hearing

17    date for Celsius' preliminary injunction and for

18    StakeHound's motion to compel arbitration.  The parties have

19    embarked on substantial discovery in connection with

20    preparing for that hearing.  Your Honor made clear that the

21    Court's mind was not made up concerning the outcome of the

22    parties' motions and that it could have resulted in some

23    aspects of the case proceeding an arbitration in

24    Switzerland, some proceeding here.  It could have resulted

25    in potentially another round of briefing being required on a

Page 22

1   freezing injunction in Switzerland with again other claims

2   proceeding in this jurisdiction.

3         So in short, despite Celsius' litigation successes

4   to date, including obtaining the TRO, we still faced a

5   potential multijurisdictional, cross-border litigation

6   morass.  So Celsius was relieved when, after Your Honor

7   ordered the TRO, StakeHound asked the Court to send the

8   parties to mediation.  That mediation was led skillfully by

9   Judge Wiles and included two long, in-person days with the

10  judge and weeks of negotiations that followed to try to

11  finalize first the terms sheet and then turn that terms

12  sheet into the settlement agreement before Your Honor.

13        All of this, again, was with the active

14  participation not only of Celsius and its special committee,

15  but also the creditors' representative in the form of the

16  UCC and its advisors.  And it was that hard-fought arm's

17  length process that led to the settlement agreement, the

18  terms of which I've described already and are detailed in

19  the agreement itself.  As I've already said, I think those

20  terms represent a massive win for creditors and readily

21  satisfy the standard for approving the settlement.

22        Under Rule 9019, the Court must determine whether

23  the settlement is fair and equitable, including by looking

24  to the familiar Iridium factors.  Each of those factors

25  weighs overwhelmingly in favor of granting the motion we

Page 23

1    submit.

2           First, the likelihood of complex and protracted

3    litigation.  As I just described, absent this settlement,

4    complex, protracted, and expensive cross-border litigation

5    would be virtually assured.  That can be avoided.

6           Second, the difficulties, if any, encountered in

7    the matter of collection.  This was potentially a serious

8    issue.  The assets at issue are crypto assets, which are

9    notoriously easy to move and difficult to trace once they've

10   been moved, and executing on any judgment or award would

11   have been complicated by the fact that StakeHound is located

12   abroad.

13          Under the settlement agreement in contrast,

14   StakeHound will transfer 100 percent of the assets at issue

15   directly into Celsius' wallets and will do it within days.

16          Third, the paramount interests of the creditors,

17   including the (indiscernible) creditors either do not object

18   or affirmatively support the agreement.  As I already noted,

19   the UCC has registered its enthusiastic support of the

20   settlement, which of course it helped to negotiate.  And

21   other groups have added their support as well.  Again, with

22   one exception that I will discuss in a moment, Fireblocks,

23   not a single creditor opposes the settlement.

24          Fourth, the extent to which the settlement is the

25   product of arm's length bargaining.  Again, negotiated at

Page 24

1    great length.  All the parties are represented by

2    sophisticated counsel.  Mediation was led by Bankruptcy

3    Judge Wiles.  Again, all of the Iridium factors we submit

4    clearly point in favor of granting the motion.

5            We'll talk briefly about Section 363.  We also

6    sought authorization under 363 of the Code for the transfers

7    by Celsius that are contemplated by the settlement

8    agreement.  Primarily we are talking about the Celsius

9    agreement to loan back to StakeHound around $10 million to

10   fund the Fireblocks litigation, which that loan will only

11   happen after StakeHound first transfers $105 million to

12   Celsius.

13           The 363 request from our perspective, Your Honor,

14   was belt and suspenders.  We weren't really sure whether it

15   was necessary, including because, again, the transfer is a

16   fundamental component of the settlement agreement and

17   because ownership of the property at issue has long been

18   hotly contested.  So at least from the perspective of

19   StakeHound, the coins from which the loan is going to be

20   made only become the undisputed property of Celsius if the

21   settlement agreement is approved.  So it's kind of a chicken

22   and the egg thing there.

23           THE COURT:  I don't want to really cut you off.  I

24   am intimately familiar with everything having to do with the

25   StakeHound litigation.  I've read all of the settlement

Page 25

1   papers.  If there are any last points you want to make, Mr.

2   Hurley, go ahead and do it.  But I'm on top of this one.

3           MR. HURLEY:  Okay.  Understood, Your Honor.  Can I

4   turn briefly to the Fireblocks objection?

5           THE COURT:  Please.  Go ahead.

6           MR. HURLEY:  So, again, the only objection is from

7   Fireblocks.  That's right, the only party that has objected

8   to the settlement agreement is the party that is the target

9   of the litigation being funded.

10          THE COURT:  Are you surprised?

11          MR. HURLEY:  Yes, a shocker.   It's not surprising

12  that Fireblocks will do basically anything to try to stand

13  in the way of the settlement agreement because it's a home

14  run for everybody involved in this case except arguably

15  Fireblocks.  That includes filing a meritless objection to

16  the motion to approve the settlement agreement.

17          So, first of all, Fireblocks doesn't grapple at

18  all with the 9019 and 363 standards in a serious way and

19  doesn't really contend that they aren't met.  Instead,

20  Fireblocks focuses primarily on arguments concerning notice

21  and confidentiality redactions, which are not persuasive.

22          First regarding notice.  Fireblocks argues about

23  any citation that Celsius was somehow required to file its

24  motion on the public -- sorry, on the main docket.  You

25  know, as an initial matter, Fireblocks --

Page 26

1          THE COURT:  Don't waste your time with that one.

2          MR. HURLEY:  Okay.  Understood, Your Honor.  So

3   let me turn to the redactions.  Celsius, in presenting the

4   motion, redacted only the aspects of the motion and

5   settlement agreement that could reveal confidential

6   information concerning litigation, financing, and strategy

7   related to the Israel litigation against Fireblocks.

8          Celsius in its opening papers cited ample caselaw

9   establishing that redactions of that kind are appropriate

10  and authorized under 107 and 9018.  In its objection,

11  Fireblocks just ignores all those authorities.  Makes no

12  effort to distinguish them.  That's because they can't be

13  distinguished.

14          In fact, Your Honor, this situation illustrates

15  exactly why material relating to litigation financing and

16  strategy can be redacted under the right circumstances under

17  Section 107 and 9019.

18          Fireblocks doesn't want access to this material

19  for any legitimate purpose, Your Honor.  And certainly not

20  to protect other creditors, none of whom oppose the

21  settlement agreement and who are represented ably by the

22  Committee.  Fireblocks wants that material expressly to gain

23  an advantage in the Israel litigation that involves

24  StakeHound and Celsius.  Full stop.  They want the

25  information specifically to be able to prejudice Celsius'

Page 27

```
 1    interests in that litigation.  As explained in our

 2    submission, they don't have that right and it shouldn't be

 3    permitted.

 4            Your Honor, I know you have a busy day.  There are

 5    a host of other arguments that we describe as kind of

 6    kitchen sink arguments.

 7            THE COURT:  Let me see.  I'm going to give

 8    Fireblocks the chance to argue and then I'll give you a

 9    chance to respond if necessary.

10            MR. HURLEY:  Thank you very much, Your Honor.

11    Just in closing with respect to those arguments, we just

12    want to urge the Court to reject those contentions as

13    meritless, approve the settlement agreement today if

14    possible so that nine-figure payment can move into Celsius'

15    coffers promptly and we can start focusing on the Fireblocks

16    action.  Thank you.

17            THE COURT:  Thank you, Mr. Hurley.

18            THE COURT:  Ms. Wickouski, do you want to be

19    heard?

20            MS. WICKOUSKI:  Thank you.

21            THE COURT:  You don't have to agree with

22    everything that Mr. Hurley said.

23            MS. WICKOUSKI:  Thank you, Your Honor.  Well,

24    since we are --

25            THE COURT:  Just identify yourself as StakeHound's
```

Page 28

1    counsel.

2           MS. WICKOUSKI:  Okay.  Thank you.  Your Honor, for

3    the record, Stephanie Wickouski from Locke Lord on behalf of

4    StakeHound.

5           As the counterparty to the settlement, obviously

6    it's not our motion, but we enter into the settlement

7    enthusiastically and support it if the Court approves it.

8           The only thing I can add is that this settlement,

9    which was very closely fought, very heavily negotiated, is

10   the product of an effective mediation and a mediation led by

11   another SDNY bankruptcy judge.  And I think that is a

12   testament to the power of the process.  But it also, if I

13   can say this, grants a level of imprimatur on the process,

14   because the process is important.  And I would have to

15   observe that among the mediations that I have participated

16   in, this one has stood out because we have the involvement

17   and the active engagement of all levels of senior management

18   on both sides.  There were times that we had meetings and

19   both CEOs were on the phone and engaged in direct

20   communication as well as counsel, as well as at times the

21   directors.  And so I think that it reflects everyone's best

22   efforts in indeed a product that I think we are all pleased

23   to support.

24           THE COURT:  Thank you very much, Ms. Wickouski.

25           On behalf of the Committee?

Page 29

1            MR. WOFFORD:  Your Honor, good morning.  Keith

2    Wofford of White & Case on behalf of the Official Committee.

3    The Official Committee, as you've heard, enthusiastically

4    supports the settlement and urges the Court to approve the

5    motion.  I won't regurgitate the comprehensive presentation

6    of our colleague, Mr. Hurley.  Look, it's supported by the

7    Creditors' Committee, it's supported by (indiscernible) from

8    them and other creditors.  Not surprisingly, the only

9    objector is Fireblocks, the Defendant.  But Your Honor, I

10   would like to note that to the extent that you entertain

11   that objection, that's to the detriment of everyone else.

12            The $10 million at issue here wouldn't be here but

13   for the settlement.  And so for that reason and the other

14   reasons stated by Mr. Hurley, again, the Committee urges

15   approval of the settlement agreement and approval of the

16   motion.

17            THE COURT:  Thank you very much.  Anybody else who

18   wants to speak in favor?  All right.

19            Fireblocks' counsel?

20            MR. WILSON:  Good morning, Your Honor.  Thad

21   Wilson from King & Spalding on behalf of Fireblocks LTD, a

22   creditor of certain of the debtors who has and continues to

23   license certain software to the Debtors.

24            Before I get into the main arguments for

25   Fireblocks' objection and the reasons why the Court should

Page 30

1    require the Debtors to unseal the settlement agreement, I

2    wanted to move the Court under Bankruptcy Rule 9015(c),

3    which incorporates Federal Rule of Civil Procedure 50 and is

4    applicable to contested matters like this for a directed

5    judgment as a matter of law on the Debtor's motion,

6    specifically Rule 50(a) of the Federal Rules of Civil

7    Procedure provides that judgement as a matter of law is

8    appropriate in favor of a party where the court does "not

9    have a legally-sufficient evidentiary basis to find for the

10   party on that issue."

11         The Debtors have moved under Section 363 of the

12   Bankruptcy Code to use estate assets outside of the ordinary

13   course.  As the Second Circuit held 40 years ago in In re

14   Lionel Corp., 722 F.2d 1063, "The rule we adopt requires

15   that a judge determining that a Section 363(b) application

16   expressly find from the evidence presented before him at the

17   hearing a good business reason to grant such an application.

18   Your Honor actually cited that decision recently in In re

19   Roman Catholic Diocese of Rockville Centre at 647 B.R. 69.

20   That's a 2022 decision.  And Lionel requires actual

21   evidence, not statements of counsel or prose in a motion.

22         Because of Lionel, this Court actually has

23   guidelines that the parties are supposed to meet in order to

24   obtain a sale order under Section 363(b).  In essence, this

25   is a sale and financing agreement, albeit one where the

Page 31

1    Debtors are acquiring substantially all of the assets of

2    StakeHound, as you heard this morning.

3            This is highly unusual.  Debtors don't normally

4    acquire companies while they are in bankruptcy.  Usually

5    it's the other way around.  And even in the motion, there is

6    minimal discussion of why an acquisition of StakeHound is

7    appropriate or reasonable.  There is no discussion of the

8    risks associated with such an acquisition.  There is no

9    unredacted information for creditors to analyze regarding

10   what liabilities will actually be paid and in what amounts.

11   There is no discussion of paying the salaries of StakeHound

12   employees.  In fact, the ones who signed the agreement who,

13   by the way, would have a conflict of interest, and even

14   portions of the releases are redacted so creditors have no

15   idea who is being released and for what.  These are just but

16   a few of the questions.

17           THE COURT:  Did you file your motion?  You said

18   you started out by making a motion.  Did you file a motion?

19           MR. WILSON:  No --

20           THE COURT:  There is a procedure for filing

21   motions.  You didn't file any of this.

22           MR. WILSON:  No, you can actually make an oral

23   motion under Rule 50.

24           THE COURT:  Oh, okay.  It's denied.

25           MR. WILSON:  Okay.  That's fine.  And, Your Honor,

Page 32

1    I would also say that --

2            THE COURT:  Now get to the 9019.

3            MR. WILSON:  Sure.  Understood, Your Honor.  The

4    Debtors are also purporting to use $10 million of estate

5    assets outside of the ordinary course with virtually no

6    information provided to the creditors or the Court regarding

7    the litigation, including its status and the defenses raised

8    by Fireblocks in that litigation.  That's woefully

9    insufficient even on its own from a moving perspective.

10           For example, the Court may be curious because it

11   has no idea to understand this or know this, that Fireblocks

12   has asserted a limitation of liability defense based on its

13   contractual agreements with StakeHound that would limit

14   potential recoveries to approximately $30,000.  That's not

15   disclosed to the Court, it's not disclosed to anyone.

16           In other words, assume StakeHound prevails on its

17   liability theory in the case, which for the record,

18   Fireblocks unequivocally and vigorously disputes, the

19   Debtors may spend $10 million of estate funds, but

20   StakeHound may only receive $30,000.

21           THE COURT:  And they only collected $105 million

22   in assets as part of the 9019 settlement that would provide

23   the $10 million loan to pursue the claims against

24   Fireblocks, which your client is entitled to vigorously

25   oppose.

1            MR. WILSON:  Right.  Your Honor, again --

2            THE COURT:  Could you finish your argument,

3    please?

4            MR. WILSON:  Yes.  Your Honor, there is a lot

5    here.  So while --

6            THE COURT:  Not as much as you think.

7            MR. WILSON:  Well, Your Honor, with respect to the

8    Debtors, they say in the last line of their reply, for

9    example, that while Celsius believes a large recovery

10   against Fireblocks is likely, that is not the sole means by

11   which the StakeHound funding amount can be repaid.  That's

12   their quote.  For that proposition, they cite two provisions

13   of the settlement agreement.  Those are entirely redacted.

14   Those are Section 9.  Those are entirely redacted.  No one

15   knows what those provisions provide

16           But, Your Honor, importantly, the Court should

17   unseal the heavily-redacted portions of the purported

18   settlement agreement so that creditors, including Fireblocks

19   and other parties-in-interest and the United States Trustee

20   have an opportunity to review the entirety of the agreement.

21           I use settlement agreement in quotes because, like

22   I said, this is really a sale and financing agreement that

23   happens to contain releases.  Again, some portions of which

24   are redacted.  This is way more than a standard settlement

25   of litigation in a bankruptcy case where one party pays --

Page 34

1            THE COURT:  Something I missed.  You referred to

2    this being a 363 sale that I'm being asked to approve?  Are

3    they acquiring all of the equity interests of Fireblocks?  I

4    didn't see that.

5            MR. WILSON:  They are acquiring substantially all

6    of the assets, Your Honor, if StakeHound and they are

7    assuming a number of liabilities.

8            THE COURT:  Finish your argument, please.

9            MR. WILSON:  Right, okay.  So it is in essence a

10   27-page sale and financing agreement.

11           As we set forth in detail in our objection, there

12   is no valid reason for the agreement to be redacted,

13   particularly when portions of the agreement relate to the

14   purchase of a business and starting the new business line

15   outside of the Debtor's ordinary course of agreement.  And

16   the agreement must be unsealed.

17           As the Court recognized at the outset of this

18   bankruptcy case, "There is a strong presumption and public

19   policy in favor of public access to court records."  The

20   reason for this, Your Honor, is so creditors and parties-in-

21   interest fairly have the opportunity to review the requested

22   relief and object on the merits where warranted.

23           Because of the redactions, Fireblocks and other

24   creditors simply cannot fairly or in an informed way make

25   substantive objections to the agreement.

```
1              THE COURT:  Is there some reason that Fireblocks

2    is the only one who has objected to this?

3              MR. WILSON:  Your Honor, we believe the settlement

4    agreement needs to be unredacted.  We have no idea.  There

5    are substantial portions --

6              THE COURT:  All right, enough.  I've heard enough.

7              MR. WILSON:  Okay.

8              THE COURT:  Have a seat.

9              MR. WILSON:  Okay.  Thank you, Your Honor.

10             THE COURT:  Anybody else?  Do you want to be heard

11   in reply, Mr. Hurley, briefly?

12             MR. HURLEY:  If Your Honor has any questions, I'm

13   happy to answer them.

14             THE COURT:  I don't.

15             MR. HURLEY:  Okay, thanks.

16             THE COURT:  All right.  First, Mr. Wilson's motion

17   on behalf of Fireblocks' oral motion, not part of the

18   record, is denied.  Untimely, improper, et cetera.  This is

19   a 9019 motion.  The Court, as in all such situations,

20   applies the non-exclusive factors set forth in the Second

21   Circuit's Iridium decision.  I've carefully considered each

22   of the factors to the extent applicable under the

23   circumstances.  I have lived with this litigation from the

24   start.  I am intimately familiar with all of the issues that

25   have arisen in this case.
```

Page 36

```
 1              The sealing motion is granted.  The only party

 2      that wishes to unseal it is the defendant in the proceeding

 3      that StakeHound and Celsius are pursuing to recover from.

 4      Sealing is appropriate on the terms of a litigation funding

 5      agreement such as the one essentially what -- what this

 6      provides.  Okay.

 7              The settlement provides for the transfer to CNL on

 8      or before the effective date of substantially all of the ETH

 9      in the possession of StakeHound less a specific number of

10      ETH that has properly been sealed and the additional ETH

11      which it will use to obtain releases in litigation

12      forbearance agreements from the non-insider CNL customers.

13      And I won't go through all the terms.  They are all I think

14      -- I've obviously seen the redacted terms, but I think the

15      unredacted terms are sufficient to give everyone fair notice

16      of what this settlement is and an opportunity to take a

17      position with respect to the settlement.

18              Obviously the litigation in Israel against

19      Fireblocks seeks a very substantial recovery as a result of

20      Fireblocks allegedly losing the keys that would enable

21      StakeHound and ultimately Celsius to recover an enormous sum

22      that has been lost by virtue of Fireblocks' activity.

23              In a recovery will be divided -- that is described

24      in the settlement agreement, a hundred percent of the

25      proceeds to CNL and (indiscernible) receives a hundred
```

Page 37

1    percent of the litigation funding amount plus 20 percent

2    interest due under (indiscernible) 70 percent to CNL and 30

3    percent to StakeHound.  Total recovery equals a pivot point

4    -- I won't go through it.  The terms are sufficiently set

5    forth in the unredacted papers.

6            I've considered all of the In re Iridium operating

7    non-exclusive factors and they overwhelmingly support

8    approval of the settlement.  So the redaction motion is

9    granted, the 9019 motion is granted.  The oral motion that

10   Mr. Wilson made from the podium for judgment is denied.

11   This is a 9019 motion.  Submit the order.  It will be

12   entered today.  Thank you very much.

13           MR. HURLEY:  Thank you, Your Honor.

14           CLERK:  Judge?

15           THE COURT:  Yes.

16           CLERK:  (indiscernible).

17           THE COURT:  I don't want to hear anything else.

18   I've heard everything I need to hear.

19           CLERK:  Okay, thank you.

20           MR. KELLY:  This is a message from the creator.

21   You must listen.

22           THE COURT:  Cut him off, Deanna.  Deanna,

23   disconnect him.

24           CLERK:  He is disconnected, Judge.

25           THE COURT:  Thank you.  We haven't had that happen

1    at one of the Zoom hearings yet.

