Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9             Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY  10004

15

16                   January 11, 2024

17                   10:04 AM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JONATHAN & FRANCES

Page 2

1    HEARING re Debtor's Motion for Entry of an Order Authorizing

2    the Debtors to Redact and File Under Seal Certain

3    Confidential Information in the BRIC Agreement (related

4    document(s) 41 15, 41 16, 4135, 4151, 4050)

5

6    HEARING re Debtors Motion for Entry of an Order (I)

7    Authorizing and Approving Certain Fees and Expenses for the

8    BRIC in Connection with the Implementation of the MiningCo

9    Transaction, and (II) Granting Related Relief. (Doc# 4151,

10   4050, 4115, 4116)

11

12   HEARING re Application of the Custody Ad Hoc Group, Pursuant

13   to Sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy

14   Code, for Allowance and Payment of Professional Fees and

15   Expenses. (Doc## 3660, 3719, 3836, 4016, 4018, 4025, 4027,

16   4035, 4093, 4188, 4193, 4194, 4205, 3467, 3356, 3498)

17

18   HEARING re Application of The Ad Hoc Group of Withhold

19   Account Holders for Allowance and Payment of Fees Under

20   Bankruptcy Code Sections 503(b)(3)(D) and 503(b)(4). (Doc#

21   3663, 3836, 4016, 4018, 4025, 4035, 4093, 4186, 4188, 4193,

22   4194, 4205, 3467, 4205, 3467, 3498)

23

24

25

Page 3

1    HEARING re Application of Ad Hoc Group of Earn Account

2    Holders for Allowance and Payment of Professional Fees and

3    Expenses Incurred in Making a Substantial Contribution (Doc

4    no. 3654, 3708, 4185, 4187, 4016, 4018, 4025, 4027, 4205,

5    3467, 3498)

6

7    HEARING re Motion to Allow Payment of Expenses incurred

8    Pursuant to 11 U.S.C. §§ 503 in making a substantial

9    contribution filed by Immanuel Herrmann. (Doc# 3674, 3836,

10   4015, 4018, 4035, 4093, 4188, 4193, 4194, 4205)

11

12   HEARING re Substantial Contribution Motion of Daniel

13   Frishberg. (Doc# 3675, 3836, 4016, 4018, 4035,

14   4093,4188,4193,4194,4205)

15

16   HEARING re Application of Ignat Tuganov for Entry of an

17   Order, Pursuant to 11 U.S.C. 503(b)(3)(D) AND 503(b)(4), for

18   Allowance and Reimbursement of Reasonable Professional Fees

19   and Actual, Necessary in Making a Substantial Contribution

20   to these Cases. (Doc# 3665, 3666, 3686, 3836, 3718, 3836,

21   4010, 4016, 4018, 4027, 4035, 4093, 4158, 4184, 4188, 4193,

22   4194, 4205, 4211, 4214, 4216)

23

24

25

Page 4

1    HEARING re Amended Notice and Amended Application of Bnk to

2    the Future (BF) Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and

3    503(b)(4) for Allowance and Payment of Professional Fees and

4    Expenses Incurred in Making a Substantial Contribution.

5    (Doc# 3672, 3787, 3836, 3670, 3712, 3799, 4015, 4016,

6    4018, 4025, 4027, 4034, 4035, 4093, 4106, 4188, 4189, 4193,

7    4194, 4205)

8

9    HEARING re Substantial Contribution application for Zachary

10   Wildes. (Doc# 3615, 3762, 3486, 4025, 4035, 4093, 4205)

11

12   HEARING re Motion to Allow Additional Recovery of Liquid

13   Crypto in the form of 20 ETH filed by Rebecca Gallagher.

14   (Doc## 3662, 3836, 4016, 4018, 4025, 4027, 4035, 4093, 4185,

15   4187, 4191, 4193, 4194, 4205, 3654)

16

17   HEARING re Motion for Payment of Administrative Expenses for

18   Substantial Contribution by Pending Withdrawal Ad Hoc Group

19   for Adrienne Woods, Creditor's Attorney, period: 2/8/2023 to

20   9/28/2023, fee:$28927.50, expenses: $350. (Doc# 3673, 3705,

21   3734, 3836, 4016, 4018, 4025, 4035, 4093, 4188, 4193, 4194)

22

23

24

25

1    HEARING re Debtor's Motion Seeking Entry of an Order (I)

2    Designating Additional Items to be Included in Appellants

3    Designation of Record on Appeal; (II) Striking Certain Items

4    from Appellants Designation of Record on Appeal; and (III)

5    Granting Related Relief. (Doc# 4126, 4163, 4174, 4032, 4180)

6

7    HEARING re Debtor's and the Official Committee of Unsecured

8    Creditor's Joint Motion Seeking Entry of an Order (I)

9    Designating Additional Items to be Included in Appellants

10   Designation of Record on Appeal; (II) Striking Certain Items

11   from Appellants Designation of Record on Appeal; and (ill)

12   Granting Related Relief. (Doc# 4166)

13

14   HEARING re Debtor's and the Official Committee of Unsecured

15   Creditors Joint Supplemental Motion Seeking Entry of an

16   Order (I) Designating Additional Items to be Included in

17   Appellants Designation of Record on Appeal; (II) Striking

18   Certain Items from Appellants Designation of Record on

19   Appeal; and (III) Granting Related Relief. (Doc# 4180, 3972,

20   4032, 4126)

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 6

```
 1   A P P E A R A N C E S :

 2

 3   KIRKLAND & ELLIS LLP

 4        Attorneys for the Debtors

 5        300 North LaSalle Drive

 6        Chicago, IL 60654

 7

 8   BY:  CHRISTOPHER KOENIG

 9        DAN LATONA

10

11   WHITE & CASE LLP

12        Attorneys for the Official Committee

13        of Unsecured Creditors

14        555 South Flower Street, Suite 2700

15        Los Angeles, CA 90071

16

17   BY:  AARON COLDNY

18

19   MCCARTER & ENGLISH LLP

20        Attorneys for Ad Hoc Group of Borrowers

21        Worldwide Plaza

22        825 Eighth Ave., 31st Floor

23        New York, NY 10019

24

25   BY:  DAVID ADLER
```

```
 1    VENABLE LLP

 2         Attorneys for Ignat Tuganov

 3         151 West 42nd Street

 4         New York, NY 10036

 5

 6    BY:  JEFFREY S. SABIN

 7

 8    TROUTMAN PEPPER HAMILTON SANDERS LLP

 9         Attorneys for Ad Hoc Group of Withhold Accountholders

10         4000 Town Center, Suite 1800

11         Southfield, MI 48075

12

13    BY:  DEBORAH KOVSKY-APAP

14

15    OFFIT KURMAN

16         Attorneys for Ad Hoc Group of Earn Accountholders

17         590 Madison Avenue, 6th Floor

18         New York, NY 10022

19

20    BY:  JOYCE A. KUHNS

21

22

23

24

25
```

Page 8

1    WILLKIE FARR & GALLAGHER LLP

2         Attorneys for BRIC

3         787 Seventh Avenue

4         New York, NY 10019

5

6    BY:  YARA KASS-GERGI

7

8    UNITED STATES DEPARTMENT OF JUSTICE

9         Attorneys for the U.S. Trustee

10        201 Varick Street, Suite 1006

11        New York, NY 10014

12

13   BY:  MARK BRUH

14

15   ERVIN COHEN & JESSUP LLP

16        Attorneys for Simon Dixon and BNK To The Future

17        9401 Wilshire Blvd., 12th Floor

18        Beverly Hills, CA 90212

19

20   BY:  CHASE ALEKSANDER STONE

21        DAVID N. TARLOW

22

23

24

25

```
 1    TOGUT SEGAL & SEGAL LLP
 2         Attorneys for Ad Hoc Custody Group
 3         One Pennsylvania Plaza, Suite 3335
 4         New York, NY 10119
 5
 6    BY:  BRYAN KOTLIAR
 7
 8    ALSO PRESENT:
 9    Jason Amerson - Pro se creditor
10    Rebecca Gallagher - Pro se creditor
11    Johan Bronge - Pro se creditor
12    Immanuel Herrmann - Pro se creditor
13    Daniel Frishberg - Pro se creditor
14    Simon Dixon - Pro se creditor
15    Cathy Lau - Pro se creditor
16
17
18
19
20
21
22
23
24
25
```

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. KOENIG:  Good morning, Your Honor.  This is

5     probably the last time I'll say it, but happy near year.

6              For the record, Chris Koenig, Kirkland & Ellis, on

7     behalf of the Debtors.

8              Your Honor, before jumping into our agenda today,

9     I just wanted to provide Your Honor and the other parties a

10    quick update on the projected effective date of the plan and

11    the commencement of distributions.

12             We are still working towards an effective date at

13    the end of January, the end of this month.  There is still

14    much work to do, but we are cautiously optimistic that we

15    can get everything done so that the company can emerge from

16    bankruptcy at the end of the month and start distributions.

17             On distribution, we have been working to present

18    communications to accountholders on what they should expect

19    when distributions commence and what they need to do to

20    receive distribution.  Of course in order to receive

21    distributions, they will need to go through a KYC process

22    with the applicable distribution agent so that the

23    distribution agent is authorized and allowed under

24    applicable law and regulations to make distributions.

25             So about two weeks ago we sent an initial email to

Page 11

1    all accountholders that are entitled to receive

2    distributions under the plan informing them of their

3    distribution agent for cryptocurrency -- that's Coinbase or

4    PayPal -- and directing them with how to KYC with that

5    distribution agent so they can get ahead of the game, go

6    through the registration process, and be ready to go to

7    receive their distribution promptly.

8              As you might expect, that communication caused a

9    flood of questions and support tickets back.  We received

10   over 25,000 support tickets in the last two weeks.

11             THE COURT:  I think there were several

12   communications that the Corut received, and in each instance

13   we made sure that copies were sent to the Committee and the

14   Debtor, counsel for the Committee and the Debtor.

15             MR. KOENIG:  Yes.  And thank you, Your Honor.  We

16   have added those to the queue and they've been responded to.

17             Of course distributions in this case, it's a

18   herculean task.  We had 25,000 support tickets.  Hundreds of

19   thousands of creditors are entitle to receive cryptocurrency

20   and almost 100,000 creditors will be entitled to receive the

21   mining newco equity.

22             So what we've decided to do to streamline the

23   process is to publish a document that walks through

24   frequently asked questions about distributions.  Almost all

25   the questions we're getting are very common and are the same

Page 12

1    10, 20, 30 questions.  So we've been collecting all the

2    questions we've received both from the main ticketing and

3    email system and also from key constituents in the case.

4    The Committee, the Ad Hoc Groups, and others.  And we have

5    an FAQ that has been posted to a blog that Celsius runs on

6    Medium with key questions and answers.  And just before you

7    took the bench, we filed just a quick notice on the docket

8    directing all parties to that FAQ so that people can go and

9    look at it.  And hopefully that streamlines the process.

10            We of course have a system in place to respond to

11   tickets.  But given the volume and the reduced workforce

12   that the company has, we thought that this was the best way

13   to get quick answers out to people who have common

14   questions.

15            We expect to continue to update that FAQ probably

16   once a week or so through emergence.  And of course we will

17   continue to update post-emergence as well.  So we encourage

18   everybody to take a look at the notice on the docket, take a

19   look at the FAQ.  It will be the most up-to-date source of

20   answers, the best way to get quick answers to common

21   questions, and much faster than opening a ticket.  It

22   includes answers to common questions such as what do I do if

23   I'm supposed to receive a distribution from PayPal but I'm

24   banned from PayPal, can I change my distribution agent, what

25   if I'm in a country that doesn't have an authorized

Page 13

1    cryptocurrency distribution agent?  So all of those common

2    questions are there.  And of course if you still have a

3    question, feel free to reach out.  All of the support emails

4    and ticket systems are on that FAQ to make it easy for you

5    to submit a question.

6           Also in advance of the effective date, we have

7    been working through all the data that's necessary for these

8    distributions.  As Your Honor may recall, the plan included

9    a convenience class for those under $5,000 of claims.  And

10   anybody above $5,000 could affirmatively elect to reduce

11   their claim to $5,000 and receive the convenience class

12   treatment.

13          When we looked at the data, we noticed that there

14   were quite a bit of people that made an election that in our

15   view may have been uneconomic.  There were seven individuals

16   who had a claim of over $1 million who nonetheless checked

17   the box.  We thought that that was probably a mistake.  So

18   we reached out to the creditors that had high claims but

19   nonetheless checked the box and said did you mean to do

20   this, would you like to rescind your election and go back to

21   the claim you had before.  We still have a little bit of

22   time before those recissions, rescissions -- not sure what

23   the word is -- are due, but over half of the people that we

24   emailed have realized that it was probably their mistake and

25   rescinded their election.

Page 14

1          That's all that I have on distributions, Your

2    Honor.  We will continue to post updates to the docket and

3    to the FAQ and of course address questions that creditors

4    have.  So unless you have initial comments for me, I will

5    turn it over to Mr. Latona and we'll get through the agenda.

6          THE COURT:  Let me ask.  So I issued an opinion

7    and an order was entered on December 27th granting the

8    Debtor and Committee's motion with respect to the changes

9    that were made in (indiscernible).  Am I correct that no

10   appeals were filed from --

11         MR. KOENIG:  That's correct, Your Honor.  I

12   believe that the 14-day --

13         THE COURT:  The 14 days has run.

14         MR. KOENIG:  Ran yesterday.

15         THE COURT:  Yes.  Okay.  I just wanted to confirm

16   that -- I did check the docket and it appeared to me that...

17         MR. KOENIG:  Right.  We had it circled on our

18   calendar, Your Honor.

19         THE COURT:  Okay.  So I also saw two reports

20   within the last week that Celsius had unstaked a substantial

21   quantity of ETH.  And was that something that was planned,

22   or was that -- because the reports I read, it freed up a

23   considerable amount of crypto for potential distribution.

24         ERIC ROBERTS:  Yes.  That's exactly why we did it,

25   Your Honor.  So the ETH that's staked, when we unstake it,

1    there is a queue to unstake.  And so we don't want to get to

2    the end of the month, great news, we have the effective

3    date, and the queue for ETH unstaking is several weeks or a

4    month or whatever.  So we went through the process of

5    beginning to unstake our ETH so that we didn't get caught

6    ready to go effective without distributions to give out to

7    creditors.  So it was very much planned, very much

8    intentional.  And the queue was a little bit shorter than we

9    expected, but it's impossible to know until you jump in that

10   queue.

11            THE COURT:  Approximately how much of crypto was

12   freed up by doing that?

13            MR. KOENIG:  Several hundred million dollars.  I

14   don't have the number offhand.  But substantially all of our

15   ETH was staked in order to earn a return during these cases.

16   But now that we are ready to give it out, we wanted to

17   unstake it so that we could promptly make distributions once

18   we're able.

19            THE COURT:  Okay.  I don't have any more

20   questions.

21            MR. KOENIG:  Wonderful.  I will cede the lectern

22   to my partner.

23            THE COURT:  Thank you very much.

24            MR. KOENIG:  Thank you.

25            MR. LATONA:  Good morning, Your Honor.  For the

Page 16

1   record, Dan Latona of Kirkland & Ellis on behalf of the

2   Debtors.  The first item on the agenda today is the Debtor's

3   motion to approve paying the expense reimbursement and fees

4   to the Brick and the related sealing motion.  The sealing

5   motion was filed at Docket 4116.  The motion itself was

6   filed at Docket 4189.

7           And, Your Honor, as outlined at the hearing on

8   December 21st, when we received news that the SEC was not

9   going to give us pre-clearance on filing the NewCo

10  transaction, the Debtors realized that pivoting to the

11  mining co transaction and otherwise monetizing those

12  illiquid assets became a very pressing concern.  But also as

13  we have stated throughout the cases at this time, since

14  selecting the Brick as the initial plan sponsor, the Debtors

15  and the Committee have made substantial progress on a number

16  of the services that were originally included in the scope

17  that the Brick was meant to serve, such as hiring

18  distribution agents to distribute liquid crypto, monetizing

19  certain illiquid assets through various stages of

20  litigation, and converting all coins into bitcoin and

21  Ethereum for distribution.  So as a result of that, the

22  scope of services needed from the Brick was substantially

23  reduced and that required a renegotiation.

24          And so over the course of the first few weeks in

25  December, the Debtors, the Committee, and the brick

Page 17

1    professionals negotiated a very hard-fought and arms length

2    negotiations the terms that are attached to the motion as

3    Exhibit A I believe.

4           And so the Brick will serve as complex asset

5    recovery manager to monetize certain of the Debtor's

6    illiquid assets and pursue certain causes of action against

7    certain of the Debtor's professionals.

8           And, Your Honor, what's notable is that the fees

9    that are going to be paid to the Brick, which are $5 million

10   over the next three years exclusive of inventive fees, are

11   not incremental to the estate.  Those are being funded by

12   reductions in both the litigation administrator and the plan

13   administration budget.  So those fees are not incremental to

14   the estate.

15          Furthermore, to the extent that Debtors were to

16   select the Brick and the scope of services as contemplated

17   in the original orderly winddown, those fees would have been

18   $46 million exclusive of incentive fees.  So this term sheet

19   and the fees negotiated represents a significant reduction.

20          The incentive fees payable to the Brick on

21   monetizing the illiquid assets and pursuing certain causes

22   of action are only payable to the extent the Brick achieves

23   a resolution event as defined in the term sheet.  And that

24   means bringing those causes of action or monetizing those

25   liquid or illiquid assets to a substantial conclusion or at

Page 18

1    least reducing it to a final judgment.  So those are only

2    payable to the extent the Brick achieves a resolution event.

3         Notably, Your Honor, no party objected to the

4    Debtor's motion.  And for the exact reason that the Debtors

5    and the Committee selected the Brick as the original backup

6    plan sponsor, the Debtors and the Committee selected Brick

7    to monetize certain illiquid assets and pursue certain

8    causes of action for their experience in this field,

9    monetizing illiquid assets in the distressed field.

10        Your Honor, the sealing motion itself seeks to

11   seal certain of the Debtor's projected recoveries on certain

12   causes of action.  We've done this before in this case, but

13   for the reasons set forth in the sealing motion because

14   revealing those to the Debtor's counterparties would give

15   them an idea of what they value --

16        THE COURT:  It's consistent with orders I've

17   entered in other cases in similar circumstances.

18        MR. LATONA:  Right.  So, Your Honor, unless you

19   have any further questions for me, we would request entry of

20   the order filed at Docket 4189.

21        THE COURT:  Does anybody else wish to be heard?

22   Mr. Colodny, do you want to be heard on this?

23        MR. COLODNY:  Your Honor, I believe I mentioned

24   this at the Mining Co hearing.  But the Brick settlement was

25   a part of a global resolution of all disputes.  The fees are

Page 19

1    part and parcel to that.  The Brick is a specialist in

2    recovering these complex assets.  We believe we have reached

3    a structure which is net neutral to the estate, incentivizes

4    the Brick to bring back more money for creditors, and that

5    they are poised and ready to do that upon the effective

6    date.  We hope that they monetize these things quickly so

7    that money can get back to creditors and we can wrap this

8    up.

9            THE COURT:  Thank you.  Anybody else wish to be

10   heard?  All right.

11           So first the sealing motion is granted.  It's

12   consistent with what I've done in other cases over the

13   years.  And with respect to the approval fees, it's granted

14   as well.

15           MR. LATONA:  Thank you, Your Honor.  We will make

16   sure to send a Word version of that to chambers as soon as

17   possible.

18           THE COURT:  Thank you very much.

19           MR. LATONA:  Your Honor, the next items on the

20   agenda relate to various substantial contribution

21   applications filed by various ad hoc groups and pro se

22   parties.  At this point I will turn the lectern over to my

23   partner, Mr. Koenig, to give some initial comments and then

24   we'll proceed on the agenda.

25           THE COURT:  Thank you very much.

Page 20

1              MR. KOENIG:  Hello again, Your Honor.  Chris

2      Koenig for the record.

3              So we have a bunch of substantial contribution

4      applications.  We are of course happy to take them in

5      whatever turn Your Honor would prefer.  The way that we

6      structured them on the agenda was there are a number of

7      applications that are supported by the Debtors and the

8      Committee and then there are some that are not.  So what we

9      did is items through I believe it's eight are supported by

10     the Debtors and the remainder are not.  So perhaps what

11     makes the most sense is to go through three through eight,

12     let the movants present.  Mr. Colodny and I can speak

13     generally as to the ones that we support. And then I know

14     Ms. Cornell objected to all of the applications.  I don't

15     know whether you want her to object once or twice.  But

16     maybe we group them in that way to try to streamline the

17     hearing this morning.

18             THE COURT:  First let me ask Ms. Cornell.  I don't

19     know whether Ms. Cornell or Mr. Bruh -- I don't see Ms.

20     Cornell in the courtroom, but she may be on Zoom.  I don't

21     know.  Mr. Bruh?

22             MR. BRUH:  Thank you, Your Honor.  Mark Bruh for

23     the United States Trustee.  Ms. Cornell could not be here.

