UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────X

In re

CELSIUS NETWORK LLC, et al.,

    Debtors

Chapter 11
Case No 22-10964 (MG)

───────────────────────────────X    24 Civ. 2063

CELSIUS MINING LLC,

    Plaintiff,

-against-

Adv. No. 23-01202 (MG)

MAWSON INFRASTRUCTURE GROUP INC.,
LUNA SQUARES LLC, AND COSMOS
INFRASTRUCTURE LLC

    Defendants.

───────────────────────────────X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 04/22/24

DECISION AND ORDER VACATING THE BANKRUPTCY COURT'S
ORDER ENTERED FEBRUARY 27, 2024 AND STAYING THE
ADVERSARY PROCEEDING PENDING ARBITRATION

McMahon, J.:

Defendants have moved to compel arbitration of all claims asserted in Adversary Proceeding No. 23-01202 and to dismiss or stay the adversary proceeding pending arbitration.

In a comprehensive opinion entered onto the Bankruptcy Court's docket on February 27, 2024, (Dkt. #25 ("Bankr. Op.")),[1] The Hon. Martin Glenn, Chief Bankruptcy Judge, granted Defendants' motion to compel arbitration of Counts III, IV, V and IX – all of which allege breaches

---

[1] "Dkt. #__" refer to docket entries in Adversary Proceeding No. 23-01202.

1

of a certain Co-Location Agreement dated February 23, 2022, between Celsius Mining and one of the Defendants herein, Luna Squares, LLC. This agreement contains an arbitration clause. The learned Bankruptcy Judge interpreted the clause as applying only to disputes "arising under" the Co-Location Agreement, found that only these four claims out of the ten pleaded "arose under" that Agreement, and concluded that no special bankruptcy concerns counseled against sending these four claims – one of which was artfully pleaded as a turnover claim – to arbitration in accordance with the parties' agreement as he interpreted it.

In the same opinion and order, Chief Judge Glenn denied Defendants' motion to compel arbitration of the remaining claims asserted in the Adversary Proceeding Complaint, on the ground that those claims did not "arise under" the Co-Location Agreement, but arose out of a certain Promissory Note, also dated February 23, 2022, that was issued to secure a loan from Celsius to Luna of some $20 million. The Promissory Note does not contain an arbitration clause. Chief Judge Glenn concluded that the arbitration clause in the Co-Location Agreement was not broad enough to comprehend arbitration of claims arising under the Promissory Note, although the loan was for the purpose of allowing Luna to acquire equipment so that it could perform under the Co-Location Agreement.

Finally, Judge Glenn denied Defendants' motion for dismissal or a stay of the Adversary Proceeding pending arbitration, on the ground that the claims he was sending to arbitration were sufficiently independent of those remaining in Bankruptcy Court so that proceeding with the latter would not run the risk of the two fora reaching inconsistent results or making inconsistent findings of fact.

Defendants appeal. They argue principally that the issue of arbitrability has been remitted to the arbitrator by virtue of the parties' express incorporation of the Rules of the American

2

Arbitration Association into the Co-Location Agreement – meaning the learned Bankruptcy Judge should simply have stayed the case and sent the dispute to the AAA, where any issues relating to arbitrability could and should be resolved.

Appellants argue in the alternative that the learned Bankruptcy Judge misread and effectively re-wrote the arbitration clause, ignoring broad language therein that necessarily comprehended disputes arising under the Promissory Note.

Finally, they urge that no bankruptcy concerns will be compromised if the Adversary Proceeding is stayed in its entirety pending arbitration, which they urge this court to do.

I conclude that Judge Glenn had the power to decide whether the parties made an agreement to arbitrate, but no more. I further conclude that, in reaching his conclusion on the issue of whether the parties made an agreement to arbitrate, Judge Glenn applied a manifestly erroneous standard, based on a far too narrow reading – indeed, an effective re-writing – of the arbitration clause in the Co-Location Agreement.

For that reason, I vacate Judge Glenn's order and grant the motion compelling arbitration of all claims in suit in the Adversary Proceeding – with the caveat (which should go without saying) that, if the arbitrator concludes that one or more of those claims are not arbitrable, they will be remanded to the Bankruptcy Court for resolution. I also direct that the Adversary Proceeding be stayed pending arbitration.

