| | |
|---|---|
| Joshua A. Sussberg, P.C.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:     (212) 446-4800<br>Facsimile:     (212) 446-4900 | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:     (312) 862-2000<br>Facsimile:     (312) 862-2200 |

*Counsel to the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**POST-EFFECTIVE DATE DEBTORS' OMNIBUS OBJECTION TO THE**
**FALLER CREDITORS' (I) MOTION SEEKING ENTRY OF**
**AN ORDER APPROVING FURTHER DISTRIBUTION UNDER**
**THE PLAN OF REORGANIZATION FOR THE FALLER CREDITORS**
**AND (II) MOTION FOR DISCOVERY TO SUPPORT CLAIMS MADE BY**
**POST-EFFECTIVE DATE DEBTORS IN REGARDS TO**
**EQUITABLE TREATMENT OF CORPORATE CREDITORS**

The above-captioned post-effective date debtors (collectively, the "Post-Effective Date Debtors," and prior to the Effective Date, the "Debtors") hereby file this omnibus objection (the "Objection") to (i) the Faller Creditors' *Motion Seeking Entry of an Order (I) Approving*

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

*Further Distribution Under Plan of Reorganization for the Faller Creditors and (II) Granting Related Relief* [Docket No. 4911] (together with all joinders thereto, the "Distribution Motion"); (ii) all joinders to the Distribution Motion;[2] and (iii) the *Motion for Discovery to Support Claims Made by Post-Effective Date Debtors in Regards to Equitable Treatment of Corporate Creditors* [Docket No. 4866] (the "Rule 2004 Motion").[3]  In support of this Objection, the Post-Effective Date Debtors state as follows.

**Preliminary Statement**

1.      The Effective Date of Celsius' confirmed chapter 11 plan occurred on January 31, 2024, which commenced one of the most complex distribution processes ever contemplated. Under the Plan, Celsius is required to distribute Liquid Cryptocurrency (or Cash to creditors who cannot receive Liquid Cryptocurrency) to approximately 400,000 creditors in over 190 countries. This distribution process is particularly complex due to the need for Celsius to use three Distribution Agents in order to ensure distributions can reach creditors all over the world.  Also, unfortunately, due to the pervasive security concerns attendant to these chapter 11 cases, creditors need to actively participate in the process (by providing KYC and other information) in order to successfully claim a distribution, which given the extremely large number of creditors, has required a very extensive, hands-on process for addressing individual creditor's questions and issues.

---

[2]   As of June 20, 2024, approximately thirty creditors have filed joinders to the Distribution Motion.  *See* Docket Nos. 4916–18, 4920–23, 4928, 4929, 4934, 4935, 4938, 4940, 4944–47, 4950, 4952–54, 4956, 4958, 4959, 4961, 4963, 4964, 4968, 4971, and 4972.  The omission of a joinder should not be taken as a waiver of the Post-Effective Date Debtors' rights to respond thereto at the hearing on the Distribution Motion.

[3]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Distribution Motion, the Rule 2004 Motion, or the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (as may be further modified, amended, or supplemented from time to time) (the "Plan"), as applicable.

2

2. Celsius designed the distribution process before the Effective Date, and continued to improve upon it post-emergence as creditors submitted tickets and requests when they encountered technical or other issues. By any metric, this overwhelmingly complicated distribution process has been a success—close to 90% of the value has already been successfully distributed to eligible creditors, and most of the remaining value has not been distributed due to creditor inaction or creditors providing incomplete or incorrect information.

3. One of the initial complaints regarding the distribution process came from corporate creditors who were not eligible to receive a distribution in Liquid Cryptocurrency because Celsius was only able to distribute Liquid Cryptocurrency to 100 corporate creditors. Celsius offered the ability to opt-in to receive Liquid Cryptocurrency to the largest corporate creditors to ensure that the maximum amount of Liquid Cryptocurrency could be distributed to creditors who wanted it. In response to creditor questions on this issue, Celsius publicly explained its position in a filing with the Court on April 4, 2024 [Docket No. 4786] (the "Prior Response").

