Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas R. Lombardi (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Counsel for Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>                Reorganized Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>Jointly Administered |
| MOHSIN Y. MEGHJI, LITIGATION ADMINISTRATOR, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS,<br>                Plaintiff,<br><br>                v.<br><br>GIUSEPPE ALIBERTO DIAZ,<br>                Defendant. | Adversary Proceeding<br>Case No. _____ (MG)<br><br>**ADVERSARY COMPLAINT** |

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtors' federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Mohsin Y. Meghji, as Litigation Administrator ("Plaintiff" or "Litigation Administrator") for Celsius Network LLC ("Celsius LLC") and its affiliated debtors ("Debtors" or "Celsius"), by and through undersigned counsel, brings this action against the Defendant, Giuseppe Aliberto Diaz ("Diaz" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1.      This action relates to a wrongful transfer of the Debtors' property or interest in property to the Defendant caused by the former CEO ("Executive") of Celsius KeyFi LLC ("Celsius KeyFi"), and Executive's majority owned vehicle ("Vehicle" and together with Executive, the "Executive Parties"). This action seeks to avoid the fraudulent transfer and recover valuable estate property from the Defendant, as well as to impose a constructive trust, and to require that the Defendant account for, and turn over that property which was stolen from Celsius (and ultimately from the whole Celsius community).

## PARTIES

2.      The Litigation Administrator brings this action pursuant to the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* (Conformed for Mining Co Transaction) [Docket No. 4289] (the "Plan"), the Litigation Administrator Agreement attached as Exhibit B to the *Eleventh Notice of Filing of Plan Supplement* [Docket No. 4297] (the "Litigation Administrator Agreement"), and section 1123 of the Bankruptcy Code. Pursuant to the Plan, Confirmation Order, and the Litigation Administrator Agreement, Plaintiff has the capacity, in his own right and name, to investigate, prosecute, compromise, and settle Recovery Causes of Action (as defined in the Plan), including

2

this Avoidance Action (as defined in the Plan), on behalf of the Debtors and their estates (the "Estates"). The Debtors relevant to this lawsuit are Celsius Network Limited and Celsius KeyFi LLC.

3. Celsius Network Limited ("CNL") is a private limited company incorporated under the laws of England and Wales with its principal place of business located at 167-169 Great Portland Street, 5th Floor, London W1W 5PF.

4. Celsius LLC is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030. All customer relationships within the broader Celsius enterprise were transitioned from CNL to Celsius LLC.

5. Celsius KeyFi is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030. Celsius KeyFi's sole member is Celsius US Holding LLC, a Delaware limited liability company whose only member is CNL.

6. Diaz, upon information and belief, resides in Italy.

**JURISDICTION AND VENUE**

7. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a); (b); and (e) and the *Amended Standing Order of Reference* M10–468 of the United States District Court for the Southern District of New York (the "Southern District of New York") dated February 1, 2012, referring to the Bankruptcy Judges of the Southern District of New York all cases and proceedings arising under, arising in, or related to a case under title 11 of the United States Code (the "Bankruptcy Code") issued pursuant to 28 U.S.C. § 157. Alternatively, subject matter jurisdiction exists as there is a "close nexus" or "conceivable effect" between this action and the confirmed plan in these Chapter 11 Cases such that this matter affects the interpretation,

3

implementation, consummation, execution, or administration of the confirmed plan. Further, the Court has jurisdiction over this matter pursuant to Article XII of the Plan.

8. This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A); (E); (H); and (O). In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

9. While Diaz may reside primarily abroad, he is subject to this Court's jurisdiction, as he has purposefully availed himself of the privilege of conducting activities within the forum by engaging in conduct within or directed at the United States in connection with the claims and causes of action alleged herein.

10. In particular, upon information and belief, Diaz has transacted business within the United States, including by engaging in communications with Executive and Vehicle within the United States from which the claims alleged arise, including by receiving the fraudulent transfer at issue, or the benefit thereof, and, upon information and belief, engaging in communications with Executive and Vehicle within the United States relating to the claims and causes of action alleged, including communications relating to arranging the fraudulent transfer at issue.

11. Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under, arises in, or relates to cases commenced under the Bankruptcy Code.

## BACKGROUND

### A. CNL's Business, Staking, and DeFi

12. CNL and its affiliates constituted one of the largest cryptocurrency-based finance platforms and Bitcoin mining companies in the world and provided financial services to institutional, corporate and retail clients across more than 100 countries.