2              MR. HURLEY:  I've been waiting.

3              THE COURT:  I've been waiting for it, too, BUT...

4              MR. HURLEY:  With Your Honor's permission, the

5    attorneys who are handling the StakeHound matter --

6              THE COURT:  They are all excused.

7              MR. KWASTENIET:  Good morning, Your Honor.  For

8    the record, Ross Kwasteniet from Kirkland & Ellis.  The

9    second item on our agenda today is the winddown motion.

10             We are here today, Your Honor, seeking approval to

11   implement the plan through the orderly winddown mechanism

12   contained in the plan itself.

13             Per controlling Second Circuit caselaw, we believe

14   that the relief we are seeking is pursuant to implementing

15   authority contained in the plan itself, specifically Article

16   4E, and that we are not modifying the plan.

17             We've also argued in the alternative, Your Honor,

18   that to the extent the relief we are seeking constitutes a

19   modification, that any such modification is not material and

20   adverse to creditors.  The Debtors and the Committee have

21   submitted declarations that support two things, Your Honor.

22   first, the business judgment underlying our proposed

23   winddown procedures, and second, our position that any

24   modification to the extent the Court determines that there

25   has been a modification is not material and adverse to

1    creditors.

2          So with Your Honor's permission after discussing

3    with the Committee, we think what makes sense in terms of an

4    order of presentment would be to get into the evidence and

5    then to reserve for argument after the evidentiary

6    presentation.

7          THE COURT:  I have not designated this hearing as

8    an evidentiary hearing.  I have reviewed all of the papers

9    and it seems to me that to the extent that there are

10   declarations, which I have reviewed, I view the evidence as

11   uncontested with respect to obviously what the original plan

12   that was confirmed was, what the terms were, what -- the

13   changes that are being made.  I used the term modification,

14   but not --

15         MR. KWASTENIET:  Understood.

16         THE COURT:  The pivot away from the original plan

17   to the winddown and the roles of the various players in it.

18   So I'm not going to permit cross-examination.  As a result

19   of the changes that result from the judicial conference's

20   guidelines on remote hearings, which this includes, I don't

21   believe I can go forward with an evidentiary hearing that

22   would require cross-examination of witnesses today.  I know

23   there's been correspondence that was dealt with.  Is this an

24   evidentiary -- I've never designated it as an evidentiary

25   hearing.  I asked whether the moving parties believed that

Page 40

1    an evidentiary hearing was required, and the answer was no.

2            It may well be that the U.S. Trustee thinks an

3    evidentiary hearing is required.  If you want to come up,

4    Ms. Cornell, and argue about that, now is the time to do it.

5            MR. KWASTENIET:  Your Honor, if I may just on that

6    point.

7            THE COURT:  Go ahead, Mr. Kwasteniet.

8            MR. KWASTENIET:  When we filed the motion, we did

9    indicate in the notice that we intended to present evidence

10   at the motion.  And in response to Your Honor's questions at

11   the status conference last week, I recall my response to be

12   that in the first instance as a legal matter, we don't think

13   the plan has been modified, and therefore we don't need

14   evidence.

15           THE COURT:  I know that's your position.

16           MR. KWASTENIET:  To the extent that there is a --

17   thank you, Your Honor.

18           THE COURT:  Thank you.  Ms. Cornell, do you want

19   to come up?

20           MS. CORNELL:  Good morning, Your Honor.  For the

21   record, Shara Cornell with the Office of the United States

22   Trustee.

23           In respect to Your Honor's question, the United

24   States Trustee does believe an evidentiary hearing would be

25   required --

Page 41

1             THE COURT:  When did you ask for it?

2             MS. CORNELL:  When did I ask for it?

3             THE COURT:  Yeah.  When did you ask for it?  I got

4    something last night that I haven't read fully, we're going

5    to have a chambers conference about because you appear to

6    have violated the protective order that was in place in this

7    case.  We'll take it up in chambers first and then if

8    necessary put something on the record.  But did you do a

9    filing that said the U.S. Trustee specifically requests that

10   the hearing on the winddown plan be designated as an

11   evidentiary hearing?

12            MS. CORNELL:  No, Your Honor.

13            THE COURT:  Okay.  It's not.  Go ahead.  What's

14   your argument?  Why didn't you?  If you thought that this

15   had to be an evidentiary hearing, you were required to have

16   filed something.  You didn't.  You filed something late last

17   night where you included an unredacted deposition transcript

18   that I'll hear you in chambers as to whether you violated

19   the protective order that's in place in this case.

20            Where is it that you filed something saying that

21   you requested this be an evidentiary hearing?

22            MS. CORNELL:  Your Honor, we did not file anything

23   with respect to that.

24            THE COURT:  Okay.

25            MS. CORNELL:  We were in communication with the

Page 42

1    parties that submitted the --

2            THE COURT:  I'm the one who counts.

3            MS. CORNELL:  I understand, Your Honor.  We were

4    under the impression from those parties that they would be

5    available for cross-examination at this hearing.  And I

6    apologize that we did not file something in advance of this

7    hearing with respect to Your Honor's comments.

8            THE COURT:  I am constrained by the judicial

9    conference resolution as to how this hearing is conducted.

10   If it was going to be an evidentiary hearing, the local

11   rules say that the first hearing on a matter is not an

12   evidentiary hearing unless it's specifically required to be.

13           At the last hearing in this case, the Debtor

14   indicated they didn't believe it needed to be an evidentiary

15   hearing.  I went forward on that basis.  And if you believed

16   it had to be an evidentiary hearing, you were required to

17   request it.  Not standing at the podium at 10:40 a.m. when

18   this hearing is being held.

19           MS. CORNELL:  I understand, Your Honor.  However,

20   it is the Debtor's burden in this case.  And they believed

21   that they had presented enough evidence or that they did not

22   believe that further evidence to be required.  We were -- I

23   think we were following their lead, Your Honor.

24           THE COURT:  Now is the time for us to take a brief

25   recess.  I want the Debtor's counsel, one or two people from

Page 43

1    the Debtors, one or two people from the Committee.  Do you

2    have any of your colleagues here?

3              MS. CORNELL:  Mr. Masumoto is here with me today.

4              THE COURT:  All right.  Then I want to see the two

5    of you in chambers as well.  We're going to deal with

6    whether you have violated the protective order in this case.

7              Just so the record is clear, a little while ago I

8    instructed that ECF 4149 be removed from public access.

9              MS. CORNELL:  Your Honor, I have confirmation that

10   it has been removed from public access.

11             THE COURT:  Yeah.  I directed that be done a

12   little while ago.

13             MS. CORNELL:  Our office --

14             THE COURT:  Let's go.  In chambers.

15             MS. CORNELL:  Okay, Your Honor.

16             THE COURT:  In chambers.  We are in recess

17   briefly.

18             (Recess)

19             CLERK:  All rise.

20             THE COURT:  Please be seated.  Just bear with me a

21   second.

22             All right, let's proceed.

23             MR. KOENIG:  Thank you, Your Honor.  For the

24   record, Chris Koenig, Kirkland & Ellis, for Celsius.  We are

25   going to proceed with legal argument on the motion.  And

Page 44

1   what I want to focus Your Honor on is the theme of the

2   argument is plan implementation or plan modification.  And

3   we submit that this is plan implementation, not plan

4   modification.  As my partner, Mr. Kwasteniet explained of

5   course, we'll make an argument in the alternative in case

6   Your Honor does not agree that this is merely plan

7   implementation.

8              But as discussed at length in our reply brief we

9   filed two nights ago, under the caselaw in the Second

10  Circuit, Johns Manville, the key fact for whether a plan has

11  been modified is whether the plan contemplates the type of

12  change that is being proposed.

13             In Johns Manville, the plan contemplated certain

14  types of changes and the Court commented that even a

15  seemingly significant change at first blush may not be a

16  modification within the meaning of Section 1127.  The Second

17  Circuit called that a variation instead of a modification.

18             Instead, there the district court found and the

19  Second Circuit agreed that "It is clear that when the plan

20  was adopted, the parties were embarking into unknown

21  territory and the operation of the Manville claims facility

22  might require adjustments and changes as additional

23  knowledge and experience were gained.  I could not

24  articulate anything more apt for our present scenario, and

25  that's exactly what our plan provided for as well.

Page 45

1           Our plan contemplated this process for the orderly

2    winddown, that we would file a winddown motion that set

3    forth the specific details of the winddown transaction with

4    no re-solicitation required.  Specifically, our plan

5    included the potential toggle to the orderly winddown in

6    Article 4, Section E of the plan.  And that section provides

7    a roadmap for what an orderly winddown would look like, but

8    it does not provide the details of that transaction.

9           MR. KWASTENIET:  Your Honor, if I may.  There is

10   inappropriate material being flashed on the screen.

11   Somebody was in the bathroom a minute ago.  There's now

12   inappropriate text commentary.  I don't know if there is an

13   ability to limit that.  But...

14           THE COURT:  All right.  Can we shut the screens

15   off?  Thank you.

16           MR. KOENIG:  Thank you, Your Honor.

17           That section, Article 4, Section E, provides a

18   roadmap for an orderly winddown transaction, but does not

19   provide the details of that transaction.  Instead, this

20   section is a one-and-a-half page summary of the type of

21   transaction that an orderly winddown would be, including

22   that there would be a mining-only newco business and it

23   describes the four main types of distributions to creditors

24   under an orderly winddown, including distribution of liquid

25   cryptocurrency, equity in that new mining company,

Page 46

1    litigation proceeds, and proceeds of Celsius' illiquid

2    assets.

3            But what the plan expressly contemplated was that

4    the key details would be filled in through a winddown motion

5    that would be filed and served on creditors on at least ten

6    days' notice.  The plan provides a toggle into an orderly

7    winddown requires us filing this motion and giving creditors

8    time to object.  It does not require any sort of re-

9    solicitation requirement.  And that's the plan that was

10   confirmed in this case.

11           And the plan provides that the key details of this

12   orderly winddown transaction were expressly left open to be

13   set forth in this winddown motion.  The key details included

14   the identity of the mining manager would operate the

15   business.  The terms of that mining manager's compensation,

16   the identity of the plan administrator, and the budget and

17   distributions for the winddown.

18           It's very notable that this section, Section 4E,

19   is in the means for implementation section of the plan.

20   That's exactly what we're doing here in this winddown

21   motion.  We are implementing the plan, we are not seeking to

22   modify or amend the plan.

23           So the most significant complaint that we've read

24   in the objections by the U.S. Trustee and the Ad Hoc Loan

25   Group is that the mining company would be capitalized with

Page 47

1    $225 million instead of the illustrative $50 million that

2    was set forth in the disclosure statement.  But this is

3    simply an implementation detail, the capitalization of the

4    mining company, that was expressly left open in the plan for

5    the winddown motion.

6           As I have described, the section 4E provides an

7    overview for what an orderly winddown will look like, but

8    leaves the details to our motion.  And that's exactly what

9    we've done here.

10          THE COURT:  $50 million versus $225 million is a

11   lot of money by most people's account.

12          MR. KOENIG:  I certainly agree, Your Honor.

13          THE COURT:  So where specifically in the plan do

14   you believe this has been left open?

15          MR. KOENIG:  Yes.  So I would point you to two

16   places.  First, the definition of the winddown budget

17   describes that the winddown motion will include

18   distributions and other costs of the winddown.  That must

19   include the capitalization of the new company.  How could it

20   not?  Distributions must include whatever would be

21   distributed from the estate to the new company.  That's in

22   that definition.  And in Section 4E, it says that the

23   winddown motion will include the winddown budget.  So the

24   winddown budget incorporates the capitalization amount I

25   would argue and the winddown motion expressly leaves open

Page 48

1    the fact that the winddown budget is going to be one of

2    those details.

3         To be clear, there is nothing in the plan that

4    provides that the mining co will be capitalized with $50

5    million.  It says the plaintiff provides that $450 million

6    will be used to seed NewCo, but the plaintiff is actually

7    silent on the capitalization amount for the mining co.

8    There is nothing to modify.  It's implementing.  There's

9    nothing to modify.

10        If Mr. Adler and Ms. Cornell are correct that

11   there is -- this is a modification, where is the

12   modification?  It's not as though it was set forth in the

13   plan and they're saying I'm redlining it out with 50 and

14   putting in 225.

15        So our argument is that this is implementation.  I

16   think the standard would be business judgement, because we

17   can't do whatever we want.  We have to demonstrate a good

18   reason.  We submitted declarations.  I understand this is an

19   evidentiary hearing.  But those declarations were

20   uncontested.  People have the opportunity to depose our

21   witnesses.  They did not even seek to do so.  And if you

22   read the objections, they don't really object that this is a

23   bad idea or a breach of business judgement; they just say

24   this should have been disclosed.

25        THE COURT:  Well, the question is -- it's

1    different.

2              MR. KOENIG:  Right.  It's different.  But not that

3    it's wrong or --

4              THE COURT:  It would require a new disclosure

5    statement and re-solicitation.

6              MR. KOENIG:  Right.  And we would argue this is

7    exactly what the plan contemplated.

8              THE COURT:  So how does the toggle affect the

9    projected distributions?

10             MR. KOENIG:  How does the toggle affect the

11   projected distributions?  So that's sort of more in the

12   modification part of the camp, but I will turn my argument

13   there.

14             So Mr. Campagna's declaration that we filed with

15   the motion explains, and he has charts in his declaration

16   that compare the projected recoveries under the orderly

17   winddown in the disclosure statement to the projected

18   recoveries today.  And he even helpfully breaks out what

19   part of that includes cryptocurrency prices and what part of

20   it sort of holds it constant.  And even if you hold the

21   prices of liquid cryptocurrency constant, the MiningCo

22   transaction results in a 67 percent total recovery for

23   creditors when compared to 61.2 percent under the baseline

24   and orderly winddown that was -- what was in the disclosure

25   statement.

1            THE COURT:  If you use the current prices, it goes

2    up to (indiscernible).

3            MR. KOENIG:  That's exactly right.  I'm trying to

4    do apples to apples so that we're not benefiting from a rise

5    up in prices.

6            THE COURT:  You gave it both ways.

7            MR. KOENIG:  Correct, using today's prices --

8            THE COURT:  You have it using May 31, '23 prices

9    and we have it November 17th, 2023.

10           MR. KOENIG:  Correct.  We did an apples-to-apples

11   as of May 31 and then we did it oranges-to-oranges as of

12   November of this year along with the motion.

13           So again, to be clear, obviously we --

14           THE COURT:  So for both -- when I say for both,

15   for both dates, the information provided shows a greater

16   recovery under the mining transaction than under what was

17   originally described as the orderly winddown.  So there's no

18   negative effect is believed to result from the changes that

19   have taken place.

20           MR. KOENIG:  In fact, we believe that the

21   recoveries are significantly higher.  Again, setting aside

22   the cryptocurrency prices, we have made significant strides

23   in reducing fees that are paid to the mining manager and

24   preserving an awful lot of value through having U.S. bitcoin

25   in the suite of agreements that they entered into pursuant

1    to the plan supplement documents, including $100 million of

2    coupons to buy new rigs from a leading manufacturer, cost

3    caps on what U.S. bitcoin is going do to build out the

4    Debtor's facilities, which we believe is really instrumental

5    for this new mining company.  And Your Honor has seen

6    through these cases the risk of having a mining company have

7    contractual obligations with third parties.  Sometimes those

8    third parties fall down. And in this industry, they fall

9    down an awful lot.  Core Scientific, Mawson, and others.

10            We believe that the Cedarvale site and building

11   out our own infrastructure is going to be massively

12   beneficial to creditors because we control our own -- we're

13   going to be vertically integrated and we control our own

14   means for production.  We are not as reliant on third

15   parties.

16            But bringing back to the point of even if this is

17   a modification, it's certainly not material and adverse to

18   creditors because the uncontroverted evidence suggests that

19   the recoveries for creditors are significantly greater under

20   our proposal.

21            Additionally, it's notable that Mr. Adler

22   complains about 225.  His clients voted for a NewCo that had

23   up to $450 million of capitalization.  Look, I understand

24   that obviously that is a different transaction, but that

25   NewCo would have been seeded with $450 million to do

Page 52

1    whatever they wanted.  And mining was the most important

2    part of that business.  So there should be no surprise.

3    There should be no -- frankly, I think it's feigned

4    surprise, Your Honor.  Because this is exactly what was --

5    this is what was voted for.  There's no change in the plan.

6    But even if there is a modification in the plan, our

7    evidence shows -- and nobody has seriously contended that

8    the recoveries are worse.  People are trying to get some

9    holdup value here.  We all sort of see it, at least the

10   Debtors see it for what it is.  And we would like to -- we

11   believe it's reasonable and appropriate to approve the

12   motion and get --

13          THE COURT:  I don't think it's fair to say that

14   the U.S. Trustee's objection is for holdout value.

15          MR. KOENIG:  No, no, I apologize.  I was referring

16   to Mr. Adler.  The U.S. Trustee obviously doesn't have -- I

17   apologize for interrupting, Your Honor.

18          But the only other thing I would say here is my

19   partner, Mr. Nash last year and during your trial made an

20   actuarial argument about how few folks were objecting.  And

21   I think it's notable here that we only have -- I think it's

22   three, one from the U.S. Trustee, one from the Ad Hoc Group,

23   and one from Ms. Lau.  And we had dozens of objections to

24   confirmation.  And I think there was an affidavit of service

25   that was filed.  We filed this motion on everybody that

Page 53

1   received notice of the confirmation.  I think it's 11,000 --

2   it's the longest affidavit of service I've ever seen.  And

3   so I would respectfully submit that the lack of objections,

4   and in fact there are a number of creditors that filed

5   statements in support.

6          Your Honor asked at the hearing on November 30th

7   that you wanted to hear from creditors about what they

8   wanted to do and what they believed and all of those sorts

9   of things.  And I think that the creditors that have filed

10  things have spoken with a resounding voice, and the

11  creditors that have not filed anything, the silence is also

12  remarkable.

13         So unless Your Honor has any questions for me at

14  the moment, I will cede the lectern.  I'm happy to jump back

15  up after we hear the objections.  Thank you.

16         MS. BONSALL:  Lisa Bonsall from McCarter &

17  English.

18         THE COURT:  Okay.

19         MS. BONSALL:  I have pro hac pending, Your Honor.

20  You haven't entered it yet.

21         THE COURT:  Go ahead.

22         MS. BONSALL:  Thank you.  First of all, just to

23  address the last comment that was made by counsel with

24  respect to objections.  There was an objection.  We filed a

25  declaration of Mr. Billinger, who is an Earn and a borrower,

1    and he objects.  And I also understand that many parties

2    were bound by a plan support of agreement and couldn't

3    object, or at least felt they couldn't.

4              THE COURT:  Really?

5              MS. BONSALL:  That's what I understand, Your

6    Honor.

7              THE COURT:  Where do you understand that from?  It

8    has -- you know, once an email has come across --

9              MS. BONSALL:  That's my -- that's what I

10    understand from --

11              THE COURT:  -- that aren't supposed to come to me

12    come to me with various pro se creditors who object to

13    everything that's ever happened in this case or any other

14    case.

15              MS. BONSALL:  It's a possibility, Your Honor.

16              THE COURT:  So it isn't slowed anybody down.  Show

17    me something in the plan support agreement that prevented

18    people from objecting to the change in the winddown plan

19    that's occurred.  Can you point to some specific language?

20              MS. BONSALL:  I cannot, Your Honor.  But I will

21    say that --

22              THE COURT:  Then don't argue that they couldn't.

23              MS. BONSALL:  Then I apologize, Your Honor.  The

24    seventh-largest creditor in the estate objected.

25              THE COURT:  Okay.

1          MS. BONSALL:  And he's an Earn creditor as well as

2     a borrower.

3          THE COURT:  Go ahead.

4          MS. BONSALL:  All right.  So the motion that was

5     filed as an implementation of the plan we believe actually

6     is contrary to the plan and in several material ways

7     violates provisions of the plan.  So the plan says at -- and

8     this is cited really by the Debtors and the Committee -- at

9     Section 4(E)(1) that the orderly winddown toggle says that

10    management compensation and its component concepts are

11    eliminated along with the plan sponsor contribution.  And

12    the Debtors include a chart in their supplemental filing at

13    Page 19.  That doesn't actually show the entire chart that

14    was in the plan and the provision that -- one of the

15    provisions that it doesn't note is the provision that says

16    that management compensation is eliminated along with the

17    plan sponsor contribution.