24     I will be arguing on behalf of the United States Trustee.

25             THE COURT:  Do you have a preference as to --

Page 21

1           MR. BRUH:  I guess when I present my objection, I

2   put it down as three groups because we objected to all of

3   them as the attorneys who are representing ad hocs, as

4   attorneys representing individuals, and then individuals.

5   So that's how we'll present our objection to Your Honor.  As

6   they present theirs, I guess I'll go last so that I can

7   present it this way.

8           THE COURT:  That's fine.  We'll proceed in that

9   fashion.

10          MR. BRUH:  Thank you.

11          MR. KOENIG:  Wonderful.  So I think the Custody Ad

12  Hoc Group is up first on our agenda.  We'll just go through

13  the agenda.

14          MR. KOTLIAR:  Good morning, Your Honor.  Bryan

15  Kotliar of Togut Segal & Segal on behalf of the Custody Ad

16  Hoc Group.  I had a joke about saying happy new year, but

17  Mr. Koenig stole my thunder.  So I'll just say happy new

18  year.

19          We are here today, as some others, on our

20  substantial contribution application.  I have the benefit

21  and the burden of going first.

22          Our application was filed on October 2nd at Docket

23  3660.  The Debtors and the Creditors' Committee, as Mr.

24  Koenig said, had filed a number of pleadings in support of

25  our application.  Those are at Docket Numbers 4025, 4027,

1    and 4179.  We did get one objection from the U.S. Trustee's

2    Office.  That's at Docket Number 4018, and we filed a reply

3    last week.  That's at Docket Number 4188.

4              As we say in that reply and in our application, we

5    have decreased our requested fees by $48,505.50, expenses by

6    $7,696.66.  In total, our total request is for $740,447 --

7              THE COURT:  $740,447.50.

8              MR. KOTLIAR:  Fifty cents in fees.  And we are not

9    asking for reimbursement of any expenses.

10             THE COURT:  So let me just -- this is going to go

11   throughout.  I don't anticipate ruling from the bench with

12   respect to any of these applications.  I have spent a lot of

13   time reviewing them.  Also reviewing the law in this circuit

14   and elsewhere, other decisions regarding substantial

15   contribution applications.

16             So what I am likely to do is probably enter a

17   single order that addresses some explanation of the law that

18   I'm applying and then considers each of those applications

19   that are before me today.  I guess one has been adjourned.

20   So you can go ahead and make whatever argument you want to

21   do.  And I think it would be best and I would like to follow

22   Mr. Koenig's suggestions in dealing with sort of the groups

23   of applications together and then give the U.S. Trustee a

24   chance to argue its objections.  And there were also other

25   objections, I guess people -- I don't know whether they may

Page 23

1    be in the courtroom or on Zoom.  I'm certainly willing to

2    listen to anyone.  I'm hoping we won't have to have

3    duplicative arguments.  But go ahead with your argument,

4    okay?  I just wanted to lay the groundwork for what -- so

5    don't expect to walk out with a ruling.

6              MR. KOTLIAR:  Understood, Your Honor.  And thank

7    you for that color.  Based on our experience and knowing how

8    closely that you review fee applications, we expect that

9    Your Honor would probably spend a lot of time with these

10   applications.

11             So I don't have anything to add other than what's

12   in our application and reply.  I'm happy to answer any

13   questions that the Court has about our application here or

14   response to the objections.

15             THE COURT:  Focus if you would and tell me what is

16   it that you think you on behalf of your clients or your

17   colleagues on behalf of your clients delivered to this case

18   that resulted in a benefit to the estate as a whole.  One of

19   the things -- I mean, I read the law in this circuit -- and

20   maybe there are some differences elsewhere.  But I read the

21   circuit law is that in order to be approved, a substantial

22   contribution application really needs to show a benefit to

23   the estate and not simply the interest of the particular

24   party that's represented.

25             MR. KOTLIAR:  Sure, Your Honor.  So I think

Page 24

1    there's four important things that our group did that was a

2    substantial contribution to this estate that was outside of

3    the interest of the members just of our group.  Those four

4    things are we brought procedural and process efficiency to

5    the case by raising important questions that weren't

6    necessarily before the Court.

7             For example, on the property of the estate

8    question that affected custody assets from the beginning of

9    the case, the Debtors did file a motion to address some

10   custody assets, but the Debtors didn't address the question

11   of title of ownership in that motion.

12            The Court may recall in the Earn litigation there

13   was a motion filed.  It didn't address the title question.

14   There were dozens of objections and a different procedural

15   posture took months to sort out.  We sort of streamlined

16   that negotiation and put the issue front and center.

17            THE COURT:  Well, when you say it took months to

18   sort out, once the issues were defined, we went ahead and I

19   wrote the decision in -- I guess it was January of last year

20   addressing the issue.  It was sort of viewed as a gating

21   issue throughout.  But go ahead.  And so the issue was

22   framed, but I'm not sure that I see how any of the ad hoc

23   groups or any of the other applicants added value to it.  It

24   was pretty clear to the Court from the start that the Court

25   had to decide the important gating issue.  Obviously as to

Page 25

 1    custody accounts, the legal issues were different.  We never

 2    -- that issue essentially was resolved.  The Debtor

 3    ultimately did not disagree with respect to the ownership of

 4    pure custody, for example.

 5          MR. KOTLIAR:  Yes.  So I think raising the

 6    question is one thing, but how the question and how much it

 7    cost that question to get resolved are two different things.

 8    And so by having a single sort of representative for custody

 9    holders on the other side of that issue and being involved

10    in the case, there was far less objections, far less people

11    to respond to, far less inquiries, and it streamlined the

12    litigation.

13          We were also the counterparty to negotiate the

14    custody settlement, which was a key aspect of the plan.  Our

15    group negotiated on behalf of all custody holders.  The

16    ultimate settlement that was obtained was not an offer that

17    was made exclusively to the members of our group, it was an

18    offer that was made to all custody holders.

19          The actions of the custody group through that

20    settlement and through the plan resolved tens of thousands -

21    - sorry, thousands if not tens of thousands of potential

22    preference lawsuits.  And I think the most important thing

23    is the leave-behind of 27.5 percent of custody accounts.  By

24    the custody settlement and under the plan, custody holders

25    that elected to participate, which was a large number, left

Page 26

1   behind 27.5 percent of their custody accounts in kind for

2   the debtor's estates and for the benefit of other creditors.

3   Base on the Debtor's voting declaration and some rough math

4   based on petition date values, as we say in our application,

5   we think that was more than -- tens of millions of dollars.

6   We think it was more than thirty or $40 million.

7            THE COURT:  Okay.  Anything else that you want to

8   point to where you think you delivered value to the estate

9   as a whole?

10           MR. KOTLIAR:  I would just add that we

11  supplemented the role that the Debtors and the Creditors'

12  Committee had in communicating with customers and answering

13  questions from the crypto community.  Because as Your Honor

14  saw, this was a heavily-involved community in this case, and

15  they have a lot of questions.  And they got answers from the

16  Debtors, they got answers from the Creditors' Committee.

17  But they also got answers from the Custody Ad Hoc Group when

18  it came to custody issues.  And I think we played an

19  important supporting role that we recognized with both the

20  Debtors and the Creditors' Committee in their support and

21  pleadings.

22           THE COURT:  Okay.  Thank you.  All right.  Let's

23  see.  Who is next?

24           MS. KOVSKY:  Good morning, Your Honor.  Deb Kovsky

25  for the Withhold Ad Hoc Group.  And at the risk of being

Page 27

1    repetitive, I would like to wish you a happy new year.

2            We filed our application and I know Your Honor has

3    read it, along with the UST's objection and now reply.  I

4    want to just point out a couple of quick things, something

5    that we do mention in the reply brief.

6            We really took the UST's issues to heart.  I did

7    reach out to Ms. Cornell after the objection was filed to

8    see if there was the possibility of a consensual resolution

9    or a narrowing of the issues.  I did not get a response from

10   her, but we did take a look again at the fees, went through

11   and voluntarily cut another $7,800 from the fee

12   reimbursement that's being requested.  That's on top of a

13   discount already being provided of almost $50,000.

14           THE COURT:  So tell me what the amount is that

15   you've --

16           MS. KOVSKY:  I'm sorry?

17           THE COURT:  Give me the amount that you're

18   seeking.

19           MS. KOVSKY:  The amount that I'm seeking is

20   $183,871.

21           THE COURT:  And $3,745.61 in expenses.

22           MS. KOVSKY:  And then $3,582.41 in expenses.

23           THE COURT:  Give me that again, because I have a

24   slightly different...

25           MS. KOVSKY:  I'm sorry.  The fees were --

Page 28

1          THE COURT:  I have the fees.  Just give me the

2    expenses.

3          MS. KOVSKY:  $3,582.41.  The fees were reduced by

4    $163.

5          THE COURT:  All right.  Go ahead.

6          MS. KOVSKY:  And, Your Honor, it sort of goes

7    without saying that these fees are not even a rounding error

8    in the context of these cases.  And I would say very de

9    minimis in the context of the value that the Withhold Ad Hoc

10   Group provided here.

11         Your Honor said that there were gating issues, but

12   those gating issues would have been determined one way or

13   the other and the Debtors would have brought them before the

14   Court and they would have been decided.  But this is an

15   adversarial judicial process that we have here.  And there

16   has to be a voice on both sides.  Because if it was just the

17   Debtors and the UCC putting before Your Honor what should be

18   the correct treatment of Withhold account claims and what is

19   the proper allocation of the value of this estate, a very

20   different answer would have been reached.  Because both the

21   Debtors and the UCC were vehemently opposed to the Withhold

22   account holders' position.  The Debtors initially seemed to

23   be somewhat aligned or sympathetic to the position that the

24   Withhold accountholders actually owned the assets that were

25   in this no-man's-land of the Withhold accounts.  But as Your

Page 29

1    Honor probably recalls, shortly before the December 7th

2    hearing, the Debtors changed position and we ended up in a

3    very adversarial posture where the Withhold Ad Hoc Group was

4    fighting not just for the 11 or so members of the Withhold

5    Ad Hoc Group, but for all of the Withhold accountholders and

6    for the proper allocation of the estate assets.  At the

7    December --

8            THE COURT:  But the issue I have, it simply can't

9    be that in every case where there's an ad hoc committee that

10   argues the positions not only that would apply to the 11

11   members of the ad hoc group but to all similarly-situated

12   creditors, you are basically advocating litigating to the

13   extent necessary for legal positions and a result unique to

14   the Withhold accountholders.

15           And at least what I'm focusing on in terms of

16   Second Circuit law is not -- and if you disagree with my

17   reading of Second Circuit law -- that the benefit has to be

18   to the estate as a whole and not to a specific set.  Because

19   the answer would be, if I'm following your logic, any time

20   there is an ad hoc group that's representing some number of

21   a larger number of people in the case that have similar

22   issues that I've got to approve a substantial contribution

23   application for the ad hoc group whether you want 100

24   percent of 50 percent or whatever percent of what you

25   started out seeking.  And that concerned me.

1          MS. KOVSKY:  Your Honor --

2          THE COURT:  In an adversary system, parties are

3    expected to bear their own costs for advocating their unique

4    issues.

5          MS. KOVSKY:  Understood, Your Honor.  But I don't

6    think we have the kind of slipper slope that you are

7    alluding to in this scenario.  This is an unusual type of

8    case.  These crypto platforms that have filed are unlike

9    virtually any bankruptcy case I think any of us have seen

10   given the numerous distinct interests, no clear fulcrum

11   debt, not even any consensus as to what constitutes debt

12   versus what constitutes property of customers.  And so there

13   had to be some kind of a global resolution.  And not just

14   the Withhold Ad Hoc Group, but I would say all of the ad hoc

15   groups that were active in this case particularly helped

16   drive towards a consensus, towards a plan that was widely

17   accepted, and that saved the estate costs, ensured the

18   proper allocation of value.

19         The work that the Withhold Ad Hoc Group in

20   particular did, we preserved an -- well, I wouldn't say

21   enormous amount in the context of this very large case, but

22   a very significant, multi-million dollar amount of crypto

23   which I think is significantly more valuable today given

24   where prices are, and enabled that to remain as property of

25   the estate.  Reached a resolution that was broadly accepted

Page 31

1     under the plan, and drove towards a consensual plan of

2     reorganization that delivers more value to all of the estate

3     stakeholders than would have occurred absent our

4     participation.

5              And I think a lot of the caselaw also refers --

6     perhaps not specifically in this circuit, but sort of

7     broadly that -- and the bankruptcy code I think refers to

8     benefit to the case.  Not necessarily to the estate, but to

9     the process.  And one of the key things that the ad hoc

10    groups did here was to preserve the integrity of the

11    bankruptcy process.  Customers could understand and know

12    that their interests were being represented and that they

13    had voices in these cases regardless of positions taken by

14    the Debtors or the UCC.  This is a really unusual

15    multivariant case that is I think not directly analogizable

16    to the typical bankruptcy case and --

17             THE COURT:  What worries me about your argument is

18    that it would result in the estate paying for attorneys'

19    fees and costs for any group in a case that advocated

20    throughout the case for their unique interests.  And I don't

21    read the law that way.  That's my concern.

22             MS. KOVSKY:  But, Your Honor, if that's true, then

23    any ad hoc committee in any case would not be entitled to

24    substantial contribution because every ad hoc by definition

25    is advocating to some extent for its own interests.  And I

Page 32

1   don't think that's the legal standard, Your Honor.  Even if

2   there is a direct personal interest, that doesn't obviate

3   the possibility of a substantial contribution claim.  Motive

4   is not determinative.  The ad hoc committees may have wanted

5   to advocate for their own interest, but they also advocated

6   broadly for the greater good of larger groups and of the

7   estate as a whole.  Everybody was driving towards the same

8   result, to get to a consensual plan process that properly

9   allocated value of the debtors among various competing

10  constituencies.  And I think that the ad hoc groups,

11  including my ad hoc group, substantially contributed to that

12  outcome.  The Debtors agree.

13          And just to be really clear, I know that the

14  United States Trustee implied that the Debtors agreed to

15  stand down from any objection to our fees in order to buy

16  votes under the plan.  I think that is a completely unfair

17  characterization.  The Debtors agreed to refrain from

18  objecting, did not agree to actively support our

19  application, which they have done.  Moreover, no member of

20  the Withhold Ad Hoc Group actually agreed to vote in favor

21  of the plan as part of the settlement.  So this is purely

22  based on the merits of the outcome and the good result that

23  our hard work, the Debtor's hard work, and the UCC's hard

24  work were able to accomplish.  So I think that suggesting

25  that this is a vote-buying exercise is completely

1    unwarranted.

2        I also want to point out that the UCC, who

3    represents the unsecured creditors in the case, they are the

4    real financial stakeholders here.  And the UCC not only did

5    not object to our application, but actively supports it.

6    And they are under no obligation to do so under any

7    agreement.  The only party that has objected is the United

8    States Trustee.  Not a single party with a pecuniary

9    interest in these cases thinks that our application is

10   unwarranted.

11       So, Your Honor, I think that given the broad

12   consensus and support for the work done not just by the

13   Withhold Ad Hoc Group but by the Custody Ad Hoc Group and

14   the Earn Ad Hoc Group, the excellent result that was

15   achieved in this case would not have happened without our

16   efforts.

17       THE COURT:.  Thanks very much.  All right.  Earn

18   is next.

19       MS. KUHNS:  Good morning, Your Honor.  Joyce

20   Kuhns, Offit Kurman, for the Earn Ad Hoc Group.

21       I'll answer this question first because you've

22   been clarifying what we're requesting.  And what we're

23   requesting in fees is three-hundred-thirty-six-thousand --

24       THE COURT:  Hang on.  Let me get...

25       MS. KUHNS:  Okay.  Get a pen.

Page 34

1          THE COURT:  go ahead.

2          MS. KUHNS:  Want you to get it right.  $336,385.93

3    in fees.  And expenses a total of $10,123.93.  And that is

4    broken down between essentially mediation expense for the

5    steering committee members and those Earn members who

6    attended the mediation of $4,830.82 and counsel expenses of

7    $6,934.55.

8          Your Honor, we strongly believe this case is rare

9    and extraordinary.  And in fact, that's the required

10   standard.  It required rare and extraordinary efforts and

11   creativity and commitment to get to the exit now in sight.

12   It is not only the complexity of the issues and the

13   challenge of reconciling the bankruptcy into the crypto

14   worlds which makes this case exceptional, but as prior

15   counsel pointed out and I believe committee counsel did in

16   its papers, this is a case that is unusual in that it

17   involves hundreds of thousands of individuals with no

18   primary lender group, no group controlling any class, which

19   pose unique obstacles to building consensus and streamlining

20   administration and mitigating expense.

21         The Ad Hoc Earn group admittedly was late to the

22   party.  All the ad hoc groups have been formed.  You have

23   issued your Earn ruling regarding title to Earn

24   accountholder liquid crypto assets in their account.  And we

25   did not pursue an independent adversary proceeding.  We took

Page 35

1     a different tact.

2            As I mentioned in my opening and closing

3     statements at the confirmation hearing, the Earn Ad Hoc

4     Group throughout, its approach throughout has been to

5     achieve to the extent possible parity and fair and equitable

6     treatment among crypto account holders with the best

7     possible recoveries attainable under all the circumstances

8     and to exit as quickly as possible to reduce the $20 million

9     monthly administrative burn.

10           And so the Earn Ad Hoc Group welcomed the

11    opportunity.  The Debtors and the Committee counsel offered

12    it by inviting the Earn Ad Hoc and the Borrow Ad Hoc to an

13    in-person mediation before Judge Wiles to hopefully

14    reconcile what were significant disagreements among Earn and

15    Borrower contingencies with respect to their treatment under

16    any plan.  A major hurdle to overcome to move the plan

17    process forward as the Earn accountholders were indisputably

18    the largest customer group in the case with the Borrower a

19    distant but still significant second.

20           Going into the mediation, the Borrow group was

21    insisting that the Earn program was a security and that all

22    Earn claims should be subordinated to all other claims under

23    Section 510.  So we went in, quite frankly, poles apart.

24           What was achieved through a commitment to

25    consensus was a plan term sheet which is found at ECF 3064

Page 36

1   which was later embedded in plan amendments and in the plan

2   ultimately confirmed the overwhelming creditor support of 98

3   percent.

4           At the core of the plan term sheet is Earn group

5   and individual Earn claimants giving up rights to promote

6   consensus and to smooth the path to confirmation, the

7   essence of a substantial contribution, by doing essentially

8   four things.  Agreeing with respect to non-contract claims

9   associated with Earn account holders that they would receive

10  105 percent of their scheduled amount of their non-contract

11  claims in lieu of their actual proof of claim amounts and to

12  support the class action settlement which had yet to be

13  presented to the Court but was really -- the genesis was the

14  mediation, which helped resolve more than 30,000 claims at

15  considerable cost savings to these estates.  In fact, only

16  1.4 percent of those voting opted out of this settlement.

17          Second, the Debtors and the Committee worked hard

18  to provide creative options to the Borrower Ad Hoc.  In

19  particular, the option to repay the balance of their loan in

20  exchange for the equivalent in liquid crypto.

21          Now, the problem with this proposal was the

22  Debtor's pool of liquid crypto was substantially less than

23  the obligations the Debtors owed the customers.  What was

24  the solution?  The solution was the Earn Ad Hoc Group was

25  asked and it agreed to give a priority to the borrowers when

Page 37

1    electing to exchange NewCo stock for liquid crypto at a 30

2    percent discount.  This was what we believe an important

3    incentive for the borrowers to accept the term sheet while

4    having, quite frankly, given the size of the Earn

5    constituency, a minimal impact on the Earn group.

6              Third had to do with participation post-

7    confirmation.  Having been victimized before, the Earn Ad

8    Hoc Group was very focused on a future seat on the NewCo

9    board and on the Litigation Oversight Committee.

10             At the mediation, the Earn Ad Hoc Group requested

11   a seat for Earn claimants on the Litigation Oversight

12   Committee and in fairness requested that the Borrower group

13   also be given a seat.  That request was granted subject to

14   Committee approval as ultimately reflected in the term sheet

15   and in the planned supplement.

16             Substantive consolidation also came up and was

17   front and center at the mediation.  The term sheet in fact

18   provides that the plan shall be amended to provide for

19   substantive consolidation of not only Celsius Network with

20   CNL, but Celsius Lending LLC and Celsius Networks Lending

21   LLC.  Critical to provide the highest recovery and asset

22   recourse to all creditors.

23             Then there was the concept of the toggle.  We were

24   given consultation rights.  In fact, consultation rights

25   were given to all mediation participants.  This was

Page 38

1   critically important as Your Honor saw at the December 21

2   hearing because it helped to promote consensus on winddown.

3   And as you also observed in your memorandum opinion of

4   December 27th, I would like to address the issue of buying

5   our silence or our vote as well.