## STATEMENT OF THE MATTER IN DISPUTE

In order to expedite this appeal, I adopt and incorporate into this opinion Chief Judge Glenn's description of the underlying bankruptcy, the agreements at issue, the adversary proceeding and the summary of the parties' arguments, which are found in his February 27, 2024 opinion at pages 2-20. I also incorporate his excellent summary of the law relating to arbitration

3

in bankruptcy, found at pages 21-26 of the February 27, 2024 opinion. The reader is referred to that opinion for any information that does not appear in this decision and order.

## STANDARD OF REVIEW

Denials of a motion to compel arbitration and/or to dismiss or stay bankruptcy proceedings pending arbitration are reviewed de novo on appeal. *Mediterranean Shipping Co. S.A. Geneva v. POL-Atl.*, 229 F.3d 397, 402 (2d Cir. 2000).

## RELEVANT FACTS ON APPEAL

The key facts – and the only facts – needed to resolve this appeal are the following:

1. On February 23, 2022, Celsius Mining (a debtor in this bankruptcy and the Plaintiff in the Adversary Proceeding) and Luna Squares LLC (one of the Defendants in the Adversary Proceeding) signed three agreements: a Co-Location Agreement, a Promissory Note, and a Security Agreement.

2. On the same day that the parties signed the Co-Location Agreement, Celsius agreed to lend Luna $20 million, so that Luna could "purchase and install modular data centers and transformers to assist Luna with satisfying its obligations under [the Co-Location Agreement]." (Adv. Proceeding Complaint, Dkt. #1, ¶ 17).

3. Luna signed a Promissory Note for this $20 million loan on the same day that the parties signed the Co-Location Agreement.

4

4. Counts I, II, VI, VII, VIII and X in the Adversary Complaint assert claims that arise under the Promissory Note. Count I asks for a declaration that Celsius is entitled to immediate and full payment of all amounts due it under the Promissory Note (and the related Security Agreement, which is essentially irrelevant to the determination of this appeal). Counts II asserts the same claim, but pleads it as a "turnover" claim pursuant to 11 U.S.C. § 542 rather than under common law principles of breach of contract. Count VI asserts that Luna failed to acquire proper title to the modular data centers and other materials that it purchased using the funds loaned to it by Celsius (as evidenced by the Promissory Note) in order to satisfy its obligations under the Co-Location Agreement Counts VII and VIII assert fraudulent transfer claims under New York's Debtor and Creditor Law §§ 273 and 276 – the fraudulent transfers in question being the funds loaned to Luna to allow it to purchase the modular data centers and related materials. And Count X asserts a common law fraud claim against Defendants, on the ground that they misrepresented what they purchased with the money loaned to them by Celsius, as evidenced by the Promissory Note.

5. The other four claim admitted arise under and assert various breaches of the Co-Location Agreement by the Defendants.

6. The Co-Location Agreement contains an exceptionally broad arbitration clause. It reads as follows (emphases and upper case appear in the Agreement):

    12.8 <u>Governing Law and Venue</u>

> This Agreement and performance of the parties to this Agreement shall be construed and governed according to the internal substantive and procedural laws of the State of Delaware applicable to contracts made and to be fully performed in such state (except any laws of that state that would render such choice of law ineffective). If there is any dispute between the parties in connection with this Agreement, including any question regarding its existence, validity or termination, unless amicably resolved by the parties, such dispute shall be finally settled by arbitration in accordance with the terms set forth hereunder. The parties agree that any such dispute shall be submitted exclusively to arbitration in accordance with the American Arbitration Association (AAA) Rules (the "**Rules**") in effect at the time of submissions for arbitration which Rules are deemed to be incorporated by reference into this clause . . . . EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY (A) SUBMITS ANY DISPUTE OF ANY NATURE BETWEEN THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT TO ARBITRATION AS PROVIDED FOR ABOVE . . . .

7. This provision describes the parties' agreement to arbitrate in two separate and distinct ways. It first calls for arbitration of "any dispute between the parties *in connection with this Agreement*, including any question regarding its [i.e., the Co-Location Agreement's] existence, validity or termination." (Emphasis added). But subsequent language in Section 12.8 – language that, for emphasis, appear in BOLDED form (all capitals) – clarifies what the parties mean by the phrase "in connection with." It means "ANY DISPUTE OF ANY NATURE BETWEEN THE PARTIES *RELATING IN ANY WAY TO THIS AGREEMENT.*" (Emphasis added).