4. In light of the rapid fluctuations in cryptocurrency prices and that distributions under the Plan would be made to most creditors in Liquid Cryptocurrency, while some creditors were only able to receive Cash, the Debtors included provisions in the Plan for how (and when) to value distributions that would be made under the Plan. Specifically, the Plan provides that the Debtors will use a Distribution Cryptocurrency Conversion Table that sets forth the prices of Liquid Cryptocurrency as of approximately fifteen days before the Effective Date. This Distribution Cryptocurrency Conversion Table (the "Distribution Valuation Table") was filed along with the Notice of Effective Date on January 31, 2024, and included prices for bitcoin (approximately $42,973) and ether (approximately $2,577) as of January 16, 2024 (the "Distribution Record Date").

5.      The concept of a pre-emergence Distribution Record Date is present in nearly every chapter 11 plan in order to ensure fair treatment of creditors as of a particular date. That is because many types of assets can have post-emergence fluctuations in value. For example, if a reorganization is contemplated by a chapter 11 plan, the equity in the reorganized company is valued as of a particular date even though its trading value may vary wildly post-emergence once the equity is actually issued. In such a case, some creditors may receive equity valued as of a particular date and other creditors may receive cash, and the chapter 11 plan approves these distributions, even though the value of that equity may go up or down post-emergence once the equity is issued and starts trading. Absent this line-drawing exercise, the Plan (and other chapter 11 plans) could potentially become impossible to administer, in this case based on the whims of cryptocurrency markets. Debtors have to be able to prepare (and reserve) for distributions under their confirmed chapter 11 plans, and that requires setting the value of the property to be distributed as of a date prior to the Effective Date so that calculations can be finalized and distributions can commence.

6.      Guided by the court-approved Distribution Record Date provisions in the Plan, the Debtors prepared for the Effective Date by calculating how much value to distribute to creditors and taking steps to ensure that they held sufficient Liquid Cryptocurrency and Cash to make distributions to approximately 400,000 creditors in the amounts required by the Plan (approximately 57.9% of creditors' Claims in Liquid Cryptocurrency or Cash). These preparations included converting Liquid Cryptocurrency to Cash for creditors who were not eligible to receive Liquid Cryptocurrency based on the prices as of January 16, 2024 and reserving that Cash for distribution. Absent setting the Distribution Record Date and valuing distributions as of that single date, the Debtors could not have calculated the 57.9% figure that creditors were entitled to.

4

Moreover, because the value of Cryptocurrency can wildly shift, the Debtors would have had to recalculate creditor distributions every single day (which would be completely impossible given the nature of the distributions here, where the Post-Effective Date Debtors direct Distribution Agents to make distributions available to be claimed by creditor; those amounts could not shift every day with market prices).

7.    Of course, valuing the Debtors' distributable assets as of January 16, 2024, meant that the value of Liquid Cryptocurrency could fluctuate post-emergence, and a creditor who receives Liquid Cryptocurrency under the Plan may ultimately receive Liquid Cryptocurrency that is worth more or less than it was on the Distribution Record Date (due to market fluctuations between January 16 and the date of distribution).  And that is exactly what happened here—in the month of February, the price of bitcoin rocketed up from $42,973 to upwards of $62,000.  For the creditors who received Liquid Cryptocurrency distributions, this was welcome news—although their distributions were worth 57.9% of the value of their Claims as of the Distribution Record Date, they could sell those assets for more in the market.  For creditors who receive Cash distributions, the value of those distributions was set at 57.9% pursuant to the Distribution Record Table and the applicable Plan provisions.  Of course, the reverse could have occurred—cryptocurrency prices could have plummeted in February, in which case creditors receiving Cash would have received value that (although it was worth the same amount on January 16) was worth more than creditors who received Liquid Cryptocurrency that was now worth far less than approximately $42,973 per bitcoin in the market.

8.    Despite the Plan provisions that set the value of those distributions as of January 16, through the Distribution Motion, the Faller Creditors essentially ask the Court to require the Post-Effective Date Debtors to "true up" their distributions under the Plan based on the increase

5

in market prices after the Effective Date. But the Faller Creditors are one of the largest corporate creditors who were given the option to receive a recovery in Liquid Cryptocurrency and they specifically elected to receive Cash.[4] The Faller Creditors also argue that they were harmed due to "unreasonable" delays in their distribution, but they were among the first twenty-eight creditors to receive Cash just three weeks after the Effective Date for approximately two-thirds of their Claims, and their remaining distributions were delayed due to the fact that they provided incorrect wire information. The four Faller Creditors' request is particularly baffling and baseless in light of these actions that they took that they now seek compensation for. Moreover, when taking into account the Faller Creditors' particular circumstances, the relief requested would be particularly inequitable to other creditors.