13. CNL was founded in 2017 to be one of the first crypto platforms that would allow users to transfer their digital assets and (a) earn rewards on such assets and/or (b) take loans using those transferred assets as collateral. The rewards offered by CNL varied by the type and amount of crypto asset transferred to the CNL platform.

14. The CNL business model was centered on deploying digital assets to generate income for CNL and its operations and growth. Among other things, CNL made loans of fiat currency and "stablecoins"—cryptocurrency pegged to fiat currencies like the U.S. dollar (USD)—to third-party retail borrowers, but only if the borrower posted collateral in the form of cryptocurrency in excess of the amount loaned. In or around late 2019 and early 2020, Celsius began to consider additional revenue-generating investment strategies, such as staking and DeFi activities.

15. Staking refers to providing cryptocurrency coins, like ETH, to a third-party platform for the purpose of earning revenue, usually in the form of a coin or other "reward." Staking does not involve trading one form of cryptocurrency for another, or otherwise speculating in cryptocurrency assets. The principal, staked coins are not exchanged for other forms of currency. While the staked coins may in some cases be subject to a lockup period, the original staking party has the right to have the ETH or other coins it staked at the platform returned.

5

16. DeFi generally refers to certain activities on a blockchain designed to provide financial services like borrowing, lending and market-making without an institutional intermediary, often utilizing so-called "smart contracts." Smart contracts essentially are programs stored on a blockchain that run when predetermined conditions are met. Smart contracts can be used to automate the execution of an agreement so that the outcome is certain, without any intermediary's involvement.

**B.    CNL and the Executive Parties Agree Executive Will Provide Staking and DeFi Services**

17. In 2020, Executive represented himself as a pioneer and expert in coin staking and de-centralized finance ("DeFi") investments in order to gain access to and control over the valuable coins of CNL. Based on Executive's representations, he was engaged to lead Celsius' DeFi efforts.

18. By August 2020, CNL and Executive agreed in principle that CNL would set up a wholly owned subsidiary to acquire the assets of Vehicle and operate Celsius' staking and DeFi activities, with Executive as CEO of that subsidiary. CNL and Executive discussed the primary terms of the transaction and prepared a draft Asset Purchase Agreement, which they exchanged in August 2020.

19. Anticipating that closing on the transaction would take some time, the parties agreed that CNL would permit Executive to begin to deploy coins on Debtors' behalf while the parties sought to finalize the acquisition.

20. CNL from time-to-time funded coins into certain wallets accessible to Executive. For example, on or around August 19, 2020, CNL created a digital wallet with the address 0xb1adceddb2941033a090dd166a462fe1c2029484 (the "0xb1" wallet) and transferred 1 ETH to the 0xb1 wallet. CNL provided to the Executive Parties the private keys to the 0xb1 wallet and certain other CNL-created wallets (together with the 0xb1 wallet, the "Celsius Wallets") so that

6

the Executive Parties could deploy CNL's coins in DeFi and staking activities. The private key to a digital wallet is similar to a password for a conventional bank account, but the private key can never be changed. Once a party has the private key, he, she or it will be able to access the associated wallet permanently.

21.     On October 1, 2020, CNL and Vehicle signed a non-binding memorandum of understanding ("MOU") concerning deployment of CNL's coins and anticipating an Asset Purchase Agreement by which CNL would acquire the Vehicle business (as later executed, the "APA"). The MOU also anticipated that CNL would incorporate a subsidiary that would receive all of Vehicle's intellectual property and employ Vehicle's employees. The subsidiary anticipated by the MOU, Celsius KeyFi, LLC, was formed on or around October 5, 2020, and the APA ultimately closed several months later, dated December 31, 2020. The MOU anticipated that Celsius KeyFi, referred to therein as NEWCO, would be authorized to deploy coins pursuant to a temporary "Service Agreement" according to certain service terms.

22.     On October 7, 2020, CNL and Vehicle entered into a service agreement (the "First Service Agreement") pursuant to which Vehicle agreed to "provide its expertise to Celsius for all things pertaining to DeFi and Staking Services." This First Service Agreement also incorporated the terms of the MOU by reference, including the service terms under which Vehicle could deploy CNL's coins. The First Service Agreement expired on or around December 30, 2020.