18         The motion proposes a U.S. bitcoin management

19    agreement with a $20 million management fee and a $20

20    million termination fee.  Those seem to be the exact types

21    of management compensation that was supposed to be

22    eliminated under the toggle provisions of the plan.

23         And by the way, Section 4(E)(1), Your Honor, is

24    the portion of the plan that deals with the toggle to a

25    winddown.

Page 56

1              THE COURT:  I don't have it open in front of me.

2      Can you read me that language in 4(E)(1)?

3              MS. BONSALL:  Pardon?

4              THE COURT:  Could you read me the language in

5      4(E)(1)?

6              MS. BONSALL:  That I was just citing?

7              THE COURT:  Yes.

8              MS. BONSALL:  It's from the chart. And again, that

9      chart is reproduced in part in the Debtor's motion or the

10     Debtor's supplement.

11              So it's the chart showing the orderly winddown

12     plan changes on the left.  It says the concept that is in

13     the NewCo plan, plan sponsor contribution.  On the right, it

14     says change, quote, concept eliminated, related concepts

15     such as "management compensation" and its component concepts

16     will similarly be eliminated.

17              THE COURT:  What page are you --

18              MS. BONSALL:  Forty-seven, Your Honor.

19              THE COURT:  Okay.

20              MS. BONSALL:  All right.  So I read that as saying

21     that the management compensation structure that was in the

22     NewCo proposal or the NewCo plan provisions is eliminated

23     when there is a toggle to the orderly winddown.  And I think

24     that the management agreement that the Debtors have not

25     finalized but included yesterday in their submission and

1    which is described in the terms sheet attached to their

2    motion with respect to its terms, first with respect to it,

3    but also its terms, I think is the type of management

4    compensation that the plan provides will be eliminated with

5    the toggle.  That same section of the plan, 4(E)(1),

6    eliminates new common stock and replaces it with backup

7    mining company common stock.  And that's defined in the

8    definitions section of backup mining company, defined as the

9    public-traded mining business that will own mining assets in

10   which creditors will receive 100 percent equity interest in

11   the mining co.

12          The proposals that the Debtor is making, they have

13   numerous provisions that we distribute right off the bat,

14   and in the future the equity in the new mining co.  And I

15   think that's a violation of the description of Mining Co. in

16   the definitions.

17          THE COURT:  What's a violation of the description?

18          MS. BONSALL:  So the proposed agreement attached

19   to the supplement filed yesterday --

20          THE COURT:  The bitcoin.

21          MS. BONSALL:  Yes.  And described in the terms

22   sheet provide for various forms of equity to be transferred

23   to U.S. bitcoin.  So one is the $20 million termination fee

24   which is convertible to equity.  And there's nothing

25   anywhere in the toggle provisions of the plan nor the

Page 58

1    disclosure statement that would put anyone on notice of

2    that.

3            The terms sheet also provides for a restricted

4    stock purchase agreement which would allow U.S. bitcoin to

5    purchase the equity that Fahrenheit would have been able to

6    purchase.  That seems to me to be a straight-out violation

7    of the orderly winddown provisions in connection with

8    Section --

9            THE COURT:  Tell me specifically which orderly

10   winddown provisions you think were violated.

11           MS. BONSALL:  Yes.  So NewCo is described as being

12   eliminated, replaced in certain places with post-effective

13   date debtors and plan administrator as further described

14   herein and as applicable.  Related concepts such as NewCo

15   capitalization amount will similarly be eliminated.

16           That, plus what I read before with respect to the

17   plan contribution agreement, it's pretty clear, at least to

18   me, that that provision is saying that the terms of the

19   NewCo transaction are no longer going to be effective and

20   there's going to be a winddown that is described in the

21   definitions in the plan as being a winddown, Your Honor, and

22   not something that could incorporate the various benefits

23   and equity rights that were in the Fahrenheit transaction.

24   You don't agree with me I can tell, Your Honor.

25           THE COURT:  No, I'm listening carefully.

1          MS. BONSALL:  Okay.  So the restricted stock

2     purchase agreement, which I think is a flat violation of the

3     requirement that the backup mining company be 100 percent

4     owned by creditors is not even attached to anything so far.

5     It is one of the agreements that the Debtor is asking the

6     Court to approve without anybody ever seeing and one of

7     several provisions that the Debtors are looking for approval

8     from Your Honor subject to further documentation that is by

9     their own terms supposed to take precedence over whatever is

10    before Your Honor now.

11          So the $20 million termination fee, the restricted

12    stock purchase agreement, the requirement that U.S. bitcoin

13    buy $12,750,000 worth of MiningCo stock right up front and

14    the incentive units that they propose to give to MiningCo

15    and the warrants that they propose to give to MiningCo all

16    violate the definition of Backup Mining Company that is set

17    forth in the definitions section of the plan.

18          So Your Honor wanted specific provisions, and so I

19    kind of got in the weeds.  I guess I --

20          THE COURT:  I'm not ruling from the bench.  I've

21    got to go back and I've got to look through --

22          MS. BONSALL:  Right.  But I guess, Your Honor --

23    we say this in our papers and I know Your Honor has

24    obviously read and familiar with everything.  But I do think

25    it's appropriate, at least right now -- I have more to say

Page 60

1    on the specific provisions, but I do think it's appropriate

2    to step back and say that this plan seems to be primarily

3    designed as a NewCo plan and it does provide obviously the

4    toggle to the orderly winddown.

5         We don't disagree with that, Your Honor.  What we

6    disagree with is the idea of implementing an entirely new

7    plan through things that were, according to the Committee

8    and the Debtor, left within the discretion of the Debtor.

9    These are material things.  Now, the plan itself does not

10   devote much attention to the orderly winddown.  That is

11   true.  But that makes the very few things that it says very

12   important.  And, frankly, it makes the disclosure statement

13   even more important.

14        And it really can't be that you have a toggle

15   provision in a plan that's called an orderly winddown that

16   sets out exactly what is supposed to happen in broad terms

17   and a bunch of definitions which say that the plan

18   administrator and the post-confirmation or post-effective

19   date debtors are going to run the company and wind it down

20   and then come forward and say but wait --

21        THE COURT:  Well, there always was going to be a

22   public company.

23        MS. BONSALL:  There was always going to be a

24   public company.  Right?  There was.

25        THE COURT:  When you say -- it's not like it's

Page 61

1    going to be liquidated and money is going to go out the door

2    in the next six months.

3              MS. BONSALL:  This makes it look like there's a

4    public company in order to maximize the benefits of an

5    orderly winddown liquidation.

6              And, Your Honor, there is no disclosure in this --

7    so my point was twofold.

8              THE COURT:  It was not -- would you agree it was

9    not a liquidation -- the winddown was not a liquidation

10   plan.  It contemplated a going business, the MiningCo was

11   going to be a going business, the equity of which was going

12   to be distributed to creditors.

13             So it's not -- you know, what I -- I must say

14             MS. BONSALL:  Your Honor, there are no --

15             THE COURT:  Stop.

16             MS. BONSALL:  Sorry.  I apologize.

17             THE COURT:  But I certainly before this case would

18   have thought a winddown would be a liquidation.  That's not

19   what this was.  It never was.  Do you agree with that?

20             MS. BONSALL:  I...

21             THE COURT:  Yes?  You don't?  Tell me.  If you

22   don't, tell me.

23             MS. BONSALL:  I don't.

24             THE COURT:  Okay.  Why not?

25             MS. BONSALL:  I think it was -- look, I'm an

Page 62

```
1    outsider.  I'm an outsider.  I came to this case a few weeks

2    ago.  I started with the disclosure statement.  I went to

3    the plan.  I don't agree with that because it's framed as an

4    orderly winddown through a public company.  So...

5              THE COURT:  The public company wasn't going to go

6    out of business in six months, it was going -- it was always

7    contemplated to be an active bitcoin mining company.  It

8    foundered with the SEC because of the inclusion of the

9    staking business for which there were no audited financial

10   statement.  The MiningCo had financial statements.  Yes or

11   no?  You're shaking your head no to everything I'm saying.

12             MS. BONSALL:  I'm sorry.  It is not clear from an

13   outsider's perspective reading this that this was

14   authorizing in any way a restructuring of a mining company

15   business for investment purposes.

16             THE COURT:  I could swear that during my lengthy

17   confirmation hearing, I heard multiple times that that's

18   exactly what was happening.  Have you gone back and read the

19   transcript from the whole confirmation hearing?

20             MS. BONSALL:  Yes.  I --

21             THE COURT:  And you didn't find anywhere in there

22   where there was a discussion that -- why would you establish

23   a -- why would you register with the SEC a mining company

24   that's going to go out of business?  You know it wasn't

25   going to go out of business in six months or a year.
```

1    Correct?  All you do is shake your head.  Yes or no?

2              MS. BONSALL:  I'm -- I read it differently, Your

3    Honor.

4              THE COURT:  No.  Answer my question.

5              MS. BONSALL:  Say it again?

6              THE COURT:  Then listen to my question.

7              MS. BONSALL:  I'm sorry.  I'm sorry.  Go ahead.

8              THE COURT:  Okay.  You shake your head no to

9    everything.

10             MS. BONSALL:  Because I have a different

11   understanding from reading this.

12             THE COURT:  Then answer my questions.  MiningCo

13   was going to be a publicly-traded company in the business of

14   mining bitcoin.  Originally it was contemplated also to have

15   this staking business, and it couldn't do that.  But the

16   concept was always to have a going-concern mining business

17   with its equity distributed to creditors.  Yes or no?

18             MS. BONSALL:  Yes.

19             THE COURT:  You could have said that a long time

20   ago.

21             MS. BONSALL:  I could have, except I don't view it

22   as a mining co for investment purposes.  There is no

23   disclosure in the disclosure statement --

24             THE COURT:  And the shares would be publicly

25   traded so that if creditors who receive the shares decided

Page 64

1    they didn't want to be in for the long haul with MiningCo,

2    they could sell the stock.

3            MS. BONSALL:  Yes.  That I -- we agree, Your

4    Honor.

5            THE COURT:  And MiningCo would continue on.  It

6    was not -- in the sense that I always thought of a winddown

7    is, you know, it's going to take six months or a year --

8            MS. BONSALL:  Five years.  It says five years.

9            THE COURT:  To dispose of all the illiquid crypto.

10   Not to deal -- not to go out of business as a mining

11   company.

12           MS. BONSALL:  Your Honor, I keep shaking my head

13   because I think --

14           THE COURT:  Show me where it said -- show me where

15   in the disclosure statement or the plan it is suggested that

16   MiningCo was going out of business.

17           MS. BONSALL:  Well, here's what it actually says

18   in the disclosure statement.

19           If the plan is effectuated through the orderly

20   winddown, the Debtors would be wound down in an orderly

21   process.

22           THE COURT:  They would.  But MiningCo was

23   separate.

24           MS. BONSALL:  The orderly winddown, however, does

25   not provide for the same opportunity to enjoy the upside in

Page 65

1    the equity of NewCo and its development of regulatory-

2    compliant operating business.

3              THE COURT:  So let's take it one step at a time.

4    Do you agree that it originally contemplated MiningCo was

5    going to have the staking business as well, correct?

6              MS. BONSALL:  NewCo was going to have the staking

7    business.

8              THE COURT:  Yes.  NewCo was going to have the

9    staking business, correct?

10             MS. BONSALL:  Yes.

11             THE COURT:  And the reason that couldn't happen is

12   because the SEC wouldn't preclear registration because it

13   didn't have -- the staking business didn't have audited

14   financial statements, yes or no?

15             MS. BONSALL:  Yes.

16             THE COURT:  The mining portion of the business, it

17   had audited financial statements, correct?

18             MS. BONSALL:  As I understand it.

19             THE COURT:  And it still -- the SEC still hasn't

20   approved.  I understand that.  Those risks are still

21   disclosed.

22             MS. BONSALL:  And a $20 million penalty if they

23   don't, which was never disclosed.  And in fact, the Debtors

24   and the Committee resisted --

25             THE COURT:  Was MiningCo going out of business in

Page 66

1     six months or a year or was it going to -- assuming that

2     it's able to register as a public company, is there

3     something that says, by the way, you'll own stock in a

4     company that's going out of business in six months, nine

5     months, a year?  Is there?  Yes or no?

6              MS. BONSALL:  No.

7              THE COURT:  Okay.  Go ahead.

8              MS. BONSALL:  And there's nothing that says that

9     we reserve the right to take the crypto that would be

10    available for distribution and invest it in a new company.

11    The argument --

12             THE COURT:  The $500 million of crypto that was

13    going to get seeded into NewCo is going back in distribution

14    to the creditors.

15             MS. BONSALL:  This is not --

16             THE COURT:  Yes or no?

17             MS. BONSALL:  This is not --

18             THE COURT:  Yes or no?

19             MS. BONSALL:  No.

20             THE COURT:  Why not?  Show me where that --

21             MS. BONSALL:  Your Honor, if I could just finish.

22             THE COURT:  No, you can answer my questions and

23    then I will let you argue.

24             MS. BONSALL:  Okay.

25             THE COURT:  You know, if you don't answer my

Page 67

1      questions, you're going to sit down very soon.

2              MS. BONSALL:  I'm sure Mr. Adler would be better.

3      Go ahead.  Your Honor, the comparison to NewCo does not

4      appear to me to be appropriate because the issue is whether

5      this is an orderly winddown, not whether this is a revised

6      NewCo.  It is actually presented as a revised NewCo

7      transaction.  And that is not what the creditors voted on.

8      The creditors voted on a NewCo transaction under certain

9      circumstances and there was to be a toggle to an orderly

10     winddown with an ongoing, hopefully public mining company

11     business in the event that they could not get clearance for

12     NewCo.

13             THE COURT:  And the mining business, was there

14     anywhere it said it will exist only for one year, four

15     years, five years?

16             MS. BONSALL:  No.

17             THE COURT:  It was contemplated to be a publicly-

18     traded company with an ongoing business, correct?

19             MS. BONSALL:  Yes.

20             THE COURT:  Go ahead.

21             MS. BONSALL:  It was not contemplated that there

22     would be investment in the MiningCo business.  At least that

23     is not disclosed.

24             THE COURT:  Really?

25             MS. BONSALL:  Where does it say that?

1                 THE COURT:  What were they seeding NewCo with --

2                 MS. BONSALL:  $50 million.  And now we're coming

3       to -- aside from the disclosures in the -- or let me back

4       up, Your Honor.

5                 So what I was saying before is that the

6       disclosures with respect to the orderly winddown were

7       relatively thin in the disclosure statement and that the

8       provisions of the plan that deal with the orderly winddown

9       are much shorter than with respect to the NewCo transaction.

10      And that makes whatever they say more important.  The

11      orderly winddown process is described briefly as a backup

12      MiningCo business in the definitions which requires 100

13      percent to be owned by creditors. And in the toggle

14      provision shows in brief terms what is going to happen.  And

15      it eliminates the Fahrenheit transaction and much of the

16      baggage that went with it, including management

17      compensation.

18                The fact that there was $50 million in

19      capitalization suggests that it was not intended to be a

20      major investment in a future company with crypto diverted

21      from distribution to creditors in order to finance it.

22                THE COURT:  Under Newco, how much in crypto was to

23      be transferred to NewCo under the plan?

24                MS. BONSALL:  There was as I recall $450 million

25      of crypto, but there were distributions and options under

Page 69

1    that scenario that --

2              THE COURT:  Is more going to be distributed to

3    creditors or less as a result of the toggle and the...

4              MS. BONSALL:  Less.  I mean, well, if you look at

5    the chart that is in the Debtor's supplement, the crypto

6    available for distribution before you start investing it and

7    diverting it to MiningCo is higher in the original orderly

8    winddown.  And, Your Honor, you as well are comparing the

9    restructuring that they are proposing to the Fahrenheit

10   transaction.  That's not what the toggle was. The toggle was

11   to an orderly winddown transaction.  So if the Debtors are

12   going to promote this -- which I think is a new plan -- if

13   they're going to promote this as part of the orderly

14   winddown transaction, if they're going to call this an

15   implementation, it should be compared to the orderly

16   winddown provisions of the Code and the disclosure statement

17   with respect to orderly winddown, not with respect to

18   Fahrenheit.

19              And the one thing that is clear is that in a

20   toggle, the Fahrenheit transaction is eliminated.  The

21   management compensation related to it is eliminated.  Right?

22   The stock is eliminated.

23              The only -- the other thing that is very clear in

24   a toggle situation is that the creditors are supposed to own

25   a hundred percent of the backup mining company.  The

Page 70

1    definitions are clear on that.  And what they are proposing

2    are compensation provisions to U.S. bitcoin that are

3    comparable or similar to the Fahrenheit compensation.

4    That's directly contrary to what it says.

5           But not only that, those compensation provisions

6    are for equity.  And so I disagree with Your Honor about the

7    impression and what was happening here.  But regardless,

8    what is clear is that the plan said 100 percent equity to

9    creditors and the proposal is giving away equity as if this

10   were the Fahrenheit plan to U.S. Bitcoin.

11          And I guess, Your Honor, I got distracted by Your

12   Honor's questions.  But the Debtors don't actually tie into

13   anywhere in their papers the definitions relating to

14   winddown proceedings that are actually in the plan.

15          And counsel touched on it briefly.  But if you

16   actually go and read those -- first of all, you know, if you

17   read the very few provisions in the plan itself with respect

18   to the orderly winddown, it says, "In the event that the

19   Debtors elect to toggle to the orderly winddown, the Debtor

20   shall appoint a plan administrator on terms no worse than

21   those contained in the Backup Plan Administrative Terms

22   Sheet."

23          I mean, this provision says that they're not going

24   to do anything that gives them some discretion with respect

25   to terms no -- no worse than in the Backup Plan

1      Administrator Terms Sheet.  There's nothing anywhere that

2      gives them authority to enhance the capitalization of

3      MiningCo.  It's not express and they don't say that it is.

4      And it's not implied in any fair interpretation of anything.

5      What they say in their papers is that because it's silent,

6      it was only -- makes sense, that's what they say, to

7      incorporate it within their discretion in terms of the

8      winddown procedures.

9              Now, the winddown procedures are defined in the

10     plan at Number 271, Your Honor, in the definitions section

11     as the mechanics and procedures to effectuate a winddown.

12             That doesn't incorporate increasing capital three-

13     and-a-half times.  Mechanics and procedures do not authorize

14     the Debtor to do an entirely new structure and pay a lot

15     more people in equity and in money.  That's not mechanics

16     and procedures.  You can't shoehorn that, what they're

17     trying to do, into the definition in the actual plan itself,

18     which is nowhere in their papers.

19             Not only that, they talk about the budget as if

20     they're allowed to do whatever they want with the budget.

21     And in fact, the way they argue that they should be entitled

22     to triple the capital requirements is through the winddown

23     budget.  But the winddown budget is actually a defined term

24     in the plan at 268.  And it says winddown budget is defined

25     as the fees and expenses for -- and disbursements -- I think

Page 72

1    they hang their hat on disbursements -- required for an

2    orderly winddown.  There is no argument that can be made

3    that transferring that capital, another $175 million worth

4    of crypto, is "required" for an orderly winddown.

5            269 defines winddown expenses as the actual and

6    necessary costs and expenses incurred by the plan

7    administrator under the agreement and winddown procedures.

8    Everything is cabined within those definitions, Your Honor.

9    And so one of the reasons I had not answered your questions

10   directly with respect to the intent of the future of the

11   MiningCo transaction is because everything that's actually

12   in the plan suggests that this is going to be a public

13   company for the benefit of creditors but not a vehicle that

14   would -- that was devoted to some sort of an investment

15   opportunity.  They justify this plan.  They justify taking

16   away $175 million worth of crypto by the upside in a

17   speculative venture.  There are no disclosures in the

18   disclosure statement with respect to the risks of MiningCo.