6        Contrary to the U.S. Trustee's suggestion, the

7   Debtors and the Committee's agreement was to support

8   substantial contribution applications that were "commercial

9   reasonable".  That's the express language of the Plan

10  Support Agreement, paragraph 13 at ECF 3516.  It was not to

11  buy silence.

12       The Ad Hoc's agreement was to promote consensus

13  and use various additional communication tools at its

14  disposal to promote the plan, which it did through public

15  town halls, hosting Twitter spaces, and its own Google

16  working space that reached over 1,200 additional creditors,

17  not just Earn creditors, and served as an information

18  corridor between Earn and other creditors to build

19  consensus, to educate them on a complex ballot, to direct

20  questions and answers to the Debtors and the Committee

21  counsel from individual creditors who might not otherwise

22  have engaged directly with them, but were willing to do so

23  with their constituents.

24       And so if silence was the objective, it was

25  certainly not the result.  In fact, the Earn Ad Hoc Group

1    continued to advocate actively inside and outside this

2    courtroom for better creditor representation on the NewCo

3    board with the considerable assistance of Mr. Dixon through

4    his YouTube channel ultimately resulting in three board

5    observers being added for the benefit of all creditors, not

6    just Earn, who will ensure a creditor perspective and voice

7    will continue to be heard at the table going forward now on

8    the Mining Co board.

9            And so support and building support and consensus

10   were essential in this case, essential to its ultimate

11   success.  And it's not surprising that this case is in fact

12   replete with supports and joinders, and appropriately so

13   given the diversity of the constituents involved.

14           As I said, we've asked for a fee through the end

15   of September which we believe is fair and reasonable as

16   supported by the Debtors and the Committee, which support is

17   appreciated, and we believe significant.

18           While the U.S. Trustee cites In re Best Products

19   as limiting substantial contribution awards to rare and

20   exceptional circumstances -- which we believe exist and we

21   have met that criteria -- Judge Brosnan cited with approval

22   In re In re Richton Intern. Corp., 15 B.R. 854 (Bankr.

23   S.D.N.Y. 1981), in which an award was granted and the award

24   in court specifically noted that the recommendation of the

25   Debtors and the Committee, as here, was a factor in its

Page 40

1   decision.

2           So we believe the Earn Ad Hoc has demonstrated it

3   did not act solely in its self-interest and its counsel did

4   not duplicate the efforts of others.  It played a unique and

5   necessary role in an exceptional case with hundreds of

6   thousands of individual creditors in enhancing

7   communications, fielding consensus and engagement leading to

8   wide creditor acceptance of a plan that has ultimately been

9   confirmed, which contained adjustments to creditor treatment

10  that minimized objections and therefore administrative

11  expense, smoothing the exit for the benefit of all

12  creditors.

13          Your Honor, the Trustee raised certain objections

14  to documentation I believe.  We have consistently as a group

15  asserted that we are not court-retained professionals and do

16  not have to meet the specific requirements of Section 330.

17  Nonetheless, Your Honor, we have provided detailed time

18  entries originally to the U.S. Trustee, the Debtors, the

19  Committee, and also to the Court and have attached those to

20  my declaration of support at ECF 4187, which was filed in

21  connection with the reply filed last week.

22          We have not presumed to supplement for the period

23  after the confirmation hearing, Your Honor.  Although we

24  have put forth that request actually in our application and

25  reiterated it in our reply.

1           As you are aware, the ad hoc has been actively

2    involved through the toggle, approval of the StakeHound

3    settlement, and the MiningCo transaction last month.  And so

4    we would request that we be allowed to file a supplement

5    through the effective date that is now hopefully imminent.

6           With respect to actual and necessary expenses,

7    Your Honor, as I said, we have broken them down into two

8    buckets.  We did give a detailed itemization.  The U.S.

9    Trustee raised certain questions.  I believe we have

10   answered them in the reply, but I will hear shortly I

11   suppose from Mr. Bruh if that's correct.  And we also

12   provided backup documentation to the U.S. Trustee's Office

13   for all the expenses.

14          As far as the expenses that we included for

15   Rebecca Gallagher, Your Honor, Ms. Gallagher did become a

16   member of the Earn Ad Hoc Group.  She certainly has

17   contributed as a class action plaintiff.  She came.  It's

18   minimal travel expense that you see to talk to Mr. Herrmann,

19   who at that point had been an active pro se claimant and was

20   the chair of the steering committee for the Earn Ad Hoc to

21   discuss her concerns about the upcoming mediation.

22          THE COURT:  Ms. Gallagher's expenses in terms of

23   participation, those were -- those have been paid for

24   already.

25          MS. KOVSKY:  No.  It's very de minimis.

Page 42

```
 1                THE COURT:  She has asked for an additional --

 2                MS. KOVSKY:  It's a car -- she drove by car from

 3      West Virginia --

 4                THE COURT:  Stop.  Stop.  Stop.

 5                MS. KOVSKY:  Yes, sorry.

 6                THE COURT:  Because I think if I'm not mistaken

 7      she has asked for an additional crypto distribution.  And I

 8      want to separate that out from whatever -- have her expenses

 9      been paid?

10                MS. KOVSKY:  No, Your Honor.  The only expense we

11      received from Ms. Gallagher -- I think she was -- her

12      pleading goes to what she considered compensation for her

13      substantial contribution as opposed to the expense component

14      at 503(b)(3)(D).  What we did is we included any ad hoc

15      member expenses on our application.

16                THE COURT:  That's what I wanted to be clear on.

17                MS. KOVSKY:  Happy to answer any other questions,

18      Your Honor.

19                THE COURT:  Focus if you would on what you believe

20      in terms of the class claim mediation itself, what was your

21      role and the role of the Ad Hoc Committee in that?

22                MS. KOVSKY:  In the mediation?

23                THE COURT:  Yes.

24                MS. KOVSKY:  Yes.  So we started talking about the

25      fact that we needed to simplify the claims resolution
```

Page 43

1   process and what would be a mechanism to do that.  And there

2   was a suggestion that if there was a bump-up of five

3   percent, ten percent -- percentages were thrown around

4   obviously in the room.  We were actually all in the room

5   together.  This was not a breakout session.  This was

6   everybody together in a room with Judge Wiles.  And so we

7   discussed a range of 100 percent.  What would be reasonable

8   and what could we really sell, quite frankly, to those who

9   felt based on their filed proofs of claim they had valid,

10  non-contract claim against these debtors and others?  What

11  would be the incentive to get them to vote and to give those

12  up?  Because they were giving up a filed claim which they

13  believed in strongly, obviously, versus a scheduled claim.

14  And so that's how that conversation occurred, because we

15  were together and we were really talking about if we're

16  going to leave and we're going to file and sign this term

17  sheet and a plan support agreement, what do we think is a

18  reasonable compromise in the future?  What is fair and

19  reasonable and what would our constituency buy into?  And

20  that's how it came up and that's how it became part of the

21  term sheet.

22          THE COURT:  All right.  Anything else you want to

23  add?

24          MS. KOVSKY:  I have nothing further, Your Honor.

25          THE COURT:  All right.  Thank you very much.

Page 44

1          MS. KOVSKY:  Thank you.

2          THE COURT:  Mr. Koenig...

3          MR. KOENIG:  We still have a few people that we

4     support.  So there's Mr. Herrmann, Mr. Frishberg and Mr.

5     Tuganov I believe should present and then --

6          THE COURT:  All right.  Well, let's -- fine.  Mr.

7     Herrmann?

8          MR. HERRMANN:  Thank you, Your Honor.  Immanuel

9     Herrman, pro se creditor.  So I just wanted to touch a

10    little bit on some of my individual contributions to the

11    case.

12         The first, earlier in the case, was expanding --

13    working to expand the examiner's report by raising important

14    questions earlier in the case and actually filing a request

15    to extend deadlines and then papers.  And that did result in

16    an expanded examiner's report.

17         Just before I do touch on some of the

18    contributions, I wanted to note that overall the

19    contributions I made in the end resulted in more coin.

20    There were many people arguing in these cases that their

21    coins were not property of the estates.  In fact, it was

22    actually -- there were less -- in fact, it was everybody

23    except Earn customers.  So in a way I was one of the Earn

24    customers earlier in the cases making similar arguments.

25         And I think in the end, you know, that's a

Page 45

1    strategy.  Obviously there weren't enough coins.  But in the

2    end, we actually got to a global resolution that brought

3    more coins into the estate.  In other words, we've settled.

4    You know, the borrowers were making those arguments, others

5    were making the -- withhold.  And in the end while custody

6    was ruled not property of the estate, basically everyone

7    else ended up making a deal in New York where it all was

8    property of the estate and everyone could live with the deal

9    and there was enormous support among creditors.

10            So I think getting in the end the global

11   settlement that I signed in New York, it was a long road to

12   get there.  But we ended up actually benefitting the estates

13   by -- you know, a lot of the lawyers have already touched on

14   it, but there were, you know, the five percent deal that we

15   made, that kind of thing.

16            I think other contributions -- so yes.  So some

17   contributions I made were expanding the examiner's report,

18   which Your Honor ruled obviously to do that.  But that was a

19   really good order that helped us get clarity on what had

20   happened.

21            I think also the argument with regards to the Earn

22   appeal actually -- the ruling that the order was

23   interlocutory gave us actually more leverage going into

24   mediation to resolve issues, sort of like how the preferred

25   litigation created ambiguity and encouraged a settlement.

Page 46

1    Again, it's like there was -- the case was so complex, so

2    many issues at first impression, so many arguments that, you

3    know, coins were or weren't property of the estate.  But

4    actually having ambiguity in this incredibly novel and

5    complex case actually in the end helped us globally resolve

6    everything and get to a resolution, which is exactly what

7    happened.

8            Other contributions were incentivizing the

9    preferred shareholders to settle.  I think during that

10   appeal, which is covered in the application, the prospects

11   of going up against the UCC and (indiscernible) in that case

12   incentivized a settlement, which paved the way to

13   confirmation.

14           In the mediation in New York, pro se creditors

15   resolved all adversary proceedings and appeals.  And by

16   agreeing to that 105 percent fraud sweetener helped pave the

17   way to resolve thousands of similar claims.  IN other words,

18   both by example and by public communication and encouraging

19   other creditors to accept the settlement.  That helped

20   resolve what could have been an incredibly difficult claims

21   process.

22           So in terms of the way the adversarial system

23   works I think -- I've learned a lot during this case and I'm

24   pro se obviously -- is there was a litigation strategy if

25   not property of the estate.  That's true.  And pretty much

Page 47

1    everyone argued that.  But there aren't enough coins.  So

2    what did we do?  We can't litigate it all for every single

3    customer.  And we make a deal.  And that's exactly what

4    happened here.  Another thing I contributed to

5    (indiscernible).  So actually the preferred appeal got right

6    to the heart of substantive consolidation issues.  That was

7    also resolved through the term sheet.  And until that

8    agreement in New York and substantive consolidation,

9    customers didn't have the economic effect of claims against

10   all entities.  We did once we confirmed the plan consistent

11   with that term sheet.

12          I think the lawyers have made many of these

13   arguments well and so I don't have to repeat all of them

14   here.  I join in those arguments with respect to my

15   application.

16          Yes, as a pro se I can only represent myself, but

17   just like an ad hoc, motive is not determinative.  I may

18   have wanted to advocate for my own interests, but I also

19   advocated in the end broadly for the greater good.  I gave

20   up direct claims, including adversary proceedings and

21   appeals working toward a consensual plan process.  Working

22   to expand the examiner report, settle with the preferred,

23   and make a deal that ended the litigation, a massive amount

24   of litigation in New York City.

25          There was also an argument I believe in the

Page 48

```
 1    Trustee's filing along the lines of the Debtors want the pro

 2    se to silence -- or the Debtor is trying to silence vocal

 3    individual creditors.  Nothing could be further from the

 4    truth.  We didn't agree to ultimately work on a plan support

 5    agreement, we took a long time to sign it.  We were very

 6    (indiscernible) with our concerns.  In the end when we got

 7    the best we could get for creditors generally for everybody

 8    -- not for myself -- that's when I agreed to sign the Plan

 9    Support Agreement.  And so again, that was putting other

10    creditors first, giving up my own claims as part of that and

11    agreeing to support the plan.  And I'm happy that we have a

12    plan.

13              THE COURT:  Okay.  Thank you very much, Mr.

14    Herrmann.

15              MR. HERRMANN:  Thank you.

16              THE COURT:  All right.  Mr. Frishberg?

17              MR. FRISHBERG:  Thank you, Your Honor.  I'll start

18    off with I've been having some connection issues.  So if I

19    cut out, I apologize.

20              As Mr. Herrmann has noted previously,

21    (indiscernible) shareholders were incentivized in part due

22    to our actions.  They may have settled without our

23    participation, but it would have taken a lot more time and

24    resources.  And (indiscernible) settlement.

25              The amounts requested in my application are
```

Page 49

```
 1    honestly not even a rounding error compared to the amounts
 2    that have been incurred in this case.  And it likely will
 3    (indiscernible) far more to just (indiscernible) expense
 4    actually requested.  So I'll try to keep this as quick as
 5    possible since it is very de minimis.
 6              Unlike the U.S. Trustee implied, there was zero
 7    quid pro quo and the Debtors were not silencing vocal pro se
 8    parties or any parties in general in any way.  If they were
 9    doing so, they did a very bad job because I have been very
10    vocal even after signing the PSA (indiscernible) following
11    the terms of it, obviously.
12              I also agreed to drop very valid claims against
13    the estate (indiscernible).  I'm not honestly sure why the
14    U.S. Trustee (indiscernible) putting our expenses and
15    requested fees under such a microscope when they are so de
16    minimis, especially when they're not applying the same
17    treatment to the tens of millions of dollars in professional
18    expenses.
19              (indiscernible) arguments, relevant arguments that
20    that were made by other parties (indiscernible) in this
21    case.  And I would like to restate what I said in my
22    application since obviously I don't want to reargue the
23    points.
24              That is all, thank you, Your Honor.
25              THE COURT:  Thank you very much, Mr. Frishberg.
```

Page 50

1      All right.

2              Mr. Sabin, are you arguing next?

3              MR. SABIN:  Good morning, Your Honor.  Jeff Sabin

4      from Venable on behalf of Ignat Tuganov, an Earn Rewards

5      accountholder, a class claim representative, a plan

6      mediation participant, and a party to the plan term sheet

7      and the plan support agreement.

8              If you would have in front of you, Your Honor, or

9      if you could find Docket 4211, which has Exhibit B so that I

10     will start with the numbers.  In addition, the numbers get

11     supplemented by a statement we make in Paragraph 7 of Docket

12     4211.  So let's go to the numbers.

13             And, Your Honor, I will attempt to answer your

14     question that you started with with the first presenter

15     today, which is what benefit to the estate in terms of what

16     we did.  Right?  Let's deal with the numbers first.

17             So numbers on Exhibit B to Docket 4211 say that

18     the aggregate amount that we are seeking is $1,436,408.60.

19     And that covers all of our time that we think is evidenced

20     by our submissions of our detailed, unredacted timesheets

21     through December 31, 2023.  Paragraph 7 of Docket 4211 makes

22     clear that not withstanding our continuing efforts, together

23     with those of Ms. Kuhns, to address with the Committee and

24     with the Debtors questions that arise and suggestions for

25     how best to expedite the plan effective date and

Page 51

1   distributions and otherwise facilitate things after those

2   distributions we will not seek.  Okay?  In paragraph 7 of

3   Docket 4211 in the third supplement.  We will not seek any

4   kind of additional time for those service that we think

5   would benefit these estates that we will render and continue

6   to render until we get to plan effective date.

7           Those are the numbers, Your Honor.  They are not

8   broken down for a different reason.  They are not broken

9   down by way of expenses versus time because we were in

10  discussions with the Committee and the Debtor as to and had

11  discussions which resulted in our voluntary reduction of our

12  request by almost 18 percent.  The actual dollars for that

13  18-plus percent represents $317,957.65 and doesn't include

14  time subsequent to December 31, 2023 which we will

15  (indiscernible) ask this Court to otherwise consider for

16  substantial contribution over and above.

17          Your Honor, Mr. Tuganov, unlike the numerous pro

18  se creditors in this case, hired counsel at his own expense

19  and risk not only to be active from the beginning of these

20  complex and novel cases.  To maximize recovery for himself?

21  He admits that.  If he were here, he would admit it.  And I

22  admit it.  But also acted to maximize recovery for other not

23  just earn reward accountholders, but since October 12th,

24  2022 has taken actions that were intended to and we believe

25  did significantly benefit all of these estates and their

Page 52

1    creditors.  Accordingly, he and his counsel believe for

2    reasons set forth in his application at Docket 3666 and his

3    reply to the objection of the U.S. Trustee at Docket 4184

4    and as evidenced by unredacted time records and a summary of

5    the time spent in each of five categories of substantial

6    contribution that I will try to summarize in my oral

7    presentation to you.  So the detailed records, the five

8    categories, they were filed at Docket 4010 for the time of

9    October 12th, 2022 through September 11th, 2023.

10            At Docket 4158 covering the period December 22 --

11   excuse me, covering the period from September 12th, 2023

12   through November 9th, your decision and confirmation of

13   2023. And at Docket 4211, covering the final period from

14   November 10th, 2023 through the end of last year, December

15   31, 2023.

16            He believes that those pleadings and the records

17   themselves set forth a case for meeting his burden of proof

18   that is necessary by a preponderance of the evidence for

19   this Court, pursuant to 503(b)(3)(D), and more importantly

20   for his case, 503(b)(4).  Because he is not seeking expenses

21   for himself.  It's his legal expense that he is seeking

22   reimbursement for as a substantial contribution.

23            He believes as construed by the various decisions

24   in this district, not only including those cases that you

25   heard from the wonderful presentation earlier this morning

Page 53

1    from Ms. Kuhns, but also including the decisions in Synergy,

2    Bayou Group, and Granite Partners are sufficient to overrule

3    the objection of the U.S. Trustee and the very late joinder

4    by Mr. (indiscernible), but also to approve Mr. Tuganov's

5    application as reduced.

6            Further support for Mr. Tuganov's application we

7    believe can be found in the final pleadings of the Debtors

8    and the UCC, those persons and entities who are best

9    situated to evaluate Mr. Tuganov's application and work,

10   each of which provide specifics of Mr. Tuganov's benefits to

11   this case and to all creditors that otherwise additionally

12   support under the applicable law and our burden to show

13   benefits to the five categories.  I anticipate and hope that

14   each will in their oral presentations following mine confirm

15   and continue to confirm what we believe is that support.

16   Okay?  And we otherwise thank them.

17           Specifically, Your Honor, as I indicated following

18   discussions with the Committee and the Debtors, we

19   voluntarily agreed to reduce our fees (indiscernible)

20   presentation.

21           So I now want to answer your questions.  What's

22   the benefit to the estate and creditors?  I want to start

23   with the efforts early on in October of 2022 when we were

24   the first to seek an expansion of the scope of the

25   examiner's investigation to include Ponzi and other matters.

Page 54

1    And we concurrently sought an early plan mediation and we

2    were the ones, and only we, to negotiate the stipulation

3    with the Debtors, with the Committee, and with the examiner

4    that otherwise led to the expansion of the scope.

5              That expansion of the scope otherwise led us once

6    we saw the findings of the examiner to consider another

7    incredibly difficult issue, which with hindsight we all saw,

8    but our client had seen and we had seen from activities in

9    other cases similarly situated but not as novel as these --

10   including the Woodbridge cases, which was a Ponzi case --

11   that said perhaps we should bring -- and we did commence an

12   action to declare the case as a Ponzi.  Which in our view

13   probably still may be true depending on where this all goes,

14   but not in these Chapter 11 cases.  But in any event, a

15   Ponzi from our experience in other cases would have

16   streamlined the claims adjudication process (indiscernible)

17   to the cases and to all creditors in these cases.

18             That adversary proceeding secondarily sought a

19   declaration of substantive consolidation of all these

20   debtors again for the benefit of all of the estate.

21             THE COURT:  Stop a second.  Tell me what was the

22   expansion of the examiner's investigation that you believe

23   provided the benefit?  Obviously I remember quite well the

24   initial scope was something that had been negotiated and

25   (indiscernible) indicate any additional issues they wanted

Page 55

1   covered in the investigation.  I think she did an excellent

2   job.  But tell me what it is specifically that you think was

3   expanded in the examiner's investigation and which the

4   results of which helped as this case moved forward.

5             MR. SABIN:  I think the answer is twofold, Your

6   Honor.  One was a focus as it became focused later --without

7   telling you joint interest privilege, et cetera -- on the

8   migration from the U.K. to the U.S.  Okay?  Which was a huge

9   issue.  And the second was a focus on all of the different

10  ask Mashinsky anything, okay?  Which went on for pages.

11  Okay?  Kudos to the examiner.  But which we read to say you

12  know what?  At some point this may very well look like

13  convincing two things that Mr. Mashinsky wanted to do;

14  convincing people to stay in and convincing to buy new money

15  in.  Okay?  And those we thought and pled in good faith

16  sound like, looked like indicia, together with other

17  indicia, of Ponzi cases.