## THE RULING APPEALED FROM

Judge Glenn concluded that the Arbitration Clause in the Co-Location Agreement was an agreement by Celsius and Luna to arbitrate only claims "arising under" that Agreement. (*See* Bankr. Op. 27). In the text of his opinion, Judge Glenn concluded, "Here the plain language [of the arbitration clause] is clear. The arbitration provision relates solely to the Co-Location Agreement and "any dispute between the parties in connection with [it]." (*Id.* at 28). Judge Glenn

was persuaded, *inter alia*, by the fact that the Co-Location Agreement and the Promissory Note were governed by the law of different states (Delaware and New York, respectively); that Counts III, IV, V and IX in the Adversary Complaint could be resolved without reference to the Promissory Note; and that the Promissory Note contained an integration clause (an "entire agreement" clause), which he believed precluded any agreement to arbitrate claims arising thereunder.

Significantly, Judge Glenn did not discuss the meaning of the phrase "RELATING IN ANY WAY TO THIS AGREEMENT" in his opinion, or explain why he did not believe that it extended arbitration to the claims that might "relate" to the Co-Location Agreement without "arising under" that Agreement.

The learned Chief Bankruptcy Judge ordered to arbitration the four claims that unquestionably asserted breaches of the Co-Location Agreement. He readily concluded that doing so would offend no bankruptcy concerns, as all four claims were non-core claims that did not arise under or implicate rights guaranteed by the Bankruptcy Code. In particular, he explained that the so-called "turnover claim" pleaded in Count III was in fact not a turnover claim at all, but a breach of contract claim identical to the one pleaded under the common law in Count IV – which claim implicated no bankruptcy concerns whatsoever. (*Id.* at 36-37).

However, he refused to order to arbitration the other six claims, because he concluded that they "arose under" the Promissory Note, to which the Arbitration Agreement did not extend.

Judge Glenn did not address Defendants' argument that it was for the arbitrator, not the court, to decide whether claims were or were not arbitrable.

Defendants appealed to this court.

7

## **CONCLUSIONS OF LAW**

1. *Judge Glenn Erred in Concluding That the Parties Agreed to Arbitrate Only Claims "Arising Under" the Co-Location Agreement.*

Arbitration is "a matter of contract between the parties; it is a way to resolve those disputes – *but only those disputes* – that the parties have agreed to submit to arbitration." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920, 131 L.Ed.2d 985 (1995) (emphasis added). It is a "fundamental tenet of law that only by agreeing to arbitrate does a person surrender the right of access to a court for the resolution of a legal dispute that is subject to adjudication." *DDK Hotels v. Williams Sonoma, Inc*, 6 F.4th 308, 318 (2d Cir. 2020) (quoting *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 190 (2d Cir. 2019)).

Ordinarily, a court must determine whether the parties made an agreement to arbitrate. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 87 L.Ed.2d 444 (1985); *Bechtel do Brasil Construcoes Ltda. v. UEG Araucaria Ltda.*, 638 F.3d 150, 154 (2d Cir. 2011); *In re MF Global Holdings Ltd.*, 571 B.R. 80, 91 (Bankr. S.D.N.Y. 2017) (Glenn, J.) (stating that bankruptcy courts evaluating a motion to compel arbitration first ask "whether there was an agreement to arbitrate the claim asserted by the Plaintiffs in the Complaint.") Of course, where the parties delegate the issue of arbitrability to an arbitrator, that arbitrator is necessarily tasked with deciding "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011). But that does not mean that a court can abdicate its responsibility to determine whether an agreement to arbitrate exists when one party insists that it made no such agreement. That is because no one can be compelled to arbitrate something he did not agree to arbitrate. Ergo, courts must "guard against 'the risk of forcing parties to arbitrate a matter that they may well not

8

have agreed to arbitrate.'" *Bucsek*, 919 F.3d at 190 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84, 123 S. Ct. 588, 154 L.Ed.2d 491 (2002)).

In this case Celsius argues that it has made no agreement to arbitrate disputes that do not allege breaches of the one and only agreement between it and Luna that contained an arbitration clause – the Co-Location Agreement. Appellants countered that the text of the arbitration clause in the Co-Location Agreement indicates that Celsius agreed to arbitrate disputes that arose in connection with the parties' overall unitary deal, notwithstanding the fact that two of the three agreements executed in connection with that deal did not contain any arbitration clause. Whether Celsius made an agreement to arbitrate all such disputes was an issue for the court to decide.