9.      The Faller Creditors' request has also resulted in an avalanche of follow on requests, including from many creditors who did not have the opportunity to elect to receive Liquid Cryptocurrency. Specifically, the Faller Creditors have since been joined by approximately thirty additional creditors. Even as to these creditors who did not have the option to elect to receive Liquid Cryptocurrency or Cash, however, the requests are inconsistent with the provisions under the Plan, are infeasible, and should be denied. Though many creditors who have joined the Distribution Motion may not have affirmatively opted to receive Cash like the Faller Creditors, the result must remain the same due to the plain language of the Plan, which the Post-Effective Date Debtors have complied with by distributing equal value as of the Distribution Record Date. The Distribution Motion should therefore be denied.

---

[4] The Faller Creditors consist of four entities. The Faller Creditors received approximately two-thirds of their distribution on February 22, 2024. The remaining distributions were delayed because the Faller Creditors provided incorrect wire information. Even those remaining distributions were made less than three months after the Effective Date (and twelve days after the Faller Creditors provided accurate wire information).

10. Finally, the Post-Effective Date Debtors' reserves—established in accordance with the Plan and approved by the Confirmation Order—are fixed and finite, and the Debtors simply cannot continuously "true up" creditors for every post-emergence shift in market prices. The Post-Effective Date Debtors have described the Plan's reserves extensively and why they cannot provide all corporate creditors with Liquid Cryptocurrency distributions or the value thereof as of the date of distribution.[5] As detailed herein, the same reasoning applies to top-up payments, and the sheer number of joinders filed to the Distribution Motion demonstrates why the relief requested must—from a strictly practical perspective—be denied. The Post-Effective Date Debtors cannot set a new Distribution Record Date for each individual distribution that is made—particularly when new distributions are successfully claimed nearly every day of the week by creditors all over the world.

11. Lastly, while creditors are undeniably frustrated by the distribution process, that does not mean that the time it has taken to complete distributions to date has been unreasonable. In addition to the novelty of the form of distributions, the Post-Effective Date Debtors are facilitating distributions to approximately 400,000 creditors in over 190 countries around the world. This process has required a staggering level of coordination amongst the Post-Effective Date Debtors, their advisors, and the Distribution Agents, with many of the remaining creditor distribution issues requiring troubleshooting at an individual level. The Debtors have also encountered several major disruptions that they could not have predicted, including that the financial condition of their banking partner, an essential component of facilitating Cash

---

[5] *Post-Effective Date Debtors' First Update on Distributions* [Docket No. 4319] at 3; *Post-Effective Date Debtors' Second Update on Distributions* [Docket No. 4623] at 8–9; *Post-Effective Date Debtors' Response to Distribution Issues Raised by Corporate Creditors and Retail Borrowers* [Docket No. 4786] at 2–8; Mar. 20, 2024 Hr'g Tr. 35:17–40–10, 69:24–15.

7

distributions under the Plan, would become precarious shortly after the Effective Date. *See Declaration of Jeremy Tilsner in Support of the Debtors' Omnibus Objection to the Faller Creditors' (I) Motion Seeking Entry of an Order Approving Further Distribution Under the Plan of Reorganization for the Faller Creditors and (II) Motion for Discovery to Support Claims Made by Post-Effective Date Debtors in Regards to Equitable Treatment of Corporate Creditors* (the "Tilsner Declaration") ¶ 10. The Debtors have managed through this and other challenges as expeditiously as possible to ensure value preservation, which at times has resulted in temporary delays.

12. The Post-Effective Date Debtors continue to implement the Plan in accordance with its terms and reiterate that the process has been, on balance, a resounding success. To date, the Post-Effective Date Debtors have distributed close to 90% of the value currently eligible to be distributed. *See* Tilsner Dec. ¶ 10. To stray from the Plan's terms at this time would open floodgates to an unprecedented post-Effective Date claims process regarding distribution grievances. These chapter 11 cases must come to a conclusion. Adhering to the Plan is the only way to achieve this goal without substantial delay.

13. For these reasons, and as more fully set forth herein, the Faller Creditors and similarly situated creditors are not entitled to an additional distribution and the Bankruptcy Court should deny the Distribution Motion and related requests, including the Rule 2004 Motion.