23.     On or around December 31, 2020, CNL and Vehicle entered into a new service agreement that superseded the First Service Agreement (the "Second Service Agreement"). The Second Service Agreement replaced Vehicle with the newly formed CNL subsidiary, Celsius KeyFi, and laid out the service terms for Celsius KeyFi's staking of CNL's coins.

7

24. Finally, on or around December 31, 2020, Vehicle, Celsius KeyFi, and CNL signed the APA dated December 31, 2020 such that CNL and Celsius KeyFi purchased all assets belonging to Vehicle. Pursuant to the APA and Second Service Agreement, Executive was to continue deploying coins as CEO of Celsius KeyFi.

25. As CEO of Vehicle and Celsius KeyFi, Executive maintained significant control over both Vehicle and Celsius KeyFi. CNL in turn vested control of the coins it transferred to the 0xb1 wallet temporarily to Vehicle and then to Celsius KeyFi. Thus, at all times, Executive exercised significant control over the CNL coins entrusted to his deployment. The parties' agreements were crystal clear, however, that the Executive Parties were to use the coins in their control solely for authorized DeFi activities.

C.  **Executive Parties Caused the Transfer of at Least 7.99 Celsius BTC to Diaz**

26. The Executive Parties caused the transfer of Celsius assets from Celsius accounts to Diaz. Specifically, without consideration to Celsius, Executive Parties effected a transfer from Celsius wallets to Diaz in at least one transaction: Diaz received 7.99 BTC on or around February 1, 2021 from a cross-chain swap originating from wallet 0xee24b229e1132dfc932725aab9b0196e94af2d32, which was funded with Celsius assets from Celsius' 0xb1 wallet (the "Subject Property"); the Subject Property moved into Diaz's wallet automatically and immediately upon first being transferred to wallet 0xee24b229e1132dfc932725aab9b0196e94af2d32 such that this "0xee24" wallet was a mere conduit.

| Transaction Hash | Date | Amount |
|---|---|---|
| 0x85435cb5d3b9d6666dfc73e0588fcb31afdaf79ef945fb24e93e6e924735f9d0 | Feb-01-2021 05:31:36 AM UTC | 8 renBTC |
| 0x921ef96c39d4c9f803d870dd4234b1f536afea52b5c16480dd009ad95fb204fd | Feb-01-2021 05:35:29 AM UTC | 7.992 renBTC |
| 805341122a8f9008843c207b85cd189b357892327b3b5231c04ce062beb77507 | Feb-01-2021 05:49:11 AM UTC | 7.991 BTC |

8

**D.    CNL and Celsius KeyFi Were Each Insolvent at the Time of the Transfer to the Defendant**

27. Both CNL and Celsius KeyFi were insolvent at the time of the transfer to the Defendant set forth above.

28. CNL (along with its successor, Celsius LLC) was insolvent at the time of the transfer made to Defendant because the value of CNL/Celsius LLC's liabilities exceeded the value of its assets at all relevant times.

29. As the *Final Report of Shoba Pillay, Examiner*, *In re Celsius Network LLC*, No. 22-10964 (Bankr. S.D.N.Y. Jan. 31, 2023), Docket No. 1956 (the "Examiner Report") stated:

> Celsius's problems did not start in 2022. Rather, serious problems dated back to at least 2020, after Celsius started using customer assets to fund operational expenses and rewards. To fund operations, Celsius posted customer deposits as collateral to take out loans in stablecoin. And to fund CEL buybacks for rewards, Celsius exchanged BTC and ETH for CEL on the secondary market. But prior to the creation of the Freeze Report, Celsius did not adequately track or reconcile customer assets and liabilities on a coin-by-coin basis. Celsius was therefore caught off guard when it recognized a shortfall in BTC and ETH (which it had been using to fund those CEL buybacks).

30. Celsius' consolidated balance sheet as of September 30, 2020 showed negative equity. In December 31, 2020, Celsius' consolidated balance sheet purported to show positive equity, but the value of CEL tokens on the asset side of Celsius' balance sheet exceeded the amount of positive equity. But CEL tokens were essentially worthless, including because they depended solely on CNL's market-making techniques and were completely correlated to the value of, and totally dependent on the continued operations of, Celsius—just as an airline rewards program is completely dependent on the underlying airline continuing to operate.