19           Now, I'm sure they argue -- they do argue.  The

20   only two sections that they cite in the disclosure statement

21   in support of their argument that they made disclosures with

22   respect to the risk of Mining Company are with respect to

23   NewCo and the NewCo transaction.

24           If you go to the disclosure statement, Your Honor,

25   and you look down the table of contents and you look at the

1    risks, they all relate to NewCo.  There is nothing in there

2    about mining Co.  They say -- I'm sure they would say --

3    they don't say it in their papers.  They're not clear in

4    their papers.  When they stand up and respond, I'm sure

5    they'll say a disclosure with respect to Fahrenheit is a

6    disclosure with respect to MiningCo.  I don't think that

7    that's fair.

8              Your Honor is saying their argument that they get

9    to do a whole new MiningCo company that is -- and we're not

10   even getting to Cedarvale and what happened there.  We're

11   not even getting to what we found out last night, which I

12   understand may not have been proper in Your Honor's view.

13             THE COURT:  Then don't argue it.

14             MS. BONSALL:  Okay.  All right.  I will argue what

15   I had planned to argue before what I read what I read last

16   night.

17             THE COURT:  Be careful of what you say.

18             MS. BONSALL:  Absolutely, Your Honor.  The

19   testimony at trial was as of a $50 million capitalization

20   for Mining Company.  The argument in their papers is that

21   this settlement that acquired the Cedarvale site is a reason

22   why they need another $80 million of capital for this

23   MiningCo.  That was not disclosed anywhere.

24             So independent of what I read last night, when I

25   finally worked my way through the trial transcripts and the

Page 74

1     motion to approve the settlement agreement, when I finally,

2     as an outsider not seeing anything in this case until after

3     November 30th, when I worked my way through everything,

4     there was no disclosure that that Cedarvale transaction in

5     an orderly winddown situation would require a monumental

6     change in the capital requirements of the mining company in

7     an orderly winddown.  That's not set forth anywhere, Your

8     Honor.  And before I read anything last night, I was

9     prepared to argue that.  It just wasn't so clear to me based

10    on the testimony that I read from trial and the declarations

11    when everybody knew about that because it was approved so

12    close but before the end of the confirmation hearing.

13              My point, Your Honor --

14              THE COURT:  Another five minutes.

15              MS. BONSALL:  I'm sorry.  Okay.  Let me zip

16    through.  Okay.  Okay.

17              The NewCo plan actually provides for a toggle to

18    an orderly winddown, replacing NewCo with the post-effective

19    date debtors and the plan administrator.  And whatever

20    discretion they had is with respect to the mechanics and

21    procedures and the plan administrator agreement.  There is

22    nothing that authorizes what they want to do here.  And it's

23    not implicit in anything.  It's not implicit in anything

24    that they can actually cite to.

25              Nobody deals with -- and Your Honor didn't seem to

Page 75

1    think it was important as I did.  The disclosures in the

2    disclosure statement that say an orderly winddown doesn't

3    provide for the same opportunity to enjoy the upside of the

4    equity and the development of a regulatory-compliant

5    operating business.

6            THE COURT:  They believe that the staking business

7    was a potentially quite profitable business, and not being

8    able to include it means that you can't enjoy the potential

9    upside that came from the staking business.  Is that true?

10           MS. BONSALL:  I don't know what they believe.

11   What I know is what they disclosed.

12           THE COURT:  Well, you know that they had intended

13   to include a staking business.

14           MS. BONSALL:  Your Honor, there are many things

15   that I infer.  And I'm sure that you're right.  But the

16   declaration that we submitted, this is a guy who read

17   everything, an Earn creditor and a Borrower creditor.  This

18   is a guy who said to us, wait a minute, this was not

19   supposed to happen, this is different from everything I

20   read.  This is a guy who came to us and said this isn't

21   what's in the disclosure statement.  He came to us and said

22   that, Your Honor.  And everybody ignores it like it doesn't

23   matter.

24           He looked at the disclosure statement.  He

25   actually read it, right?  And he read the plan.  And he said

Page 76

```
 1    --
 2              THE COURT:  Do you have any other points you want
 3    to make?
 4              MS. BONSALL:  Okay, sorry.  Let me just -- yes,
 5    Your Honor.
 6              The Debtors are promoting this as not being
 7    adverse to creditors because even though the original
 8    orderly winddown with the numbers in it would provide a
 9    higher distribution of liquid cryptocurrency, they say it
10    doesn't matter because a dollar of crypto now is the same as
11    a dollar invested in NewCo.  And I think that concept is
12    naïve and inaccurate.  An investment in NewCo is an
13    investment in a new company and it is very different than --
14    it's not a public company now, Your Honor.  We actually
15    don't know whether it ever will be.
16              THE COURT:  We don't.  You're right.  They've said
17    that.  They've made that point clear.
18              MS. BONSALL:  They did not make that point clear.
19              THE COURT:  Oh really?
20              MS. BONSALL:  I do not think that that's clear in
21    the disclosure statement, Your Honor.  There is nothing in
22    the disclosure statement going to --
23              THE COURT:  There isn't a disclosure that it's
24    dependent on the SEC?
25              MS. BONSALL:  MiningCo?
```

1          THE COURT:  Absolutely.  It's a public company?

2          MS. BONSALL:  No, no, I'm sorry.  What I meant was

3    there is no discussion of the risks of taking crypto, your

4    crypto, and investing it in a mining company that is not

5    public and that may never be public.  There's nothing in

6    there on that, Your Honor.  I mean, now you're not shaking

7    your head, but looking quizzically at me.

8          THE COURT:  No.  I'm accepting that point.  Finish

9    up.  Finish up.

10         MS. BONSALL:  That to me is like my bank saying,

11   you know, one dollar of your deposit is --

12         THE COURT:  Do you have any other points you want

13   to make other than that?  I'm glad that your bank would feel

14   that way.  Any other new points that you wish to make?  Your

15   time is about up.

16         MS. BONSALL:  Do you mind I fi just check with Mr.

17   Adler for a nanosecond, Your Honor?

18         THE COURT:  Go ahead.

19         MS. BONSALL:  Your Honor --

20         THE COURT:  I'm just going to put on the record,

21   unrelated to your argument, that because of interferences

22   and inappropriate things on Zoom, we're only going to be --

23   if anybody else is seeking to be admitted, only attorneys

24   will be admitted.  No other parties will be admitted.  I

25   just want to put that on the record.

1          Go ahead.

2          MS. BONSALL:  I was reminded, Your Honor, that the

3     creditors of the estate overwhelmingly voted in favor of

4     crypto distributions over anything else.  I understand the

5     argument to that will be the toggle provided for 100 percent

6     ownership in the mining company, which is true.  I flag 100

7     percent once again.  But also, that was on a $50 million

8     capitalization, not a $225 million capitalization.

9          I would also refer Your Honor to Page 265 of the

10    disclosure statement.  And, Your Honor, you're obviously

11    technologically savvy.  If you do a word search on the

12    disclosure statement, you will see what I'm saying.  Do a

13    word search on winddown and see what happens.

14          So the actual section in the disclosure statement

15    that says the debtors may toggle to a winddown describes the

16    company as basically a company that does not have any upside

17    for creditors.  And I think that my point on that, Your

18    Honor -- I would quote it to you but I would have to go look

19    it up and I know I am closing in on my time.  But look at

20    it, Your Honor.  It says toggle to winddown.  It's Page 265.

21    This is again what the Committee and the Debtors put forth

22    to the creditors and it does not suggest --

23          THE COURT:  You've made this point already, a long

24    time ago.  Thank you very much for your comments.  Anybody

25    else wish to be heard?

1          MS. BONSALL:  I'm glad you heard it, Your Honor.

2          THE COURT:  Ms. Cornell?

3          MS. CORNELL:  Good morning again, Your Honor.

4          THE COURT:  Good morning.

5          MS. CORNELL:  Shara Cornell on behalf of the

6     Office of the United States Trustee.  I will do my best to

7     be brief.  I think that the points have been made.

8          The Debtors and the Committee have not met the

9     burden to establish that these substantial plan

10    modifications should replace the terms contained in the

11    confirmed plan.

12          It appears that the parties knew that the

13    transaction under the plan --

14          THE COURT:  Slow down a little bit.  Slow down a

15    little bit.

16          MS. CORNELL:  I'm sorry.  Sorry.  I'm trying to be

17    cognizant of the time.

18          THE COURT:  I know.  I know.  But I'm listening

19    carefully, okay?  But a little slower.

20          MS. CORNELL:  It appears that the parties knew the

21    transactions under the plan were stale at the time of

22    confirmation yet made no effort to correct the record.

23    Instead, they allowed the creditors to vote on the plan as

24    is.

25          But the changes in funding under the new

Page 80

1   transaction is in fact intimately connected to what

2   creditors will receive under the plan.  $170 million worth

3   of crypto is a lot of money.

4        The Debtors will argue that the creditors aren't

5   receiving less because they will be receiving stock in the

6   mining company.  Receiving stock in a potentially public

7   company is not the same as the debtors have claimed.  That

8   stock currently has an unknown value.  We don't even know if

9   the company will go public.  And there's even an out in the

10  new transaction to get out of going public.  What will

11  happen in May of 2024, we don't know.

12       Upon information and belief, we don't believe that

13  the Debtors have even submitted the paperwork regarding a

14  new MiningCo transaction to the SEC as of today's date.  The

15  timing of the distribution also changes the value received

16  by creditors.  Crypto or money now is not the same as stock

17  and equity later.

18       The Debtor should be required to provide the Court

19  more information regarding proposed modifications including

20  the funding requirements.  The Debtors and the Committee

21  have tried to distract from these changes by repeatedly

22  comparing the new U.S. bitcoin mining transaction with the

23  Fahrenheit transaction.  But it's misleading because we

24  should be comparing it to the backup transaction with Brick

25  which was approved and paid for by the Debtor's estates.  A

Page 81

1    $1.5 million commitment fee was paid over the summer.

2              And I believe Your Honor asked earlier where in

3    the disclosure statement or plan it was identified that

4    there would be a $50 million contribution to MiningCo.  And

5    I can direct Your Honor to Disclosure Statement, page 28 of

6    830 that specifically states that there would be a $50

7    million contribution under the BRIC.  There is no asterisk

8    there saying that this could be increased, will be

9    increased, or that the Debtors are aware that this is going

10   to be increased.

11             It's only been a month since confirmation occurred

12   and these problematic changes have nothing to do with the

13   SEC.  It has everything to do with the value of the Debtor's

14   assets and the funds needed to go forward.  These are not

15   crypto issues.  These are the issues in every single

16   bankruptcy case.  Why the changes now and not a month ago?

17   Accordingly, the movants must provide an evidentiary basis

18   for these proposed changes and an explanation for why we're

19   hearing them now and they have not.  Unless Your Honor has

20   any other questions for me, that's all I have today.

21             THE COURT:  Thank you.

22             MS. CORNELL:  Thank you.

23             THE COURT:  Mr. Sabin, I see you wanting to jump

24   out of your seat.

25             MR. SABIN:  Your Honor, I will be brief.  Jeff

Page 82

1    Sabin from Venable on behalf of Ignat Tuganof, class

2    representative, party to the PSA, who filed pleadings

3    yesterday at Docket Number 4136 and 4137.  And I know this

4    Court reads pleading, so I'm not going to --

5               THE COURT:  I actually read Mr. Tuganof's filing.

6               MR. SABIN:  I want to answer first your question.

7    Okay?  And I want not just supplement the answer that Mr.

8    Koenig, but I want to give you some details on it.

9               So let's go to the Joint Amended Plan, Page 47 and

10   48.  This is Article IV(e) and I believe you'll make

11   reference to and find there a reference to a market test as

12   part of an orderly winddown, which is on Page 48 of the

13   Joint Amended Plan.  And it is under that heading, if you

14   will, if you look at Page 48, a backup plan sponsor and a

15   backup plan sponsor transaction, contemplating a market

16   test, which is discussed not just in the motion, discussed

17   in the supplement file, which we joined, it's also discussed

18   by Mr. Puntus.  It's also discussed by Mr. Campagna.  And,

19   as I understand it, since it's not an evidentiary hearing

20   and you are taking the declarations as uncontested, it alone

21   is the real answer because that market test resulted in a

22   number of things that are relevant to a conclusion that our

23   clients believe, that I think the Debtors, believe that I

24   think the Committee, believes that the Ad Hoc Earn Creditors

25   believe, that creditors here, including Mr. Adler's client,

Page 83

1    are getting more, whether you compare it to an apple or to

2    an orange.  And they're getting more not just because it's

3    not 50 million contributed, it's 225.  They're getting more

4    because on the flip side of this, the fees that were to be

5    market tested, which are in the record as part of the backup

6    plan sponsored term sheet, are greatly reduced.  And those

7    fees include fees that were not even disclosed because what

8    was disclosed was the identity of a possible mine manager,

9    okay, but not necessarily the fees that would go with that

10   mine manager in the disclosure document.  Plus incentive

11   fees for managing the liquid assets, incentive fees for

12   managing litigation.  And when you read the uncontested

13   documents today, you will see there's a significant savings

14   to these estates by what is being proposed as the

15   implementation of the orderly winddown, which contemplated

16   the market test that revealed not only all of those things,

17   but it also revealed and it took cognizance of things that

18   changed since the disclosure statement.

19        The Cedarville motion was not even around when the

20   disclosure statement was approved.  The Cedarville motion

21   wasn't yet approved when the deadline to vote otherwise

22   occurred, but it was on file.  Mr. Adler's clients got

23   notice of it.  The US Trustee got notice of it.  My

24   recollection is neither of them objected in any fashion for

25   the relief requested to that favorable settlement to

Page 84

1    creditors and to these estates.

2         That settlement otherwise resulted in two things

3    for today.  The purchase by a Debtor of the Cedarville

4    facility and an interim services agreement which is going to

5    help build that thing.  A market test otherwise resulted in

6    a change from 50 to 225.  No ifs, ands, or buts.  Reduced

7    fees.  No ifs, ands, or buts.  And it contemplated, okay, a

8    different value which is also now part of the record.  When

9    you look at the disclosure statement, orderly winddown of

10   MiningCo was $424 million.  The value after a market test,

11   whether you include the 12.7 million of new money from US

12   bitcoin or whether you do it before is far in excess of the

13   424.  It's high, I believe -- I'll defer to a presentation

14   I'm sure that Mr. Colodny will make -- as high as $740

15   million, far more then what was contemplated.

16        Moreover, I now take issue, looking at Page 48,

17   and I'm looking at the table again, Article 10, conditions

18   to effective date.  And I want to take issue with what you

19   heard from the counsel to the Ad Hoc  Borrowers and from Ms.

20   Cornell.  And I want to focus on the conditions to the

21   effective date that change under an orderly winddown, a very

22   important point.  Those conditions that changed, which were

23   fully disclosed and were included in the modified plan filed

24   on September 27th which you otherwise as part of Paragraph

25   21 of your findings of fact, approved as complying with

Page 85

1    Section 1127, those conditions removed SEC approval in

2    connection with the winddown plan for purposes of issuance

3    of the stock to creditors under Section 1145, fully

4    disclosed in the disclosure statement, which will, because

5    of the number of predators who are receiving MiningCo stock,

6    make MiningCo a public company.

7           So it is not necessary for the SEC to bless, okay,

8    the registration station, regardless of whether the Form 10

9    has not been filed.  This company will go public assuming

10   that, assuming that this Court approves today, what I think

11   it can approve.  Assuming it does, then this plan can be

12   substantially consummated, not just by the distribution of

13   higher amounts of liquid crypto, but by the distribution of

14   MiningCo stock, which will make this company public.

15          I think there is a misreading of a section of a US

16   MiningCo term sheet in agreement regarding what happens or

17   what could happen to that public company on May 1.  My

18   reading of that agreement consistent with the term sheet,

19   all public now is part of this motion, and as part of the

20   supplemental plan supplement, is that the NewCo, the

21   MiningCo, excuse me, the MiningCo Board has the right to

22   decide whether to terminate if there has not been by May 1,

23   2024, SEC approval of the contemplated registration

24   statement.  That doesn't mean that creditors who receive

25   MiningCo stock can't trade it.  The law I believe is that if

Page 86

1     you're an underwriter because of the amount of claims you

2     may own in

3     this case, you may have certain limits on your trade

4     ability, but it is highly unlikely that there aren't more

5     than one or two or a handful of creditors who might fit the

6     definition of an underwriter and more likely that creditors

7     who will receive MiningCo stock if they want, can privately

8     sell it.  Okay?

9              So from my perspective, Your Honor, this is about

10     implementation, as Mr. Koenig argued to you, not plan

11     modification.  It is about adversity so that even if

12     alternatively, you conclude that this is a modification

13     under 1127, whether there needs to be additional disclosure

14     and/or separately additional voting.  I believe neither.  I

15     believe this Court --

16              THE COURT:  Even if it's a modification, that

17     doesn't necessarily mean that additional disclosure and

18     voting is required?

19              MR. SABIN:  Correct.  And I believe this Court so

20     held and so cited other cases back in 2011 in the In Re

21     Boylen case, which, as I understand, it has not changed in

22     this district or others that I know of.

23              So for all of those reasons, Your Honor, and

24     independent of the reasons in our joinder relate to the

25     following and last point I want to make, which is the Ad Hoc

Page 87

1    Committee participate and their declarant participated in

2    three days of mediation before Judge Watts.  Those three

3    days of mediation yielded a centerpiece of this plan and it

4    yielded benefits to the retail borrowers themselves that are

5    in our pleading.  And it did so in a fashion that not

6    contemplated, the word was "required" under the plan term

7    sheets which is appended to our filing.  It required those

8    borrower group who signed that term sheet after three days

9    of borrowing to sign a PSA, the PSA in this case.  At the

10   11th hour, they said we're not doing that.

11          And so my last point is independent of adversity

12   or not, they're getting all the benefits and none of the

13   burdens.  We don't think that's fair.  For all those

14   reasons, Your Honor --

15          THE COURT:  Thank you, Mr. Sabin.  Thank you.  Mr.

16   Colodny.  I think you got the SEC all up in arms, Mr. Sabin,

17   but go ahead, Mr. Colodny.

18          MR. COLODNY:  Eric Colodny, White and Case on

19   behalf of the Official Committee of Unsecured Creditors.

20   I'm going to be brief, Your Honor.  The disclosure

21   statements in the clearest place I found, it said as

22   explained throughout this disclosure statement --

23          THE COURT:  Can you just give me the citation for

24   the page you're reading?

25          MR. COLODNY:  It's at Page 111.  As explained

Page 88

1    throughout this disclosure statement, the orderly winddown

2    is a standalone reorganization of the Debtor's mining

3    business and an orderly liquidation of the Debtor's other

4    assets.  Couldn't be clearer.

5           The chart that's included in the plan and the

6    definition of backup MiningCo stock explicitly states that

7    there is not a mining manager that has been selected under

8    the backup transaction that's described in the plan.  As Mr.

9    Koenig said, that's left for the winddown motion.  But what

10   it does state in the chart under US Bitcoin agreements,

11   concept eliminated unless US Bitcoin is selected as the

12   mining manager in connection with the orderly winddown.  It

13   also says that the winddown motion will disclose the

14   identity of the mining manager.  That's exactly what we did

15   here.  When we got the SEC's determination, we ran a short

16   process in which we spoke with US Bitcoin, who, to be

17   honest, we didn't know would be interested anymore.  They

18   were part of the Fahrenheit deal.  One of the reasons that

19   this flexibility was built into the plan is we had no idea

20   at the time what could occur.  It was left for the winddown

21   motion, for the implementation of the winddown.

22           As part of that, we also went to the BRIC and

23   Galaxy also submitted an additional bid as has been put in

24   the record already.  We ran a process to get the best

25   transaction.  And I heard the borrower group argue many

1    times that this is not what they thought would occur.  Not

2    once did they say, this is not a good deal, this is not

3    within the Debtor's or the Committee's business judgment,

4    and this is not -- or did they refute any of the statements

5    that were made in any of those declarations with respect to

6    the transactions before.