18            So it was the findings of the examiner related to

19  those two things which if I went back and reread our own

20  complaint are responsive to your question.

21            THE COURT:  Okay.  Go ahead.

22            MR. SABIN:  So what then happened, consistent with

23  what our client has always attempted to do, talk first, try

24  to resolve before you delay and cause this estate to spend

25  money.  A separate issue for the benefit to the estate.

Page 56

1              But most importantly, it led to immediate

2      discussions with counsel for the debtors and for the UCC of,

3      gee, what are we going to do with this adversary and when

4      are we going to do it.  And the essence of it led to a story

5      that I will unveil as it otherwise leads to the class proof

6      of claim and leads to mediation issues which we again

7      highlight as additional benefits to all creditors and the

8      estate.  And it did so by this.  We stayed that adversary.

9      There were never (indiscernible) answers, there never was a

10     motion to dismiss.  There never was discovery.  And instead,

11     we stayed it in a fashion that said we'll give you a certain

12     notice to the UCC, to the Debtors before we ever decide to

13     pull the trigger.  We never did.

14             What did we get for that?  We got information that

15     otherwise we thought would be helpful to resolving either

16     our own issues or the whole case issues.  And we got that in

17     the stipulation which was entered April 27th, 2023, pursuant

18     to which in the first instance the UCC said we'll give you

19     information.  Sign the protective order, we'll start giving

20     you information.  And we started getting that information.

21     And that information also was in consideration for another

22     thing that the stipulation did to save this estate.  If we

23     were ever to pull the trigger in the adversary, the

24     Committee said why waste time.  We would like to intervene.

25     And we said fine.  Never happened.  But it was in the

Page 57

1    stipulation.

2            So that stipulation and the information provided

3    led to may discussions.  First with the UCC and then with

4    the Debtors under executed joint interest agreements which

5    continue to today.  And pursuant to those joint interest

6    agreements, we were then discussing issues critical and

7    anticipated and needed to be addressed by the entirety of

8    the cases before we exited Chapter 11.

9            At the time you may remember a threefold or

10   fourfold approach.  You had the preferred over here, you had

11   (indiscernible) motion for an intercompany claim and motion

12   for substantive consolidation and some other things.  But

13   again, our own experience in another case, which was

14   Woodbridge, which was a Ponzi case, led us to discussions

15   that may have already been in the mindset of the excellent

16   work being done by the Committee of the use of a proof of

17   claim for the entire class of account holders.  Not just

18   Earn, not just retail; everybody who hadn't settled by then.

19           And indeed, there was a motion filed by the

20   Committee seeking class status if you recall.  And

21   independent of some early skirmishes with what is it that

22   should or should not happen by way of opt-outs and voting

23   and things of that nature, which are pleadings which we

24   recite and our papers show, we quickly got to a consensus

25   with the Committee.  Let's proceed with the motion.  And

Page 58

1    that was concurrent, as you may recall, with the litigation

2    proceeding, with the preferred at the time.

3          And not only did we work with the Committee, but

4    Mr. Tuganov was chosen to be one of the three proposed class

5    representative.  And that otherwise meant and required --

6    and he understood that -- that he had to assist.  Okay?

7    Telling his own story, telling what he knew about these

8    cases.  And he was an early Earn Rewards customer.  And he

9    had knowledge -- again, without highlighting joint interest

10   -- about the migration which was very relevant.

11         He had knowledge that may or may not have

12   otherwise led to the actual draft of the class proof of

13   claim which was addressing non-contract types of claims that

14   would be asserted in the class proof of claim.

15         And independent of his own preparation and time

16   spent with us and time spent with Committee counsel to

17   prepare for potential depositions or testimony had that

18   motion actually gone to a hearing on the contested matter,

19   it otherwise had the benefit -- again, of focusing what was

20   next.  Because towards the end of that process, the

21   preferreds settled.

22         And I want to highlight just for a minute -- and I

23   don't want to argue this and it's not in our papers.  But

24   that preferred settlement raises to me an interesting legal

25   issue not raised in our papers, and I don't want to argue it

1    now.  It's sort of like just let's not forget that even in

2    this case and together with at least two others, 9019 has

3    been used as a method to solve adversary proceedings and pay

4    fees in connection with non-retained professionals.  And

5    indeed if I recall right, $24 million out of the $25 million

6    went to pay for fees in connection with that litigation.

7         In any event, that settlement didn't necessarily

8    resolve the still-vexing plan issues including treatment of

9    retail borrowers and other issues highlighted, some of which

10   I will highlight again because they are so important, by Ms.

11   Kuhns in her oral argument earlier this morning.

12         So to paint the picture by late June 2023, cases

13   benefitted from the then-recent settlement proposed with the

14   preferreds.  But then they also benefitted by what do we do

15   and how do we identify and focus on the vexing issues that

16   we need to solve, all of us and all the estates, to get out.

17         And so mediation was suggested, mediation was

18   held, and mediation was participated in by Mr. Tuganov and

19   his counsel over three days. But before that, the mediator

20   had requested the preparation of (indiscernible) papers.

21   Some of our fees were exactly for that.

22         And as you asked Mr. Kuhns, so what was your role,

23   I will answer the same question for myself.  Our role I

24   think was in two hats if you want to think of it.

25   Facilitator, i.e. facilitating consensus, and a creator.  A

Page 60

1    creator of, hi, what's the solutions, what's the words we

2    need to get the solutions, and how do we do it.

3            And in connection with that, the class proof of

4    claims settlement was key in two ways.  Not only did it set

5    a finite number for everybody who did not opt out -- there

6    were only a few with hindsight who didn't opt out at five

7    percent above the scheduled amount.  But more importantly,

8    it avoided litigation over whether the Earn rewards program

9    and/or the Loan program for that matter could have been a

10   security requiring consideration of whether those claims

11   should be subordinated under 510(b), an issue hotly

12   discussed at the mediation, especially in view of pending

13   litigation that still is pending in terms of some litigation

14   with regulators in other cases.

15           Number two.  It resolved the treatment of retail

16   borrowers.  But the importance for our own clients as to how

17   that was resolved was that that portion of our adversary

18   seeking substantive consolidation was adopted.  It wasn't

19   adopted in full -- and as we know we left the mining company

20   over here because the facts were it was separate enough.

21   Okay?  And hopefully the SEC will say that soon.  And that a

22   Form 10 and a registration statement will be approved.  But

23   the key was substantive consolidation of both the then U.K.

24   lenders lending entity and the Debtor U.S. lending entity.

25           So Mr. Tuganov is a party and signed the plan term

Page 61

1    sheet, was involved in negotiations pursuant to which the

2    plan support agreement was otherwise executed.  Both of

3    those gave him the benefit of being a party to be consulted

4    with if we had to toggle from a NewCo plan to a Mining Co

5    plan.

6              So by late September 2023 after the vote was in,

7    Mr. Tuganov's role and that part of our expenses related to

8    his continuing contributions made consistent with his

9    obligations under and his rights under the PSA which

10   included -- again without violating joint interest --

11   discussions, comments, written suggestions for proposed

12   findings of fact, for the confirmation brief, for the trial

13   that was held on confirmation, for the toggle and the

14   preparation for the toggle, for the responses to the orderly

15   winddown, to support for the StakeHound settlement, which by

16   the way I'm happy to otherwise inform the Court, because it

17   is public, that the settlement and all of the tokens that

18   were to come in has gone effective.  A very good thing for

19   all of the estate.

20             And lastly, Your Honor, the preparation for the

21   initial distribution and the effective date.  Were those

22   costs under 503(b)(4) reasonable based on time, nature,

23   extent, and value of the services?  We think so.  In fact,

24   we think our firm's rates, including my rate, are probably

25   less, significantly less than rates for retained

Page 62

1     professionals in this case.

2              I ask to reserve some time, Your Honor, if

3     necessary to respond to the U.S. Trustee.  Our responses are

4     in our reply so far.  And otherwise, as you consider and

5     (indiscernible), I hope you can come to a conclusion that

6     supports our application.  Thank you, Your Honor.

7              THE COURT:  Just let me look through my notes

8     before...

9              So a portion of your fees were incurred in

10    connection with the retail borrower settlement?

11             MR. SABIN:  Inside the mediation.  I've already

12    highlighted that.  So that related to the subcon of the two

13    lending entities to the fact that 510(b) wasn't going to e

14    used against either Earn or Borrower and that the settlement

15    itself otherwise contemplated inside the plan term sheet,

16    the increase of the class proof of claim for everybody,

17    including retail borrowers, to 105 and was contemplating two

18    other things in the plan term sheet, Your Honor, which are

19    in the plan, which is giving retail borrowers the right to

20    choose between setoff and paying off.

21             THE COURT:  So I'm focusing on that retail

22    borrower settlement because it seems to me -- I mean, why

23    isn't it just an ordinary settlement germane to the

24    bankruptcy that didn't necessarily increase the size of the

25    estates?  And that's part of the test --

1          MR. SABIN:  I think we are talking past each

2     other.

3          THE COURT:  Okay.

4          MR. SABIN:  There was a prior retail borrowing

5     settlement proposed.  And I think that's what you're talking

6     about.  And then there is the retail borrower settlement in

7     the plan term sheet.

8          THE COURT:  Okay.

9          MR. SABIN:  All right?  And I believe to the

10    former, I think that information that was had had and

11    discussions we had subject to joint interest had uncovered

12    facts that otherwise were discussed with the Committee and

13    the Debtors that would say that settlement just should not

14    go forward and should not otherwise be included in the plan

15    (indiscernible) time.

16         THE COURT:  All right.  I don't have any other

17    questions.

18         MR. SABIN:  Thank you, Your Honor.

19         THE COURT:  Thank you very much.  All right.

20         Mr. Koenig?

21         MR. KOENIG:  For the record, Chris Koenig for the

22    Debtors.

23         THE COURT:  So how we will proceed, you're

24    speaking in support of substantial contribution obligations

25    for the ones we've covered so far.

Page 64

1           MR. KOENIG:  Correct.

2           THE COURT:  Mr. Colodny, you're going to speak to

3    this as well?

4           MR. COLODNY:  Yes.

5           THE COURT:  Okay.  And then we'll turn to Mr.

6    Bruh.  Go ahead.

7           MR. KOENIG:  Great.  Thank you, Your Honor.  So I

8    don't intend to be duplicative of the folks that have come

9    before.  What I would like to do is provide you with what I

10   hope is a useful perspective of an estate fiduciary and to

11   help you work through what I think is the most challenging

12   issue here, which is why is this case different, why is this

13   a substantial contribution that is different than what

14   happens in every run-of-the-mill bankruptcy.

15           So this is an extremely unique case for a variety

16   of reasons.  But from the Debtor's perspective, the most

17   important of which is other than the Committee, there were

18   no represented parties and the vast majority of the

19   creditors here are unsophisticated retail investors, over

20   600,000 of them.  And so from the very early stages of the

21   case, we as the Debtors were focused on how are we ever

22   going to confirm a plan, how are we ever going to get

23   support of retail investors who are unsophisticated and not

24   familiar with bankruptcy when we don't have the usual --

25   they are not represented by counsel, there is not somebody

Page 65

1    that we can go to as a conduit who is representing them.

2            And so I would like to take Your Honor back to the

3    early days of the case when there were so many letters being

4    filed, so many pro se motions being filed.  Because there

5    was no represented party -- I'll put custody and hold it to

6    the side for a second because they got organized pretty

7    quickly.  But I will focus on Earn.  The first six months of

8    the case there were so many individual pro se motions

9    largely from Earn accountholders who were trying to litigate

10   the issue of property and we were trying to put a tent

11   around the circus and tried to streamline it into one

12   proceeding.  We ultimately filed the motion that led to the

13   trial in December and led to Your Honor's ruling.  But that

14   was incredibly inefficient, led to dozens of objections,

15   required many depositions, required testimony of witnesses

16   and ultimately was a very expensive endeavor.  And

17   importantly, the Earn Ad Hoc Group was not there for that.

18   Ms. Kuhns had not yet arrived on the scene.

19           So by contract, I'll -- that was the earn

20   experience.  The Custody and Withhold experience was

21   different because of the involvement of the Custody and

22   Withhold ad hoc groups.  Very early on in the case, they

23   filed their litigation.  And I think if you compare the

24   filings of the Earn accountholders and of the Custody and

25   Withhold accountholders, there were almost none for Custody

1   and Withhold because they felt like they had a voice.  They

2   felt like they had somebody that was representing them.  And

3   I think that it ultimately inured to the benefit of the

4   estate and reduced the cost of the estate that we had one

5   streamlined litigation with a represented party who was

6   representing the interest not only of their specific

7   clients, but of similarly-situated clients.  And I think

8   given the administrative run rate of these cases, the cost

9   that we would have all incurred to deal with what certainly

10  would have been many more pro se motions, letters,

11  objections, was significantly reduced by the experience that

12  we had with Custody and Withhold.  And we had a very

13  streamlined litigation.  We entered into a stipulation that

14  divided up their arguments into a way that was efficient for

15  the estate.  It allowed us to argue gating issues first and

16  leave other issues for later depending on Your Honor's

17  ruling.  And that really saved an awful lot of expense for

18  the estate and ultimately led to a settlement.  Had these ad

19  hoc groups not had been here, we would have had to go

20  through the Earn experience all over again.  We would have

21  had to file a motion about ownership of property of the

22  estate and we likely would have had dozens of objections and

23  had to put on testimony.  I think it is beyond a doubt if

24  you compare the Earn experience with the Custody and

25  Withhold experience, it's wildly different because of

Page 67

1    participation.

2         I often represent debtors.  That is the primary

3    area of my practice.  And ad hoc groups in most cases

4    represent sophisticated counterparties who have done this

5    before and may not even need counsel in order to understand

6    the basics of bankruptcy and what their rights are.

7         Here, it's very different.  We had no one to

8    negotiate with to try to move the cases forward.  The only

9    path was litigation through Earn.  We filed the motion we

10   filed because we felt we had to.  There was nobody to

11   negotiate with, unlike Custody and Withhold.

12        In a normal Chapter 11 case, I would be offended

13   if an ad hoc group filed a substantial contribution motion.

14   Because I would say they're doing what they did in order to

15   advance their own interests.  And of course this is -- under

16   the American judicial system parties ordinarily bear their

17   own expenses.  This case is different.  We would not be

18   standing here today if not for these parties because I'm not

19   sure that we would have gotten support for any Chapter 11

20   plan.

21        Just finishing out on Custody and Withhold, the

22   settlements that we entered into with them are the

23   cornerstones of the plan.  It is notable that the plan that

24   was proposed took place almost immediately after those

25   settlements.  And I'll tell you speaking from the Debtor's

1    perspective, the time at which we realized that we had a

2    good chance to propose and confirm a plan was when we got to

3    deals with the Custody and Withhold Ad Hoc Groups because we

4    knew that we had groups of creditors that had organized,

5    that could reach a reasonable and value-maximizing

6    settlement and that those settlements could be embodied into

7    a plan that would allow these estates to move forward and to

8    get out of bankruptcy.

9              Also notably Custody and Withhold, we think that

10   the settlements that we reached there and the litigation

11   that we entered into helped to mold the preference

12   litigation that ultimately was included in the plan.  Had we

13   not reached that settlement and had we not explored that

14   litigation, we would not have had such a streamlined process

15   for settling preferences as we had in the plan, and I think

16   we would have seen an awful lot more litigation.  Perhaps

17   there would have been avoidance actions commenced by the

18   estates.  Perhaps you would have had individuals commencing

19   adversary proceedings for rulings that they did not have

20   preference exposure.  I think the benefit of the preference

21   settlement embodied in the Custody and Withhold settlements

22   served as cornerstone for that important part of the plan

23   and ultimately saved the estate a bunch of value.

24              So let's turn to Earn and Ms. Kuhns.  So I

25   explained how the Earn trial was not orderly in part because

Page 69

1    Ms. Kuhns was not on the scene.  I think it's important to

2    note that around that time -- maybe it was Mr. Herrmann, I

3    don't remember exactly who filed the motion for mediation.

4    And at the time we all opposed it.  The reason we opposed it

5    is we did not believe that it was a good use of time or

6    resources to negotiate with a couple of individual pro se

7    creditors.  How are we ever going to build a consensus by

8    negotiating with a couple of creditors in a room.  And I

9    think that it is not at all a coincidence that mediation

10   happened when it did.  It happened because that is almost

11   exactly when Ms. Kuhns got on the scene and organized her

12   group.  And she had town halls on Twitter and generally

13   reported to Earn in general.  And we felt very comfortable

14   that negotiating with the Earn Ad Hoc Group meant

15   negotiating with Earn.  And Earn had to that point been a

16   bit of an unruly group and a disorganized group.  I mean,

17   Mr. Herrmann was doing a good job as he could to try to

18   corral them.  But all of the other ad hoc groups had counsel

19   and Earn did not.  And Earn is of course far and away the

20   largest creditor constituency.  And so it was only because

21   of the emergence of the Earn Ad Hoc Group that we felt

22   mediation was reasonable and appropriate at the time that it

23   was, and that mediation was widely successful.  I won't

24   belabor the point.  But just really quickly, it resolved

25   litigation between Earn and Loans, which is another

Page 70

1    cornerstone of the plan.  And the class claims settlement

2    should not be overlooked.  Because we spent an awful lot of

3    time, the Debtors -- and I'll speak for Mr. Colodny and the

4    Committee -- in trying to figure out how to resolve claims

5    in this case.  Because we had 600,000 creditors.  We had

6    tens of thousands of proofs of claim.  And we want to get

7    distributions out to creditors promptly.  But of course

8    everybody has their day in court and everybody has the right

9    to right for what they believe they are entitled to in their

10   claim.  And so we were dealing with that due process problem

11   on the one hand, and the problem of we need to get

12   distributions out to people efficiently on the other hand.

13          And as Your Honor probably remembers, we went

14   through several fits and starts trying to come up with an

15   efficient process.  We first filed some claims objections to

16   certain pro se creditors' claims that we said were going to

17   be bellwether objections, and that did not seem as though it

18   was going to be an efficient process once we got it started.

19   And then the Committee filed a class claim motion.  And it's

20   unclear -- you know, had that been litigated all the way to

21   the end, I think that that would have been expensive and

22   time-consuming.  And the class claims settlement resolved

23   hundreds of thousands of proofs of claim and saved the

24   estate enormous expense.  I'll tell you that at the time we

25   had the settlement, we were preparing claims objections for

Page 71

1    every claim that had been filed because we had to in order

2    to try to move the cases forward.  That would have been

3    enormously expensive, time-consuming, and wasteful.  And we

4    think that the class claims settlement resolved nearly every

5    accountholder proof of claim.  There are around 2,000 opt-

6    outs of over tens of thousands of creditors that had filed

7    proofs of claim.  And we think that that will speed

8    distributions so that when we can emerge, we can actually

9    make distributions to most every creditors in the case

10   instead of then having to go through a long and drawn-out

11   claims resolution process.

12          So we think that we would simply not be here

13   without the ad hoc groups.  I don't believe that we would

14   have a confirmable plan.  I don't think that we would have

15   had the votes that we had.  It was integral to the process

16   that these individuals who are unsophisticated in terms of

17   the Bankruptcy Code had counsel representing them and

18   advising them on the way that bankruptcy works.  Before

19   these ad hoc groups were involved, we saw all sorts of

20   motions.  You saw motions to convert the cases to Chapter 7,

21   you saw motions to force mediation.  You saw a variety of

22   lift stay motions.

23          And order really came to the case in large part

24   because of these represented parties.  And as I said at the

25   beginning of my argument, I think pro se parties filed less

Page 72

1    court filings because they saw that there was a lawyer on

2    the scene who was representing their interests and they

3    didn't necessarily need to be involved.

4           So I think that this case is very unique and their

5    contributions are different from the contributions of your

6    ordinary ad hoc group who are really just representing their

7    own interests.  Each of these groups has done what they can

8    to move the cases forward.  I've talked about Custody and

9    Withhold, Earn.  We talked about mediation that they

10   participated in.  I don't believe the mediation would have

11   been possible without them.  The organization that they

12   brought to the Earn community as a whole.  You saw so many

13   letters and motions before they arrived on the scene, and it

14   really dwindled after that.

15          I want to speak about Mr. Tuganov and his counsel.

16   Mr. Tuganov is frankly the party in the case that has

17   probably been here the longest and has been involved

18   throughout.  The Custody and Withhold folks were very

19   involved for the first half of the case.  They reached

20   settlements and sort of, you know, there was no need for

21   them to continue to be involved.  And Earn came about in the

22   latter half of the case.

23          Mr. Tuganov has been here throughout.  As his

24   counsel noted, he was instrumental in getting the examiner's

25   scope expanded.  I'll tell you that he was very helpful in

Page 73

1    mediation and in helping to drive consensus there.  I don't

2    believe that we would have been able to do it without him or

3    his counsel.  And in general, both he and all of the ad hoc

4    groups had very helpful comments and questions throughout.