Judge Glenn agreed with Celsius. He concluded that the parties made no agreement to arbitrate disputes that did not "arise under" the Co-Location Agreement – specifically, that they made no agreement to arbitrate dispute that arose under the Promissory Note, which contained no arbitration clause.

The learned Chief Bankruptcy Judge was correct to address that threshold question, so as to protect Celsius' right not to be compelled to arbitrate disputes it had never agreed to arbitrate.

However, I am convinced that Judge Glenn reached the wrong answer.

The Bankruptcy Court's error lies in its conclusion that the Arbitration Agreement applies only to claims "arising under" the Co-Location Agreement. In fact, the phrase "arising under" – a phrase familiar to courts confronted with arbitration clauses[2] – appears nowhere at all in the Section 12.8 of the Co-Location Agreement. Its incorporation into that agreement rewrites Section

---

[2] *See, e.g., In re Kinoshita*, 287 F.2d 951, 953 (2d Cir. 1961); *Trs. of N.Y. State Nurses Assoc. Pension Plan v. Hakkak*, No. 22-cv-5672 (ER), 2023 WL 4967071, at *5-6 (S.D.N.Y. Aug. 3, 2023); *Watson v. USA Today Sports Media Grp., LLC*, No. 17-cv-7098 (NRB), 2018 WL 2316634, at *2-3 (S.D.N.Y. May 8, 2018); *Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 633 F. Supp. 2d 109 (S.D.N.Y. 2009); *Bristol-Myers Squibb Co. v. SR Int'l Bus. Ins. Co., Ltd.*, 354 F. Supp. 2d 499, 504-05 (S.D.N.Y. 2005).

12.8 and so must be rejected. Delaware law compels courts interpreting contracts governed thereunder to look to the "ordinary and usual meaning" of the language in a contract. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). And interpretation of language that does not appear in the contract perforce can hardly be deemed the "ordinary and usual meaning" of the language of the contract.

What the contract actually does say is not all that difficult to interpret. Section 12.8 of the Co-Location Agreement provides that disputes "in connection with this Agreement" shall be arbitrated. Again, the phrase "in connection with" is not unfamiliar to a court that sees many motions to compel arbitration each year; it does not mean "arising under," as Judge Glenn concluded, but is a somewhat broader term. *See, e.g., Fed. Ins. Co. v. Metro. Transp. Auth.*, 785 F. App'x 890, 891-92 (2d Cir. 2019) (arbitration clause providing for "resolution of all Disputes arising out of, under, or in connection with" the agreement was sufficiently broad to bind a nonsignatory to the contract); *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998) (arbitration clause providing arbitration of "[a]ny dispute, controversy or claim arising under or in connection" with the agreement was "the prototypical broad arbitration provision"), *abrogated on other grounds by Katz v. Cellco P'ship*, 794 F.3d 341, 344 (2d Cir. 2015); *E&B Giftware, LLC v. Kinsbourne*, No. 14-cv-4709 (VB), 2015 WL 2330469, at *3 (S.D.N.Y. May 12, 2015) ("The use of the words 'any' and 'in connection with or in relation to' signal, under well-settled Second Circuit precedent, that [an] arbitration clause is broad."). The dispute over whether the full amount of the Promissory Note has become due and owing as a result of failure to make payment thereunder at least arguably arises "in connection with" the Co-Location Agreement; a claim that monies paid out by Celsius as Luna's Lender should be clawed back because the loaned funds

evidenced by the Note were not used as intended by the Co-Location Agreement almost certainly has the requisite "connection."

However, one reads a contract to give meaning to every word contained therein. *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008). The words "in connection with" in Section 12.8 are followed immediately by the phrase "including any question regarding [the Co-Location Agreement's] existence, validity or termination." Those words plainly refer to the Co-Location Agreement and only the Co-Location Agreement. If "in connection with" were all that Section 12.8 said about arbitrable disputes, it would be at least arguable that Judge Glenn reached the correct conclusion.