## Argument

**I.    The Faller Creditors' Requested Relief Should Be Denied.**

    **A.    The Plan Values Distributions as of the Distribution Record Date of January 16, 2024.**

14. The Distribution Motion should be denied because the relief requested therein is inconsistent with the plain language of the confirmed Plan.

8

15.     ***First***, the Plan permits the Debtors or Post-Effective Date Debtors "to make any distribution in [Cash] if no Distribution Agent is reasonably available to make a Liquid Cryptocurrency distribution to any particular creditor." Plan Art. IV.G; *see also* Plan Art. IV.K.1 ("For the avoidance of doubt, if the Debtors or the Plan Administrator cannot make a distribution of Liquid Cryptocurrency to a particular creditor (including because no Distribution Agent is available to make such distribution), such creditor will receive a distribution of fiat."). The Debtors included this provision in the Plan to ensure they could still make distributions under the Plan to creditors that were not able to receive a Liquid Cryptocurrency distribution for any reason. And, as the Post-Effective Date Debtors previously explained in the Prior Response, the Debtors' contractual agreement with Coinbase limits the Debtors to making distributions of Liquid Cryptocurrency to only 100 corporate creditors. This is due to the heightened KYC requirements for non-individual creditors, as explained in detail in the Prior Response. Although the Faller Creditors seem intent on re-litigating the Debtors' decision to use Coinbase as a Distribution Agent, the terms of Coinbase's engagement were approved in the Confirmation Order.[6]

16.     ***Second***, as these chapter 11 cases have made clear, Cryptocurrency is a volatile asset. To be able to implement the Plan and make distributions, the Debtors needed to "draw a line in the sand" and pick a date to use to value Cryptocurrency distributions under the Plan. Pursuant to the Plan, the Distribution Cryptocurrency Conversion Table, which is used to calculate the amount of Liquid Cryptocurrency a Holder of an Allowed Claim receives under the Plan, would be set as of a date "expected to be approximately fifteen (15) days prior to the applicable Liquid Cryptocurrency distribution date." Plan Art. I.A.90. Absent doing so, the Debtors would be unable

---

[6] The Coinbase distribution agreement was part of the approved Plan Supplement. *Seventh Notice of Filing Plan Supplement* [Docket No. 3869], Ex. G.

9

to calculate distributions to creditors in advance of making them, which would make management of the already-established claim reserves near impossible (if not actually impossible).

17. To illustrate—to prepare for making initial distributions as soon as practicable following the Effective Date (*i.e.*, beginning on January 31, 2024), the Plan provided that the Debtors would use cryptocurrency prices as of fifteen days before the projected Effective Date—that is, January 16, 2024—to calculate the amount of distributions under the Plan. Accordingly, after calculating the Distribution Record Table, the Debtors set aside an amount of Liquid Cryptocurrency and (after converting Liquid Cryptocurrency to Cash) Cash for those creditors who were scheduled to receive Liquid Cryptocurrency or Cash, as applicable. The Debtors, in an exercise of their business judgment and in accordance with the provisions of the Plan, decided to convert Cryptocurrency to Cash as of January 16, 2024, to ensure they would have sufficient Liquid Cryptocurrency and Cash to facilitate distributions in light of the volatility of cryptocurrency prices. Tilsner Dec. ¶ 7. Absent preparing for distributions using prices as of the Distribution Record Date, any later shift in cryptocurrency prices—either up or down—would have jeopardized the Debtors' ability to make distributions to creditors in according with the Plan. The amount of Cash to be distributed on account of these Claims has therefore been set since January 16, 2024 and, while cryptocurrency prices rose following January 16, 2024 (and they could just as easily have fallen), the value set aside for distributions has remain unchanged—the Post-Effective Date Debtors did not receive a benefit from the price run up from which to compensate any such creditors.

18. Put differently, the reserves were established on the basis of the Distribution Valuation Table. If it is cast aside, the foundation will be ripped from under the reserves, and the issues described above would be back in play. Future distributions would also be dependent on

10

the performance of cryptocurrency markets, and individual creditors would all argue that they need to be trued up based on shifting market prices. This process would be completely unmanageable.