31. Additionally, there was never a real market in which to deploy CEL. Instead, CNL, as the only purchaser of CEL tokens, propped up CEL's value by engaging in calculated buying

9

sprees of CEL tokens. While this caused the value of CEL prices to appreciate at first, CNL eventually ran out of the funds from its crypto asset deployments necessary to fund its own CEL buybacks, and in 2020, CNL began using customer-deposited Bitcoin (BTC) and Ether (ETH) to fund its CEL purchases.

32. When BTC and ETH rapidly appreciated in value in early 2021, the shortfall in BTC and ETH, which CNL had been using to fund those CEL buybacks, significantly increased CNL's liabilities.

33. Additionally, Celsius suffered other losses of over $800 million that further decreased the asset side of its balance sheet, including based on activities of the Executive Parties, keys lost by Fireblocks for tens of thousands of ETH tokens that Celsius provided to StakeHound, collateral posted with Equities First Holdings that was not returned, and losses in Grayscale Bitcoin Trust.

34. Celsius was also insolvent based on other mismatches between its liabilities and assets. At any given time between 2020 and 2022, Celsius was susceptible to collapsing at any moment if its customers started to withdraw their assets, which Celsius was relying on to fund its own CEL buybacks to artificially pump up its CEL assets. Indeed, this scenario finally occurred in 2022, when CNL could no longer bridge its deficits and its customers began to withdraw their assets from CNL *en masse*.

35. Throughout the time period during which Executive effected the fraudulent transfer, Celsius KeyFi was likewise insolvent due to – among other things – staggering liabilities owed to CNL related to the loss, mismanagement, and theft of its coins.

36. Celsius KeyFi was formed for the singular purpose of deploying CNL coins in DeFi and staking investments and had no other business or sources of revenue. While in theory, under

10

the Service Agreements, Celsius KeyFi could have earned a "profit share" based on profits it was able to generate through its investment of CNL's assets, its trading activities never generated any profits, only massive losses. What Celsius KeyFi did have in abundance was liabilities, including not only liabilities related to operating expenses like payments to contractors, but also liabilities to CNL related to the gross mismanagement and/or theft of hundreds of millions of dollars' worth of CNL's coins. As such, Celsius KeyFi was insolvent pursuant to any relevant standard.

## FIRST CAUSE OF ACTION
**(Turnover Under Section 542 of the Bankruptcy Code)**

37. Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

38. At all times, Celsius had legal ownership and right to possession over the Subject Property and all of the proceeds, rents or profits thereof.

39. Upon information and belief, Diaz had possession, custody or control of the Subject Property or its proceeds at the time Celsius filed its chapter 11 petition on July 13, 2022, and/or had possession, custody and control of the Subject Property or its proceeds during the pendency of Celsius' chapter 11 cases.

40. The Subject Property is or was property that the trustee may use, sell, or lease under section 363 of the Bankruptcy Code.

41. The Subject Property is not of inconsequential value or benefit to the Debtors' estates.

42. Pursuant to section 542 of the Bankruptcy Code, Plaintiff is entitled to a judgment ordering Diaz to turn over the Subject Property, and all proceeds, rents or profits thereof, or recovery of an equivalent judgment for the value of the property of the estate.

43. It is possible that certain Subject Property may come into Diaz's possession, custody or control in the future. Celsius therefore requests that the turnover judgment be continuing in nature, requiring the turnover (or satisfaction of judgment) of any such Subject Property that may come into the Defendant's possession, custody or control in the future.

## SECOND CAUSE OF ACTION
**(Fraudulent Transfer)**

44. Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

45. As stated above, the Executive Parties caused at least one fraudulent transfer of Celsius' assets or interest in property from wallets owned by Celsius directly into a wallet over which Diaz had possession, custody or control.

46. The Executive Parties effected the transfer to Diaz through their dominion and control over the Celsius Wallets and the Subject Property in those wallets by virtue of their access to the Celsius Wallets' private keys and their direction of the activities of Celsius KeyFi and Vehicle, including through Executive's position as CEO of Vehicle and then Celsius KeyFi.

47. The transfer to Diaz was made for less than reasonably equivalent value (in fact, as stated above, for no value) at a time when CNL and Celsius KeyFi were insolvent, or else because CNL and Celsius KeyFi became insolvent as a result of such transfer.