7            The other thing I take a lot of issue with is that

8    we're comparing this to NewCo.  We're not.  If you look at

9    Mr. Campagna's declaration -- and I think this chart is the

10   most helpful thing here -- at Docket Number 4051.  And it's

11   Exhibit A.  It shows a comparison of the orderly winddown in

12   the plan versus the MiningCo transaction.  And as Mr. Koenig

13   walked through, it shows 531 pricing to make it apples to

14   apples.  And in that instance, it shows that everyone is

15   receiving, all people that are entitled to receive claim

16   distribution for unsecured creditors, which as you found,

17   borrowers are unsecured creditors to the extent of the set

18   off so they sit pairing with respect to earned creditors in

19   that respect, everyone's receiving 7.5 percent more MiningCo

20   common stock recovery because of the market test that was

21   run and the US Bitcoin being selected.  And they're

22   receiving, I believe it's 1.7 percent less initial

23   cryptocurrency.  That's as of May 31st.

24           He also includes 11/17 pricing.  And if you look

25   at that, there's almost $300 million more liquid

Page 90

1    cryptocurrency that's being distributed to people.  That

2    results in an approximate 75.7 percent total recovery.

3    That's far in excess of what we predicted people would

4    receive under the orderly winddown.  People are receiving

5    more recoveries in every single form of currency that we

6    provided under the plan.

7           And to be clear, we said in an orderly winddown,

8    it will receive liquid cryptocurrency, backup mining company

9    stock, which Your Honor pointed out was always intended to

10   be a public company, a reorganized public company.  So,

11   liquid recovery rights, which are going to be the proceeds

12   generated by a BRIC through the monetization of the illiquid

13   assets and litigation proceeds.  That's exactly what people

14   are receiving.

15          Now, Mr. Cornell cited one of the Johns Manville

16   cases which I believe they were changing the terms of the

17   trust, and they looked at the previous case that Mr. Koenig

18   cited.  The Second Circuit there said first, I looked at the

19   plan to see if the modification language is in the plan.

20   It's not.  And they pointed out three other different trust

21   agreements where they said, look at this, it says you can

22   modify.  Look at this one, it says you can modify.  This one

23   is different.  You can't impute modification because people

24   specifically stated it here.  We do this in contract all the

25   time.

1            In the first Johns Manville case, they said we

2     look to the plan and the plan says you can modify this.  So

3     we find that even though this is a change, it was

4     specifically contemplated in the plan and the bankruptcy

5     court did not care in entering an order approving that.

6     That's exactly what we did here.  This is entirely

7     contemplated in section I believe it's 4(e).  It states

8     about the orderly winddown.  Now there are things that were

9     left open and we filed a motion to give specific disclosure

10    of those things.  The process that was wrong, we filed the

11    declaration of Ken Ehrler.  The terms of the new US Bitcoin

12    Agreement, all disclosed.  It was sent to 600,000 creditors.

13    Mr. Koenig mentions the 11,000 page disclosure, their

14    affidavit --

15            THE COURT:  Certificate of service.

16            MR. COLODNY:  Certificate of service.  Three

17    objections: one from the borrower group, one from the US

18    Trustee and one from Ms. Lau.  We also have spent a ton of

19    time with Ms. Cornell walking her through the terms of the

20    plan attempting to explain to her.  Those terms aren't

21    mentioned anywhere in her objection.  Instead, she simply

22    points at the fees owed BRIC and says, why did you pay for

23    those?  We paid for them to be ready.  When we went to move

24    to them, we found a better transaction.  We then reached an

25    agreement with the BRIC.

1              THE COURT:  My recollection, I made it wrong.  She

2       opposed the BRIC plan, the BRIC backup for Fahrenheit bid.

3              MR. COLODNY:  Correct.

4              THE COURT:  And I want to go back to the

5       transcript, but I vaguely remember that particularly in

6       light of what happened in other cases, I didn't want to find

7       this -- I thought it was perfectly reasonable exercise of

8       business judgment for the Debtor to decide that it wanted to

9       have alternative backups if Fahrenheit deal didn't work.

10      And consequently, I approved the fees.

11             MR. COLODNY:  Correct.  And when the Fahrenheit

12      deal did not, the BRIC was there.  They were the backup.  We

13      found a better deal.  And ultimately, we were able to come

14      to an agreement with the BRIC, an agreement which produces a

15      better result for creditors.  It fits entirely within the

16      budget that we disclosed.  And the BRIC is now incentivized

17      to go out and to recover more value for creditors.  We

18      decided that litigating was not the best answer.  We got

19      together, we struck a deal that is an improvement for

20      everybody.  That's exactly the market test that was defined.

21      Everything that we've done fits squarely within the four

22      corners of the plan, was disclosed to everybody, and

23      produces the absolute best result for creditors, which is

24      getting out now.

25             THE COURT:  Thank you.

1          MR. COLODNY:  Thank you.  All right.  Ms. Scheuer,

2     I saw you in the back getting excited.  But let me ask -- go

3     ahead.  Who else wishes to be heard?  We are probably, well,

4     who else is going to want to be heard?  Tell me who you are.

5     No, you're not going to be heard again?

6          MS. KUHNS:  Earn Ad Hoc Creditors.

7          THE COURT:  Go ahead, Ms. Scheuer.

8          MS. SCHEUER:  Good morning, Your Honor.  For the

9     record, Therese Scheuer for the US Securities and Exchange

10    Commission.  With me in the courtroom is William Uptegrove,

11    also from the US Securities and Exchange Commission.

12         Your Honor, the SEC filed a reservation of rights

13    but does not object to the MiningCo motion.  Your Honor,

14    there has been a lot of discussion about the role of the SEC

15    in relation to the plan.  And if the Court will permit, I'd

16    like to briefly address that issue.

17         THE COURT:  Go ahead.

18         MS. SCHEUER:  Thank you, Your Honor.  Your Honor,

19    the Debtors have said in their bankruptcy papers that they

20    sought preclearance from the staff with respect to the Form

21    10 that they had hoped to file.  Preclearance, Your Honor,

22    is an informal process in which registrants can seek

23    guidance from the staff.  Generally speaking, practitioners

24    can reach out to the staff before filing a registration

25    statement to seek interpretive guidance.  Guidance, Your

Page 94

1    Honor, that's all.  Registrants or issuers are not required

2    to go through the preclearance process.  And given the

3    context here, it's an important point.  NewCo was not

4    required by any SEC rule to get preclearance prior to filing

5    the Form 10.  With respect to the Form 10 itself, Your

6    Honor, registrants generally file a Form 10 when they seek

7    to have a class of securities listed on an exchange or when

8    they wish to register a class of securities and become a

9    reporting company under the Exchange Act.  Companies can

10   also be required to register if certain thresholds of assets

11   and holders of record are exceeded.

12          As Your Honor has stated earlier in the hearing,

13   Form 10 requires audited financial statements and that's for

14   all predecessor entities, Your Honor.  In this case, that

15   would have meant that as part of the Fahrenheit deal, all of

16   the entities contributing assets to NewCo would have had to

17   file audited financial statements.

18          The Debtors have stated in the bankruptcy case

19   that the issue they were seeking preclearance on was whether

20   they could get, in their words, a waiver of the normal

21   requirements to file historical financial statements as part

22   of the Form 10.  The Debtors stated that they only had

23   audited financials for the mining business, not the other

24   entities contributing crypto and other assets to the NewCo

25   under the Fahrenheit deal.  And the Debtors wanted guidance

1     from the staff that under this particular set of facts, they

2     could submit financials for the mining business only which

3     is something less than is normally required under the

4     securities laws.  At confirmation, Your Honor asked the SEC

5     to respond to the Debtor's request as expeditiously as

6     possible.  The staff in the division of corporation finance

7     worked diligently to respond.

8              The Debtors had provided some certain information

9     as late as October 25th, Your Honor.  The Debtors have

10    stated that on November 9th, Corpfin staff told them that

11    Corpfin staff would not require the Debtors to provide all

12    of the financials of the predecessor entities as long as

13    they had audited financial statements for all the assets to

14    be contributed to NewCo.  But the Debtors state that that

15    proposal wouldn't work and the deal effectively ended

16    because the Debtors are not able to produce audited

17    financial statements relating to any assets other than the

18    mining business due to the condition of the Debtor's

19    historical financial records.

20             Your Honor, so what the Debtors wanted the SEC to

21    Bless was public trading in a company whose publicly

22    available information was not just incomplete but wholly

23    missing in material part from the information to be provided

24    to investors.  And this was because the financials for

25    certain businesses were unreliable and un-auditable.

Page 96

1          The point of the SEC's disclosure regime is to

2     provide investors with accurate information about what

3     they're investing in.  We understand that the Debtors and

4     others had hoped to proceed with the Fahrenheit deal despite

5     the absence of the information that would normally be

6     required, but the Debtors disclosure statement contained

7     numerous disclosures explaining that they might have to

8     pivot away from the Fahrenheit transaction.  They understood

9     that the deal might not work for a number of reasons.  That

10    was the reason for the toggle in the deal.  The Debtor's

11    implementation of the toggle has been something less than

12    seamless is not an issue that was caused by the staff.

13          Your Honor, I'd just like to briefly address the

14    possible Form 10 filing anticipated in the MiningCo motion.

15    We understand that parties and creditors and perhaps the

16    Court would like some indication from the SEC about the

17    likelihood of success of the MiningCo registration process,

18    but we cannot do that without even seeing the Form 10 that

19    they proposed to file.

20          THE COURT:  I haven't asked for it, just to be

21    clear.

22          MS. SCHEUER:  And to my knowledge, no Form 10 has

23    of the date been filed for MiningCo.  When a Form 10 has

24    been filed with all the accompanying information, it will go

25    through the usual process.  The review staff may comment on

Page 97

1     the Form 10.  Comments sometimes result in revisions or even

2     withdrawal of the Form 10.  We cannot speculate on the

3     outcome of that review.

4            If the parties want to structure a transaction

5     that involves a public company, there is a process for doing

6     so and the parameters are well known and well established.

7     Thank you, Your Honor.

8            THE COURT:  Thank you very much.  All right.  I'm

9     sure I'm going to make all of you unhappy.  We're taking a

10    break until 2:15.  We'll resume the further arguments.  Let

11    me, let me see.  Who is it?  Who wishes to argue at 2:15?

12    You're not arguing again.

13           MS. KUHNS:  You asked, Your Honor.

14           THE COURT:  Well, I'll see you all at 2:15.  I

15    wish -- I had hoped we would be able to continue and finish,

16    but we can't.  We're in recess until 2:15.

17           (Recess)

18           THE COURT:  All right.  Thank you.  Please all be

19    seated.  All right, we're back on the record in Celsius 22-

20    10964.  Before we begin, I just want to make a brief

21    statement that, you know, after all of the hybrid or Zoom

22    hearings we've had, today actually was the first time we've

23    had any disruptions.  There are at least three or four court

24    staff were monitoring the hearings.  During the lunch break,

25    my courtroom deputy had communications from creditors who

1   were cut out or were cut off from the hearing.  I feel

2   strongly that public access to these hearings is very

3   important.  We're permitting anybody who wishes to rejoin to

4   do so.  In the event of any disruptions, and without going

5   into detail, I believe that the disruptors have been

6   identified.  And I just want to say that every possible

7   remedy: civil, criminal, or otherwise that can occur as a

8   result of any disruptions to the court hearing will take

9   place.

10          I think it was a question do we keep everybody

11  shut out of the hearing or do we try once again to make this

12  as transparent as possible?  And that's what we've decided

13  to do to make this as transparent as possible.  It really

14  doesn't apply to you all in the courtroom.  But I do think

15  it's, you know, I've tried throughout and we've had -- I'm

16  told there were close to 200 people on Zoom this morning.

17  And that's our goal.  We have restrictions.  I said earlier

18  at the start of the hearing because anything that's an

19  evidentiary hearing, because of judicial conference

20  regulations, there are limits on what we could do that we

21  used to do before during the pandemic.  But I hope to make

22  this as transparent as possible.  So with that, let's go

23  back on the record and I apologize.  I didn't hear your name

24  clearly.  I know you wanted to speak.  You indicated that

25  several times.

Page 99

1              MS. KUHNS:   Joyce Kuhns, Offit Kurman, for the

2     Earn Ad Hoc Group.

3              THE COURT:   Come on up.

4              MS. KUHNS:   Thank you, Your Honor.

5              THE COURT:   Just let me find a place in my pad,

6     okay?  Okay.  Yeah, please go ahead.

7              MS. KUHNS:   Thank you Your Honor, Joyce Kuhns,

8     Offit Kurman, for the Earn Ad Hoc  Group.  The Earn Ad Hoc

9     has been consistent in its position in favor of a quick exit

10    with the best possible recoveries achievable and the most

11    liquid crypto possible in creditor pockets while minimizing

12    execution risk.  We believe the MiningCo transaction is

13    consistent with the best interests of creditors and

14    recognize their intense desire to get out of Chapter 11 and

15    cut off the $20 million a month administrative burn.  Your

16    Honor, as counsel, we have spoken to the creditors on a

17    regular basis, the Earn creditors.  Quite frankly, the

18    creditors are exhausted and they're frustrating.  I think

19    they think they may be living in Groundhog Day.  And they

20    sincerely believed at the conclusion of the confirmation

21    hearing that the end was in sight.

22              Now subsequent events have altered that perception

23    and landscape admittedly.  First, with the SEC clarifying

24    its position on NewCo after entry of the confirmation order,

25    which necessitated the pivot to the orderly winddown.  The

Page 100

1    Debtors and the Committee correctly gauged there was

2    absolutely no creditor appetite or tolerance for an

3    elongated reauction process and instead, instituted the

4    rebidding procedures resulting in the selection of US

5    Bitcoin as the mining manager and the filing of a joint

6    motion.

7           The Earn Ad Hoc feels the joint motion contains

8    essential clarifications to the confirmed plan, which have

9    been mentioned previously: the identification of a mining

10   manager, the winddown procedures and the winddown budget,

11   the market testing that was called for and now the famous

12   chart that everybody's been referencing at 4(e) of the plan,

13   and that certain elements were always contemplated to be

14   flushed out in the event of a toggle.  And we believe that

15   this transaction fits squarely within the four corners of

16   the plan the creditors voted for overwhelmingly.

17          We believe a re-solicitation is unwarranted and

18   will only result in unnecessary delay, considerable expense,

19   and if we consider the average burn, monthly burn this case,

20   we're estimating maybe between 60 and $80 million, and will

21   expose creditors to the downside risk of the recent rapid

22   appreciation in Bitcoin pricing, which was discussed more

23   fully in Mr. Dixon's letter to you. Your Honor.  And I

24   believe his counsel would like to address after me.

25          Given the fast moving crypto marketplace, if this

1    plan did not --

2          THE COURT:  People would like to have it in their

3    hands to do it.

4          MS. KUHNS:  Absolutely, to do what they want with

5    it, to do what they want with it.  Well, it is the Debtor

6    and the Committee's burden to satisfy you that these are

7    clarifications only, which we believe they are, and if

8    modifications, they do not materially and adversely affect

9    creditors, which we maintain they do not.  We believe they

10   have met their burden today.

11         I would also point out that the Earn Ad Hoc Group

12   consists of Earn creditors as well as those who have

13   borrowed accounts.  Earn has only asked for what it is

14   entitled to.  It came to grips with the bankruptcy reality

15   of the dollarization of its crypto claims.  The Earn

16   claimants knew when they voted that in a toggle, all

17   elections would be canceled and all unsecured creditors

18   would be on a level playing field in receiving their

19   distributions of liquid crypto, stock, illiquid assets, and

20   litigation recoveries.

21         By contrast, the Ad Hoc Borrowers refuse to accept

22   the reality and want to revert to an orderly winddown

23   scenario with elections never available under that quarterly

24   winddown, and a scenario that is no longer feasible.  Since

25   due to the passage of time, we have had the Core Scientific

Page 102

1    settlement with the acquisition of Cedarville site to which

2    the Ad Hoc Borrower group did not object.  We have the

3    StakeHound settlement.

4          THE COURT:  Everybody was excited about that

5    settlement.

6          MS. KUHNS:  It seemed like it, Your Honor.  Let's

7    put it this way.  We didn't object, obviously.  And the pay

8    down of coin-base agreements, all of which necessitated a

9    realignment of the winddown budget and reallocation of

10   duties and fees among the winddown administrators and

11   managers.

12         As you will hear, the rise in liquid crypto prices

13   and the downward adjustment and the orderly winddown

14   administrative costs have actually result in higher initial

15   liquid crypto distributions than under the original plan and

16   the original winddown, not lower.  I would also point out

17   that US Bitcoin is initially investing $17 million based on

18   a $700 million valuation.  So clearly, it's a believer as

19   well.

20         THE COURT:  You know I sort of have the feeling

21   that -- this may be a bad analogy -- but, you know, the

22   chairs on the Titanic have been moved around, but it's the

23   same players.  I mean, US Bitcoin has been on the scene

24   throughout.  I mean I don't see any surprises.

25         MS. KUHNS:  That's why we felt the rebidding

Page 103

1    procedure that was followed here makes sense, really,

2    because the parties had already been identified.  I'm really

3    concerned that if this motion is not approved, we're going

4    to be back in the dance again and with the delay and the

5    expense of what that entails.

6            And so as you consider the motion, Your Honor,

7    please be mindful that not all creditors are whales who can

8    wait out another month-long process.

9            THE COURT:  You know I guess Mr. Adler chose not

10   to return with his partner because I was going to ask, did

11   they take a vote on their Ad Hoc Committee?  We heard the

12   one big player with a loud voice.

13           MS. KUHNS:  I don't know, Your Honor.  From what

14   I'm hearing, I just don't think this is the consensus.

15           THE COURT:  This hearing -- I don't mean to

16   interrupt you but -- he's supposed to be here.  This hearing

17   didn't end.  This hearing continued.  He and his partner

18   chose not to be here this morning -- not to be here this

19   afternoon.  And I'll have to consider whether that merits

20   striking the whole argument.  But, you know, go ahead, I'm

21   sorry.

22           MS. KUHNS:  No, go ahead.  I'm sorry.

23           THE COURT:  I certainly wanted to know from them.

24   I don't know, I haven't looked to see how many people are

25   members of the Ad Hoc Borrowers Committee.  Did they take a

1   formal vote?

2          MS. KUHNS:  I don't know if it's been increased.

3   I think when we were in mediation, it was around 15.  We

4   have around 21 based on our 2019 filing.  We have people who

5   are active and didn't want to be part of the 2019 just

6   because they didn't want to be part of a larger --

7          THE COURT:  He and his partner wanted to get up

8   and speak again.  Go ahead.  I'm sorry.

9          MS. KUHNS:  Well, Your Honor, your point is well

10  taken.  Because it that I don't think that the position of

11  the one whale reflects the creditor body based on the lack

12  of objections, the lack of objections to Core Scientific.  I

13  mean we have a series of things that have been put forward.

14  We have a very active creditor base and I'm sure some of

15  them will want to be heard after the lawyers.  But I don't

16  think that's the consensus view.  The consensus view really

17  is that, you know, we have the whales, but we also have some

18  who lost their life savings.  And they've been hanging in

19  here for 18 months through inflationary market.  And quite

20  frankly, we believe they need and they deserve their

21  distributions now.  So thank you, Your Honor.  I don't want

22  to take up any more of your time.

23          THE COURT:  I'm sorry to delay you this morning.

24          MS. KUHNS:  Understood.  I think Mr. Manderson is

25  available on Zoom.  I'm not sure if you were aware of that.

1    He represents BNK to the Future and Mr. Dixon.  I think he

2    might want to be heard.

3            THE COURT:  Okay.

4            MS. KUHNS:  Thank you, Your Honor.

5            THE COURT:  Thank you.

6            MR. STONE:  Your Honor, this is actually Chase

7    Stone.  I'm with Chris Manderson.  We are from Ervin Cohen

8    Jessup.  We represent Mr. Dixon and BNK to the Future.  Mr.

9    Dixon is present on Zoom, obviously represented by counsel.

10           THE COURT:  Just hold on a second.  We're trying

11   to see if we can make this louder.  Are you able to get

12   closer to your microphone?

13           MR. STONE:  Sure, is that any better?

14           THE COURT:  Say your name again?  Chase Stone?

15           MR. STONE:  Chase Stone, correct.

16           THE COURT:  I'm sorry.  Go ahead, Mr. Stone.

17           MR. STONE:  So as I --

18           THE COURT:  And I did have a written communication

19   from Mr. Dixon that I did see.

20           MR. STONE:  Correct.  Okay.  That's the substance

21   of what Mr. Dixon would like to be heard on if Your Honor

22   would allow him to briefly  present some of the information

23   that I think might be helpful to speak to the creditor's

24   perspective.