5    Not on issues that were particular to them or their

6    constituency, but to try to get to the right answer.

7            On the disclosure statement, each one of the

8    counsel had very helpful comments and questions that helped

9    us craft a very complicated legal document in a way that

10   their clients would understand.  We are lawyers for the

11   company, we are not representing the individuals.  We don't

12   hear the questions directly.  They did, and they helped

13   filter those questions through to us and make sure that the

14   plan, the disclosure statement, and the associated documents

15   were understandable by the common creditor here.  I don't

16   think that we could have done it without them.

17           So for all these reasons, I think that these cases

18   were much more efficient.  There was far less administrative

19   cost.  I think it's notable the costs that are being sought

20   today are pretty de minimis in comparison to the costs of

21   the cases and the retained professionals.  Ms. Kuhns'

22   application is in the hundreds of thousands of dollars.  And

23   I'll tell you that given the amount of motions and letters

24   and phone calls that we would have otherwise all

25   collectively had to deal with, I think there is a

1   substantial cost savings that these individuals felt that

2   they had a represented party that they could go to with

3   their questions that could be resolved without needing to

4   invoke the (indiscernible) process.

5           So for these reasons, I think that this case is

6   very different from your ordinary Chapter 11.  We had a

7   disorganized group of creditors before the arrival of these

8   ad hoc groups.  This is very different from a normal case

9   that has sophisticated parties.  And it really brought order

10   to the case that was crying out for it.  And I just don't

11   think that we would be here today.

12           I think another important fact and a

13   distinguishing fact is that no economic stakeholder is

14   objecting to these applications.  As I said, in an ordinary

15   case with sophisticated bondholder groups, if somebody filed

16   this motion, I would be the first to stand up and object and

17   say that that's not appropriate.  I think that both of the

18   estate fiduciaries are standing shoulder-to-shoulder with

19   each of the applicants, and importantly so.  In ordinary

20   cases, I would not be standing here today.  I'm doing that

21   because I believe, and we all collectively believe from the

22   Debtors, that these folks have made a substantial

23   contribution and that we would not be here without them.

24           I'll just briefly address the comment that somehow

25   we were buying silence.  I'll tell you that when we entered

1    into the agreement to support, I was not expecting to stand

2    up here for this long and address Your Honor and stand

3    shoulder-to-shoulder.  We of course support their fees.  But

4    it's really what they've done since the mediation to move

5    the cases forward and to help us get out that have made me

6    feel so passionately about this issue.  And I believe that

7    they have moved the cases forward, and we would not be here

8    without them.  So certainly we are not buying their silence.

9    I had frankly expected to file a milquetoast joinder and

10   stand up here and have some brief remarks and let the

11   applicants carry the water.  But we think it's appropriate

12   because they have really done so much to move the cases

13   forward.  And I hope that Your Honor takes all of this into

14   consideration when you -- you have what I know is a very

15   difficult task ahead of you to consider these applications

16   in the light that they are in this unique case.

17           So unless Your Honor has further questions.

18           THE COURT:  Thanks, Mr. Koenig.  The one thing, I

19   would like you to order a transcript from today on an

20   expedited basis because I want to be able to review the

21   transcript.

22           MR. KOENIG:  We will do so.

23           THE COURT:  Thank you.

24           MR. KOENIG:  Thank you.

25           THE COURT:  Mr. Colodny?

Page 76

1            MR. COLODNY:  Good morning, Your Honor.  Aaron

2     Colodny from White & Case on behalf of the Official

3     committee of Unsecured Creditors.

4            You have to deal with a legal issue.  There are

5     three requirements in the Second Circuit for someone to have

6     an application for substantial contribution granted.  The

7     first is the one you've touched on already, did the efforts

8     benefit more than the creditor's self-interest.  Courts look

9     at the estate, broader classes of creditors, not self-

10    interest.  Second, did they provide a demonstratable benefit

11    to the estate, and third, were they duplicative of estate

12    professionals and reasonable under the circumstances.

13           We support the applications of the Earn, Custody,

14    Withhold Groups, Mr. Tuganov, Mr. Frishberg, and Mr.

15    Herrmann.  And Ms. Gallagher, but defer to the Court as to

16    what is a reasonable expense with respect to her.

17           As my partner, Mr. Wofford says a lot, it's our

18    clients' money that's at stake here.  This estate is

19    primarily an insolvent estate in which every asset is owned

20    by the creditors.  And here those creditors are retail

21    holders that lost their own personal assets.  This is not a

22    case where you have somebody that has a job at a corporation

23    and they're getting paid by that corporation to protect

24    their intertest.  These are people who have lost their

25    houses, lost their own personal interests.  And they chose

1    through funding professionals to put their own money up at

2    risk for the benefit not just of themselves, but for the

3    broader creditor constituents, whether that be their classes

4    or the estates as a whole.  And I truly believe after

5    working with these creditors and attorneys that they all had

6    a goal of enriching the estates as a whole.

7              In the case Bayou Group, 431 B.R. 549 (Bankr.

8    S.D.N.Y. 2010), the court there looked at I believe it was a

9    creditor application for substantive contribution, and it

10   asked whether the efforts of those groups facilitated the

11   successful negotiation and confirmation of the plan.  And it

12   said that efforts that were in favor of the successful

13   negotiation and confirmation of a plan that led to a value-

14   maximizing resolution benefitted the estates as a whole.

15   And I think that all of the groups that I discussed before

16   have made those contributions.

17             I think of them in three buckets.  The first are

18   negotiating the building blocks of this plan.  When Mr.

19   Koenig stood up, he said he didn't have a counterparty.  I

20   believe that we were part of that counterparty, so I am a

21   big biased there.  But --

22             THE COURT:  (indiscernible).

23             MR. COLODNY:  Exactly.  Each of these groups

24   advocated not just for their own self-interest, but on

25   behalf of their broader constituency.  And in doing so, they

Page 78

1     had to give up key things for the benefit of all.  For the

2     custody group, it was 27-and-a-half percent of coins in

3     kind, which is thirty to $40 million which went back to the

4     estate.  Those coins have gone up in value a significant

5     amount since that settlement was structure and resulted in a

6     massive benefit to all creditors of the estate.  Custody

7     holders, unlike everyone else, are getting back coins in

8     kind.  They had a very strong incentive to negotiate the

9     settlement, but they could have gotten back a hundred

10    percent of coins in kind.  They chose to resolve that and to

11    donate part of that recovery that they could have otherwise

12    received to the estate.

13            We also avoided a very long and drawn-out second

14    phase of that trial which we all know would have taken

15    months, significantly delayed the resolution of these cases.

16    And we would be sitting here today mired in litigation,

17    whether it be the custody, the preferred shareholders,

18    without a confirmed plan in front of Your Honor.  That

19    sacrifice I don't think can be overlooked.  The Withhold

20    group did the same thing.

21            You've heard a lot about the mediation.  That

22    mediation was not trying to go through -- without violating

23    mediation privilege, it was not a walk in the park.  We came

24    in there drastically apart in terms of what was an

25    acceptable solution and we were able to bridge that gap

1    through constructive dialogue in front of Judge Wiles.  I

2    truly believe that without the participation of direct

3    creditor representatives, including Mr. Herrmann, Mr.

4    Frishberg, Mr. Cruz, Mr. Tuganov, we would not have gotten

5    to where we are today.

6            And at that mediation, all groups agreed to sign a

7    plan support agreement.  That plan support agreement was

8    ultimately entered into by the Earn Group, Mr. Frishberg and

9    Mr. Hermann and Mr. Dixon.  And the plan support agreement,

10   they all upheld their ends of the deal.  They all stood by

11   us.  And when we needed them when the SEC came and gave us a

12   curveball, they all helped us to move past that, to come to

13   a consensual resolution that maximized value and got us out

14   of bankruptcy.

15           I also want to touch on the class claim. Because

16   there again, this is sacrifice the creditors made for the

17   benefit of all.

18           If you look at Ms. Gallagher, she has an

19   incredible story.  In I think it was April '22, she went to

20   Miami and met Mr. Mashinsky and asked him face-to-face, Mr.

21   Mashinsky, I have my entire life savings with you; are my

22   assets safe?  He said absolutely.  Created a case for fraud.

23           Ms. Gallagher was one of our class plaintiffs.

24   Worked with us to develop a declaration, put herself without

25   counsel, at risk of being deposed by the preferred equity

1    holders, and went through a lot to tell her story to show

2    that.  She also gave up that claim by not opting out of the

3    class settlement in return for 105 percent of her claim.

4    She could have gotten much, much more potentially.  But she

5    chose to be a part of the Earn Ad Hoc Group, to participate

6    in that class claim settlement.  And in doing so, that

7    contribution, whether it be by Ms. Gallagher, by the Earn Ad

8    Hoc Group, by Mr. Herrmann, who dismissed his litigation,

9    that's going to allow millions of dollars to be sent out to

10   creditors on the effective date.  It's going to reduce the

11   amount that had to be reserved not just for disputed

12   amounts, but also to litigate all of those claims.  That

13   would not have been an easy task.  We were looking at 70,000

14   proofs of claim all with distinct questions, all with

15   distinct factual questions that would have been resolved.

16          We still have ADR procedures to resolve those in

17   an efficient manner, but even ADR procedures cost a lot of

18   money.  And I believe that the sacrifice of the parties that

19   have sat here today and are asking for reasonable

20   compensation for the benefit of the whole and expediting

21   distributions, reducing reserves, and reducing

22   administrative expense, which were three things I was

23   incredibly focused on, really prove a demonstrable benefit

24   not just to the individual accountholders, but to the

25   estate.  And when I think about the class claim, folks that

Page 81

1    were instrumental in getting to that settlement are Mr.

2    Tuganov, Ms. Gallagher, the Earn Ad Hoc Group, Mr. Herrmann,

3    and Mr. Frishberg, all who attended the mediation with the

4    exception of Ms. Gallagher, and all who participated in the

5    settlement or prosecution of that class claim.

6              The last item is whether those contributions were

7    unique.  And this is where I believe the United States

8    Trustee said if you just left the Debtors and the Committee

9    to it, they would have gotten to this result anyways.  I

10   don't believe that's the case.  We represent all creditors.

11   I believe that all creditors required direct creditor

12   participation to buy into this claim and that the

13   participation of the Earn Group and the individual creditors

14   were instrumental to get that.

15             THE COURT:  There was an earlier time in this case

16   where, rightly or wrongly the Committee was challenged by

17   many of the creditors.

18             MR. COLODNY:  That's correct, Your Honor.  We had

19   to make a lot of difficult decisions in this case.  And I

20   think that by including these creditors, they now understand

21   that and they recognize the position we were in.  When we

22   were here in December '22 talking about whether it's

23   property, the point that I made that stuck out in my head

24   was if it is your property, you can trace it, then you may

25   get a bitcoin, but someone else is going to get nothing.

Page 82

1    There's not enough to go around.  And that was a sacrifice

2    that our group had a lot of trouble coming to ground with.

3    But ultimately it did it for the benefit of everybody.  I

4    think that a lot of these sacrifices by creditors and those

5    that are standing here today are on the same vein.

6             So I don't believe that these are duplicative

7    services.  I believe that everybody here had a very unique

8    contribution which led to this.  And we would not be

9    standing before you today with a plan that was approved by

10   98 percent with a toggle to get to a different plan if it

11   was met with one objection.  You know, everybody had to

12   sacrifice, and they sacrificed for the benefit of the entire

13   estate to get to a result which will hopefully result in

14   very large distributions to creditors in the near future.

15             THE COURT:  Thank you very much, Mr. Colodny.

16             MR. COLODNY:  Thank you.

17             THE COURT:  All right.  Mr. Bruh?

18             MR. BRUH:  Thank you, Your Honor.  I'll approach

19   this with some general comments initially and then

20   addressing each of the groups that argued before Your Honor.

21   And then if I can reserve a closing, because there will be

22   more groups coming before Your Honor.  And then I can just

23   wrap my closing touching upon all those parties.  Okay.

24             So as Your Honor stated, attorneys look to their

25   client for payment.  That's the general rule.  Here the

1    Applicants are asking the Court to deviate from that rule.

2    And the UST submits in its omnibus objection, the Applicants

3    have failed to satisfy their burden and thus their request

4    should be denied.

5              Every single one of the applicants engaged in

6    activities and pursued paths in protecting his or her own

7    interests or the interests of a particular group.  Any

8    benefit was incident or indirect to the estate.  It is a

9    high bar, and each applicant failed to exceed it.

10              Now, if the actions of the movant duplicated work

11    by the estate-compensated professionals costs more than the

12    benefit or are calculated primarily to benefit the client,

13    the motion would not be granted.  And that's In re Granite

14    Partners, 213 B.R. 440, 446.

15              The provision is also not intended to be used in

16    essence to reach a settlement with the party in the case for

17    eventually coming along and agreeing to treatment under a

18    plan.  And I would note that that is a direct quote from

19    your former colleague, Judge Drain, at a hearing I attended

20    in the Vernon 4540 Realty bankruptcy from May 24th, 2022 in

21    connection with a substantial contribution application by a

22    creditor.

23              And reaching a settlement with the parties to come

24    along and agree to treatment under a plan is the Debtor's

25    playbook here. Counsel said it today.  And we believe that's

1    not what the provision is for.  And as Judge Drain as well.

2           And before I talk about the specific groups that

3    made their arguments today, I do want to touch upon

4    reasonableness.

5           So if the Court was to rule against us and make a

6    finding that there has been substantial contribution by

7    these applicants, which we contend there has not been, they

8    have not met their burden.  We further submit that the

9    applications before Your Honor are not reasonable, certain

10   of the requests are not allowed by law or fail to comply

11   with the guidelines.  It is our position that after the

12   Court reviews those applications, you would agree with the

13   United States Trustee that there should be significant

14   reductions and/or outright denials based on reasonableness.

15          I want to touch upon a few things here.  I think

16   Your Honor hit the nail on the head when we were talking

17   about the ad hoc groups.  Each group is for a particular

18   category of claim, not the whole.  They have specific roles

19   to protect the interests of their own members.  That is why

20   they are named such.  Steering Group, Withhold, Borrowers,

21   et cetera.  We all know the names.  We all have been part of

22   the case from the beginning.

23          Now, if we look at an attorney-client relationship

24   here, it's for the attorneys to represent their clients'

25   interest.  That is the members of a particular group -- here

Page 85

1    the ad hoc members or individuals in the case of Mr. Tuganov

2    or Mr. Dixon who we haven't heard from yet today.

3           To deviate from that relationship would be a

4    violation of attorneys' duty to their clients and the

5    attorney-client relationship.  Any benefit to any other

6    group must be incidental or indirect.  Accordingly, the

7    substantial contribution claim must fail.

8           And I think it's important to note and look at

9    what the UCC states in its papers at ECF 4027 and what it

10   does not state with respect to the applications.

11          In paragraph three in referring to the ad hoc

12   groups, the Committee states that they all negotiated

13   separate settlements with the Debtors and the Committee that

14   were widely accepted by their classes and they were integral

15   to the confirmation of the plan.  But that is not what

16   substantial contribution provision is intended for; to get

17   the votes for a client.

18          And in paragraph two of the Debtor's objection at

19   ECF 4025, they make a similar statement about the

20   settlements achieved for the treatment of certain classes.

21   Also their word choice, "certain classes", is telling.  As

22   well as the absence of the most important word, "all" in

23   front of classes.

24          Now, settlement negotiations do not give rise to

25   substantial contribution claims.  We cite the case of

1    Columbia Gas Systems, 224 B.R. 540.  It's a Delaware case.

2    We think it's instructive for Your Honor today.  Obviously

3    it's not binding on  Your Honor.  It's cited on Page 31 of

4    69 of our objection.

5            Second, we would point out we don't dispute that

6    the creditors were vocal.  We have a hundred appearing

7    today.  We've had hundreds more.  The 341 was a thousand

8    people I believe.  They were involved in this case.  And at

9    times, Your Honor, it bordered on blood lust for the

10   Debtors.  I was here virtually every hearing.  But those

11   creditors would have done what they did regardless.

12           Now, turning to the specific groups.  The first

13   one before Your Honor was the Custody group.  I'm just going

14   to touch upon some of the issues that we raise in our

15   objection before Your Honor just to summarize it, but we

16   stand on our papers with respect to our objections today.

17           It effectively bowed out of these cases after it

18   reached a settlement with the Debtors concerning its

19   members.  What it did was settle now, get paid now.  Any

20   percentage of the claim, it was 27.5 I think it is, that

21   they left on the table was in exchange for various releases

22   of all claims and causes of actions with respect to the

23   holders of the Custody account.  That's in paragraph 20 of

24   the application at ECF 3660.  That is what those members

25   bargained for.  Thus, any nominal benefit that flowed to the

Page 87

1       estate from that was incidental and that application should

2       be denied.

3              And then with respect to reasonableness, we set

4       out the issues there, so we'll rest on our papers with

5       respect to that.

6              Moving along, we have the Withhold group.  It does

7       not dispute that the services that are performed were for

8       its members and the Withhold accountholders, not the overall

9       creditor body.  That's in paragraph 29 of its application at

10      3663.  The applicant hangs its hat on the Court's statement

11      at the December 7th hearing, but that was not a finding in

12      any way.  The Court's words were to the effect that if the

13      Court resolve issues for some groups, it may be well rules

14      that would suggest the outcome as to everybody else.  We

15      believe that that statement is in line with In re US Lines

16      Incorporated, 103 B.R. 427.  It's a Southern District case

17      where services calculated primarily to benefit the client do

18      not justify an award even if they also confirm indirect

19      benefit on the estate.  That's cited on Page 29 of 69 of our

20      objection.

21             And then again with reasonableness, we will rest

22      on our papers.  We identified those issues.

23             Turning to the ad hoc group.  Again, the Earn Ad

24      Hoc -- it's the Earn, excuse me, the Earn Ad Hoc Group.

25      Again, the Earn Group's purported benefit to the estate was

1    nothing more than a settlement reached for the benefit of

2    its members and for plan support which is now the

3    substantial contribution provisions intended for.  The five

4    percent increase is for 30,000 claimants.  That is those

5    claimants who have non-contract claims against the Debtors,

6    no one else.  That's paragraph 17 at ECF 3654 of their

7    application.

8             And what we see as troubling is the term sheet

9    that the group entered into explicitly states that the plan

10   will provide for payment of certain of these applications.

11   And we raise that issue at Page 39 of 69 of our objection.

12            I think all of this showcases the cascading

13   problem which was identified in the Alumni Hotel Corp. case

14   that was cited in our papers, at 203 B.R. 624.  It's a

15   Michigan case, but it's instructive.  It says successful

16   reorganizations require consensual activity.  And as one

17   applicant's fees are approved, others might argue they also

18   made a substantial contribution.  And that's at page 31 of

19   69 of our objection, and that's what's happening here.  And

20   the fact of the matter is encouraging -- the fact of the

21   matter, excuse me, is encouraging cop and mice participating

22   in settlement negotiations and proposing settlement terms

23   are the professional obligation of a creditor's counsel.

24   Again, the Alumni case.

25            Now, with respect to board appointments that the

1    Earn group talked about, they are for Earn accountholders.

2    Their interests, not others.  And while I rest on

3    reasonableness with respect to fees and I do hear, I do want

4    to point out that the Earn Ad Hoc Group has an expense for

5    monitoring the docket and Twitter for $6,700 and change.

6    And that expense, who it was was disclosed to us, but to no

7    one else.  And we find it extremely troubling and it's

8    shocking and we believe a blatant money grab in this case.

9    I mean, I am not at liberty -- I won't say who because it

10   wasn't filed on the docket.  But we were provided that

11   information.  And I just wanted to put that before the

12   Court.

13         And all of this is just a microcosm of all of

14   these ad hoc applications we well as the firms representing

15   individuals, which I'll discuss in a minute.  In a minute

16   I'll talk about Mr. Tuganov.  It's a grab at the coins.

17   Professionals made a lot of money here.  We have heard that

18   from some of the pro se.  And it seems that these applicants

19   want their piece, too.

20         Now turning to Mr. Tuganov.  It was pointed out

21   there was a mistake in our papers, and we apologize.  We

22   stand by -- the chart had the right number.  I didn't want

23   to file anything with the Court.  I thought I would just

24   bring it up to the court here.  It didn't affect argument in

25   any way.

1          In Paragraph 7 of the UCC's statement, they state

2     that Mr. Tuganov was active in these cases.  Being active

3     does not entitle you to a claim of substantial contribution.

4     Inherent in the term substantial is the concept that the

5     benefit received by the estate must be more than incidental

6     when arising from the activities of the Applicant has

7     pursued in protecting his or her own interests.  And that's

8     Dana Corp. case at 390 B.R. 108.

9          It's undisputed that Mr. Tuganov -- I'll talk

10    about Mr. Dixon and I'm sure he will as well -- and the

11    other applicants were active in these cases.  They acted for

12    their own self-interest.