But the learned Bankruptcy Judge failed to give meaning to every word in the contract. Judge Glenn simply ignored the portion of Section 12.8 that is printed in BOLDFACE TYPE. That sentence, which is equally part of the parties' agreement to arbitrate, provides that both Celsius and Luna "IRREVOCABLY AND UNCONDITIONALLY (A) SUBMITS ANY DISPUTE OF ANY NATURE BETWEEN THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT TO ARBITRATION AS PROVIDED FOR ABOVE." That language could not be broader and it could not be clearer. If a dispute OF ANY NATURE between Celsius and Luna relates IN ANY WAY to the Co-Location Agreement, then the parties "irrevocably and unconditionally" agree to submit it to arbitration.

The words "of any nature" are significant. There is no requirement that the dispute "arise under" or even be "in connection with" the Co-Location Agreement to be arbitrable. Nor is there any requirement that resolution of a dispute require interpretation of the Co-Location Agreement, or that resolution of the dispute be governed by the same law that governs the Co-Location Agreement. No, the parties stipulated that if a dispute between them, whatever might have

occasioned it, however it arose, or whatever law or agreement governs its resolution, *bears the slightest relationship to the Co-Location Agreement,* then it must be arbitrated. That is what they agreed. In effect, the boldfaced language demonstrated what the parties meant by the phrase "in connection with" that preceded it in Section 12.9 – it defined that term. By applying the far narrower "arising under" standard, Judge Glenn effectively rewrote the parties' contract and severely limited the agreement to arbitrate that they freely made.

I emphasize that this conclusion is compelled by the words of the Co-Location Agreement. Appellants argue that I should conclude that the disputes Judge Glenn declined to send to arbitration are arbitrable because the three February 23, 2022 contracts were entered as part of a unitary transaction. But Celsius is correct that when some simultaneously executed contracts contain an arbitration clause and others do not, only clear and unequivocal evidence indicating that the arbitration clause extends to all the contracts will result in application of the arbitration agreement in one such contract to disputes arising under another.

So it is not because of the unitary nature of this multi-contractual transaction that I am vacating Judge Glenn's order. Rather, it is because the language of the parties' agreement clearly and unequivocally indicates that they agreed to a far broader arbitration clause than the learned Bankruptcy Judge believed. Per the plain language of Section 12.8, the parties did not limit their arbitration agreement to disputes "arising under" the Co-Location Agreement. Instead, they made an agreement to arbitrate disputes of any nature – including but not limited to disputes that pertain to other contracts – as long as those disputes "relate in *any way*" to the Co-Location Agreement. (Emphasis added). By adding the boldfaced language, they emphasized what they meant by disputes "in connection with" the Co-Location Agreement.

12

Because the learned Bankruptcy Judge misinterpreted the scope of the parties' agreement to arbitrate, and concluded that they had only agreed to arbitrate a narrower range of disputes than their exceedingly broad language comprehends, his determination that Celsius only agreed to arbitrate disputes "arising under" the Co-Location Agreement rests on a faulty premise and so must be vacated.

The question then becomes: who decides whether a dispute "relates in any way" to the Co-Location Agreement?

The answer is: the arbitrator.

2. *It Is for the Arbitrator to Decide Whether the Disputes "Relate In Any Way to this Agreement"*

There is a difference between deciding whether the parties made an agreement to arbitrate and deciding whether a particular dispute falls within the scope of an arbitration agreement. In the context of this case, there is a difference between deciding Celsius' claim that it made no agreement to arbitrate disputes unless those disputes "arose under" the Co-Location Agreement – an argument I have rejected – and deciding whether the ten counts in its complaint fall within or outside of Section 12.8's properly interpreted arbitration clause. Having resolved the former issue, I turn to the latter.

Chief Judge Glenn did not even mention Defendants' argument that it was not his province to decide whether the claims in suit in the Adversary Proceeding were arbitrable. Judge Glenn instead examined each claim and decided whether it "arose under" the Co-Location Agreement, and so should be referred to arbitration. Not only was he wrong to decide that issue under an "arising under" standard, he erred by making that decision at all. That is because in this case the parties agreed that the arbitrator would resolve disputes over whether any individual count "relates in any way" to the Co-Location Agreement. They did so by incorporating into Section 12.8 the

13

Rules of the American Arbitration Association, which provide that the arbitrator "shall have the power to rule on . . . the arbitrability of any claim or counterclaim." Commercial Rules & Mediation Procedures R-7(a), AMERICAN ARBITRATION ASSOCIATION, (Oct. 1, 2013), www.adr.org/sites/default/files/CommercialRules_Web-Final.pdf.