19. Further, to date, approximately thirty creditors have filed joinders to the Distribution Motion, and countless other creditors (including non-corporate creditors receiving fiat) would be incentivized to file similar motions if the requested relief is granted. To date, the joinder motions assert an entitlement to approximately $1.78 million in aggregate additional distributions. Based on remaining distributions, the Post-Effective Date Debtors calculate that corporate creditors who were not eligible to receive Liquid Cryptocurrency may be entitled to as much as an additional $52 million[7] in the aggregate if the Distribution Motion is granted. Tilsner Dec. ¶ 11. Moreover, all creditors receiving Cash distributions under the Plan would have a similar argument, and that amount would be an additional $29 million in the aggregate on top of the additional $52 million corporate creditors may be entitled to. Tilsner Dec. ¶ 11.

20. The Plan distributes all of the Debtors' assets to creditors on a pro-rata basis and is accordingly a zero-sum distribution process. Any distributions to fiat creditors will reduce distributions to other creditors. That is, any additional distributions would need to be made either from the Post-Effective Date Debtors' reserves or by lowering or eliminating future distributions to other creditors on account of Illiquid Recovery Rights and Litigation Proceeds.

---

[7] For purposes of this calculation, the Post-Effective Date Debtors assumed all initial distribution attempts were successful and that all distributions that have not yet been attempted will be made at June 18, 2024 cryptocurrency prices. Because of volatility in cryptocurrency prices, the aggregate amount of additional distributions to creditors who have not received a distribution, either because the initial distribution attempt was unsuccessful or because a distribution has not yet been attempted, is subject to variation based on when such creditors' initial distributions ultimately take place and could increase substantially if cryptocurrency prices continue to rise.

> **B.    The Faller Creditors, When Presented with a Choice of Liquid Cryptocurrency or Cash, Requested a Cash Distribution.**

21.    The Faller Creditors' argument that they are entitled to a distribution "true-up" is further undercut because they specifically elected to receive a Cash distribution on account of their Claims. In mid-January, in an effort to efficiently allocate the 100 slots for distributions to corporate creditors, the Debtors contacted the largest corporate creditors, including the Faller Creditors, to determine whether they preferred a Liquid Cryptocurrency or Cash distribution. Such creditors were given a choice between Liquid Cryptocurrency or a Cash distribution due to the size of their claim and the Debtors' determination to return as much Liquid Cryptocurrency to corporate creditors as possible.

22.    In response to the Debtors' communication, the Faller Creditors elected to receive Cash, apparently "because they were concerned about the uncertainty of receiving cryptocurrency on a timely basis and the delay for opening new accounts." *Affidavit of Laura Faller McNeil in Support of Faller Creditors Motion Seeking Entry of an Order (I) Approving Further Distribution Under Plan of Reorganization for Corporate Creditors and (II) Granting Related Relief* [Docket No. 4912] (the "Faller Affidavit") ¶ 3. After the rapid rise in cryptocurrency prices, however, on February 13, the Faller Creditors requested to be transitioned to a Liquid Cryptocurrency distribution. *See id.* The Post-Effective Date Debtors were unable to honor this request because they had already allocated the 100 opportunities for corporate creditors to receive a Liquid Cryptocurrency distribution, there were no additional slots available, and the Debtors had (as a result of the Faller Creditors' election) reserved an amount of Cash for the Faller Creditors as of the Distribution Record Date of January 16.

23.    Now, the Faller Creditors want to be "made whole" for the increase of Liquid Cryptocurrency prices after January 16. It would be absurd to permit a creditor who elected the

12

form of their distribution and was aware of the volatility of the cryptocurrency market to later allege they are entitled to an additional distribution on account of how their selection played out. Further, granting an unwarranted distribution to the Faller Creditors on account of their decision would unfairly benefit the Faller Creditors, because it would enable them to reap the upside of changes in the cryptocurrency market at the expense of other creditors. The same reasoning applies to creditors who were always scheduled to receive a Cash distribution—such creditors must receive a distribution based on the Record Distribution Date (even though they did not elect to receive Cash), as provided for in the Plan. The request should therefore be denied.