48. At the time of the transfer to Diaz, CNL and Celsius KeyFi were each engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with them was unreasonably small capital.

49. At the time of the transfer to Diaz, CNL and Celsius KeyFi intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

50. Upon information and belief, the Executive Parties effected the transfer to Diaz with the intent to hinder, delay, or defraud creditors, which is imputed to the transferors.

51. The transfer of Celsius assets to Diaz is marked by numerous badges of fraud: (1) CNL and Celsius KeyFi each received less than reasonably equivalent value (in fact, they received no value) for the transferred Subject Property; (2) the Executive Parties were closely associated with Diaz; (3) the transfer was made while CNL and Celsius KeyFi were insolvent or else the transfer caused CNL and Celsius KeyFi to become insolvent; and (4) the transfer was part of a broader scheme in which, during the course of their tenure and after, the Executive Parties caused additional transfers of tens of millions of dollars' worth of Celsius assets to dozens of other third parties.

52. Celsius is therefore entitled to a judgment avoiding the transfer to Diaz and recovering the fraudulently transferred assets or their value from the Defendant.

## **THIRD CAUSE OF ACTION**
**(Unjust Enrichment)**

53. Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

54. Diaz does not have a contract with Celsius.

55. Diaz was enriched by receiving the Subject Property.

56. Diaz's enrichments were gained at Celsius' expense.

57. This enrichment was unjust because Diaz provided nothing of value to Celsius, and his enrichment has come at the expense of Celsius' legitimate creditors and customers.

58. It would be inequitable for Diaz to retain the benefit of Celsius' property, including any proceeds of such property, without payment for its value.

13

59. Because no contractual remedy exists, the Plaintiff has no adequate remedy at law for Diaz's unjust enrichment.

60. Plaintiff is entitled to a money judgment in the amount of value by which Diaz was unjustly enriched in an amount to be proved at trial.

61. Plaintiff is entitled to recovery of the Subject Property and any and all proceeds thereof.

62. Plaintiff is entitled to the remedy of a constructive trust upon the Subject Property and any and all proceeds thereof.

63. Plaintiff is entitled to an equitable lien upon the Subject Property and any and all proceeds thereof.

**FOURTH CAUSE OF ACTION**
**(Conversion)**

64. Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

65. At all times relevant herein, Celsius had the right to possession, custody or control of the Subject Property.

66. Diaz, acting in concert with Executive, assumed control over the Subject Property, thereby interfering with Celsius' rights in that property in a manner inconsistent with those rights.

67. This interference with Celsius' rights in the Subject Property is tortious conversion. Diaz's conversion of Celsius property has resulted in damages to Celsius in an amount to be proven at trial.

68. Plaintiff is also entitled to the remedy of replevin and the proceeds thereof in an amount to be proved at trial.

69. Alternatively, Plaintiff is entitled to the remedy of trover and the proceeds thereof in an amount to be proved at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request as follows:

(a) Judgment in favor of Plaintiff and against Diaz on all causes of action;

(b) Directing Diaz to turn over the Subject Property and any and all proceeds thereof to Celsius, together with any other Subject Property and any and all proceeds thereof that may come into Diaz's possession, custody or control in the future;

(c) Avoiding the transfer to Diaz and awarding recovery of the avoided property or its money equivalent;

(d) Replevin, trover, or actual damages for the conversion of the Subject Property;

(e) Imposing a constructive trust upon all Subject Property or its proceeds in favor of Plaintiff to remedy Diaz's otherwise wrongful conduct, resulting in his unjust enrichment;

(f) Requiring Diaz to disgorge the Subject Property and any and all proceeds and profits generated from the Subject Property to Celsius;

(g) Awarding Plaintiff actual damages in an amount to be determined at trial;

(h) Awarding Plaintiff pre-and post-judgment interest at the maximum amount permitted by law; and

(i) Awarding such other and further relief as this Court deems just and proper.

Dated:      July 13, 2024
                New York, New York

AKIN GUMP STRAUSS HAUER & FELD LLP

By:  */s/ Mitchell P. Hurley*
Mitchell P. Hurley
Dean L. Chapman Jr.
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
mhurley@akingump.com
dchapman@akingump.com

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas R. Lombardi (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
edscott@akingump.com
nlombardi@akingump.com

*Counsel for Plaintiff*