25           THE COURT:  That's fine.

Page 106

1          MR. STONE:  Okay.  Mr. Dixon can appear now.

2     Thank you.

3          THE COURT:  Thank you, Mr. Stone.  Mr. Dixon.

4          MR. DIXON:  Thank you.  Can you hear me okay, Your

5     Honor?

6          THE COURT:  Yes, I can.

7          MR. DIXON:  Okay.  It doesn't allow may camera to

8     come on.  It's doesn't allow on Facebook my camera to come

9     on.  It doesn't allow that.

10          THE COURT:  If you would, get as close to your

11     microphone as you can.  I want to be sure that we hear you

12     clearly.  Okay?

13          MR. DIXON:  Okay.  I think you can see me now.

14          THE COURT:  Yeah, you got a big setup there.

15          MR. DIXON:  Okay, yeah.  Thank you.  Your Honor,

16     as somebody that did sign the planned support agreement, I

17     take somewhat of an offense that I'm not able to object.  I

18     think the debtor, Celsius, and the UCC will testify to the

19     fact that I gave them a very hard time throughout this whole

20     process and pushed back until I was willing to sign a

21     planned support agreement because I thought there was no

22     better.  There are many things that I'd like to see better

23     in this plan, but I do believe in the current situation that

24     this is the best plan.  And in the letter I wrote to you, I

25     gave three reasons from my professional opinion on why I

Page 107

1   think that is that I'd love to share very briefly.

2          Firstly, is that delay could lead to a significant

3   loss for creditors.  We calculated that after the price of

4   $54,000 per bitcoin, which is just around the corner, we

5   don't know what the price would do, then it is possible that

6   the next subordinated class could opportunistically try and

7   take some of the gain from creditors.  Even though we're

8   only getting back 25 percent of our crypto, we could be made

9   100 percent whole just based upon an early decision.  Now,

10  one of the very first calls that I had with the Debtor in

11  the UCC was to try and ensure that we don't sell our

12  cryptos.  That's allowed us to gain approximately $2 billion

13  in value just as a result of the crypto not being sold,

14  unlike FTX and BlockFi.

15          And the second reason I gave is that currently

16  there is no viable alternative.  BRIC has now joined with

17  MiningCo.  From my understanding, they were more interested

18  in managing the illiquid assets and US Bitcoin Group was

19  more interested in managing the mining.  It seems we now

20  have the best of both worlds now they have come together and

21  there is no other alternative.  So resoliciting --

22          THE COURT:  Yeah, I just, you know earlier in this

23  case, I was monitoring almost on a daily basis what the

24  price of bitcoin is.  I stopped that, but I'm looking now at

25  the screen.  It says 43,492,60.  I will say, Mr. Dixon, when

1    I saw the valuation reports that were done and they

2    estimated, I can't remember now a year or a year and a half

3    from now they're projecting $50,000 on bitcoin.  I was quite

4    skeptical.  Bitcoin was probably 25 or $30,000 at that

5    point, but now it's like almost $45,000.  And so I just make

6    those comments.  I mean, I just, I'm not the expert.  I

7    didn't do the valuation report.  I saw that.  I questioned

8    in my own mind, ultimately was convinced, persuaded by it,

9    to use that $50,000 -- I can't remember exactly what date

10   that was projected as -- but suddenly that's looking pretty

11   real.  Go ahead, Mr. Dixon.

12            MR. DIXON:  Yeah, Your Honor, I've been involved

13   in bitcoin for 13 years and I never bet against bitcoin.

14   And we are at that stage in the cycle where bitcoin has

15   historically gone up in value.

16            So the third reason is the cost of re-

17   solicitation, I think needs to be factored into the equation

18   when calculating how much we might actually get.  So we have

19   repeatedly said that there's approximately $20 million cost

20   of being in bankruptcy.  I estimate, based upon what we've

21   seen, when people might come along and try and

22   opportunistically take some of our crypto value, that we

23   might end up in another six months process, six times 20

24   million is 120 million.

25            So rather than the 175 million more crypto, which

Page 109

1    is being calculated on the lone Ad Hoc's objection, it's

2    actually, once you factored in the price and the cost saving

3    of the fact that we're not using BRIC anymore, that's about

4    103 million cost savings that brings the 175 million down to

5    approximately 72 million.

6            Now, if we ended up in bankruptcy for another six

7    months, then we'd actually end up with $48 million less

8    crypto as a result of going through the re-solicitation,

9    which would be, I believe, the identical plan that we have

10   in front of us right now.  So that's the third reason.

11           The fourth reason is that the assets are identical

12   under this plan.  They're just distributed in a very

13   slightly different way.  Rather than the 175 million being a

14   crypto distribution, which I've already pointed out would

15   soon lead to $48 million less crypto with six months delay,

16   it's put into equity into the company.  And by having it as

17   equity into the company, we get to use some of the mining

18   assets that are, that are sunk costs.  Now many, some

19   people, some creditors, and I presented this, I have 13,000

20   creditors that joined a mailing list and I give webinars

21   regularly.  I presented these numbers to all those

22   creditors.  There's 1300 people that are in this that joined

23   to listen to this presentation that I gave on these numbers.

24   And of those that attended, there was nobody that disagreed

25   that this is the right way to put forward.  I can't testify

1    to that, but that's what we saw.

2              So the fifth reason is that the mining company,

3    even if people are skeptical about the upside of the mining

4    company, there are many mining companies that would love to

5    be public.  The SEC has given their comments today.  And if

6    another company and the board decided that a company for

7    Galaxy, for example, wanted to be public, they --

8              THE COURT:  Excuse me.  Mr. Shah -- Mr. Adler.

9              MR. ADLER:  I apologize --

10             THE COURT:  The hearing started at 2:15.

11             MR. ADLER:  I apologize.

12             THE COURT:  Go ahead, Mr. Dixon.  I'm sorry to

13   interrupt you.

14             MR. DIXON:  No worries.  I'm almost done.  So the

15   fifth point is that there is 292 million based upon the

16   numbers in the plan of additional value if we can merge the

17   mining company, even if we don't have a terribly efficient

18   mining company at the moment.  So that's additional value.

19             The final reason that I think we should do that is

20   my experience from the past.  I've been involved in most of

21   the major bitcoin bankruptcies.  Now none of those were from

22   the US.  So this is my first Chapter 11 and my first one was

23   Mount Gox in 2014, which filed for bankruptcy in Japan.  Now

24   when it filed for bankruptcy, 90 percent of the bitcoin was

25   lost, but the price appreciation of bitcoin meant that

1    creditors were made whole in that case.  As soon as

2    creditors were made whole in US dollar value, all of the

3    different opportunistic parties came along to try and get

4    their piece as the next subordinated class.  This led to

5    years and years and years of delay.  I hope the same doesn't

6    happen in the first case where this may happen in the US.

7         Another bankruptcy I was involved in was Bitfinex.

8    Now they distributed the crypto even though the haircut was

9    locked in in dollars before they exited.  And this meant

10   that all of the gains went to the creditors and it was the

11   most successful recovery for a bitcoin company in history.

12        And so from those two different experiences, if we

13   can get out of Chapter 11 before we are made 100 percent

14   whole, I believe we can prevent all of those opportunistics

15   really taking advantage of the fact that that crypto does

16   belong to creditors.  And then if you factor in the delay

17   cost, you end up with $48 million less crypto anyway.  So

18   based upon all of these things, this is the first case that

19   I'm aware of, of bitcoin going through what happened in

20   Japan and British Virgin Islands, in the US.  And so I'd

21   rather -- and I'm sure I hope that you would rather, Your

22   Honor -- not have to rule on what happens when bitcoin makes

23   you 100 percent whole.  And therefore we end up with less

24   and less bitcoin, the higher the price goes up.  I put it to

25   everybody.  It is 100 percent in creditors best interest to

Page 112

1    exit without a re-solicitation because it could just lead to

2    a worst result for the exact same result  Thank you very

3    much.

4            THE COURT:  Thank you very much, Mr. Dixon.  Let's

5    just hold on for a moment here.  Mr. Adler, come up to the

6    microphone.  When was the last 2019 statement you filed?

7            MR. ADLER:  I believe December or in February.

8            THE COURT:  There was one filed in January '23.

9            MR. ADLER:  That's the one.

10           THE COURT:  That's the last one?

11           MR. ADLER:  I believe so.

12           THE COURT:  How many members of your Ad Hoc

13   Committee.

14           MR. ADLER:  Approximately 70 I believe.

15           THE COURT:  And was there a vote on the Ad Hoc

16   Committee whether or not to file objections?

17           MR. ADLER:  The steering Committee decided to file

18   objections.

19           THE COURT:  How many on the steering Committee?

20           MR. ADLER:  Five.

21           THE COURT:  And did you take a vote of the entire

22   Ad Hoc Committee in deciding to file an objection?

23           MR. ADLER:  Yes, Your Honor.

24           THE COURT:  And what are the results of that vote?

25           MR. ADLER:  They were in favor.

Page 113

1            THE COURT:  What was the results of the vote, the

2     numbers?  How many voted, how many voted to object?

3            MR. ADLER:  Everyone voted to object.  Everyone

4     voted in favor of it.

5            THE COURT:  How many?

6            MR. ADLER:  All five members of the steering

7     Committee.

8            THE COURT:  I didn't ask about the steering

9     Committee.  I asked about the full Ad Hoc Committee.  I'm

10    asking did the whole Ad Hoc Committee vote whether to file

11    objections?

12            MR. ADLER:  No.

13            THE COURT:  And did you communicate to the full Ad

14    Hoc Committee that the steering Committee decided to file an

15    objection?

16            MR. ADLER:  Yes.

17            THE COURT:  And when did you do that?

18            MR. ADLER:  It was done before the objection was

19    filed.

20            THE COURT:  Did you get any responses?

21            MR. ADLER:  I got responses, yes.

22            THE COURT:  Is there any reason that you and your

23    partner chose not to return to court at 2:15 when the

24    hearing was started?

25            MR. ADLER:  Your Honor, there was a mix up between

1    Ms. Bonsall.  I was on a conference call.  Ms. Bonsall was

2    involved in something else and we just both lost track of

3    it.  We do apologize.

4              THE COURT:  All right.  Anybody else wish to be

5    heard?  Mr. Koenig.

6              MR. KOENIG:  Thank you, Your Honor.

7              THE COURT:  Let's see if there's more people on.

8    Anybody else on Zoom wish to be heard?

9              CLERK:  Judge, Mr. Amerson has a hand up and Cathy

10   Lau.

11             THE COURT:  Okay.  Just so everybody is clear.

12   Because of the set up in the courtroom, I don't see the

13   hands raised.  So you'll have to point them out to me.  Call

14   them out, Deanna, in the order in which they're raised if

15   you can.  Thank you very much.  All right, go ahead.

16             CLERK:  Yeah.  Jason Amerson.

17             MR. AMERSON:  Thank you.  Jason Amerson, pro se

18   creditor.  I'd turn my video on but I think it's still

19   disabled so it's up to the Court.

20             THE COURT:  I would prefer if you turn your video

21   on.

22             MR. AMERSON:  Yeah, I tried.  So it is coming in

23   super overexposed at the moment, Judge?

24             THE COURT:  Go ahead, Mr. Amerson.

25             MR. AMERSON:  Your Honor, I recognize that the

1    Court may appreciate the comments from Simon Dixon.  I'd

2    like to make it clear that he is creditor.  Not a

3    consultant, nor is he is a bankruptcy expert. I don't know

4    if he --

5             THE COURT:  Can you either -- I don't know where

6    your microphone is, but you cut in a little in and out.

7    You're going to have to move a little closer to your

8    microphone, even if it has you leaning forward.  Okay?

9             MR. AMERSON:  Certainly, I can do that.

10            THE COURT:  Okay.  Thank you.

11            MR. AMERSON:  I'll just start from the top.  So I

12   recognize that the Court may appreciate the comments and the

13   opinions of Mr. Simon Dixon.  I'd like for it to be known

14   that he is a creditor and not a consultant with respect to

15   the bankruptcy.  He's not been hired by the Debtor nor the

16   UCC to provide advice or counsel on behalf of Debtors.  So

17   in spite of whatever experience he had with bitcoin

18   bankruptcy, his opinion is really just that of one creditor.

19   So no question really.  Just a comment.

20            THE COURT:  Okay.  Anything else you want to add?

21            MR. AMERSON:  Not at this time.  Thank you, Your

22   Honor.

23            THE COURT:  Thank you very much, Mr. Amerson.

24   Anybody else on Zoom wish to be heard?

25            CLERK:  Yes.  We have Cathy Lau next.

1          THE COURT:  Okay.  And Ms. Lau and Ms. Lau did

2     file an objection.

3          MS. LAU:  I would like to read my objection if

4     that's possible.  I submitted some exhibits, if those could

5     be pulled up.

6          THE COURT:  No, just -- you filed your objection

7     and it's on the docket.  And people have access to that.  If

8     you want to add any comments, please go ahead and do so.

9          MS. LAU:  Okay, because my exhibits are completely

10    different from what was there.  I will just read what I had.

11         THE COURT:  Don't read your objection.  It's --

12         MS. LAU:  No.  I'm not reading my objection.  This

13    is completely different.

14         THE COURT:  Go ahead.

15         MS. LAU:  So I am here to object to going forward

16    with this plan because it has no way of succeeding in a way

17    that is in creditors' interests the way it currently stands

18    and also has no path to success if the same people

19    responsible for putting this together, like this current

20    plan, are tasked with making a new plan for creditors to

21    vote on it.  Because everyone involved in the creation of

22    the reorganization plan has turned this bankruptcy into a

23    situation to enrich themselves and structured the plan in a

24    way that they have the powers to administer the plan, pursue

25    litigation and direct NewCo amongst themselves to ensure

1    that each will command a big enough slice of the pie that

2    will allow them to continue to profit from this case, even

3    after we exit this bankruptcy, all while confidently

4    continuing to claim that each self-serving appointment has

5    been made in the creditors' interests knowing that with

6    every one of them in on this arrangement, they can count on

7    each other to validate and vouch each placement and cite the

8    credentials that come with their overpaid positions of power

9    to invalidate any protests coming from pro se creditors

10   against their self-dealing.  As one creditor on Twitter

11   said, I've had to say it over and over again since the early

12   days of Chapter 11, the term fiduciary duty has been

13   selectively interpreted during this ordeal.  Not sure why

14   creditors even use this term when we know that this specific

15   aspect has been disregarded as it relates to creditors'

16   interests.  I want to play a clip of a video to demonstrate

17   what appears to be happening.  You're about to hear an ex-

18   lawyer describe what he learned while studying law in

19   California.  And what he describes, I feel, captures what is

20   going on.

21             THE COURT:  Ms. Lau, Ms. Lau --

22             MS. LAU:  Yes.

23             THE COURT:  If you have comments that you wish to

24   make in support of your objection, that's what this is

25   about.

Page 118

1                    MS. LAU:  That is what I'm presenting.

2                    THE COURT:  Well, that wasn't, okay.  So I'm going

3        to give you a chance but you need to direct your comments to

4        the issues that are pending before the Court today, not your

5        long standing grievances, which I've been hearing for some

6        time.

7                    MR. KWASTENIET:  Your Honor, we would also object

8        that she appears to just be reraising the same arguments

9        that she raised at the confirmation hearing.

10                   THE COURT:  Go ahead, Ms. Lau.

11                   MS. LAU:  I think that this is really difficult

12       because I prepared something to read and you don't want me

13       to read it.  So I think I'm going to have to think about it

14       because I really worked hard on what I had and it's not even

15       what I started during the confirmation hearing.  I never

16       even got to read everything I had in the confirmation

17       hearing because I got cut off.  So I don't exactly know what

18       you wanted me to do.  But everything that I submitted, like

19       my amendments to like my exhibits and stuff, none of it was

20       what I submitted as an objection.  Everything that I'm

21       saying now is not what I included in my objection.  I wrote

22       something that was completely different and I'm not given

23       the chance to read it.  So I don't know what to say.

24                   THE COURT:  I'm going to give you a chance to read

25       what you have.  What you've said so far is not pertinent to

Page 119

1     the issues that are before the Court today.  But I'm going

2     to give you five minutes to read a statement or portions of

3     your statement.  Please go ahead.  I won't interrupt you but

4     keep your comments brief.  Go ahead.

5            MS. LAU:  I don't think I have time.  I have to --

6     can I please have time to think about this?  Because I don't

7     have -- this was going to be longer than five minutes.  So I

8     am going to have to think about what I'm going to say.

9            THE COURT:  No.  I'm telling you right now.  I'm

10    giving you five minutes because you're comments so far have

11    not been pertinent to the issues that the Court is faced

12    with now.  If you wish to ahead, I'll give you five minutes.

13    I will not interrupt you, but that's the time limit.

14           MS. LAU:  Well, I guess I'll just move to the end

15    of my comments, which was to share with you how creditors

16    have been feeling about this situation.  I had shared

17    creditors, but if you can see what creditors have been

18    saying about this case, it was like imagine trying to go

19    through another auction and having to tell the judge, we

20    can't possibly have seen this coming after telling the judge

21    we want to pay a backup bidder millions because we saw this

22    coming, then deciding not to use the backup bid specifically

23    designed for this very moment.  First order of business, the

24    litigation judge should be clawing back the professional

25    fees and misaligned incentives where the board stands to

1   make millions if they can avoid over like orderly winddown.

2   Celsius UCC fails its shared responsibility to put all

3   creditors first.  The bankruptcy process is disgusting.  He

4   nailed it.  This is the third opportunity they've had to go

5   with a winddown and they choose not to do it even though it

6   is clearly in the best and safest approach.  Just pathetic

7   at this point.  All of these quotes basically are like

8   creditors who are saying that like the lawyers should be

9   round out, like should be like clawed back on because as it

10  says, somebody said, judge should ask lawyers for a refund

11  and UCC for some compensation back.  If it is really about

12  the creditors.  We voted for the shit deal or the orderly

13  winddown.  Not a high bid, cascading pack of ideas and

14  plans.  Liquidate us and give us our crypto.  Some clawbacks

15  that matter are against the professionals that robbed us

16  along the way.  How can they charge advisory and expert

17  professional fees when they fucked up at literally every

18  opportunity.  Is there zero accountability?  It's complete

19  madness.  What are we paying BRIC for?  I look forward to

20  whatever crazy excuse they have at the next hearing on the

21  30th.  And like I already said, I said it over and over

22  again since the early days of Chapter 11, the term

23  "fiduciary duty" has been selectively interpreted during

24  this ordeal.  Not sure why creditors even use this term.

25  And we know that it is a specific aspect that has been

1    disregarded as it relates to creditors' interests.  The

2    bankruptcy proceedings have not been fair because those in

3    charge who have pretended to represent us, have only

4    represented themselves and claw the fees and expenses back

5    before going into either a plan restructure or orderly

6    winddown is imperative to ensure that creditors are not

7    roped into feeling they have to vote yes to a plan granted

8    to them to prevent the remainder of their funds from being

9    taken from further prolonging of this bankruptcy, which is

10   what will happen if creditor funds are not returned to them

11   so that we can start to feel comfortable with voting for a

12   real plan.  And in the case of the orderly winddown,

13   clawbacks are necessary so that creditors are not forced to

14   receive scraps of what they could have and should have

15   gotten had all the self-dealing parties not stolen so much

16   from our estate and left us with so much less than we would

17   have if they hadn't gotten involved in the first place.

18   This case can still be turned around to help the real

19   parties.  It was meant to help the creditors if the

20   creditors are finally given a chance to be put first.