13         Now, for example, Mr. Tuganov participated in

14    mediation.  He did that at his own request.  There was a lot

15    of talk about the Ponzi scheme investigation.  What came out

16    of that was Mr. Tuganov's counsel's time spent, about

17    $273,000.  It doesn't include the Debtors, the Committee,

18    any other court-retained professionals.

19         THE COURT:  Just give me a minute.

20         I'm sorry, go ahead, Mr. Bruh.

21         MR. BRUH:  Thank you, Your Honor.  I was just

22    discussing -- and I'll start again.  We were talking about

23    the Ponzi scheme investigation.  We saw in Mr. Tuganov's

24    counsel's recourse that $273,000 was spent.  That was

25    approximately $1.46 million application for one individual

1    in this case, mind you.  And when reviewing the examiner's

2    689-page report, the word Ponzi appears seven times.  That

3    was -- it's nothing more than a nothingburger in this case.

4    There was no benefit to the estate.  But counsel wants to be

5    paid for those services.  That's just a burden on this

6    estate.

7              Overall we believe that Mr. Tuganov's actions were

8    a mushrooming legal expense for the estate and so are his

9    expenses which include a meal for his attorney at $380.

10             We believe that when parties knew they were filing

11   applications as such with Mr. Tuganov's counsel, they should

12   have complied with the rules of the Court and broke down

13   their applications as the professionals have done for each

14   and every application before Your Honor.

15             We will say that there is these post-confirmation

16   fees of $75,000 (indiscernible) to get to confirmation, and

17   now people want to be paid more money.  There's time entries

18   for defending, for filing a reply to our objection.  And

19   that's not compensable time, Your Honor.  When will the

20   bleeding end?  With respect to other issues,

21   unreasonableness, we'll rest on our papers.

22             And I just would like to reserve time to respond

23   to the other applicants in a general closing.

24             THE COURT:  Okay.  Thank you very much.

25             MR. BRUH:  Thank you, Judge.

Page 92

1              THE COURT:  All right.  Let's take a ten-minute

2    recess and then we'll resume.  Okay?

3              (Recess)

4              THE COURT:  Please be seated.  All right.  Where

5    are we picking up, Mr. Koenig?

6              MR. KOENIG:  Your Honor, I don't know if you had

7    intended to hear from the applicants again or whether we're

8    continuing on.

9              THE COURT:  No.  We're continuing on.

10             MR. KOENIG:  Okay.  So if we're continuing on, it

11   is BNK To the Future's motion.

12             THE COURT:  Okay.

13             MR. KOENIG:  We're on agenda number nine.

14             THE COURT:  Nine.  Okay.  Who is going to argue on

15   BNK To The Future?

16             MR. TARLOW:  Good morning, Your Honor.  David

17   Tarlow from Ervin Cohen & Jessup on behalf of BNK To The

18   Future.  And I am here with my associate, Chase Stone.

19             And I just want to start off this way.

20   (indiscernible).

21             THE COURT:  You're cutting in and out.  So I'm not

22   sure what the issue is for you, but...

23             MR. TARLOW:  Okay.  Is that better?

24             THE COURT:  Yes, that's better.

25             MR. TARLOW:  Okay.  So as I know that

Page 93

```
 1    (indiscernible).

 2              THE COURT:  It's still not working.

 3              MR. TARLOW:  Still not working?

 4              THE COURT:  No.  What is the microphone that

 5    you're using?  Is it on your computer or...

 6              MR. TARLOW:  Yeah, it is on my (indiscernible).

 7              THE COURT:  Let me suggest maybe sit down in front

 8    of it.  It's okay.  Because you're starting to come through

 9    clearly, and then it's breaking up.

10              MR. TARLOW:  Okay.

11              THE COURT:  Go ahead.

12              MR. TARLOW:  Can you hear me now?

13              THE COURT:  For now.

14              MR. TARLOW:  Okay.  So, Your Honor, BNK Of The

15    Future and Simon Dixon are requesting (indiscernible) in the

16    amount of (indiscernible).

17              THE COURT:  Mr. Tarlow, this is just not working.

18    You're cutting in and out.  Where are you located?

19              MR. TARLOW:  I'm located in Beverly Hills.  I can

20    run on into Mr. Stone's office and see if he's any better.

21              THE COURT:  Why don't you try that?  We'll come

22    back to you.  Okay?  But this is not -- I want to give you a

23    chance to argue.  But when you keep breaking up like that, I

24    can't follow you.  All right.  So I'll call the next in

25    line, and then we'll come back to you immediately
```

Page 94

1    thereafter.  Okay.  So the next is Zachary Wildes's motion

2    for substantial contribution.  Is anybody appearing for

3    Zachary Wildes?  Mr. Wildes?

4              CLERK:  I don't see (indiscernible), Judge.

5              THE COURT:  All right.  The next I have is Rebecca

6    Gallagher.

7              MS. GALLAGHER:  Hello, Your Honor.  Can you hear

8    me?

9              THE COURT:  Yes, I can.  Go ahead.

10             MS. GALLAGHER:  Yes.  Hello.  Rebecca Gallagher,

11   pro se.  I am placing my substantial contribution claim

12   because of being the lead plaintiff, a bellwether selected

13   and an admin in the Earn telegraph group.

14             As the debtors said, there is not actually a

15   definition in the Bankruptcy Code for the term substantial

16   contribution.  Therefore, it is to your discretion to decide

17   how, in this case, you will rule on the matter.  And as Mr.

18   Koenig has pointed out, this is a very novel case, very

19   unusual, and it's not going to be the same as most typical

20   bankruptcies in how you rule on this matter.

21             However, as we've said, in determining the factors

22   that go into this, whether the services benefited a

23   creditor, the estate itself or all interested parties is

24   taken into account, and also whether the services resulted

25   in an actual significant and demonstrable benefit to the

Page 95

1    estate is taken into account.  And so I would argue that in

2    my case, by lending my story and taking all the time it took

3    to forge the declaration and to participate in the class

4    claim, resulted in benefits to the entire estate, in the

5    savings of costs and lengthy litigation that Mr. Koenig laid

6    out for us earlier, and that all interested parties

7    benefited from this.

8           It also had a demonstrable benefit because at that

9    time, there were 30,000 claims, proof of claims that had

10   been filed on the docket that totaled many millions of

11   dollars.  So it resulted in a saving of all of that

12   litigation and length of time.

13          I'd also like to say in response to the U.S.

14   trustee, who said that my actions could have been performed

15   without the interjection of an applicant, I would like to

16   say that you can't have a class claim without lead

17   plaintiffs.  So the role that myself and my two other fellow

18   lead plaintiffs took could not have been performed by

19   somebody else.  It needed a creditor to step up and take

20   that role.

21          Also, I look at Mr. Tuganov, who had legal

22   representation.  I worked without that legal representation

23   as I could no longer afford that because of the state that

24   this bankruptcy has left my finances in.  So I feel that my

25   time and effort spent preparing my declaration and working

Page 96

```
1    with Mr. Colodny and the people at White & Case is equally

2    as valuable.  I see that Mr. Tuganov is charging $255,706

3    just for class claim matters that took 220 hours.  I did all

4    this work by myself as a pro se, and so I would ask, why is

5    his time valuable and to be compensated like that, but my 20

6    ETH is to be disregarded.  I feel that I put just as much

7    effort into this.

8            When I filed my proof of claim, I had 17 actions

9    against the debtors for various fraudulent behaviors.  And

10   as Mr. Colodny pointed out, I had a direct proof of fraud

11   against Mr. Mashinsky himself.  But I laid all that down to

12   be able to represent everybody and to speed this process up

13   and to get the recovery for all creditors outside of the

14   custody group of the 105 percent.  So I would ask that you

15   would consider my 20 ETH, which, in my view, is very minimal

16   compared to all the expenses that have been and fees against

17   the estate.  It's not very much, but for me, it would be

18   very significant because I had such a large holding of ETH

19   on the platform, which I have now lost.

20           I'd also like to make a correction for the record

21   that in the Exhibit A of the U.S. trustee's objection, she

22   states that I make a claim for $437,000.  Well, that's not

23   correct.  That's actually the money that I have lost to the

24   petition date pricing that I've had to walk away from.  I'm

25   actually only asking for 20 ETH, not $437,000.  And so I
```

Page 97

1    would respectfully ask Your Honor to consider this, and

2    thank you very much for allowing me to speak.

3              THE COURT:  Thank you very much, Ms. Gallagher.

4    All right.  So let's go back.  Mr. Tarlow, are you able to

5    pick up with your argument?

6              MR. TARLOW:  Yes, I am, Your Honor.  Thank you.

7              THE COURT:  Okay.

8              MR. TARLOW:  And I hope that this is a better

9    feed.  So most of what we'd like to put in front of the

10   court obviously is in front of the court in the papers, and

11   I'm going to try not to repeat what's in the papers, other

12   than to highlight a couple of things.

13             To start off, we are seeking substantial

14   contribution amount of $599,616.71.  And that is broken up

15   by three different entities, one of which is my law firm,

16   which is seeking $301,000 in legal fees as well as costs to

17   include $15,642.01, legal fees from Brown Rudnick in the

18   amount of $222,688.50 and costs of $614.20 and financial

19   services fees in the amount of $59,034 to DBK Financial

20   Services and costs $368.

21             Mr. Dixon and BNK To The Future have provided

22   substantial contribution to the estate in this matter.  They

23   did so in a lot of different ways.  But I'm just going to

24   focus on a couple of things.  First of all, Mr. Dixon was

25   never part of any of the ad hoc committees.  Mr. Dixon, on

Page 98

1    his own and on behalf of his company, BN To The Future, they

2    took the risk and the expense of retaining outside counsel

3    and financial services in order to educate both himself and

4    the creditors in this case as to the plan going forward, to

5    highlight the good parts of the plan and to get consensus

6    from a wide variety of creditors in support of the plan and

7    the way that he did that, and I think Your Honor has seen

8    his videos, or at least some of his videos, lots of videos

9    posted onto YouTube.

10          He's not seeking reimbursement for any of his time

11   or effort doing that, but in order to do so, he needed to

12   educate himself on this entire process, to further educate

13   himself on the plan and what would benefit the creditors.

14   And he was constantly posting hour- to two-hour-long videos

15   on YouTube and on Twitter to educate the creditors.  And

16   also some of the attorneys would watch these videos and get

17   educated as well.

18          Mr. Dixon was also part of the plan support

19   agreement, retained my firm, ECJ, and we immediately jumped

20   in and worked on the negotiations of that plan support

21   agreement.  The agreement took several legal hours in order

22   to negotiate it back and forth with both the debtor and the

23   UCC and ultimately came up with a plan support agreement

24   that Mr. Dixon agreed to and Mr. Dixon complied with his

25   obligations under that plan support agreement.  He supported

Page 99

1    the plan (indiscernible).  He put that out to creditors, and

2    numerous creditors have actually weighed in on this.  And we

3    submitted that as part of Mr. Dixon's declaration showing

4    that they used the materials that he provided to them in

5    order to ultimately support the plan.

6            We also had a situation in December where both the

7    debtor and the UCC came to Mr. Dixon and asked him to submit

8    information to the court and to appear at the trial in

9    December and to explain certain things, specifically, why

10   re-solicitation should not go forward, such as the fact that

11   it's a (indiscernible) a month burn rate if it were to go

12   forward.  And he also brought a lot of value to the estate

13   by his idea that the estate should not be selling the

14   cryptocurrency, but should be keeping it within the estate

15   and its equity, because that would be much more valuable to

16   the estate than would be selling it for pennies on the

17   dollar.  And because of that, the estate has held onto that

18   cryptocurrency, while the cryptocurrency has increased in

19   value and brought probably over $1.5 billion in value to all

20   of the creditors.  This is substantial contribution.  This

21   is what a motion like this is meant to be.

22           As far as the argument that Mr. Dixon and BNK To

23   The Future were acting purely in their own self-interests,

24   that simply is not the case.  Mr. Dixon and BNK To The

25   Future took on roles of a plan consultant to the debtor and

Page 100

1    a board observer solely to represent the interests of the

2    creditors, and not just his self-interest.  I mean,

3    obviously he is a creditor, so he is interested.  But it

4    wasn't solely self-interest at all.  It was on behalf of all

5    of the creditors to look to make sure that they were all

6    getting a fair deal here.

7            Simon was not the member of any ad hoc committees,

8    and any argument that the ad hoc committees, by definition,

9    are self-interested simply doesn't apply to him.  And then

10   we've got clearly the 160 hours or so of content that he put

11   on the Internet, which shows that what he was trying to do,

12   he wasn't doing that for himself.  He was doing that for the

13   benefit of the creditors.

14           So all in all, there was other things that he did

15   as well, such as when he retained Brown Rudnick.  Brown

16   Rudnick did work that ultimately led to the structure of the

17   plan initially.  Those were costs that were borne by Mr.

18   Dixon and BNK To The Future, and it helped Mr. Dixon to

19   articulate the plan to the unsecured creditors.

20           So I think that the evidence that you have before

21   you, Your Honor, really does indicate that what Mr. Dixon

22   and BNK To The Future did here created substantial value to

23   the estate and that he should be awarded those costs.  And I

24   just want to note that those costs are but a fraction of

25   what he actually had incurred for both legal fees and

Page 101

1  financial fees (indiscernible) only 50 percent of what Brown

2  Rudnick had billed on this and a substantial reduction of

3  ECJ's fees.  So that would conclude --

4          THE COURT:  All right.  Anything else?

5          MR. TARLOW:  No.  I've got nothing else, Your

6  Honor.

7          THE COURT:  All right.  Thank you, Mr. Tarlow.

8  All right.  So I'll again give -- is Zachary Wildes on

9  appearing by Zoom?  No?  All right.  We've already heard

10  from Rebecca Gallagher.  Next is the pending withdrawal ad

11  hoc group motion.  Is anybody appearing for them?  It's

12  Number 12 on the agenda.

13          MS. WOODS:  Yes, Your Honor.  This is Adrienne

14  Woods, appearing for the pending withdrawal ad hoc group.

15  Your Honor, I'm only here today because I only just managed

16  to speak with my clients shortly before the hearing, and

17  upon discussion, we've agreed that we will withdraw our

18  application.

19          THE COURT:  All right.  Thank you very much, Ms.

20  Woods.

21          MS. WOODS:  Thank you, Your Honor.

22          THE COURT:  Okay.  Let me make a note.  All right.

23  Mr. Bruh?

24          MR. BRUH:  Thank you, Your Honor.  Again, Mark

25  Bruh, for the United States trustee.  I do want to backtrack

Page 102

1    for a minute because I overlooked talking about a couple of

2    the individuals.  So I'll lump them together now, and we

3    could resolve them all.  So with respect to the individual

4    application, the United States trustee clearly identifies

5    the issues with those requests in our objection.

6         In addition to those outlined in our objection, I

7    would reiterate that Mr. Hermann and Mr. Frishberg

8    participated in the mediation at their own request.  We

9    don't believe there's any basis for Ms. Gallagher's request

10   of 20 Ethereum to be paid to her.  We do acknowledge and

11   apologize to the estate for pulling the wrong number there.

12   I wanted to put that on the record.  And then with respect

13   to Mr. Wildes, albeit he didn't say anything, he does have

14   an application before Your Honor.  I think there were two

15   components.  One seeks reimbursement for a financial

16   services firm, which is non-compensable, which is not

17   allowed.  And the law firm's services are all personal in

18   nature, as they were itemized in that one little invoice.

19   And there was no showing that it benefited the creditor body

20   or the estate as a whole.  And then I'll turn to Mr. Dixon

21   and then my closing remarks, if that's fine with the court.

22        THE COURT:  Yeah.  Go ahead.

23        MR. BRUH:  Thank you.  So, with respect to Mr.

24   Dixon and BNK To The Future, the docket reflects that he's

25   done very little in these cases.  To the extent that he was

Page 103

1   participating on Twitter, YouTube, social media, et cetera,

2   all those activities increased his brand, promoted his

3   business, and he had a significant claim in these cases, and

4   he's trying to get a return on that claim.

5          Mr. Dixon's application talks about how he was

6   instrumental in the Fahrenheit and BRIC bids.  Well, neither

7   worked out as they were intended to in this case.  Mr.

8   Dixon's reply -- I'll move on there.  His time records, I

9   don't know if they were submitted.  There have been some

10  filings after and beforehand, but they're supposed to be

11  kept contemporaneously.  When we filed our objection, we had

12  not seen any time records in connection with the

13  application, and we have not reviewed any to date, Your

14  Honor.  So we would stand reasonable that he hasn't passed

15  that test.  Also, he's seeking compensation for a financial

16  firm, In re Granite Partners.  Those services are not

17  compensable, Your Honor.  That relates to DBK Financial

18  Services, and I think that's approximately $50,000.

19         Mr. Dixon's application does talk about

20  discussions with the debtors in the UCC.  Well, what is

21  absent in these cases, and most telling are any declarations

22  in support of these applications.  Other than Mr. Dixon's

23  self-serving affidavit, there's no declarations from anyone

24  in support of these applications today.  And again, with

25  respect to reasonableness, I'll rest on our papers.

Page 104

1              So, in closing, Your Honor, debtors have spoken

2      glowingly about certain of the creditor groups, but that

3      conflicts with Paragraph 43 of their objection at ECF 4025,

4      wherein they state that the ultimate success of these

5      Chapter 11 cases is overwhelmingly due to the work of estate

6      professionals who have a fiduciary duty to maximize the

7      value of the debtors' estate.  It sounds to me with words

8      like that there's no room for a substantial contribution

9      claim.

10             I'll also note that no applicant has uncovered

11     assets for any creditors.  It's not a 100 percent plan.

12     We've highlighted, and we believe there's duplication of

13     services, and we set forth that in our objection.  I haven't

14     heard anything, if there is duplication, if any of the

15     retained professionals would waive fees so that these

16     applicants can get paid today.  An applicant cannot recover

17     for case administration, reviewing documents, attending

18     hearings, consulting with clients and these applications are

19     replete with those entries.

20             These cases had a lot of moving parts, but that's

21     why the United States trustee appointed a diverse committee

22     to handle those issues for the benefit of all creditors.

23     And with respect to the class claim action, we've heard a

24     lot about that.  That's a name on a piece of paper.  And

25     then let the committee go and do their work.  But based upon

Page 105

1    the representations by Mr. Tuganov's counsel today, it

2    appears that his work significantly overlapped with the work

3    of the committee in connection with the class claim action.

4    I haven't gone through it line by line.  His time records

5    were a little difficult to read, and they weren't broken

6    down into categories which I'm usually accustomed to on my

7    end reviewing applications, as Your Honor well knows, and

8    also the class claim, that's a settlement choice made by

9    creditors.

10           So, in conclusion, the United States trustee does

11   not dispute that various of these professionals and

12   individuals participated in these cases.  However, that does

13   not give rise to the extraordinary actions that you need to

14   overcome to have a substantial contribution in these cases.

15   They have not shown --

16           THE COURT:  Well, would you agree that the --

17   let's put aside what the role of the committee was, what the

18   role of other counsel were with respect to the class claim

19   and the settlement.  But the class claim benefited the

20   entire creditor body and not just a subset of creditors.  Do

21   you agree with that?

22           MR. BRUH:  It appears so, yes, Your Honor.  But

23   then we look at who did the work in connection with it.

24           THE COURT:  And so, when the motion to permit a

25   class claim was filed, the preferred holders objected to the

Page 106

```
1    committee counsel being the one -- argued that the committee

2    could not be the plaintiff.  There had to be individual

3    plaintiffs.  So there was an effort, and three specific

4    plaintiffs were identified.  You agree with that?

5              MR. BRUH:  Yes.

6              THE COURT:  All right, and so with respect to the

7    class claim, that's why I'm not necessarily in sync with you

8    as to whether any professionals other than the committee's

9    professionals made a substantial contribution to the class

10   claims and resolution of the class claims.  Obviously it was

11   settled --

12             MR. BRUH:  Right.

13             THE COURT:  -- successfully done, and certainly

14   appreciate that.  That certainly simplified this case

15   considerably.  The class claims were important because of

16   the ruling that I had made that the only contractual claims

17   were against LLC, but specifically said that there could be

18   non-contract claims, amongst others.  That was sort of the

19   genesis then of whether was the court suddenly going to be

20   faced with hundreds of thousands potentially of separate

21   claims.  It was pursued as the class claim.  So that -- I

22   start with the premise that the class claim benefited the --

23   satisfied, ticked off the check.  It benefited the entire

24   creditor body, not just specific plaintiffs, specific

25   creditors.  You agree with that?
```

Page 107

1           MR. BRUH:  I mean, it seems to be based upon the

2    result and how it came about, yes, Your Honor.  But we do

3    have issues concerning the reasonableness of the --

4           THE COURT:  Well, let's put aside the question.

5    Yes, and I do scrutinize the reasonableness.  But so is your

6    objection then about the reasonableness rather than the fact

7    that the work was done and for which they're seeking

8    compensation?  I recognize the reasonableness is going to

9    have to be satisfied.