"When the parties' contract delegates the arbitrability question to an arbitrator . . . a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc., v. Archer & White Sales, Inc.*, 586 U.S. 63, 68, 139 S. Ct. 524, 202 L.Ed.2d 480 (2019). Of course, the Supreme Court has cautioned that parties must "clearly and unmistakably" indicate in their contract that this is their intention. *Id.* at 69, 139 S. Ct. 524. And contrary to Appellees' suggestion, the Supreme Court did not decide whether the arbitration clause in *Henry Schein* – a clause that said any arbitration would be conducted "in accordance with the rules of the American Arbitration Association" – clearly and unmistakably evidenced an intent to have the arbitrator whether particular claims fell within the parties' arbitration clause. It remanded the case back to the lower courts to figure that out. *Id.* at 72, 139 S. Ct. 524.

The "clearly and unmistakably" standard for delegating the issue of arbitrability to an arbitrator is consistent with long-standing Second Circuit precedent. There exists a presumption that a court will do exactly what Judge Glenn did here – determine whether a claim falls within the scope of a mandatory arbitration clause. That presumption can only be rebutted with "clear and unmistakable evidence *from the arbitration agreement* . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (quoting *Bell v. Cendant Corp.*, 292 F.3d 563, 566 (2d Cir. 2002)) (emphasis added); *see also DDK Hotels*, 6 F.4th at 317. Both before and after the Supreme Court's decision in *Schein*, our Court of Appeals has cautioned that a mere reference to the AAA rules in

an arbitration agreement does not necessarily and without more indicate the requisite "clear and unmistakable" intent to have the arbitrator decide issues of arbitrability. This is especially true where the arbitration agreement in question is not broad. *See DDK Hotels*, 6 F.4th at 318-19 (collecting cases); *LAVVAN, Inc. v. Amyris, Inc.*, No. 21-1819, 2022 WL 4241192, at *1-2 (2d Cir. Sept. 15, 2021).

I have examined the parties' arbitration agreement with great care. It seems to me to indicate "clearly and unmistakably" that the parties agreed to have the arbitrator decide whether the ten claims in suit in the Adversary Proceeding do or do not "relate in any way" to the Co-Location Agreement.

For one thing, as was the case in *Contec* – where the Second Circuit concluded that reference to the AAA Rules was "clear and unmistakable evidence" of the parties' intent to send issues of arbitrability to the arbitrator – the arbitration clause in this case is exceedingly broad, potentially encompassing disputes that do not relate directly to breaches of the Co-Location Agreement. *See Contec*, 398 F.3d at 208. That was not the case in *DDK Hotels*, a case in which the Court of Appeals concluded that various restrictions in the arbitration agreement narrowed the scope of claims to be arbitrated. *DDK Hotels*, 6 F.4th at 319.

Even more significantly, the language of the arbitration clause in this case does not simply designate AAA rules as governing procedural issues in arbitration. It goes much further. It provides that any "such dispute" (that is, any dispute that relates in any way to the Co-Location Agreement) "shall be submitted exclusively to arbitration in accordance with the American Arbitration Association (AAA) Rules (the "**Rules**") in effect at the time of submission for arbitration, *which Rules are deemed to be incorporated by reference into this clause.*" In other words, the parties expressly made the substantive provisions in the AAA Rules part of their contract. If that does not

constitute "clear and unmistakable evidence" that the parties intended for the arbitrator to decide whether their disputes were arbitrable – which is what the AAA Rules provide -- then I cannot imagine what would, short of an express statement to that effect. And while an express statement would of course be helpful, we know, because of *Contec*, that no such express statement is necessary.

I thus conclude that the learned Bankruptcy Judge should have sent this entire matter – all ten claims – to the AAA for arbitration. There, the first order of business will be for the arbitrator to decide which, if any, of the claims are arbitrable, because they relate in any way" to the Co-Location Agreement and so arise "in connection with" that Agreement. If the arbitrator concludes, as Celsius argues, that one or more particular disputes between the parties does/do not "relate in any way" to the Co-Location Agreement, she will not arbitrate them, and that issue/those issues will be litigated in the Bankruptcy Court. If, however, the arbitrator concludes that any claim in suit "relates in any way" to the Co-Location Agreement, then the parties must arbitrate that claim – because that is what they have agreed to do.