### C.    There Was No Unreasonable Delay in the Faller Creditors' Distributions.

24.    The Faller Creditors cannot credibly argue that the distribution timeline was unreasonable. Just twenty-two days after the Effective Date, on February 22, 2024, the Faller Creditors received approximately 65% of their aggregate distribution on their Claims. *See* Distribution Motion ¶ 1 n.2. The Faller Creditors were actually among the first creditors to receive any Cash distribution under the Plan when they received their distribution on their largest claim on February 22. Tilsner Dec. ¶ 9.[8]

25.    As to the other three Claims held by the Faller Creditors which received distributions in April, the timing was, at least in part, of their own making, as they submitted wire information that was not sufficient for the Post-Effective Date Debtors to successfully send a wire. Tilsner Dec. ¶ 9. When the issue was discovered, the Faller Creditors were contacted to resubmit their wire transfer information. The wires were made successfully within twelve days after the Faller Creditors submitted the revised wire information. Tilsner Dec. ¶ 9. As such, the Faller Creditors have now received all distributions for which they are currently eligible.

---

[8]    The Faller Creditors were one of the first twenty-eight creditors to receive a Cash distribution. Tilsner Dec. ¶ 9.

13

26.     The Faller Creditors cannot credibly argue that the timing of these distributions has been unreasonable, which is what they must establish as the Plan only requires that distributions be made as soon as *reasonably* practicable following the Effective Date. *See* Plan Art. IV.G ("Distributions shall generally commence on, or as soon as reasonably practicable after, the Effective Date."); Plan Art. VI.D ("Except as otherwise provided for in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date or as soon as reasonably practicable thereafter."). The Debtors' distribution process has been one of the most complex distribution processes ever accomplished in chapter 11, involving distributions to approximately 400,000 creditors, approximately 1,900 of whom are corporate creditors, in over 190 countries around the world. Further, many distribution-related issues require troubleshooting at an individual level. To further complicate matters, in February 2024, the Debtors' banking partner's financial position became precarious, requiring the Post-Effective Date Debtors to take steps to safeguard creditor assets by transitioning to a new banking partner. *See* Prior Response at 8; Tilsner Dec. ¶ 10.

27.     Under these circumstances, the success of the distribution process—the Post-Effective Date Debtors have distributed close to 90% of the Liquid Cryptocurrency currently eligible for distribution—is remarkable, and the Faller Creditors' assertion that they should have received their distributions quicker falls flat, particularly in light of the delays they themselves caused by providing insufficient wire detail.

28.     Finally, the Faller Creditors assert that they would have bought Liquid Cryptocurrency at market prices immediately if they had received their Cash distribution on January 31. Specifically, the Faller Creditors suggest that of course they would have bought Liquid Cryptocurrency with their distribution and received the benefit of increased market prices, but why

14

stop there? They could argue that they would have bought Nvidia stock (up nearly 100% since January 31 prior to a stock split in early June). This argument is exactly the type of 20/20 hindsight decision-making that the Distribution Record Date is intended to avoid.

> **D. The Faller Creditors Misinterpret the Plan to Require the Debtors to Convert Their Claim from Cryptocurrency to Fiat as Close to the Anticipated Date of Distribution as Reasonably Practicable.**

29. The Faller Creditors cite Article 4.K.1 of the Plan, a wholly inapplicable provision, in their argument that the Debtors were required to convert their Claims into Cash closer to the anticipated date of distribution. *See* Plan Art. IV.K.1 ("If there is no Distribution Agent capable of making a distribution to the Account Holder in Liquid Cryptocurrency **at the time such Account Holder's Claim becomes an Allowed Claim or is otherwise made available for distribution and the Plan Administrator has not otherwise converted such Liquid Cryptocurrency to fiat**, the Debtors, Post-Effective Date Debtors or Plan Administrator, as applicable, shall convert the Liquid Cryptocurrency that would otherwise be distributed to the Account Holder to fiat currency as close to the anticipated date of distribution as reasonably practical under the circumstances, and shall distribute such fiat currency to the Account Holder.") (emphasis added by Post-Effective Date Debtors). This provision preserves the Post-Effective Date Debtors' ability to make distributions on account of Disputed Claims that are Allowed after the Effective Date in Liquid Cryptocurrency or Cash depending on the availability of a Distribution Agent at such time. If there is no Distribution Agent available to make a Liquid Cryptocurrency distribution and the Plan Administrator is holding Liquid Cryptocurrency on account of such Disputed Claim as of the time it is Allowed, then this provision permits the Post-Effective Date Debtors to convert such Liquid Cryptocurrency to Cash for distribution and requires the Debtors to do so quickly.