21   Please recognize that this proposed time for what it is.

22   It's a cash cow for plan creators serving their interests

23   rather than creditors and please have creditors either have

24   a fair chance at a second go of reorganizing the company or

25   give us our paper as was promised including that which was

Page 122

1    allegedly legally stolen from us. I spent hours compiling a

2    chart that included like plan creators and their roles and

3    their conflicts of interests and all these connections. I'm

4    not being permitted to present it so clearly. Everything

5    that I present now just sounds crazy to you because you

6    can't see the connection. Every single person on the NewCo

7    board and on the litigation Committee and all the

8    administrative positions, all these positions have all been

9    filled by people involved in creating the plan. Like every

10   single opportunity that has been taken to like take

11   advantage of the creditor situation has been taken, but

12   nobody's going to see that because nobody wants to see the

13   paper that I made. I think that's really unfair because I

14   don't know what's going on with this court. Everyone knows

15   that everybody involved in creating this plan has just been

16   introducing all these -- it feels like this mining plan is

17   just a distraction because what you really should be looking

18   at is the composition of the board and the people involved

19   in leading this plan because every single one of them has

20   appointed somebody representing them and all of them are

21   getting like future positions and future roles and future

22   payment from this plan being put forth. I think that's the

23   real reason why they're so focused on putting this mining

24   plan forward. They don't care if it's a mining plan or any

25   kind of plan as long as like the board that they chose and

1    every single position that they filled still stays the same.

2    You could see that in the plan that I uploaded and within

3    the (indiscernible) that I uploaded because I spent a lot of

4    time playing together and showing you what their conflicts

5    of interest are and what the conflicts are.  I wanted to

6    prevent it, but I'm not allowed to.  So that's really

7    difficult for me to do.  I feel like this just demonstrates

8    how creditors really -- it's like for us to --

9            THE COURT:  Ms. Lau, Ms. Lau, you used your five

10   minutes.

11           MS. LAU:  Yes.  Thank you.

12           THE COURT:  Everything that you filed is on the

13   public docket for anyone who wishes to read it.

14           MS. LAU:  Okay.

15           THE COURT:  Anybody else on Zoom wish to be heard?

16           CLERK:  Yes.  We have Lucas Holcomb.

17           THE COURT:  Okay, go ahead.

18           CLERK:  Lucas, can you unmute?

19           MR. HOLCOMB:  There we go.  Can you hear me now?

20           THE COURT:  Yes, I can.  Go ahead.

21           MR. HOLCOMB:  Okay, thank you, Your Honor.  Lucas

22   Holcomb, pro se creditor, although I feel with the emotions

23   that were just expressed, I do agree with Simon Dixon that

24   getting out of bankruptcy is in the best interest of the

25   creditors.  I think we're all kind of tired of the

1    situation.  And, you know, continuing to pay lawyer fees --

2    no offense to lawyers -- is just eating away at the estate.

3    As an aside, Your Honor, I did file a letter to the Court on

4    November 10th, Docket Number 395, regarding multiple ballots

5    and how they're handled.  And I'm still waiting for a

6    response for that.  If that's something that could be

7    addressed at some point, I would appreciate it.

8            THE COURT:  All right.  Anything else you want to

9    add, Mr. Holcomb?

10           MR. HOLCOMB:  That is it, Your Honor.  Thank you.

11   I'm sorry I didn't get to court sooner.  I had pneumonia and

12   the flu at the same time.  So I tried to make the end of

13   November and early December court appearances to speak about

14   that letter, but my sicknesses prevented me.

15           THE COURT:  All right.  Thank you, Mr. Holcomb.

16           MR. HOLCOMB:  Thank you.

17           THE COURT:  Deanna, does anybody else wish to be

18   heard?

19           CLERK:  Yes, Immanuel Herman.

20           THE COURT:  Go ahead, Mr. Herman.

21           MR. HERMAN:  Hello, Your Honor, Immanuel Herman,

22   pro se creditor.  Unfortunately, I'm going to have to remain

23   off camera and I'll be fairly brief.  First I just wanted to

24   join in what Simon Dixon and the Earn Ad Hoc said.  Second,

25   I take issue with implications like Mr. Dixon does that I

1      can't speak out if, you know, because of signing a plan

2      support agreement.  Like others who signed the planned

3      support agreement, a lot of us gave the Debtors and the UCC

4      a hard time about it before we signed and we signed when we

5      were confident that the plan was as good as it was going to

6      get.  I will also say that I believe that the current plan

7      is consistent with what's already been voted on and that we

8      should avoid re-solicitation, which for the reasons that Mr.

9      Nixon outlined, will cost the estate, you know, potentially

10     tens to hundreds of millions of dollars.

11             One issue that I have raised for many months with

12     the Debtors directly and others is the concern about what

13     happens if crypto would go up to the point where it makes

14     creditors more than whole or 105 percent hole.  And I

15     completely believe that if that happens, lots of creditors

16     will come out of the woodwork, subordinated creditors, and

17     it's going to become a total mess.  And we shouldn't let the

18     perfect be the enemy of the good.  The most important thing

19     right now is to exit, to get people their crypto back.  And,

20     you know, in a bull market, even if it's not frankly the

21     perfect mining company or anything else, there's a decent

22     chance that people who have that stock could do just fine.

23     Even if the stock ends up not doing fine people, you know,

24     it doesn't make sense to reverse course now and push for

25     just a liquidation.  It would take too long.  We've come too

Page 126

1    far.  And we need to finish the job, get out of Chapter 11.

2    And that is pretty much what I have to say, Your Honor.

3              THE COURT:  Thank you very much, Mr. Herman.

4    Deanna, anybody else?

5              CLERK:  Yes.  Kulpreet Khanuja.

6              THE COURT:  Thank you.

7              MR. KHANUJA:  Can you hear me, Your Honor?

8              THE COURT:  Yes, I can.

9              MR. KHANUJA:  I'm sorry I'm slightly under the

10   weather.  So, thanks so much for your time, Your Honor.  I'm

11   part of the Earn Ad Hoc as well, so I totally support the

12   proposal and everything that has been mentioned from Ms.

13   Kuhns and Ad Hoc. Now, exactly one year ago, some of the pro

14   se motions, including my own, were around the ownership of

15   the assets.  They were the denied.  Now, while denying those

16   motions, the Honorable Judge acknowledged that some of the

17   arguments were unique to our situation, while some of the

18   other arguments were common to many, if not thousands of

19   creditors.  So basically for the common good, the decision

20   was taken.  And since then, we formed the another Ad Hoc and

21   we worked with (indiscernible) the people and for the

22   creditors.  Now it's before the judge with all of the same

23   items and (indiscernible).  As part of our Ad Hoc, we have

24   spoken to many creditors who are facing unimaginable

25   hardship.  We think the current plan and the current

1      proposal that is in front of them will make the exit

2      possible and help them financially.  That's all.

3              THE COURT:  Thank you very much.  All right.

4      Anybody else, Deanna?

5              CLERK:  Daniel Frishberg.

6              THE COURT:  Okay.  Mr. Frishberg.

7              MR. FRISHBERG:  Hi.  Daniel Friberg, pro se.  I'm

8      going to be as brief as I can.  Everyone else has basically

9      said that I was going to say so I'll say one thing.  There's

10     a very loud vocal minority of creditors who oppose the plan

11     such as the borrowers, but it should not supersede basically

12     the entire rest of the creditor body who just want to get

13     out of bankruptcy to prevent the burn.  The opportunity cost

14     for creditors is massive and the entire thing could unravel,

15     the entire plan in general could unravel if people are made

16     dollar whole.  Also some pro se customers, including myself,

17     filed a joiner on the docket.  I'm not sure if you're able

18     to see it because we only filed this morning.  Approve the

19     MiningCo transaction and end the bankruptcy.  Thank you.

20     Have a good day, Your Honor.

21             THE COURT:  Thank you, Mr. Frishberg.  Anybody

22     else, Deanna?

23             CLERK:  Jason Amerson had his hand up.

24             THE COURT:  Okay.  Go ahead.

25             MR. AMERSON:  I'm sorry, Judge, I'm only --

Page 128

```
 1                THE COURT:  You already spoke already.

 2                MR. AMERSON:  I know.  I was informed that my

 3    audio was coming through almost unintelligibly.  So I just

 4    want to make sure people understood what I said.

 5                THE COURT:  I was able to hear and understand you,

 6    Mr. Amerson.

 7                MR. AMERSON:  Okay.  Thank you, Judge.

 8                THE COURT:  Okay.  Thank you.  Deanna, anybody

 9    else?

10                CLERK:  Those are the only hands I see.

11                THE COURT:  All right.  Mr. Koenig.

12                MR. KOENIG:  Good afternoon, Your Honor.  For the

13    record, Chris Koenig, Kirkland and Ellis for Celsius.  So

14    just to bring it back, I think it's important to know the

15    options that are in front of the company right now, the

16    options that we have.  The choice is not between $50 million

17    orderly winddown or $225 million orderly winddown.  The

18    choice is between emerging from bankruptcy in January

19    because the motion has been granted --

20                THE COURT:  A little slower please.

21                MR. KOENIG:  -- with an approved orderly winddown

22    motion or we will have to re-solicit the plan at 225 million

23    or some higher number.  There is no other alternative.  And

24    Mr. Puntus' declaration walks through the capitalization

25    amount in great detail.  He explains that after we receive
```

Page 129

1    the feedback from the SEC and the Debtors and the Committee

2    determined to toggle the orderly winddown, we talked to

3    several bidders about being the mining manager.  And in

4    Paragraph 12 of Mr. Puntus' declaration, he explains that

5    all bidders proposed a capitalization amount for MiningCo

6    that was consistent or higher than $225 million.  He says

7    that $50 million is "entirely inadequate" for the new

8    company and he explains exactly why that capitalization

9    amount is needed including for the build out of the

10   Cedarville site.

11           So again, it is not like we can just red pencil

12   the plan.

13           THE COURT:  The build out of the Cedarville site

14   is a result of the settlement that I previously approved

15   where the Debtor acquired the Cedarville site.

16           MR. KOENIG:  Correct, Your Honor.

17           THE COURT:  And anybody who objected to it had an

18   opportunity to object at that time.

19           MR. KOENIG:  Yes.  And I would note that as part

20   of that motion, we, of course, described this is a piece of

21   land that needs to be built out.  There are construction

22   costs.  We even filed a construction contemporaneously with

23   the motion.  So for the borrowers to now suggest that this

24   is a surprise they learned during last night's deposition is

25   astonishing to me because it was disclosed with Core

Page 130

1    Scientific in the first place.  And also Mr. Ken Ehrler's

2    declaration described the Cedarville capitalization amount

3    when we filed the winddown motion.  So suggest this is some

4    sort of 11th hour surprise is astonishing.  But just to

5    bring it back.  The borrowers are complaining about two main

6    things, the capitalization amount, they want $175 million

7    more in liquid crypto.  But that option is simply not on the

8    table today.  The only options are to emerge now at 225

9    million or to re-solicit a plan at 225 million because we're

10   not going to send this mining company out into the

11   wilderness without the appropriate tools that it needs to

12   survive as a going concern.

13          The borrower, if we have to re-solicit, as

14   multiple people have pointed out, that will cost the estates

15   and the borrowers and all the other creditors significantly

16   more money because of the cost of these Chapter 11 cases.

17   The borrowers are effectively taking this position for hold

18   up value and the Debtors simply aren't going to pay it.

19          So let me turn to the borrower's argument in a

20   little bit more detail.  I'm going to take this in the order

21   I did before, first, it's implementation, not modification.

22   And then even if it is modification, re-solicitation is not

23   required.  Ms. Bonsall raised two main issues, you know, why

24   this is a modification of the plan and not merely

25   implementation.  First, the 50 million versus the 225

Page 131

1    million and then the fact that there's equity compensation

2    being paid under the MiningCo transaction.

3           So I addressed the 50 versus 225 in my earlier

4    statement, but just to bring it back because it's so

5    important.  The definition of the winddown budget in the

6    plan includes disbursements that are necessary for the

7    winddown.  Why would the disbursements necessary to

8    capitalize the new company not be a disbursement that is

9    necessary for the winddown?  The new company could not

10   emerge and could not operate without cash and that cash

11   could only come from one place, the estate.  So, of course,

12   it was contemplated within the plain language of the

13   documents.  I can see that Your Honor maybe is not --

14          THE COURT:  No, no.  It's so -- is the $50 million

15   figure in the original disclosure statement for the plan

16   that was voted on?

17          MR. KOENIG:  It is in the disclosure statement.

18          THE COURT:  Described as what?

19          MR. KOENIG:  It is described as the capitalization

20   of the mining company that is being illustratively described

21   in the disclosure statement.  Now, what I would say is the

22   plan allows us to revise the terms on the same or better

23   terms.  And the language is very clear about, you know, we

24   can do a market check, we can evaluate and propose a plan

25   that is as good or better for creditors.

1          THE COURT:  Where is the language in the

2    disclosure statement or the plan that supports what you just

3    said that that was an option or possibility that was

4    described to creditors when they voted on the plan?

5          MR. KOENIG:  So what I would -- I'll start with

6    that same table that we've looked at a couple of times.

7          THE COURT:  Just give me the pages when you get to

8    it.

9          MR. KOENIG:  Sure.  Okay.  So it starts on Page

10   47.  I'm using the numbers on the bottom, Your Honor.

11         THE COURT:  Okay.

12         MR. KOENIG:  The Page 47 of the plan has --

13         THE COURT:  Changes of the plan.

14         MR. KOENIG:  Right.  The table that we've all

15   talked about, right?  So the winddown procedures -- this is

16   now on Page 48.  It starts on 47 and goes over to 48.  You

17   know the Debtor shall file the winddown procedures -- words,

18   words, words -- to implement an orderly winddown in

19   connection with the winddown motion.  Such procedures shall

20   provide additional details regarding the winddown assets,

21   the winddown budget, the identity of the mining manager and

22   any revisions to the winddown procedures and shall be

23   subject to approval by the bankruptcy court in connection

24   with the winddown motion.  It goes on to say in that table

25   that there will be a market check of the terms of orderly

Page 133

1    winddown and that those terms can be filled in on terms that

2    are at least as good as what was set forth in the disclosure

3    statement.

4           And as Mr. Campagna explained in his declaration,

5    those terms are significantly better.  The economic terms

6    are significantly better, hundreds of millions of dollars of

7    more value for the creditors.  And so we're taking the

8    flexibility in the plan and running with it.

9           THE COURT:  Let me ask hypothetically.  One of the

10   major complaints seems to be that the disclosure statement,

11   the plan originally contemplated $50 million capitalization

12   and that number has now moved to 225.  What if it moved from

13   50 to 500?  Would that then be a modification that would

14   require re-solicitation and a vote?

15          MR. KOENIG:  I don't believe so, Your Honor.  What

16   I would say is that the plan allows us to implement

17   something that is on the same or better terms.  We would

18   have to make that showing that it's on the same or better

19   terms.

20          THE COURT:  Actually, let me stop you there

21   because -- and please correct me if I'm wrong.  It seems to

22   me that I have two decisions that I have to make.  One, does

23   -- we'll use your terms -- does the motion constitute a

24   modification or an implementation?

25          MR. KOENIG:  That's right, Your Honor.

1            THE COURT:  If it's implementation, there may be

2     some baggage with that term, and otherwise it reflects good

3     business judgment and I can approve it.  Okay.  The other

4     choice, if I conclude it's a modification, what's the

5     language of the test?  I have to decide whether it has a

6     material adverse effect on creditor recoveries?

7            MR. KOENIG:  That's right, Your Honor.

8            THE COURT:  Okay.  So here, you know, if the

9     capitalization goes from 50 million to 60 million, but the

10    result is superior recoveries by creditors, supports

11    implementation -- would support -- it's a modification but

12    there's no material adverse effect on creditor recoveries.

13           MR. KOENIG:  Yeah, so you're saying that it's a

14    modification that should be approved without re-

15    solicitation.

16           THE COURT:  Yeah, without re-solicitation.  So,

17    here, you're going from 50 to 225.  That's only half the

18    equation.  I also have to look at what's the effect and

19    conclude, do I have before me evidence to establish that

20    putting 225 in capitalization versus the 50 million that

21    originally was suggested, leaving room for adjustment of the

22    budget or whatever, the debtor and Committee have

23    established that the proposed betterment of the terms are

24    sufficiently likely that yes, this is -- it's a

25    modification, but it doesn't have an adverse effect on

Page 135

```
1    creditor recoveries; therefore, no solicitation is required.
2              MR. KOENIG:  I think that if you believe that this
3    is -- that this is a modification of a plan and --
4              THE COURT:  I haven't -- let me make clear, I
5    haven't decided that yet.  But I'm just -- I'm going through
6    the decision tree.
7              MR. KOENIG:  Right.
8              THE COURT:  Okay.  If I -- if I say no, it's not a
9    modification --
10             MR. KOENIG:  We have to demonstrate good business
11   judgment.  We couldn't just say all of the --
12             THE COURT:  What do you have to show if it is --
13   if I conclude it is a modification?  In order for me not to
14   order new disclosure statement, new solicitation.
15             MR. KOENIG:  I think I have to demonstrate that
16   the modification, if it is a modification, does not have a
17   material adverse effect on creditors, and I think we've done
18   that through the Campagna declaration and the charts that
19   he's explained that it's hundreds of millions of dollars
20   better for creditors, and I think Mr. Puntus's testimony
21   supports that as well when he talks about the fact that a
22   dollar of liquid crypto distributed in peoples' pockets is
23   economically equivalent to -- I may have broken your
24   microphone.  Can you still hear me?
25             THE COURT:  Yeah, (indiscernible)
```

1          MR. KOENIG:  That a dollar of liquid crypto is

2     equivalent to a dollar of increased equity that the

3     creditors owe.  You said the Titanic.  I try not to describe

4     clients as the Titanic.  I think about it more like

5     ingredients in a salad, Your Honor.  There's a little bit

6     less tomatoes.  There's a little bit more carrots.  But it's

7     all going to creditors.  The creditors are getting the whole

8     salad.  They get to eat the whole salad.  Maybe there's a

9     little bit -- you know, the ingredients have moved around a

10    little bit, but this is all the same parties.  This is all

11    the same -- this is all the same currency that we've been

12    talking about the whole time.  You know, we -- as I

13    mentioned before, the early winddowns can include four types

14    of distributions.  This is including those same four types

15    of distributions.  It's a little bit more carrots; it's a

16    little bit less tomatoes.  Maybe I said it (indiscernible)

17          THE COURT:  So, what -- what's the standards that

18    I have to apply in determining -- okay.  The 50 to 225, no

19    one's arguing that's what it is -- 50 to 225.

20          MR. KOENIG:  Right.

21          THE COURT:  Okay.  What level of confidence --

22    what burden do you have in establishing that the result is

23    better for the creditors?

24          MR. KOENIG:  I think it's a -- I think that we are

25    --

Page 137

```
 1              THE COURT:  Or not worse for the creditors.  Not

 2     materially worse for the creditors.

 3              MR. KOENIG:  This is in the modification world.

 4              THE COURT:  Yes, in the modification world.

 5              MR. KOENIG:  I think we have to demonstrate that

 6     it's more likely than not that the recoveries are better for

 7     creditors because that's the typical standard --

 8              THE COURT:  Where do you derive the more-likely-

 9     than-not standard?  That's what I'm struggling with.

10              MR. KOENIG:  Yeah.

11              THE COURT:  Because, look -- and I really

12     genuinely haven't decided this.  I'm --

13              MR. KOENIG:  Right.

14              THE COURT:  You know, I'm -- look.  You can't sit

15     in this chair and you're all on the side; you've done all

16     this work, okay?  I approve everything.  You know, I have

17     hearings on approving fee statements.  So, Mr. Dixon is

18     probably right.  What's going to happen -- this doesn't get

19     approved.  That does not -- it isn't going to get approved

20     just because I think, "Oh, God.  I've got to put a stop to

21     this tomorrow."

22              MR. KOENIG:  You have to interpret the law.

23              THE COURT:  Yeah, I have to interpret the law, and

24     that's what I'm asking about.  So -- or I could decide it in

25     the alternative.  I'm not saying I am.  I could decide it in
```

Page 138

1    the alternative; it's an implementation, not a modification.

2    And if it's a modification, it doesn't have a material

3    adverse effect on creditor recoveries.  In fact, it appears

4    to me that the debtor has demonstrated that creditor

5    recoveries are going to be superior.  They can be a lot

6    worse if we have to go through -- if this were done, a new

7    disclosure statement, new voting, exactly the same thing I

8    have before me today, the burn rate just continues for

9    months while this goes on.  But that's not -- I can't decide

10   it just on that basis.