10           MR. BRUH:  Well, I think that once a name is put

11    on the paper, and then the committee would do the work

12    behind the scenes in support of the class claim to

13    streamline the process to the benefit of all, the whole

14    creditor body and the estate to which it was appointed to do

15    so.  So that's where we stand with respect to that.

16           THE COURT:  All right.  Anything else you want to

17    add, Mr. Bruh?

18           MR. BRUH:  On that issue, no, Your Honor.

19           THE COURT:  No, go ahead.

20           MR. BRUH:  So I'll pick up that we believe that

21    the applicants have not shown by a preponderance of the

22    evidence that they provided a substantial benefit to the

23    estate and mere conclusory statements are not enough.  So

24    this case has been funded by a treasure chest of coins which

25    has doubled since the petition date.  And that's great for

Page 108

1    all creditors because now there -- there were a lot of

2    people are very nervous and frustrated and upset at the

3    beginning.  That's just using --

4             THE COURT:  Well, there's a lot of people who are

5    still --

6             MR. BRUH:  I know, but in a bankruptcy sense, with

7    the numbers coming out we've seen far worse returns to

8    creditors in cases.  We all can attest to that.  And I'm

9    just using bitcoin and Ethereum as an example for the

10   doubling.  I haven't analyzed every coin that was

11   (indiscernible) here.  But we're near the finish line and

12   not everyone gets to put their hands in the treasure chest.

13   It's our position and we believe that these applications as

14   we set forth today and in our objection are saddling

15   hundreds of thousands of creditors with additional

16   administrative expenses that they did not ask for.

17             Now, cost of the applications in relation to

18   retained professionals is not relevant to justification as

19   to why someone should be allowed to be paid in this case.  A

20   finding of substantial contribution is reserved for the rare

21   and extraordinary circumstances where creditors' involvement

22   truly enhances the administration of the estate.  Words

23   matter and those words are precise and extremely limiting.

24   The movants have not demonstrated their burden and thus the

25   application should be denied.  I would put on the record it

1    was raised that we have no financial stake.  When I talk in

2    the colloquial --

3              THE COURT:  I've said this many times, I mean, I

4    value all the work the U.S. trustee does, but in particular

5    with respect to scrutinizing all fee applications, whether

6    it's in the regular course or substantial contribution.  So

7    you don't have to defend the role of the U.S. trustee in

8    carrying out this important --

9              MR. BRUH:  Thank you, Your Honor.  And I would

10   just say thank you for allowing me to get this all out on

11   the record.  There was a lot to unpack here and to the

12   extent I missed an application or an issue, I rest on the

13   objections in our papers.  Thank you again.

14             THE COURT:  Thank you, Mr. Bruh.  All right.

15   Before I hear from the debtors' counsel and committee's

16   counsel again, with respect to some of the second group of

17   applications that I've heard, there were some additional

18   objections filed by pro ses and things.  Is there anybody --

19   so this really picks up with the objections, starting with

20   Herrmann, Frishberg, Tuganov, BNK To The future, Wildes and

21   Gallagher.  Is there anybody else who wishes to be heard

22   objecting to those applications?

23             MR. LATONA:  Good afternoon, Your Honor.  For the

24   record, Dan Latona, of Kirkland & Ellis, on behalf of the

25   debtors.  The debtors did file an objection to certain of

Page 110

1    the substantial contribution applications.  That's at Docket

2    Number 4025.

3           To point out, just to disagree a little bit with

4    Mr. Bruh while, he did say that estate professionals have

5    overwhelmingly moved these cases forward, it's not true that

6    they have exclusively moved these cases forward.  As both

7    Mr. Koenig and Mr. Colodny articulated earlier in the

8    hearing, creditor participation in these Chapter 11 cases

9    has been robust, and in certain instances, that's had a

10   positive outcome on these cases.  For example, the class

11   claim settlement, the retail borrower settlement were both

12   integral pieces of the plan that helped move these cases

13   forward.

14          But, Your Honor, the Bankruptcy Code does require

15   the fees and expenses be actual and necessary under Section

16   503(b)(3) and under 503(b)(4) for professional services

17   incurred in making a substantial contribution.  And certain

18   of the substantial contribution applications do not provide

19   sufficient detail for the debtors to be able to determine

20   whether the fees incurred were actual and necessary in

21   advancing and administering these Chapter 11 cases.  For

22   example, the Wildes application is a one-paragraph letter

23   that was filed on the docket with two invoices that do not

24   provide detail to help the debtors or the committee

25   determine whether those expenses were actual and necessary.

Page 111

1    Similarly, Ms. Gallagher's application doesn't demonstrate

2    that 20 ETH is the actual and necessary compensable amount

3    for her time.  That 20 ETH would be approximately $52,000 in

4    today's dollars.

5              THE COURT:  Let me just stop on that.  Over the

6    years, I've had multiple class action adversary proceedings

7    brought in this court, in WARN Act cases, for example, and I

8    think they've all settled.  One may have been dismissed, but

9    the rest all settled.  When counsel in any of those cases

10   were seeking -- connection with the approval of the

11   settlement was seeking approval of the settlement, they

12   would include in it if they were looking for some return to

13   the named plaintiffs.  It would be included then and

14   evaluated as part of the settlement.  That didn't happen

15   here.

16             So Ms. Gallagher has made an application for an

17   award as a named plaintiff in the class claim, which did

18   settle.  But the time when it should have been brought, in,

19   my view, was as part of the settlement.  If there was going

20   -- I separate that out.  I asked some questions earlier

21   today whether her expenses, for example, they're part of

22   another separate application that's been made, separate that

23   out from an award for her role as the class plaintiff.  Go

24   ahead.

25             MR. LATONA:  Yeah, Your Honor, and what I would

Page 112

1     say is we appreciate Ms. Gallagher's participation in these

2     cases.  What we're trying to determine is whether that 20

3     ETH is an actual and reasonable cost incurred, and we'd be

4     happy to discuss with Ms. Gallagher what the actual amount

5     would be in this case would it be appropriate, and I think

6     the committee --

7               THE COURT:  I'm not taking any additional filings

8     with respect to these applications.  I've made that clear.

9               MR. LATONA:  Of course.  Lastly, Your Honor, I'll

10    finish up with Mr. Dixon and BNK To The Future.  Mr. Dixon

11    has been prominent in these Chapter 11 cases, both in the

12    courtroom and on social media.  He also participated earlier

13    in the cases as a potential bidder in the debtors' sale

14    process.  He did also file a number of letters on the docket

15    in support of the plan, and we appreciate Mr. Dixon's role

16    in this.

17              As part of the plan support agreement, the debtors

18    and the committee both agreed to support any application by

19    Mr. Dixon and BNK To The Future for fees and expenses

20    incurred as part of negotiating that plan support agreement.

21    And it's not clear, nor does the application distinguish

22    what fees were actually incurred as part of negotiating the

23    plan support agreement.  And so I understand Your Honor is

24    not going to take additional filings in these cases.  But to

25    the extent Mr. Dixon would like to distinguish which of

Page 113

1     those fees were incurred as part of the plan support

2     agreement, the debtors would be supportive.

3              With that, Your Honor, I will turn over the

4     lectern, either physically or virtually to anybody else who

5     would like to speak.

6              THE COURT:  All right.  Thank you.  Does anybody

7     else wish to be heard at this point?

8              CLERK:  Judge, Jason Amerson is on.

9              THE COURT:  Yeah.  Go ahead, Mr. Amerson.  Just

10    one moment.

11             MR. AMERSON:  Yes, Your Honor.

12             THE COURT:  So you filed an objection to the BNK

13    To The Future substantial contribution application.  Go

14    ahead, Mr. Amerson.

15             MR. AMERSON:  That's correct, Your Honor.  Is the

16    court able to re-enable my video?  I had it working earlier,

17    but it's not allowing --

18             THE COURT:  Your video is not working.  I can hear

19    you loud and clear.

20             MR. AMERSON:  Okay.  There -- I think --

21             THE COURT:  Oh, there you are.  Now I can see it.

22             MR. AMERSON:  Yeah.  Okay.  I'm not sure if I'm

23    washed out or not.

24             THE COURT:  No, you're coming through.  The

25    picture is very clear.

Page 114

1            MR. AMERSON:  First of all, Judge, I would like to

2      say you've been very patient with all the comments today,

3      and I have noticed over the last year and a half, you've

4      been very patient with pro se creditors, allowing them to

5      speak their mind and get their thoughts out before the

6      court.  So that's very appreciated.  It hasn't gone

7      unnoticed.  In order to respect the court's time today, I

8      did prepare my comments in advance, which I have actually

9      added to based on what I've heard today.  So if you'll

10     indulge me, I think I can get this out in about 12 minutes.

11     I'll even set a timer to try to make sure I keep on that

12     timeframe.

13            THE COURT:  Go ahead.

14            MR. AMERSON:  Okay.  So, first off, I do not agree

15     -- and this initial comment is based on what I heard today.

16     So let me preface that.  I do not agree with the logic of a

17     number of the arguments presented here today that suggest

18     the court should interpret any creditor's agreement not to

19     object further or continue to take an adversarial position

20     against the debtors' plan should therefore qualify as a

21     substantial contribution.

22            Furthermore, the assertion that the appointment of

23     a board of observers is a benefit to all creditors is

24     fatally flawed.  These appointments are a net zero benefit

25     to all of the convenience class creditors.  For the

Page 115

1    creditors who obtain equity in the NewCo, the benefit of the

2    board of observers has yet to be determined as a true

3    benefit.  I would argue the pursuit of these appointments

4    might very well have been motivated solely to support a

5    future substantial contribution claim.

6         The debtor never designated any individual to

7    officially represent the creditors and their legal

8    representations' assertion that those who submitted

9    substantial contribution claims somehow swayed nearly

10   600,000 creditors to overwhelmingly approve the plan is pure

11   conjecture.  This would suggest that they had enormous reach

12   and influence that they exerted on creditors to sway them in

13   their decision-making.  Educating and informing creditors

14   was the responsibility of the Celsius UCC, who held numerous

15   town halls specifically with Celsius creditors, along with

16   multiple communications through their Twitter/X social media

17   account, not to mention emails sent directly from to the

18   creditors to keep them informed on the bankruptcy process.

19        The argument that overall amounts being requested

20   by the claimants in relation to other fees already billed to

21   the estate by professionals is immaterial and not supported

22   by the Bankruptcy Code.  This was not the responsibility of

23   a handful of creditors to serve, and serves as no

24   justification to further dip into creditors' estate funds

25   once more, thus reducing funds available to the rest of the

Page 116

1    creditors.

2            The court is aware that the U.S. trustee also

3    submitted a well-crafted objection to several of the

4    substantial claim contributions by various parties, not

5    surprisingly made up of mostly creditors.  It is commonly

6    assumed by the courts that any creditor coming before the

7    court is doing so primarily as a self-interested party.  I

8    am not here today to discuss those other individuals.  I am

9    here specifically to object to one individual based on his

10   unique relationship with the debtor.  Just one individual, a

11   single creditor who over the past year and a half has been

12   highly controversial figure in this bankruptcy process.

13           I would like to read from a quote from the U.S.

14   trustee's own objection to Mr. Dixon's application: "At

15   best, Mr. Dixon's alleged work is duplicative of these

16   efforts and, at worst, his work may have derailed the work

17   of the committee and the debtors from other successful

18   plans."

19           Now, I would assume the U.S. trustee based their

20   objection to Mr. Dixon's substantial claim contribution for

21   nearly $600,000 in reimbursement solely on the facts

22   available in this case.  My objection, like the trustee's,

23   is also based on similar arguments, but I'd like to provide

24   some additional context and historical perspective that the

25   trustee did not and could not provide.  I'd like to state

Page 117

1    upfront that my objection is firmly aligned with the strict

2    requirements as outlined in 11 USC Section 503 of the

3    Bankruptcy Code governing any allowance or administrative

4    expenses.

5            But there's more to the story than just a simple

6    reimbursement.  First, you need to know the context by which

7    Mr. Dixon has come before you today and the Celsius estate

8    with his hand out.  (indiscernible), Mr. Dixon first

9    partnered with the former CEO of Celsius Network, Alex

10   Mashinsky, to help promote and encourage nearly 1,000

11   investors to invest their funds in the Celsius Series A

12   equity round.  I only mention this because Mr. Dixon often

13   represented himself solely as an unsuspecting creditor who

14   was financially damaged and victimized.  There is much more

15   to it.

16           The reality is Mr. Dixon helped to bring in

17   millions of dollars of investment funds into the Celsius

18   Network through his partnership with the company, funds

19   totaling nearly $170 million at their peak and later

20   declared worthless by this court, thereby becoming a total

21   loss to his investors.  As near as I can tell, there has

22   never been an admission nor an apology by Mr. Dixon to his

23   investors that he ushered into the Celsius Network starting

24   in January of 2022.

25           Now at this time, I would like to remind Your

1    Honor that Mr. Dixon is not a licensed financial advisor.

2    Mr. Dixon heavily relied on social media, mainly YouTube, to

3    post videos in the first half of 2022, singing the praises

4    of investing in Celsius, which likely gave untold retail

5    investors confidence to utilize Celsius Network as a crypto

6    Earn and loan platform.  Celsius appeared to appreciate Mr.

7    Dixon's efforts on this front, so much so that they later

8    offered Mr. Dixon a board seat on the Celsius Network board

9    of directors, likely a consolation prize for all his hard

10   work bringing in millions of dollars in the Series A equity

11   round.

12            By the way, Mr. Dixon surprisingly declined that

13   offer, thereby passing up a golden opportunity to become a

14   board member and have real influence on the direction of the

15   company, and after all those Celsius promotion videos I

16   mentioned on YouTube, Mr. Dixon has since taken them all

17   down so I cannot directly cite them as evidence in my

18   objection today.

19            Just months before Celsius Network filed for

20   bankruptcy in the Southern District of New York, Mr. Dixon

21   was making unsolicited offers to the CEO of Celsius in an

22   attempt to get Celsius to purchase his company for a

23   staggering $500 million, which was later rejected, a figure

24   apparently not supported at all by the PowerPoint slide deck

25   that Mr. Dixon presented as justification for the exorbitant

1    figure.

2           Despite the assumption by many that Celsius

3    Network was a cash flush company, a serious downturn in

4    crypto markets, exacerbated by unexpected events, commonly

5    referred to as black swan events due to their rarity,

6    combined with some ill-advised decision-making by Celsius

7    executives, made for the perfect storm of events

8    necessitating the filing of Chapter 11 bankruptcy

9    protection.

10           At the time, Mr. Dixon had around $10 million on

11   the platform, some he claimed to be his personal funds and

12   some he claimed belonged to his company.  He was adamant

13   that none of the funds under his name or that of his

14   company, BNK To The Future, which is not a bank, belonged to

15   his customers, a claim that many have come to doubt,

16   especially taking into account the nature of Mr. Dixon's

17   company, whereby he solicits monies from retail investors

18   with the expectation that he will find suitable investments

19   in order to provide them with a desirable return.

20           Mr. Dixon's business is not publicly traded and

21   incorporated out of the Cayman Islands.  Just days after the

22   Celsius Network withdrawal pause on or about June 12, 2022,

23   Mr. Dixon was already taking a clear position in his Twitter

24   social media posts that seemed geared towards undermining

25   and challenging the decision-making at Celsius.

Page 120

1              Unfortunately, Mr. Dixon was in the same boat as

2      all the other creditors.  Had he only not passed up that

3      golden opportunity to serve on the Celsius board of

4      directors.  One can only speculate, but it seems likely he

5      never accepted the position because as an insider he would

6      be prohibited from soliciting Celsius to purchase his

7      company.

8              In the latter half of 2022, well into our

9      bankruptcy, Mr. Dixon throttled up his discontent against

10     Celsius Network on social media, seemingly in an effort to

11     beat down any positive perception that the company, Celsius

12     Network, had desirable assets and could successfully emerge

13     from bankruptcy (indiscernible), a strong post-bankruptcy

14     entity being the desired outcome of most, if not all,

15     companies that enter into Chapter 11 bankruptcy protection.

16             Creditors and competitors alike took notice as Mr.

17     Dixon took to the crypto social media talk show circuit,

18     appearing before anyone who would listen.  I, like many

19     other creditors, did not understand his behavior at the time

20     because this seemingly only served to devalue the Celsius

21     assets and decrease our odds that a well-funded bidder would

22     come along and essentially buy us out and possibly make us

23     whole.

24             To my surprise, it was disclosed in early 2023

25     that Mr. Dixon had quietly been engaging in the bidding

Page 121

1    process, vying for Celsius Network assets, a fact in direct

2    conflict with his earlier statements to the contrary.  After

3    the submission of his failed bid on Celsius assets in late

4    2022, Mr. Dixon again dialed up the rhetoric against Celsius

5    enough that the debtor and the Celsius UCC were taking

6    notice.  It was apparent to me that measures were being

7    taken to quell Mr. Dixon's dissent.

8              Now, throughout this bankruptcy process, we have

9    had two primary powerhouses, powerhouse law firms working on

10   our behalf in this bankruptcy, White & Case and Kirkland &

11   Ellis, both well-known in the industry to be amongst the top

12   professionals when it comes to bankruptcy.  And I'm

13   complimenting everybody up there, so (indiscernible) I just

14   went off script.  Let me get back on.

15             Its highly professional expert lawyers don't have

16   the -- if the highly professional expert lawyers don't have

17   the answers to a problem, they are empowered to hire the

18   appropriate resources and experts to keep the process moving

19   forward for the debtor.  I'd like to point out that at no

20   time did they enter into -- that either firm enter into a

21   financial agreement with Mr. Dixon to retain his services or

22   counsel in guiding the debtor through the bankruptcy

23   process.

24             Despite not being contracted in any way, Mr. Dixon

25   found a way to continually insert himself into the

Page 122

1    conversation ahead of other creditors.  Curiously, Mr.

2    Dixon's filing request for nearly $600,000 in expenses

3    reimbursement, his participation in your courtroom has been

4    very minimal.  Only after this application was submitted did

5    he come before you in an effort to tout his experience and

6    knowledge in the field of bitcoin and crypto, arguably much

7    too late to make a meaningful difference.

8              Almost done, Your Honor.  In Mr. Dixon's

9    application, he cited his role to an agreement executed on

10   March 10, 2023, titled a plan consultation party agreement,

11   which can be found in Exhibit C of Docket 3799 and which was

12   not a contract to retain Mr. Dixon's services, but rather

13   simply an agreement to allow him access to the debtors'

14   confidential and privileged information not afforded to

15   other creditors.

16             The agreement did not infer that compensation or

17   expenses could or would be covered or reimbursed.  The

18   agreement clearly states, and I quote, "Plan consultation

19   party shall not be eligible to receive compensation or

20   benefits for any services provided hereunder."  The

21   agreement was mostly a one-sided agreement in that it

22   outlined parameters for which Mr. Dixon would have access

23   to, but made absolutely no request of Mr. Dixon to provide

24   any feedback or guidance to the debtor, the only exception

25   being that it expressly instructed Mr. Dixon to represent

Page 123

1    himself in any way as an officer or an employee of the

2    debtor.  There was no request made or promises to Mr. Dixon

3    as a result of the plan consultation party agreement, the

4    key word there being party.  He was made a party to

5    information (indiscernible) by the debtor and not a

6    consultant to the debtor.

7              Judge, the word consultant does not appear even

8    once in the executed agreement which I just mentioned.

9    Earlier -- I'm going off script here.  Earlier, Simon

10   Dixon's lawyer referred to him as a consultant, but I want

11   to make it clear he did not agree to become a consultant.  I

12   would challenge anybody who would argue otherwise.  He was

13   not in writing, formally a consultant in any way.

14             Why would the debtor and their legal counsel agree

15   to this?  One can only speculate.  But if you take into

16   account Mr. Dixon's often heated social media statements

17   putting him directly at odds with the debtor, then it only

18   makes sense to quell that dissent by effectively reading him

19   into the process.  Thus, he is under an NDA and would have

20   to mitigate and temper his public statements going forward.

21             Mr. Dixon's application is full of references to

22   activities and events which predate him having special

23   access via the plan consultation party agreement.  What it

24   does contain, or, I'm sorry, what it doesn't contain is any

25   specific breakdown of his legal expenses and why such legal

Page 124

1    expenses were even necessary to begin with.  I personally

2    find it mind boggling to think that he paid his attorneys

3    hundreds of thousands of dollars just so he could be given

4    access to privileged information.

5              Precisely what did Mr. Dixon's attorneys do that

6    Kirkland & Ellis and White & Case were unable to accomplish

7    themselves?  We may never know, as it turns out.  There was

8    not an itemized bill provided.  There was never an official

9    letter or billing statement from any of his multiple

10   attorneys.  Mr. Dixon may tell the court that this money is

11   not for him, but rather for his attorneys.  It seems Mr.

12   Dixon is really here for their benefit today, representing

13   them.  Mr. Dixon's request simply lacks the critical

14   empirical evidence that the court could use to consider his

15   actions a substantial contribution, a contribution whereby

16   one could present tangible and measurable evidence that

17   their activities led to the benefit of the creditors' estate

18   rather than to its detriment.  I have seen no concrete

19   evidence in Mr. Dixon's application to the court that his

20   actions were anything less than self-serving and entered

21   into at his own risk.