3. *No Bankruptcy Concern Precludes Submitting These Claims to the Arbitrator.*

There is one last wrinkle to be addressed.

As the learned Chief Bankruptcy Judge explained, even when a claim is contractually arbitrable, it is possible for a bankruptcy court to decide, in its discretion, not to submit that claim to arbitration, because doing so would implicate compelling concerns peculiar to bankruptcy. (*See* Bankr. Op. 32-37). A bankruptcy court may choose to send such a claim to arbitration, but not without first considering whether the claim should remain in the Bankruptcy Court.

Insofar as Judge Glenn considered this issue, he correctly concluded that no bankruptcy concern barred or counseled against arbitration of the four claims that "arose under" the Co-

16

Location Agreement – Counts III, IV, V and IX. He noted that three of those four claims were pleaded as non-core claims; they did not arise under or implicate rights created by the Bankruptcy Code or issues that could only arise in bankruptcy. Of particular note, he concluded that the fourth claim -- Count II, which is pleaded as a turnover claim under 11 U.S.C. §542(b) – should also go to arbitration, because it was not really a turnover claim and did not actually implicate any rights created by the Code. Instead, it is an instance of what we call "artful pleading." Count III seeks identical relied to Count IV, which is a simple breach of contract claim for return of those very deposits, which Luna contests. Moreover, Celsius actually pleads in the Adversary Proceeding Complaint that it has forfeited return of the deposits paid under the Co-Location Agreement (Count III). Taken together, Judge Glenn had no difficulty concluding that this particular "turnover" claim did not need to remain in the bankruptcy court. (Bankr. Op. 36-37). I find no flaw in his reasoning.

Applying the learned Bankruptcy Judge's impeccable logic to the claims that he did not consider, I conclude that no peculiar bankruptcy rights or concerns counsel against sending Counts I, VI, VII, VIII and X to arbitration. All but one of these counts plead claims that arise under various non-bankruptcy common law rules or statutes; breach of contract, common law fraud, New York Debtor and Creditor Law, and the Federal Declaratory Judgment Act. The exception is Count II, which, like Count III, is pleaded as a turnover claim. But Count II stands in the identical posture to Count III. Like Count III, Count II is another instance of "artful pleading" intended to try to wedge a non-core claim into Bankruptcy Court. It is identical to Count I, which seeks a declaration that there has been a breach of the Promissory Note and recovery of damages therefor. That breach is contested, so Count II, like Count III, is not properly litigated as a "turnover" claim. Judge Glenn's reasoning in connection with Count III applies equally to Count II.

There is, therefore, no peculiar Bankruptcy concern that will be implicated if the Adversary Complaint is sent in its entirety to arbitration. And if the arbitrator concludes that one or more claims are in fact not arbitrable because they do not "relate in any way" to the Co-Location Agreement, I am sure the Chief Bankruptcy Judge will arrange for their speedy disposition in his court.

4. *The Adversary Proceeding is Stayed Pending Arbitration*

Because it is impossible for the Bankruptcy Court to know at this moment which of the claims asserted in the Adversary Proceeding Complaint are arbitrable and which (if any) are not, the Adversary Proceeding must be stayed in its entirety pending arbitration. Stay rather than dismissal is almost invariably the favored remedy, *Katz*, 794 F.3d at 347, but it is particularly appropriate here, where the parties will doubtless be submitting their arguments about the arbitrability of particular disputes to the arbitrator. It would be error to dismiss claims in the belief that they will be arbitrated when the arbitrator has not yet made any decision on the matter.

## CONCLUSION

The Bankruptcy Court's order is vacated. For the reasons discussed above, this court directs that the parties shall immediately submit the disputes pleaded in the Adversary Proceeding Complaint to arbitration in accordance with the AAA Rules for Commercial Arbitration. Any challenge to the arbitrability of any claim asserted in that pleading is reserved for the arbitrator. The Adversary Proceeding is stayed in the Bankruptcy Court pending arbitration.

This constitutes the decision and order of this court on appeal. The Clerk of Court is directed to remove this appeal from the court's list of open items.

Dated: April 22, 2024

_____
U.S.D.J.

BY ECF TO ALL PARTIES
BY EMAIL TO CHIEF BANKRUPTCY JUDGE GLENN

19