30. This provision does not apply to the Faller Creditors. Prior to the Effective Date, the Faller Creditors were informed that, because they are corporate creditors, there may not be a Distribution Agent able to make a Liquid Cryptocurrency distribution to the Faller Creditors on the Effective Date when their Claims were made available for distribution. Further, the Faller Creditors requested a distribution in Cash. *See* McNeil Aff. ¶ 3. As such, as discussed above, prior to the Effective Date, the Debtors timely converted Liquid Cryptocurrency to Cash to set aside sufficient Cash to make a distribution to the Faller Creditors and all other creditors originally scheduled to receive Cash. This was done to ensure that, whether cryptocurrency prices later rose or fell, similarly situated creditors would receive the same recovery as of the Distribution Record Date as provided for in the Plan. Given that there was no Liquid Cryptocurrency to convert into Cash for a distribution to the Faller Creditors, the provision the Faller Creditors cite is inapplicable and any argument made by the Faller Creditors that is premised on this provision should be denied.

## II.   The Rule 2004 Motion Must Be Denied as Moot.

31. While Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity," the "pending proceeding rule" provides an exception to the broad scope of discovery under Bankruptcy Rule 2004. Fed. R. Bankr. P. 2004(a). Pursuant to the pending proceeding rule, if an adversary proceeding or a contested matter is pending in the bankruptcy case, parties to that proceeding or matter must seek discovery under Bankruptcy Rules 7026 through 7037 (with certain exceptions and additions specified in Bankruptcy Rule 9014) rather than the liberal provisions of Bankruptcy Rule 2004. *See In re National Assessment, Inc.*, 547 B.R. 63, 65 (Bankr. W.D.N.Y. 2016); *In re Bennett Funding*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996). Permitting a party to seek discovery pursuant to Bankruptcy Rule 2004 when it is related to a pending proceedings is inappropriate because it may circumvent the safeguards and protections of the Federal Rules of Civil Procedure.

*See In re Enron Corp.*, 281 B.R. 836, 841 (Bankr. S.D.N.Y. 2002) ("Based on [Bankruptcy] Rule 2004's substantive differences, courts have expressed concern that Rule 2004 examinations not be used as a tactic to circumvent the safeguards of the Federal Rules of Civil Procedure.").

32. In the Rule 2004 Motion, the Faller Creditors seek discovery regarding the very subject of the Distribution Motion, including discovery concerning when the Post-Effective Date Debtors learned of their original banking partner's precarious financial position, the Debtors' and Post-Effective Date Debtors' efforts to identify additional Distribution Agents for corporate creditors, and any correspondence regarding Coinbase's agreement to facilitate Liquid Cryptocurrency distributions to only 100 corporate creditors.

33. To begin, the requested discovery is wildly overbroad and is unnecessary to the Faller Creditors' ability to file and prosecute the Distribution Motion (evidenced by the fact that the Faller Creditors were able to file the Distribution Motion before the Rule 2004 Motion was set to be heard). Prior to filing this Objection, the Post-Effective Date Debtors contacted counsel to the Faller Creditors and notified them that they should serve discovery in connection with the Distribution Motion rather than relying on the pending Rule 2004 Motion. On June 18, 2024, counsel to the Faller Creditors indicated via e-mail that they are still seeking all of the discovery in the Rule 2004 Motion as part of the Distribution Motion. The Post-Effective Date Debtors believe the discovery is incredibly overbroad and is not necessary, but the parties have not met and conferred yet. To the extent that any discovery disputes are not resolved, the Post-Effective Date Debtors can and will bring any such disputes to the Court's attention. In any event, the Faller Creditors' attempts to take discovery through the Rule 2004 Motion must be denied as moot.

| | |
|---|---|
| New York, New York<br>Dated:  June 20, 2024 | /s/ Joshua A. Sussberg<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:     (212) 446-4800<br>Facsimile:      (212) 446-4900<br>Email:            joshua.sussberg@kirkland.com<br><br> - and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:     (312) 862-2000<br>Facsimile:      (312) 862-2200<br>Email:            patrick.nash@kirkland.com<br>                       ross.kwasteniet@kirkland.com<br>                       chris.koenig@kirkland.com<br>                       dan.latona@kirkland.com<br><br>*Counsel to the Post-Effective Date Debtors* |