11            MR. KOENIG:  So, as to your question about the

12   (indiscernible) the first is the debtors have the -- the

13   movant has the burden --

14            THE COURT:  Then you would --

15            MR. KOENIG:  -- in an awful lot of things in

16   bankruptcy, and the standard is "more likely than not",

17   unless the code or the rules or some sort of case law

18   indicates that we have a higher standard.  The other thing I

19   would say is I don't think it really matters what the

20   standard is because we submitted evidence and the evidence

21   is on the contrary.  Mr. Campagna provided, you know,

22   testimony in his declaration about what the recoveries would

23   be.  Nobody else has challenged those assumptions.

24            THE COURT:  The only thing they said is 225 rather

25   than 50.

Page 139

1            MR. KOENIG:  They would prefer more liquid

2       cryptocurrency is what they're saying, but they're not

3       saying that recoveries are actually lower as a result.  They

4       just -- they would prefer more carrots and less tomatoes,

5       but that's not the standard.  The standard is, what is the

6       effect on the creditors' recovery?  What is the economic

7       effect?  And we've explained that the mining company is

8       worth hundreds of millions of dollars.

9            THE COURT:  It seems to me it can't be -- the

10      standard can't be that raising capitalization from 50 to 225

11      torpedoes the plan no matter what.  Even if they show the

12      pot of gold at the end of the rainbow, more likely than not,

13      they seem to be telling me, "50 to 225 -- that's not the

14      plan that was voted on.  You've got to order (indiscernible)

15      new disclosure statement, re-solicitation."

16            MR. KOENIG:  So, let's say a couple things.  Let's

17      say the plan doesn't say 50 million in it anywhere.  There's

18      Exhibit C in the disclosure statement.  I've got the

19      disclosure statement.  Exhibit C in the disclosure

20      statement, Page 1 -- it's Page 345 of 830 on the top.

21      That's where you locate Exhibit C.

22            THE COURT:  Okay.

23            MR. KOENIG:  So, there's a footnote and it says

24      something similar to what the plan says, which is if the

25      debtors decide to pivot to the orderly winddown, they may do

Page 140

1    so on terms set forth in the backstop plan sponsor agreement

2    -- that's the agreement with the brick -- or on terms that

3    provide a better recovery --

4              THE COURT:  Better recovery.

5              MR. KOENIG:  -- to the debtor's creditors than the

6    backstop plan sponsor.  Those words matter, Your Honor.

7    That set forth a standard that it has to be better for

8    creditors' recoveries, and that's exactly what we've done

9    (indiscernible)

10             THE COURT:  Where's that language on "provides a

11   better recovery"?

12             MR. KOENIG:  It's Page --

13             THE COURT:  345 of 830?

14             MR. KOENIG:  Correct, it's in Footnote 1 on that

15   page, Your Honor.  And what I would also point out to folks

16   that want more liquid crypto is by moving from the Newco to

17   the orderly winddown, the illiquid assets -- it would have

18   gone to the Newco and been monetized by Fahrenheit.  When

19   they were monetized, that would be capital of Newco instead

20   of, you know, "Maybe the new board will decide to make a

21   dividend to shareholders; maybe not."  Who knows?  That's

22   the new board's fiduciary duty.  By moving to the orderly

23   winddown, there are litigation administrators that are being

24   appointed to monetize those assets, and once monetized they

25   will immediately be available for distribution to creditors.

Page 141

1    So, for folks that want more liquid cryptocurrency, they're

2    going to get it.  (indiscernible)

3              THE COURT:  So, you're saying that I should look

4    at Footnote 1, Exhibit C, Page 345 of 830 that includes this

5    language of the plan that provides for better recovery for

6    creditors.

7              MR. KOENIG:  Correct, Your Honor, in addition to

8    the provisions of the plan that I said earlier.  I think

9    that that's the really constructive footnote.  Okay.  So,

10   let me turn back -- let me turn back to my argument.  So,

11   we've covered the 50 versus 225.  The other argument that

12   Ms. Bonsall raised was the equity compensation and whether

13   it was 100 percent or 100 percent subject to dilution.  And

14   so, frankly, I think she's just misreading the documents,

15   and it is complicated and there's a lot to sort through and

16   there's a lot of -- there's a lot of definitions.  So, I'm

17   looking again at the table in 4E in the plan.  It is true

18   that that table sets the defined term "Management

19   Compensation" and "Plan Sponsor Contribution" are deleted,

20   but if you go and you look at the defined terms in the plan,

21   those are the exact economic terms that were agreed to with

22   Fahrenheit.  It doesn't mean that there's zero compensation

23   for the mining manager.

24              If you look at the definition of "management

25   compensation" it includes three components:  a management

Page 142

1    fee, a mining manager fee -- both those are cash; they were

2    $20 million a year or $15 million a year -- as well as the

3    equity awards that was part of the Fahrenheit agreement.

4    So, three different components.  They were getting $35

5    million combined in cash and some equity.  If you were to

6    remove that definition, not just the words on the page but

7    the entire concept, we couldn't pay the mining manager

8    anything, cash or equity.  It's not just the equity.  You

9    couldn't pay them anything.  That can't possibly be the

10   import of documents.  We describe how you're going to have

11   to pay the mining manager a fee, and of course, nobody's

12   going to do work for free in this country.

13            What I would say for the equity point -- equity is

14   always subject to dilution, and in fact, or plan recognizes

15   that here.  The plan provides -- let me make sure I have the

16   right definition.  In the definition of "unsecured claim

17   distribution consideration", that describes the recoveries

18   to unsecured creditors, distributions to unsecured

19   creditors.  It says:  "Creditors will receive 100 percent of

20   the Newco common stock, subject to dilution by equity

21   incentives claims."  So, the Newco plan undisputedly

22   included equity, right?  And the plan described it as 100

23   percent equity to creditors --

24            THE COURT:  Subject.

25            MR. KOENIG:  Subject to dilution.  And every

Page 143

1    Chapter 11 plan I've ever been involved with had a -- that

2    there was a reorganization, not a liquidation -- included

3    equity incentives for management, and that's because that's

4    what every public company in America does; that's what every

5    large private company in America does.  You want to do that

6    to align the interests of the management company and the

7    shareholders.  So, of course any business is going to have

8    equity compensation.  The removal of those defined terms,

9    which again were economic terms agreed to with Fahrenheit --

10   that just means that the economic terms are out.  It doesn't

11   mean that no other similar economic terms could ever be

12   added.  That would mean that we couldn't pay our mining

13   manager cash or equity.  That can't possibly be what was

14   meant.  All it did was kill the defined term in the plan

15   documents.

16           Let's see.  Oh, and what I would say to that --

17   when I mentioned the defined term for Newco common stock in

18   Section 4E, that provides that the defined term for the

19   Newco common stock is replaced by "backup MiningCo common

20   stock".  So, if you trace through the definitions, it says:

21   "100 percent of backup MiningCo common stock, subject to

22   dilution".  That's really important, Your Honor.

23           So, I'll turn next to the modification part of the

24   argument.  I didn't hear Ms. Bonsall actually even argue

25   that the purported modification was material and adverse to

Page 144

1    creditors.  I didn't hear her argue that.  She said --

2            THE COURT:  She did.  (indiscernible) 50 to 225.

3            MR. KOENIG:  But she didn't explain how that was

4    worse for creditors.  She said, "Oh, there's less liquid

5    crypto," but it's not like we're lighting $175 million on

6    fire.  We are moving from the creditors' left pocket to the

7    creditors' right pocket.  We're, you know, changing the

8    ingredients on a salad.  We're rearranging the

9    (indiscernible) chairs, if Your Honor prefers.  But it all

10   belongs to creditors, and as I said earlier, Mr. Puntus

11   testified that a dollar in the left pocket is the same as a

12   dollar in the right pocket.  In fact, he thinks that that's

13   a conservative approach and that a dollar of equity could be

14   worth an awful lot more.  He points to Marathon, which in

15   the last year -- one of the largest and most successful

16   mining companies in the country -- their stock price went up

17   400 percent and Bitcoin price went up 150 percent.  What he

18   testified to was that the price of the stock in the mining

19   companies tends to outstrip the price of the commodity,

20   because as the commodity goes up, people are very interested

21   in those that generate the commodity.

22           So, I said it -- I said it before and I'll say it

23   again, just because it's such a key point.  The recoveries

24   of creditors are much higher, even holding cryptocurrency

25   prices constant at both --

Page 145

1           THE COURT:   (indiscernible)

2           MR. KOENIG:   -- apples to apples and oranges to

3      oranges, and the oranges are even -- if you don't control

4      for cryptocurrency prices, the recoveries are much, much,

5      much higher.  The value of the mining business has almost

6      doubled from what's in the disclosure statement, from 424

7      million in the orderly winddown to $740 million, and that's

8      the price at which US Bitcoin is invested.  They're putting

9      their money where their mouth is.  It isn't just me or even

10     Mr. Campagna saying, "Oh, yeah, Judge.  You know, the value

11     of the mining business has gone up."  Somebody who is

12     putting their new money on the table is agreeing that that

13     is the price at which -- the value at which, I should say --

14     the mining business should be considered.

15          Ms. Bonsall also argued that we're saying that we

16     can do anything we want in the budget; we can just move

17     things around willy-nilly.  Not sure -- we sort of talked

18     about that.  I have a business judgment standard.  I have to

19     articulate a good reason.

20          THE COURT:   (indiscernible) -- what if instead of

21     50 million you were going to put 500 million?

22          MR. KOENIG:   I think that that -- I think that the

23     argument is easier given that it's lower than the 450

24     million the creditors voted on for Newco.  I think that it

25     can argue that capitalizing Newco up to 450, any number

Page 146

```
 1   below 450 is easier.  I don't think 500 would be

 2   insurmountable.  I think, you know, as the number gets

 3   higher, it's going to be an awful lot harder for us to

 4   demonstrate that the new company actually needs it, but the

 5   evidence we've submitted today suggests that it doesn't.

 6   So, I would say 500 is more difficult than 450 or 449, but I

 7   don't think it's a redline either way, but I do think it's

 8   easier given that creditors voted on 450 capitalization

 9   amount for Newco, which the main business line is mining,

10   and the new board could have devoted 450 million to mining

11   if they wanted to.  That would have been their choice.  So,

12   any number below 450 is -- should be within the reasonable

13   expectations of creditors, I would argue.

14           I just want to take a moment to correct a couple

15   of points.  Ms. Bonsall says that the fees are higher in the

16   orderly winddown because the US Bitcoin fee went from 15

17   million to 20 million, but what she's missing is in the

18   Newco transaction -- I mentioned this a few minutes ago --

19   it was 15 US Bitcoin, 20 to Fahrenheit, for a total of 35.

20   What we did is we gave US Bitcoin a portion of that $20

21   million fee to compensate them for the fact that they are

22   now running the business that Fahrenheit was supposed to be

23   running.  So, we gave them 5 of the 20; that is a $15

24   million cost savings.  It's certainly not higher.  I covered

25   Cedarvale already and how we disclosed that -- Mr. Ehrler's
```

Page 147

1   declaration in the Cedarvale settlement motion, the

2   construction contract the day after we filed the motion.

3   Ms. Bonsall made quite the to-do about her client reading

4   everything in the disclosure statement, but frankly, I was

5   astonished by the declaration she filed.

6           In Paragraph 2, it says, "I read everything; I

7   read the disclosure statement.  I didn't understand that

8   there was a new business."  Then two paragraphs later, it

9   says, "Well, I understand the capitalization for that new

10  business was $50 million."  I don't understand how those two

11  things can be consistent.  There's plenty of places in the

12  disclosure statement that of course talk about how MiningCo

13  is going to be established under the orderly winddown.  I

14  won't bore Your Honor with all them, but just to point out

15  the first one, Page 5 of the numbered pages on the bottom is

16  the first place where this appears.  It's the fifth page of

17  the disclosure statement.  It provides that the debtors can

18  pivot to the orderly winddown, which is a standard -- a

19  standalone reorganization of the debtor's mining business.

20          THE COURT:  I -- one of the things that bothered

21  me about the argument I heard this morning was it seemed to

22  be saying winddown equals liquidation.  It doesn't.  The

23  winddown plan here contemplated a new standalone business.

24  The issue was what was -- what lines of business were going

25  to go into it.  They may have had very good reasons for

1    wanting to put staking with it.  It isn't happening, but it

2    was -- the business wasn't going to be liquidated in one,

3    three, or five years.  The expectation, the hope is that

4    creditors will receive a tradeable security --

5              MR. KOENIG:  Right.

6              THE COURT:  Which they can keep or sell.

7              MR. KOENIG:  Right.  And what I would say, there

8    was a provision of the disclosure statement that she

9    referenced that talked about "You won't be able to realize

10   the upsides of new regulatorily compliant businesses,"

11   plural.  The plural is important.  MiningCo is just mining.

12   The reason why the disclosure statement read that way was

13   Newco contemplated mining, staking, and other regulatorily

14   compliant businesses that may occur into the future.  That's

15   why the disclosure read that way.  It didn't say, "There

16   will be no new business."  It just said, "You won't be able

17   to realize the upside from all these other interesting

18   cryptocurrency businesses."

19             THE COURT:   (indiscernible) sitting in the

20   audience.  I guess what I wondered about is, could --

21   assuming that MiningCo becomes registered, tradeable

22   security, could it decide next year it's going to expand its

23   lines of business to include staking and then acquire the

24   assets of a private entity, or from the liquidation of the

25   rest of Celsius wind up having a staking business that just

1    wasn't there when they started the business?

2            MR. KOENIG:  I'm a bankruptcy lawyer, not a

3    securities lawyer.  I'm sorry, was that --

4            THE COURT:  That's not really a question, but it

5    did -- it's something that crossed my mind.  I was just

6    wondering about -- and let me make clear, never for a minute

7    did I expect the SEC to modify its procedures for

8    considering whether or not to give early clearance to Newco.

9    I did not.  The only thing I hoped was that the SEC would

10   act expeditiously, okay?  I'm not in the slightest

11   questioning their decision that no, they couldn't do early

12   clearance when there are no audited financials for this

13   significant part of the business.  So, I just --

14           MS. SCHEUER:  (indiscernible)

15           THE COURT:  So, I -- really, and I mean that

16   sincerely.  I have great respect for the SEC, and I just --

17   but I've just been wondering about when you see all the

18   public companies that decide to do acquisitions, to do --

19   expand the lines of business.  We'll see what happens five

20   years from now, whether the statement looks good then or not

21   and whether people reach into it or not.

22           MR. KOENIG:  Right.  Before I move on from Mr.

23   Villinger I'll just say, sort of apropos with the questions

24   you had for Mr. Adler earlier, when he first filed that

25   declaration, I was frankly expecting to see an awful lot of

Page 150

1    others from the other members of this group, and I was a

2    little bit surprised that they was only -- that there was

3    only one.  Just a couple of quick comments and then I'll be

4    done.  Ms. Bonsall talked about how there were no

5    disclosures about the risks of investing in a new Bitcoin

6    mining business -- I used the break to skim through the

7    disclosure statement.  Starting --

8              THE COURT:  You know, I looked at those risk

9    disclosures pretty carefully.  I think, in fact, I added one

10   or two.

11             MR. KOENIG:  I was going to say, the thing I

12   remember was at the disclosure statement hearing Your Honor

13   freehand drafted --

14             THE COURT:  Yeah.

15             MR. KOENIG:  -- one more that we put in there.

16   So, I remembered that -- I remembered that they were there,

17   but there's -- starting on Page 263 of the disclosure

18   statements -- the disclosure statement.  Five, six, seven,

19   eight, nine, ten, eleven, twelve -- all mining related.

20   There's a lot more to it, but I won't waste the Court's

21   time.  She also said that there's nothing about the risk of

22   not obtaining regulatory approvals.  I would point her and

23   the Court to Page 258 of the disclosure statement.

24             THE COURT:  That was frequently mentioned in court

25   that you needed regulatory approval from the SEC and so that

1    risk was always prominent.

2         MR. KOENIG:  Right.  I just -- I was surprised

3    that the argument was being made that they'd read

4    everything, and then they talked about how all these

5    different things aren't there and it's pretty plainly there

6    in the documents.  So, just to wrap up on the borrowers,

7    it's pretty apparent what the borrowers are doing here.

8    They had the ability in the Newco transaction to opt for

9    more liquid crypto.  That election is expressly written out

10   of the orderly winddown in the plan, so they're upset about

11   that.  They would like to get more liquid crypto.  But that

12   doesn't allow them to hold up the plan for everybody else.

13   That's just the way the documents read, the documents that

14   they support and the documents that they did not object to

15   at confirmation.  They don't get to relitigate everything

16   because given the way that things went they are

17   disappointing.  We're all a little bit disappointed about

18   the way that things went with having to pivot to the orderly

19   winddown, but we're here and we're trying to make the best

20   of it.  We want to get out of -- we want to get out of

21   bankruptcy and make distributions, and as I said, the two

22   options before the Court are, approve the motion and let us

23   get out of bankruptcy, or of course if Your Honor determines

24   a re-solicitation is necessary, we will do it, but we have

25   to do it.  There's no way to simply pivot to the $50 million

1    winddown.  Unless you have anything else for me on the

2    borrowers, just really briefly for the record, Ms. Lau's

3    comments on --

4              THE COURT:  Don't even bother.

5              MR. KOENIG:  Okay.  That's all I have.  The

6    debtors respectfully request (indiscernible)

7              THE COURT:  Mr. Colodny?

8              MR. COLODNY:  I don't have much more, Your Honor,

9    but your question of (indiscernible) $500 million -- I'm not

10   sure I agree with Mr. Koenig that $500 million would be

11   acceptable and 450 was Newco, which was supposed to be a

12   much bigger company.  This was something --

13             THE COURT:  I don't either.

14             MR. COLODNY:  This was something that was

15   discussed, negotiated, and I think Mr. Adler put it in one

16   of his nine footnotes to his supplements.  It said he agreed

17   with me that the votes say something.  We did not go into

18   this thinking that there was unlimited amounts of cash to

19   put into the Newco.  We went in with the thought of, "What

20   is the appropriate amount to make sure that the equity is

21   not impaired and we're able to give the most amount of

22   cryptocurrency back to creditors?"  And I think that the

23   business judgment in arriving at that is what Your Honor has

24   to look at, and I think that here, you have a creditor-led

25   fiduciary, debtors who are fiduciary to all constituents,

Page 153

1    and an ad hoc group of a large amount of earned creditors,

2    and you heard from Mr. Dixon (indiscernible) earned

3    creditors we've spoken with a lot that all are saying 225 is

4    the correct number.

5            We don't want to impair what is, you know,

6    arguably the largest asset of this estate and going to be a

7    large part of everyone's distribution at the risk of giving

8    a little more crypto to everybody.  You know, this is a

9    balancing act.  In bankruptcy, there's always business

10   judgments that are executed.  There are always people that

11   don't agree with the business judgments but here we sought

12   to test that extremely carefully.  We approached it in a

13   very measured manner with that in mind and arrived at 225 as

14   the appropriate figure, trying to strike that appropriate

15   balance.

16           THE COURT:  Okay.

17           MR. COLODNY:  Thank you.

18           THE COURT:  All right.

19           MR. KOENIG:  I'm sorry, Your Honor.  We do have

20   one more -- we have a sealing matter, so just

21   (indiscernible)

22           THE COURT:  Granted.

23           MR. KOENIG:  Thank you.

24           THE COURT:  And I just didn't say that; I did read

25   the motion.

Page 154

1              MR. KOENIG:   Thank you, Your Honor.   We'll submit

2      the order.

3              THE COURT:   Okay.   I'm taking it under submission.

4      I understand the importance of trying to resolve this

5      quickly.   I think one of my law clerks communicated my

6      request for expedited transcript from today's hearing.   I

7      have to go back -- I've got a lot of reading to do.   I did

8      read a lot before taking the bench today.   I want to go back

9      and look at some of the specific things in the disclosure

10     statement and I will try and reach a decision promptly, but

11     we're also at a very busy end of the year period, busy --

12     not necessarily all with work in the court.   All right.

13     Thank you very much for everybody's participation.   Karen,

14     thank you very much, as always.   We're adjourned.

15              (Whereupon these proceedings were concluded at

16     3:33 PM)

17

18

19

20

21

22

23

24

25

Page 155

1                          C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 22, 2023