22             As you know, Your Honor, the Bankruptcy Code does

23   not define specifically what a substantial contribution is.

24   However, the debtors' counsel posted a publication on their

25   own company website which can be found in Exhibit A of my

Page 125

1    objection, Docket Number 4015, stating, and I quote, "Courts

2    generally have required the claimant show that it took

3    extraordinary actions that led to an actual and demonstrable

4    benefit to the debtor's estate, or as some courts say,

5    direct and material."  This reminds me of when Supreme Court

6    Justice Potter Stewart was asked to describe his test for

7    obscenity in 1964.  He responded by saying, I know it when I

8    see it.

9           Well, Judge, I'm pretty sure I know what a

10   substantial contribution looks like.  And Mr. Dixon's

11   activities do not come close to justifying that the

12   creditors' estate should be made to pay him nearly $600,000

13   just for his well-crafted and long application amongst the

14   other creditors that are coming to you today for a handout.

15   Mr. Dixon asserts that his claim could have been much higher

16   if he had chosen to request reimbursement for the countless

17   number of hours of his social media videos he posted on

18   YouTube, almost as if to say that we should be somehow

19   grateful that he is cutting us a break and also his

20   attorneys have discounted their fees as well.

21           However altruistic and honorable Mr. Dixon would

22   have you believe his comments were, it is purely irrelevant

23   and immaterial to what the law requires in order to qualify

24   for a substantial contribution reimbursement.  From where

25   I'm sitting -- well, let me skip over that.

1          I would ask the court today to please deny Mr.

2     Dixon's request, as it ultimately does not qualify under 11

3     USC Section 503 of the Bankruptcy Code.  Please show all

4     creditors listening today that the court will take the

5     necessary action to maximize and preserve the debtors'

6     estate for the benefit of all creditors, and the estate will

7     not serve as a perpetual ATM machine to the people with the

8     loudest voices.

9          Last paragraph.  My heart goes out to all

10    creditors who lost hope and sold their claim early on for a

11    mere pittance after possibly reading many of Mr. Dixon's

12    negatively slanted tweets about the debtors' chances of

13    successfully emerging from bankruptcy.  Unfortunately, many

14    creditors may have been influenced into giving up their best

15    chance of receiving a maximum recovery at the conclusion of

16    this bankruptcy process.  I think that untold numbers of

17    creditors may -- I'm actually going to skip over that

18    comment now.  I don't think it's relevant.

19          Finally, Your Honor, I would like to thank the

20    U.S. trustee today immensely for not subordinating their

21    duties and acting in the best interest of all creditors on

22    this matter.

23          THE COURT:  All right.  Thank you very much, Mr.

24    Amerson.  Mr. Koenig, did the debtor want to respond to any

25    of the arguments we've heard?

Page 127

```
 1              MR. KOENIG:  To Mr. Amerson's argument?

 2              THE COURT:  No.

 3              MR. KOENIG:  Mr. Latona just spoke before.

 4              THE COURT:  Okay.  That's fine.  Mr. Colodny?

 5              MR. COLODNY:  Briefly, Your Honor.  Aaron Colodny,

 6      from White & Case, on behalf of the Official Committee of

 7      Unsecured Creditors.  We filed an objection to Mr. Dixon's

 8      application as well.  We don't object to the entire amount,

 9      but I think the law is clear that losing bidders are

10      generally not compensable for substantial contribution.

11      That's In re S&Y Enterprises, LLC, 480 B.R. 452 (Bankr.

12      E.D.N.Y. 2012).  And I think in Mr. Dixon's declaration,

13      which is not admitted into evidence because we are not at an

14      evidentiary hearing, he breaks it into two different

15      categories.  He has the services provided by Brown Rudnick &

16      Cooley, which he says were part of the bid, and then

17      afterwards by ECJ, which were part of his support for the

18      plan moving forward.  We support the payment of the fees by

19      ECJ as part of his substantial contribution in generating

20      support for the plan.  However, we don't support the payment

21      of the fees of an unsuccessful bidder.

22              THE COURT:  All right.  Thank you.

23              MR. COLODNY:  Thank you, Your Honor.

24              THE COURT:  All right.  Does anybody else wish to

25      be heard briefly?
```

1            CLERK:  Judge, Cathy Lau is on the --

2            THE COURT:  Go ahead, Ms. Lau.

3            MS. LAU:  Okay.  I am making an objection to Simon

4     Dixon's substantial contribution claim.

5            THE COURT:  Go ahead.

6            MS. LAU:  Okay.  So Simon Dixon's substantial

7     contribution application is unreasonable, excessive, lacking

8     merit and shamelessly insulting with him even seeking

9     reimbursement for the fees he is paying his lawyers to

10    defend against the objections to his application today.  He

11    has not broken down what his expenses are for and wants to

12    wait until after the hearing to let the U.S. trustee examine

13    his bills, which makes no sense as clearly its content

14    should be examined before any approval is given to determine

15    if the other fees and expenses he has tried to include

16    reflect activities that have actually benefited creditors

17    and the estate.  It makes one wonder why they couldn't

18    provide them sooner, especially given the unreasonableness

19    of the future expense they did break down, and especially

20    since the date for the substantial contribution hearing had

21    already been extended, giving them more than enough time to

22    gather the information.

23            Simon has tried to use his participation in the

24    last hearing to justify having the entirety of his

25    application approved, despite the fact that it was part of

Page 129

1    the plan support agreement he signed that he would support

2    the reorg plan and continue to push to have creditors

3    support it in exchange for his board observer seat and

4    support from the debtor and the UCC for part of his

5    application.

6        If the plan did not pass by December 31st, he

7    would have had to forfeit both his board position and their

8    support.  So it was probably that that was a major

9    motivation for his participation in and wanting to help the

10   plan pass in the hearing, and he should not be given more

11   for his role just because he's trying to obtain more

12   benefits for himself than were already negotiated for.

13       To see Simon under a plan support agreement and

14   fighting to have every last scrap of his substantial

15   contribution application paid to him is a complete 180 from

16   how Simon presented himself and his perception of Chapter 11

17   and what he was saying he was fighting for initially when he

18   was trying to build a follower base for himself within the

19   Celsius case.

20       In June 27, 2022, before Celsius entered a

21   bankruptcy, he tweeted, I am fighting against, if Celsius

22   enters bankruptcy protection, client positions will be sold

23   to U.S. dollars at the current market price and clients will

24   be added to the list of the firm's creditors.  I'll share

25   how you can play your part soon.

Page 130

1           So this was a big deal because he said, Simon,

2      then he went on (indiscernible) months arguing for making

3      Celsius creditors truly whole, but suddenly shifted his

4      stance and settled for having predators receive their crypto

5      only in the form of bitcoin and Ethereum, priced on dollar

6      terms at the U.S. petition (indiscernible), directly counter

7      to what he said he was fighting for at the start of the

8      bankruptcy.

9           As a Celsius creditor described in a tweet, whole

10      would be the value of the crypto we held in Celsius.  If I

11      have one bitcoin and it goes to 100,000, giving me back

12      20,000 just because it was the value at the time of the

13      bankruptcy is not whole.  Giving me one coin is whole.

14           So Simon had been saying that Tradefi didn't

15      understand how crypto worked and that he was the only one

16      who could explain to them why it was so necessary to receive

17      our cryptos back in the form we had it because of the severe

18      loss of value to creditors and money going to the lawyers if

19      we settled on petition date pricing.  With petition date

20      pricing, any increase in crypto's value would be lost to the

21      creditor and made available to the debtor and the lawyers,

22      thereby screwing over creditors who had purchased crypto for

23      its upside potential.  And Simon had been aware of it from

24      the beginning.

25           But he abandoned fighting for this and settled on

Page 131

1    arguing for something that had the appearance of in-kind,

2    promising to return crypto to creditors in the form of

3    bitcoin and Ethereum that actually was not in-kind at all,

4    forcing them to accept the dollar value of their holdings at

5    a bear market value, and allowing the debtors to keep all

6    the upside value for themselves, which the lawyers and other

7    plan creators could use as a source of (indiscernible) to

8    continue (indiscernible) the expense of creditors.

9           Creditors have discussed this total shift in ethos

10   of recovery with one creditor meeting back in January 25,

11   2023, especially since the UCC literally just told us this

12   was why they supported the ownership of Earn going to

13   Celsius, because it made returning the crypto in kind

14   easier.  And I remember Celsius repeatedly saying they

15   intended to return in-kind also.  And in reply to that said,

16   good point.  They really need to explain this total shift in

17   ethos of recovery.  All we've heard from day one, primary

18   objective of preserving and giving creditors options to

19   access the remaining crypto while trying to maximize value

20   of non-crypto assets through building or through bid or

21   reorg.

22           So it would appear that both the debtors and the

23   UCC had been leaning towards crypto in-kind to creditors.

24   And when they offered Simon a plan consultant position, he

25   should have used that time to explain the creditors'

Page 132

1   position and why petition date pricing makes sense, and

2   instead he focused his time on working with bidders in a

3   stalking horse bid he proposed that he said would produce

4   significantly better results for creditors and would be

5   worth the increased lawyer's fees.  And this was a

6   significant shift from the attitude he expressed earlier in

7   December 20, 2022 when he tweeted that -- sorry, I've got to

8   find that.  He said, I now believe that Chapter 11 is a U.S.

9   scam to drain creditors of every remaining dollar and sell

10  all their assets to pay the debtor and their service

11  providers.

12          So it's interesting that after casting the Chapter

13  11 process in such a bad light and influencing a general

14  consensus by creditors against any extension of the Chapter

15  11 process, Simon shifted tune again.  And then he said that

16  because he was given a plan consultant position and able to

17  work with bidders and stuff, he said he started endorsing

18  the extension of the law process, saying patience, the

19  longer the auction, the better the terms.  Expect news

20  today, Celsius creditors, the Celsius scam should eventually

21  become a transparent bitcoin machine for victims if I get my

22  way and he retweeted tweets saying I know a lot of creditors

23  shit on Celsius UCC, but it's a fact they have made a much

24  better decision than the UCC.  Would I have done things

25  differently?  Yes.  Let's see where we land.  And we still

1    have a lot of collective influence over the process because

2    of Twitter spaces.

3            So as you see before, he was actually really

4    advocating for that petition date pricing that a lot of

5    Celsius creditors -- right now, when you check Twitter, all

6    the Celsius creditors are miserable over not getting over --

7    like, over not being made whole, like the petition date

8    pricing, they've all been complaining about because they

9    have not been able to get the upside that they thought they

10   would be getting.

11           Like if you look in a tweet -- actually, this was

12   one of the concerns of the Earn ad hoc committee because

13   Simon Dixon, he had put together people's claims to the Earn

14   ad hoc committee's reservation of rights.  And one of the

15   rights that they wanted to put forth to the debtor was the

16   lack of transparency about who is getting the benefit of the

17   crypto appreciation from the petition date.

18           Simon, because he went as part of the group that

19   advocated for this, I don't think that that was discussed.

20   He could have used his position to argue about this, but

21   instead he wanted to get his board observer seat.  So that

22   was never brought up.  Also, one of the issues that the ad

23   hoc committee wanted to talk about was the lack of detail

24   about the $2 billion claim against FTX.  And again, that was

25   not discussed further.  So that was actually something that

Page 134

1    would have brought potentially lots of value to creditors if

2    it had returned $2 billion to creditors.  But again, that

3    was something that was not talked about more because the

4    focus was on just getting a board seat for Simon.

5           So if you look, somebody posted on Twitter, so are

6    we looking at a 75 percent to 100 percent recovery of the

7    claim amount to be returned?  And everybody said that I

8    thought we were getting 50 (indiscernible) says here it

9    appears recovery will be closer to 25 percent of value in

10   the Celsius app.  No depositor (indiscernible) with the

11   intent to get back a dollarized claim at fair market values.

12   And somebody else says, your crypto will be dollarized at

13   the time of the bankruptcy, meaning 19,800 per bitcoin, you

14   will get 51 percent of the amount in today's bitcoin value,

15   meaning you will get one-fourth of bitcoin or less if

16   bitcoin, that's my understanding, maybe 30 percent in kind.

17          This was not what creditors were fighting for at

18   the beginning of the bankruptcy.  This was how Simon built

19   his follower base, by telling everyone that he was going to

20   be fighting (indiscernible) in-kind distribution because

21   everyone actually cared the most about.  People really

22   wanted to have their crypto returned back to them in as

23   great a value to them as possible.  And Simon told us that

24   he would be fighting for that, but then he shifted to only

25   have it returned back to us in bitcoin and ETH, which was

Page 135

1    definitely self-interested because (indiscernible) maxi and

2    a bitcoin maxi wants bitcoin to succeed over any other coin.

3          So by making it so that all of our coins, all of

4    our altcoins got sold for bitcoin, that was helping bitcoin

5    because it was making all the altcoins lose through selling

6    (indiscernible) and then making us purchase bitcoin.  So he

7    totally changed what he said he was going to do to benefit

8    himself.  And actually when he said that, when he came to

9    talk in December, I mean, like during the December hearing

10   to talk about the rug pull that was going to happen if we

11   didn't approve the plan, a lot of the creditors have been

12   arguing that the rug pull was not such a bad idea.

13         For example, someone asked, can someone explain

14   why rug pull is a bad idea?  I'd be thrilled to get 100

15   percent of my funds back, even at those prices, rather than

16   60 percent back of shares in a mining company.  Am I missing

17   something?  And someone said, imagine if you sold at the

18   bottom (indiscernible) back near the top.  Then the culprit,

19   Celsius, gave themselves a big bonus at your expense for

20   managing their way out of Chapter 11.  That's what's

21   happening with the 100 percent option.  And it's not 100

22   percent in-kind.  It's 100 percent dollarized, which blows.

23         Simon doesn't address at all that us with mostly

24   stable (indiscernible) of the family that had Celsius had

25   stables for the most part.  So we cheered for the rug pull.

Page 136

1    We used bitcoin as a bank and not as speculative assets.  I

2    think we should get back 100 percent.

3              Someone said, mining is currently (indiscernible)

4    having in a few months will be extremely competitive

5    (indiscernible) there is no guarantee they will survive long

6    term.  I wish we had liquidated everything 18 months,

7    distributed what was left and saved hundreds of millions of

8    dollars in fees.

9              And someone said, we're getting close to 100

10   percent of USD claim, not of the actual crypto, an important

11   distinction.  I hope everyone understands.  In actual crypto

12   we'll get probably close to 30 percent to 35 percent back

13   and (indiscernible) because a lot have stables inside.  We

14   want our crypto back, not fiat.  And even though we like to

15   see the dollar value of our portfolios going up, we like

16   just the same seeing (indiscernible) we have going up.

17             Also rug pull scenario would force us to

18   (indiscernible).  It's interesting that he was willing to

19   extend the court process for his stalking horse bid that

20   didn't even amount to anything.  And then he actually led us

21   to the rug pull scenario by suggesting that stalking horse

22   bid because if we had undertaken the stalking horse bid, we

23   would (indiscernible).  We could have exited Chapter 11 in

24   two months or sooner than where we are now.  And then he

25   used that rug pull scenario to tell us that now we have to

Page 137

```
 1    accept this plan or else we're going to get screwed with

 2    this rug pull.  And as you see, a lot of creditors actually

 3    prefer to have the rug pull just because they want --

 4    everyone just wants their money, their crypto in-kind back

 5    and (indiscernible) --

 6              THE COURT:  Ms. Lau?  Ms. Lau?  Ms. Lau?

 7              MS. LAU:  Yes.

 8              THE COURT:  All right.  You're straying from what

 9    the issues are before (indiscernible) --

10              MS. LAU:  Sorry.  Okay.  I'm not (indiscernible).

11              THE COURT:  Thank you.

12              MS. LAU:  Yes, but (indiscernible) --

13              THE COURT:  You are done.  Ms. Lau, you are done.

14              MS. LAU:  No.

15              THE COURT:  You are done.  Deanna, if she keeps

16    speaking, cut her off.

17              CLERK:  Okay, Judge.  We also have Lawrence

18    Porter.

19              THE COURT:  Go ahead, Mr. Porter.

20              MR. PORTER:  Good day.  Happy New Year

21    (indiscernible).  As you've heard, this is very unique, and

22    it continues (indiscernible) even in the responses of people

23    (indiscernible) creditors like myself and Cathy.  Originally

24    (indiscernible) couldn't believe what (indiscernible).  And

25    when Simon Dixon came forward, we questioned his motivation
```

Page 138

1    extensively (indiscernible) I gather he signed NDAs, with

2    the UCC and White & Case being silent in comparison to Simon

3    Dixon (indiscernible) bankruptcy international creditors

4    that are not familiar with the bankruptcy proceeding, as

5    well as many of the creditors in America, I'm sure.

6    (indiscernible) for American creditors when the SEC had

7    outstanding litigation (indiscernible) I think the genesis

8    was when (indiscernible) and Simon Dixon's plan wasn't going

9    to work the way he intended originally.  Personally, I'm in

10   the (indiscernible) being clawed back for more than 100,000.

11   It's very unique.  And I appreciate all your efforts.  I

12   appreciate Simon Dixon's efforts.  And I just don't think

13   that anybody can blame one person.  I believe Simon Dixon's

14   intentions were for the best outcome for all of the

15   creditors.  Thank you very much, Your Honor.

16           THE COURT:  Thank you, Mr. Porter.  Deanna, is

17   there anybody else who wishes to speak?

18           CLERK:  Yes, Chase Stone.

19           THE COURT:  All right.  Briefly, Mr. Stone.

20           MR. TARLOW:  Your Honor, I'm trying to -- this is

21   David Tarlow again.  I'm still in Mr. Stone's office.

22           THE COURT:  Oh, I'm sorry, Mr. Tarlow.  Yeah,

23   you're in Mr. Stone's office.  Go ahead, Mr. Tarlow.

24           MR. TARLOW:  Just really briefly, Your Honor, we

25   did submit the invoices for all the legal work that was

1      done.   I appreciate all the comments that have been made.

2      As far as the ECJ fees, they were not even generated until

3      we were talking about the plan support agreement, which was

4      about August and September of 2023, when Mr. Dixon was in

5      full support of just the creditors and was not pursuing any

6      personal bid at all.   Early on in this, obviously, there's

7      no contention about that he was going after his own bid.

8      But like any sort of proceeding in court, things are fluid.

9      Things change, things pivot.

10             As far as Mr. Amerson, he brought up a lot of

11     points.   Just a couple things.   First of all, there's no

12     evidence of any duplicative work that was done with respect

13     to Mr. Dixon and the debtors and the unsecured creditors.

14     There was no evidence that Mr. Dixon was working with Mr.

15     Mashinsky.   In fact, Mr. Dixon was defrauded by Mr.

16     Mashinsky, as everyone else was.

17             I think that one of the things that's reflected by

18     the fact that Mr. Amerson and Ms. Lau and Mr. Porter jumped

19     on is that other creditors were listening to Mr. Dixon,

20     other creditors were following him, and ultimately, Mr.

21     Dixon did a lot of work with respect to pushing forward the

22     plan, which culminated in December when he was in front of

23     Your Honor and fielded Your Honor's questions as to why the

24     plan should not be resolicited and why it should go into

25     effect.   And that's all I have to say.

1          THE COURT:  Thank you, Mr. Tarlow.  All right.

2     Thank you.  All right.  There are two other matters that

3     remain on the calendar, Items 13 and 14.  They relate to

4     motions in connection with Mr. Bronge's appeal, motions

5     seeking to designate additional items to be included in

6     appellant's designation of record and striking certain items

7     from appellant's designation of record.  So one motion is

8     4126 and the second one is 4180.  I'm taking both of those

9     under submission without argument.

10          MR. LATONA:  Just really quickly, Your Honor.

11     We've reached an agreement with Mr. Bronge as of the

12     contents of his record on appeal, and we're working to get -

13     - we had identified some documents.  He had identified some

14     documents.  We've reached an agreement with him on his

15     documents.  We're working towards an agreement on our

16     documents.  I expect we'll be able to resolve this

17     consensually and file a stipulation.  If not, we'll ask Your

18     Honor to rule, but I don't think it'll be necessary.

19          THE COURT:  Okay.  When do you think you'll be

20     able to resolve it?

21          MR. LATONA:  Next week.  I'll say by the end of

22     next week.  We'll either resolve it or we'll submit it.

23          THE COURT:  All right.  I'll wait that long.

24     Otherwise, I'm going to rule on it --

25          MR. LATONA:  Understood.  I think we'll be able to

Page 141

1    get this done.

2           THE COURT:  -- without hearing argument.  All

3    right.  We're adjourned.

4           MR. LATONA:  Thank you.

5           THE COURT:  Thank you very much, everybody, and

6    you can order the transcript.

7

8           (Whereupon these proceedings were concluded at

9    1:28 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 142

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 12, 2024