Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas R. Lombardi (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Counsel for Plaintiff*

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Reorganized Debtors. | Jointly Administered |

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

| | |
|---|---|
| MOHSIN Y. MEGHJI, LITIGATION ADMINISTRATOR, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS,<br><br>Plaintiff,<br><br>v.<br><br>CEZARY FALBA, DENNIS REICHELT, DRAGOS ILIE, LENA WDOWIAK, MICHAL KLIK, ULADZIASLAU STARASTENKA, KAROL NOWAK, LUKASZ KROL, MACIEJ ZAŁĘSKI, RAFAL MOLAK, RAFAEL RECHE, LEVAN MKHEIDZE, ELENE CHKEIDZE, JASON STONE, and KEYFI INC.,<br><br>Defendants. | Adversary Proceeding<br>Case No. _____ (MG)<br><br>**ADVERSARY COMPLAINT** |

Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated debtors ("Plaintiff" or "Litigation Administrator"), in connection with the bankruptcy cases of Celsius Network LLC and its Debtor Affiliates ("Debtors" or "Celsius") by and through undersigned counsel, brings this action against Defendants and alleges as follows:

## NATURE OF THE ACTION[2]

1.      This action relates to Celsius property that Executive and Vehicle wrongfully caused Celsius to transfer from Celsius wallets to Defendants and to or for their own benefit.  This action seeks to avoid fraudulent transfers, and to recover valuable estate property from the Defendants other than the Executive Parties, as well as to impose constructive trusts, and to require that such Defendants account for, and turn over that property which was taken from Celsius (and ultimately from the whole Celsius community) (the "Subject Property").

2.      As described at greater length herein, the Executive Parties lost hundreds of millions of dollars' worth of Celsius assets in poor investments and misappropriated tens of

---

[2] Capitalized terms undefined herein have the meaning ascribed elsewhere in the Complaint.

millions of dollars' worth of Celsius assets, taking many for themselves and sending others to third parties.  The Defendants to this suit aside from the Executive Parties (such defendants, the "Contractor Defendants") were all contractors of either or both of Celsius Keyfi LLC ("Celsius KeyFi") or Vehicle and worked closely with the Executive Parties in all aspects of the Executive Parties' deployment of Celsius assets.  The Contractor Defendants themselves received substantial quantities of misappropriated Celsius assets.

3.     This action seeks to recover as property of the estate certain Celsius Direct Transfers, Celsius Indirect Transfers, and Executive Transfers.  Alternatively the Celsius Direct Transfers, Celsius Indirect Transfers, and Executive Transfers were transfers of property or an interest in property made with actual intent to defraud the creditors of the Debtors, or else made for an exchange of less than reasonably equivalent value for the Debtors at a time during which they were insolvent, became insolvent, were left with unreasonably small capital, intended to or believed that the Debtors would incur debts beyond the ability to repay as they matured, or as to certain Contract Defenders were transfers for the benefit of insiders under an employment contract outside of the ordinary course of business.  Additionally, the Contractor Defendants here are liable for state law claims as a result of the theft that occurred here, and additionally aided and abetted Executive's breach of fiduciary duty, for which they are liable.

## PARTIES

### A.     Plaintiff

4.     The Litigation Administrator brings this action pursuant to the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC*

3

*and its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (the "Plan"), the Litigation Administrator Agreement attached as Exhibit B to the *Eleventh Notice of Filing of Plan Supplement* [Docket No. 4297] (the "Litigation Administrator Agreement"), and section 1123 of the Bankruptcy Code.  Pursuant to the Plan, Confirmation Order, and the Litigation Administrator Agreement, Plaintiff has the capacity, in his own right and name, to investigate, prosecute, compromise, and settle Recovery Causes of Action, including this Avoidance Action, on behalf of the Debtors and their estates (the "Estates").

5.      Celsius Network Limited ("CNL") is a private limited company incorporated under the laws of England and Wales with its principal place of business located at 167-169 Great Portland Street, 5th Floor, London W1W 5PF.

6.      Celsius Network LLC ("Celsius LLC") is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.  All customer relationships within the broader Celsius enterprise were transitioned from CNL to Celsius LLC.

7.      Celsius KeyFi is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.  Celsius KeyFi's sole member is Celsius US Holding LLC, a Delaware limited liability company whose only member is CNL.

**B.      Defendants**

8.      Defendant Jason Stone ("Executive") is a resident of New York.  Executive was the founder and principal of Defendant KeyFi Inc. ("Vehicle"), as well as CEO and chief fiduciary of Celsius KeyFi and directed the transfers of the assets at issue in this litigation.

9.      Defendant Vehicle is a Delaware corporation that, upon information and belief, has a principal place of business located in New York.  Vehicle assisted Executive in directing the transfers of the assets at issue in this litigation.  Upon information and belief, Vehicle's address is also the address of the apartment where Executive lives.  Executive is the largest shareholder of Defendant Vehicle.

10.     Defendant Cezary Falba is a former contractor of Celsius KeyFi during the time that Executive was CEO of Celsius KeyFi.

11.     Defendant Dennis Reichelt was, upon information and belief, at some time a shareholder of Vehicle.  Reichelt was also a former contractor of Celsius KeyFi during the time that Executive was CEO of Celsius KeyFi.

12.     Defendant Dragos Ilie was a contractor of Celsius KeyFi during the time that Executive was CEO of Celsius KeyFi.

13.     Defendant Lena Wdowiak is a former contractor of Vehicle

14.     Defendant Michal Klik is a citizen of Poland and a former contractor of Vehicle

15.     Defendant Uladziaslau Starastenka is a former contractor of Vehicle

16.     Defendant Karol Nowak was a contractor of Celsius Network Inc. during the time that Executive was CEO of Celsius KeyFi and performed services for Celsius KeyFi.

17.     Defendant Lukasz Krol, upon information and belief, was at some time a shareholder of Vehicle.  Krol was a contractor of Celsius KeyFi during the time that Executive was CEO of Celsius KeyFi.

18.     Defendant Maciej Załęski, upon information and belief was at some time a shareholder of Vehicle.  Załęski was a contractor of Celsius KeyFi during the time that Executive was CEO of Celsius KeyFi.

19.     Defendant Rafal Molak was a contractor of Celsius KeyFi during the time that Executive was CEO of Celsius KeyFi.

20.     Defendant Rafael Reche was a contractor of Celsius KeyFi during the time that Executive was CEO of Celsius KeyFi.

21.     Defendant Levan Mkheidze, upon information and belief, is a citizen of the Republic of Georgia.

22.     Defendant Elene Chkeidze (together with Mkeidze, the "Indirect Initial Transferees"), upon information and belief, is a citizen of the Republic of Georgia.

## JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a); (b); and (e) and the *Amended Standing Order of Reference* M10–468 of the United States District Court for the Southern District of New York (the "Southern District of New York") dated February 1, 2012 referring to the Bankruptcy Judges of the Southern District of New York all cases and proceedings arising under, arising in, or related to a case under title 11 of the United States Code (the "Bankruptcy Code"), issued pursuant to 28 U.S.C. § 157.  Alternatively, subject matter jurisdiction exists as there is a "close nexus" or "conceivable effect" between this action and the confirmed plan in these Chapter 11 Cases such that this matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan.  Further, the Court has jurisdiction over this matter pursuant to Article XII of the Plan.

24.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A); (E); (H); and (O).  In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

25.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under, arises in, or related to cases commenced under the Bankruptcy Code.

26.     Defendant Executive is domiciled in the United States and Defendant Vehicle is organized in and has its principal place of business in the United States and so both Defendants are subject to the general personal jurisdiction of the Court.

27.     The remaining Defendants may be domiciled outside of the territorial jurisdiction of the United States. These Defendants would nevertheless be subject to this Court's jurisdiction because each one has purposefully availed themself of the privilege of conducting activities within the forum by engaging in conduct within or directed at the United States in connection with the claims and causes of action alleged herein.

28.     In particular, each of the Defendants has transacted business within the United States, including by repeatedly directing communications to Defendants Executive and Vehicle within the United States from which the claims alleged arise, including by receiving one or more of the Fraudulent Transfers at issue, or the benefit thereof, and, upon information and belief, engaging in communications with Executive and Vehicle within the United States relating to the claims and causes of action alleged, including communications relating to arranging the Fraudulent Transfers at issue. Furthermore, each of the Contractor Defendants entered into contracts with either or both of Celsius KeyFi or Vehicle, each of which are organized in and operate out of the United States, and performed services under those contracts. All such contracts contained New York choice of law provisions.

29.     The Contractor Defendants additionally participated in a conspiracy with co-conspirators located in the United States, including Executive and Vehicle, who took overt acts

in furtherance of the conspiracy within the United States, including effecting the fraudulent transfers at issue.

## **BACKGROUND**

### C.    **CNL's Business, Staking, and DeFi**

30.    CNL and its affiliates constituted one of the largest cryptocurrency-based finance platforms and Bitcoin mining companies in the world and provided financial services to institutional, corporate and retail clients across more than 100 countries.

31.    CNL was founded in 2017 to be one of the first crypto platforms that would allow users to transfer their digital assets and (a) earn rewards on such assets and/or (b) take loans using those transferred assets as collateral.  The rewards offered by CNL varied by the type and amount of crypto asset transferred to the CNL platform.

32.    The CNL business model was centered on deploying digital assets to generate income for CNL and its operations and growth.  Among other things, CNL made loans of fiat currency and "stablecoins"—crypto currency pegged to fiat currencies like the U.S. dollar (USD)—to third-party retail borrowers, but only if the borrower posted collateral in the form of cryptocurrency in excess of the amount loaned.  In or around late 2019 and early 2020, Celsius began to consider additional revenue generating investment strategies, such as staking and DeFi activities.

33.    Staking refers to providing cryptocurrency coins, like ETH, to a third-party platform for the purpose of earning revenue, usually in the form of a coin or other "reward." Staking does not involve trading one form of cryptocurrency for another, or otherwise speculating in cryptocurrency assets.  The principal, staked coins are not exchanged for other forms of

currency.  While the staked coins may in some cases be subject to a lockup period, the original

staking party has the right to have the ETH or other coins it staked at the platform returned.

34.     DeFi generally refers to certain activities on a blockchain designed to provide

financial services like borrowing, lending and market-making without an institutional

intermediary, often utilizing so-called "smart contracts."  Smart contracts essentially are programs

stored on a blockchain that run when predetermined conditions are met.  Smart contracts can be

used to automate the execution of an agreement so that the outcome is certain, without any

intermediary's involvement.

**D.      CNL and the Executive Parties Agree Executive Will Provide Staking and DeFi Services**

35.     The Defendants are recipients of estate property that was transferred to or for their

benefit during the course of the Executive Parties' mismanagement and misappropriation of

Celsius' assets.

36.     In 2020, Executive represented himself as a pioneer and expert in coin staking and

decentralized finance ("DeFi") investments in order to gain access to and control over the valuable

coins of Celsius Network Limited ("CNL," and together with its successor Celsius Network LLC

("Celsius LLC") and Celsius KeyFi, "Celsius").  At one point, Executive oversaw and controlled

more than one billion dollars' worth of CNL assets.  Unfortunately, in addition to losing hundreds

of millions of dollars' worth of assets, the Executive Parties misappropriated millions of dollars in

coins and other property from Celsius "wallets"—blockchain addresses where coins and other

digital assets can be stored—by transferring them to non-Celsius wallets, cryptocurrency exchange

accounts or other destinations.

37.    In 2020, when CNL began to explore deploying CNL's coins in staking and DeFi strategies, based on, inter alia, Executive's representations, CNL engaged the Executive Parties to lead the effort.

38.    By August 2020, CNL and Executive agreed in principle that CNL would set up a wholly owned subsidiary to acquire the assets of Vehicle and operate Celsius' staking and DeFi activities, with Executive as CEO of that subsidiary.  CNL and Executive discussed the primary terms of the transaction and prepared a draft Asset Purchase Agreement, which they exchanged in August.

39.    Anticipating that closing on the transaction would take some time, the parties agreed that CNL would permit Executive to begin to deploy CNL's coins on CNL's behalf while the parties sought to finalize the acquisition.

40.    CNL from time-to-time funded coins into certain wallets accessible to Executive. For example, on or around August 19, 2020, CNL created a digital wallet with the address 0xb1adceddb2941033a090dd166a462fe1c2029484 (the "0xb1" wallet) and transferred 1 ETH to the 0xb1 wallet.  CNL provided to the Executive Parties the private keys to the 0xb1 wallet and certain other CNL-created wallets (together with the 0xb1 wallet, the "Celsius Wallets") so that the Executive Parties could deploy CNL's coins in DeFi and staking activities.  The private key to a digital wallet is similar to a password for a conventional bank account, but the private key can never be changed.  Once a party has the private key, they will be able to access the associated wallet permanently.

41.    On October 1, 2020, CNL and Vehicle signed a non-binding memorandum of understanding ("MOU") concerning deployment of CNL's coins and anticipating an asset purchase agreement by which CNL would acquire the Vehicle business (as later executed, the

"APA").  The MOU also anticipated that CNL would incorporate a subsidiary that would receive

all of Vehicle's intellectual property and employ Vehicle's employees.  The subsidiary anticipated

by the MOU, Celsius KeyFi, was formed on or around October 5, 2020, and the APA ultimately

closed several months later, around December 2020.  The MOU anticipated that Celsius KeyFi,

referred to therein as NEWCO, would be authorized to deploy CNL coins in DeFi activities for

the benefit of Celsius pursuant to a temporary "Service Agreement" according to certain service

terms.

42.     On October 7, 2020, CNL and Vehicle entered into a service agreement (the "First

Service Agreement") pursuant to which Vehicle agreed to "provide its expertise to Celsius for all

things pertaining to DeFi and Staking Services."  This First Service Agreement also incorporated

the terms of the MOU by reference, including the service terms under which Vehicle could deploy

CNL's coins.  The First Service Agreement expired on or around December 30, 2020.

43.     On or around December 31, 2020, CNL and Vehicle entered a new service

agreement that superseded the First Service Agreement (the "Second Service Agreement").  The

Second Service Agreement replaced Vehicle with the newly formed CNL subsidiary, Celsius

KeyFi, and laid out the service terms for Celsius KeyFi's staking of CNL's coins.

44.     Finally, on or around December 31, 2020, Vehicle, Celsius KeyFi, and CNL signed

the APA dated December 31, 2020.  Pursuant to the APA and Second Service Agreement,

Executive was to continue deploying CNL's coins as CEO of Celsius KeyFi solely in authorized

DeFi activities.

45.     As CEO of Vehicle and Celsius KeyFi, Executive maintained significant control

over both Vehicle and Celsius KeyFi and the Celsius Wallets.  Thus, at all times, Executive

exercised significant control over the Celsius coins entrusted to his deployment.

E.    **CNL Demands Return of Its Coins, But Executive Parties Leave a Substantial Gap**

46.    It did not take long before CNL lost confidence in Executive's leadership and decision-making as CEO of Celsius KeyFi and demanded the return of all of CNL's coins. During the fall of 2020, Executive and Celsius personnel, including Alex Mashinsky, held meetings on an approximately weekly basis to discuss Executive's deployment of CNL's coins. At these meetings Executive repeatedly and consistently stated that the Executive Parties' deployments of CNL's coins for staking and DeFi activities were profitable.

47.    Given the tens of thousands of transactions deployed each day and the anonymity of users associated with particular wallets, it was practically impossible for Celsius to monitor the Executive Parties' activities with Celsius assets without their complete and accurate cooperation. The Executive Parties claimed that they were working on a "wormhole" program that would allow Celsius to have visibility into their trading activities, including the purported profits thereof, but the Executive Parties consistently failed to deliver that program or any other reporting system to enable Celius to track and understand the Executive Parties' deployment of CNL assets.

48.    In addition, the Executive Parties' deployments of Celsius ETH were liquidated on two separate occasions in November 2020 and February 2021. These "liquidation events" both occurred on the Compound protocol and resulted in the total loss of 18,836 ETH (around 29.5 million USD).

49.    In early 2021, troubled by the Executive Parties' reporting failures, the liquidation events, and other issues, Celsius instructed the Executive Parties to return the coins Celsius had made available for deployment, including to ensure the coins were accounted for and subject to improved security measures.

50.     The Executive Parties agreed, and Executive and his affiliates prepared a written plan for unwinding positions the Executive Parties had taken and swiftly returning CNL's coins.

51.     But the Executive Parties did not execute on the plan, and by March 24, 2021, the Executive Parties had not returned the coins in their control as they had promised.

52.     Accordingly, on March 26, 2021, Celsius KeyFi's board convened and issued formal, written board resolutions commanding Executive, as CEO of Celsius KeyFi, to return all of CNL's coins to the 0xb1 wallet.  The board resolutions were unequivocal in directing Executive:

> to immediately . . . unwind all deployed Crypto Assets and transfer them, along with all un-deployed Crypto Assets, in each case together with all interest thereon, to the [0xb1 wallet and] . . . to provide the seed and password for the [0xb1 wallet to Celsius and] . . . disclose . . . all codes, keys and other information concerning access and control of any wallet in which Crypto Assets belonging to Celsius are, have been, or may be held, or that were opened or used for the purpose of or in connection with any Company affairs, including without limitation, holding or deploying any Crypto Assets.

53.     The board provided a copy of the resolutions and a direction letter to the Executive Parties on March 26, 2021.

54.     The Executive Parties effected these wrongful transfers through their control of Celsius Wallets, and with the intent (which is imputed to Celsius) to hinder, delay or defraud the legitimate creditors of Celsius, which was insolvent at the time of the transfers and received no consideration in exchange for the purloined assets.

55.     Celsius succeeded in recovering the majority of its coins from the Executive Parties voluntarily, over a period of weeks, but a substantial gap remained.

56.     On August 23, 2022, Celsius commenced an adversary proceeding against the Executive Parties with respect to their wrongful conduct.  *See Adversary Complaint*, *Celsius Network Ltd. v. Stone (In re Celsius Network LLC)*, No. 22-01139 (Bankr. S.D.N.Y. Aug. 23, 2022), Docket No. 1.  At the outset of the case, following a two-day trial, the Court found that Celsius

had "shown a substantial likelihood of prevailing on the merits and [was] entitled to a temporary restraining order restraining the defendants from transferring any other assets away."  The Court issued a Temporary Restraining Order accordingly, which was kept in place throughout the remainder of the case.  Celsius' action against the Executive Parties resulted in a settlement on June 28, 2024 by which the Executive Parties agreed to return substantial assets to Celsius (the "Executive Settlement Agreement").

F.     **Executive Parties Steal Thousands of CNL's Coins**

57.     Celsius ultimately determined that the Executive Parties returned far fewer coins than had been provided, including approximately 89,275 fewer ETH.  In some cases, the Executive Parties did not return coins because they had simply lost those coins in poor investments.  In others, the Executive Parties misappropriated assets, keeping many for themselves and sending others to third parties, including the Defendants.

58.     As to the investment losses, the Executive Parties turned out to be inept at the investment strategies they were undertaking.   For example, Executive apparently placed a significant sum of Celsius ETH deposits into DeFi investments like automatic market makers ("AMMs") that are likely to return a mix of coins different than the mix deposited.  For instance, if the price of ETH increases during the deployment, the AMM smart contract likely will return to the investor fewer ETH than the investor deployed.  The Executive Parties promised Celsius that they would hedge against such risks and that their deployments would be "delta-neutral." Apparently, however, Executive and Vehicle failed to hedge against these and other risks created by their deployments, which were dramatic during the relevant period on account of substantial swings in coin prices and the tremendous increase in the value of ETH.  The Executive Parties' improvidence resulted in a loss of tens of thousands of Celsius ETH.  These losses are known as

14

"impermanent loss." This impermanent loss was in addition to the tens of thousands of ETH lost by the Executive Parties in the liquidation events described *supra*.

59.    As to the misappropriation, it is clear that Executive and Vehicle also caused the transfer of substantial Celsius assets from Celsius Wallets for unauthorized purposes, some of which were made directly or indirectly to the Defendants, and to or for the benefit of the Executive Parties. Celsius received no value for any of the Fraudulent Transfers.

## G. Executive Parties Open Binance Accounts in Foreign Citizens' Names

60.    Executive also transferred large amounts of coins to his own wallets, Vehicle's wallets, and various third-party wallets, including those belonging to the Defendants. Executive did not move coins in a straightforward, linear fashion. Instead, he moved coins among dozens of wallets with great frequency, as well as routed coins through accounts at more than a dozen different crypto exchanges and also through the now-banned "mixer" Tornado Cash. Certain of the crypto exchange accounts were in Executive's name, but many others were fraudulently opened in the names of third parties who sold their identifying information to the Executive Parties for purposes of evading the exchanges' "know your customer" money laundering requirements, including certain Defendants in this action. Executive himself maintained control over at least some of these purported third-party accounts.

61.    For example, the Executive Parties used the name, passport, and other personal "Know-Your-Customer" information of Defendant Levan Mkheidze, a citizen of the nation of Georgia, to open a Binance account ("Binance 001") with the address 0x904912b9a2cf0185c06020fe90d51e08b2880d99. However, upon information and belief, upon funding the Binance 001 account, the Executive Parties may have retained exclusive access to and control of the coins contained therein. The Executive Parties transferred tens of millions of

dollars' worth of Celsius assets from Celsius' 0xb1 wallet to the Binance 001 account. Certain of the Fraudulent Transfers identified herein were first transferred to the Binance 001 account and to or for the benefit of the Executive Parties, and then transferred from the Binance 001 account to certain Defendants and to or for the benefit of the Executive Parties as described more specifically herein.

62.     The Executive Parties similarly used the name, passport, and other personal "Know-Your-Customer" information of Elene Ckheidze, a citizen of the nation of Georgia, to open a Binance account to which they retained exclusive access and control.

**G.     Executive Uses a Money Laundering App to Mask Destinations of Transfers**

63.     During his tenure as CEO of Celsius KeyFi and continuing afterwards until such time as OFAC banned its use, Executive also regularly employed a notorious money laundering application called Tornado Cash to obfuscate the origin, destination and counterparties to his transfers, including transfers some of the Defendants in this action. Tornado Cash is a privacy protocol "mixer" that masks the path of ETH that is transferred from a sender to a receiver on the blockchain. Among other things, a user can deposit ETH to Tornado Cash and then withdraw the ETH through a wallet with a different public key, or address, thus obscuring the final destination of the transaction on the blockchain. On August 8, 2022, the U.S. Department of Treasury announced that OFAC had placed Tornado Cash on its SDN List, and that "all transactions by U.S. persons or within (or transiting) the United States" with Tornado Cash were prohibited. According to OFAC, this severe sanction was warranted because Tornado Cash is "commonly used by illicit actors to launder funds, especially those stolen during significant heists."

64.     That is just how Executive and certain of the Defendants used Tornado Cash here. Between May 2021 and January 2022, the Executive Parties caused Celsius to make at least fifty-eight transfers, consisting of approximately 1,336 ETH valued at over $4.3 million at recent

prices, to Tornado Cash. Upon information and belief, the Tornado Cash transfers were of property belonging to Celsius, or the proceeds of such property, and were directed to wallets under the Executive Parties or Defendants' possession, custody or control.

65. In perhaps Executive's most brazen misappropriation of Celsius's assets, in September 2021, Executive accessed Celsius' 0xb1 wallet, took coins worth $1.4 million, and then funneled them through Tornado Cash. As noted, the private key for a wallet can never be changed, so once a party has that key, it has permanent access to the wallet. Hence, after Executive's departure from Celsius became effective in the spring of 2021, Celsius sought to transfer all assets it recognized as valuable out of the Celsius Wallets. But in September 2021, an airdrop related to a prior deployment of CNL's coins was made into the 0xb1 wallet of 1.4 million DAI, a stablecoin pegged to the value of the U.S. dollar. The airdrop was made without notice to Celsius, but it had apparently been anticipated by Executive.

66. On September 21, 2021, Executive accessed the 0xb1 wallet and transferred the $1.4 million worth of DAI to a wallet with the public key 0x8cc24e59e29a0f9b46f1746b392eaf2483d75096 (the "0x8cc" wallet) that was owned or controlled by the Executive Parties in transaction 0xabc88ccfbf49bc3984a59a84e1637d364563d5f660557d2d4927f5d58a12600d. On the same day, in three transactions, the 0x8cc wallet converted the stolen DAI into 485 ETH. Then, in seventeen separate transfers beginning on September 22, 2021, and concluding on October 12, 2021, the 0x8cc wallet transferred a total of 485 ETH to the money laundering application Tornado Cash (as set forth below). Executive has testified that he retrieved the funds transferred to Tornado Cash and retained a portion for himself and transferred another portion to Defendants Maciej

Załęski, Lukasz Krol, and Dennis Reichelt, with the assets purportedly divided evenly among the three.

| Transaction Hash | Date | Amount |
|---|---|---|
| 0x9223b7aeb20df3cbb0af0e71b4b9be892754f02f89731660b2efc0b74afd92ca | 10/12/2021 15:34 | 1 ETH |
| 0x13acf479f307c34e5d35b87a802e1cd9c1fa38bb30e9428f82966b95b610def3 | 10/12/2021 15:34 | 1 ETH |
| 0x2e00084fd5119984f9691d69e57ade6ab63a0e9d964384ba465b3c91fdd70da0 | 9/27/2021 15:59 | 10 ETH |
| 0xc8463add084230e8aa0f557c65cd97260ba4ed710ff70069dd32c3a0a286c53c | 9/27/2021 15:45 | 1 ETH |
| 0x52e64332d22f42c58eed2a7d6682279f1cf2fd0ecbabd0ab9c179e70c693a782 | 9/27/2021 15:45 | 1 ETH |
| 0x4fd6ed2a870c3ec1df5f5cbe1b11931a46b9e2154a2b94c88cbd78adbff5e744 | 9/27/2021 15:44 | 1 ETH |
| 0x237b522cd32f9ee94e35e4ace72c01efbffd773db7f704d4ed05d707ed0a94aa | 9/22/2021 14:58 | 10 ETH |
| 0xf23e1a175676f1d5cc7f11c72a553f1b036af204199162e145480b7e8cd2b4ab | 9/22/2021 14:58 | 10 ETH |
| 0x4a1c57a07fd45eec28ef2e525da95e6658650e2861504b61ad8f2c4703e21f80 | 9/22/2021 14:57 | 10 ETH |
| 0xf0a5f63a95a9507bc217dba81f75bc95f6aceabf054e69cd2bb8fedb80f185a9 | 9/22/2021 14:57 | 10 ETH |
| 0x168bdf450df0cdec1ed13da23b21f8eccffad74d24fc4a7f3589927845a50c8a | 9/22/2021 14:57 | 10 ETH |
| 0x0f183326eab54c568bf67a6ed035fa520b9737b1f8e93eb4b0a719bf324a806c | 9/22/2021 14:57 | 10 ETH |
| 0xc6d25c5c7a77432b33642e931fb7703076ed0f8e9e786a952064204f3f8f735a | 9/22/2021 14:56 | 10 ETH |
| 0x9eacc4e6d454f2ac7f302fd4d674c75f357c531299e1f282b6728715d899cddc | 9/22/2021 14:55 | 100 ETH |
| 0x3fdd6d07211ca355df029558c2d42ccbe5202baa7b3dc37c64aa91e0285eb558 | 9/22/2021 14:55 | 100 ETH |
| 0x710461f1a047cc044d8e68d6cba4e55d2664217b32d194e7c4349a2bb8ac5ab9 | 9/22/2021 14:55 | 100 ETH |
| 0x37739082035861ce939adc60edbd580efde3a6599d77f6135380f68944bcb6fc | 9/22/2021 14:54 | 100 ETH |

## H.   Defendants Received Millions in Stolen Celsius Assets from the Executive Parties

67.    During and after Executive's tenure as CEO of Celsius KeyFi, the Executive Parties wrongfully caused Celsius Wallets to transfer Celsius assets to wallets and cryptocurrency exchange accounts owned or controlled by the Defendants ("Defendant Wallets") and to or for the benefit of the Executive Parties.

68.    The transfers at issue in this litigation fall into the three general categories set forth below (collectively, the "Fraudulent Transfers"), the third of which includes some transfers that are a subset of the second.

69.     First are transfers of coins directly from Celsius Wallets to certain Defendants (the "Celsius Direct Transfers").  The Celsius Direct Transfers include the following Fraudulent Transfers:

a.   Direct Transfers to Dennis Reichelt:

 i.   On or around January 22, 2021, Celsius Wallets made two transfers of approximately 1.54 wBTC, each, to Reichelt.  The transaction hashes were: 0xd1ecc352d67f6dd96099e3381e148aa66d3e932bbf0d4c37c3a22a7133ea5330; and 0x14164abea9719ddaa27e62035e278aa2b26776fa85c1986bfff0e5118d187962.

 ii.   On or around March 17, 2021, Celsius Wallets made two transfers of approximately 100,000 USDC, each, to Reichelt.  The transaction hashes were: 0x59bf6b288b82a029a40a9172d9dd49c12622eea98b1adaf39b1fc8a5a750b880; and 0x59bf6b288b82a029a40a9172d9dd49c12622eea98b1adaf39b1fc8a5a750b880.

 iii.   On or May 12, 2021, Celsius Wallets made a transfer of approximately 25,000 USDC to Dennis Reichelt.  The transaction is documented by an internal ID from Binance:  No. 60200873036.

b.   Direct Transfer to Karol Nowak

 i.   On or around February 3, 2021, Celsius Wallets transferred approximately 1,600 USDC to Nowak.  The transaction hash was 0x44863a8f1e0b0ce52a2b1295179be5864b2caa7e74a70d638525c952f4d04be2.

c.   Direct Transfers to Lukasz Krol

 i.   On or around December 29, 2020, Celsius Wallets transferred approximately 30,000 USDT to Krol.  The transaction hash was 0x8f556d020ceb73ec208cb19da5887400c686a03953b39bfc3e59bc81935ce68a.

 ii.   On or around January 22, 2021, Celsius Wallets made two transfers of 1.54 wBTC, each, to Krol.  The transaction hashes were: 0xd1ecc352d67f6dd96099e3381e148aa66d3e932bbf0d4c37c3a22a7133ea5330 and

0x14164abea9719ddaa27e62035e278aa2b26776fa85c1986bfff0e5118d18
7962.

iii.    On March 22, 2021, Celsius Wallets transferred approximately 25,000
USDC to Krol.  The transaction hash was
0x0d286c0dc70b41667a915d3acfc6d9219b2861dc63fcee2e114b591d1a3e
0018.

d.  Direct Transfers to Maciej Zaleski

i.    On January 22, 2021, Celsius Wallets made two transfers of
approximately 1.54 wBTC, each, to Zaleski.  The transaction hashes were
0xd1ecc352d67f6dd96099e3381e148aa66d3e932bbf0d4c37c3a22a7133ea
5330 and
0x14164abea9719ddaa27e62035e278aa2b26776fa85c1986bfff0e5118d18
7962.

e.  Direct Transfer to Contractor Defendants

i.    On or around January 27, 2021, Celsius Wallets made a transfer of
approximately 15 ETH to one or more Contractor Defendants.  The
transaction hash is
0x09c1377080875813376cb46b0a7ec905a92f8d19dc3055f47adc5d63a55
825b1

ii.    On or around March 26, 2021, Celsius Wallets made six transfers
comprising of approximately:  20 ETH, 15 ETH, 15 ETH, 7.5 ETH, 7.5
ETH, and 15 ETH to one or more of the Contractor Defendants.  The
transaction hashes are:
0xbbf5dfc51b644e0f182dbf9080129c54b6b46badcc03b8763861cd4558e5
6143;
0x5be316e70262cd8b6d501f2a20659babd4e1bea971c590c6fb1bec80b5d8
a9a3;
0xea646bae879edbed7707f08fe863bdb8aa329fdf1533ab9f632f387f55cf0a
15;
0xca4b084baebc3e281f88a38cd8c225aac59826b9c5cd079d521aa0660f6a
98fe;
0xb98aa043e0f2dffaee4a2cfe3fe15f692cbd9c210bc8cedf462ca934d9197d
a8;
0x96d2153f76fb97377829b1d58892a9c10f51956594c724ca4a7ef9aa7567
dd77.

iii.    On or around February 23, 2021, Celsius Wallets made a transfer of
approximately 15,000 USDT to one or more of the Contractor Defendants.
The transaction hash is
0xc488959b4ed2660ed244a532b2106554a98a5b73e8b06552169c5cdc0cb
c3bcb.

f. On information and belief, Celsius Wallets made additional transfers to one or more of the Contractor Defendants as well which Plaintiff will identify in discovery.

70. Second are transfers of coins from Celsius to the Defendants that passed through other wallets en route to the Defendants (the "Celsius Indirect Transfers"). The Executive Parties caused each of the Celsius Indirect Transfers, all of which were made to or for the benefit of the Contractor Defendants and/or the Executive Parties.

71. The first step in the transfers of assets subject to the Celsius Indirect Transfers include the following:

a. As set forth below, Celsius Wallets transferred through Binance 001 the following: 8,000,000 MATIC, 50,000 LINK, 3,025,315.61 USDT, 2,239,909.04 USDT, 6,000 LINK, 219,823.44 MATIC, 575,000 ALPHA, 7,500,000 USDT, 6,500,000 USDT, 10 YFI, 10 YFI, 137,734 LINK, 10,000 BADGER, 50,000 USDC, 1,773,240.84 USDT, 29.97 BTC and 7,000,000 USDC from between January 31, 2021 and April 21, 2021;

| Transaction Hash | Date | Currency | Amount |
|---|---|---|---|
| e7d023a82dc45f8cbe2032e8a261aeaa37dd88cab840326c8d2be437333b7a64 | 1/31/2021 15:38 | BTC | 29.97 |
| 0xee00e12f8b0a3e31b2297a3081bd48f68dc44e585753ced040aaf7335d2ff136 | 3/17/2021 19:30 | MATIC | 8,000,000.00 |
| 0x7f8a4d0e8295c3ae4020d750db5ef26558dd5d04f20e3051a72708802acc9b43 | 3/23/2021 1:36 | LINK | 50,000 |
| 0x13f74a9e9c04bafabc039f148c25dc728b28bc1ac38104f53157396980db4942 | 4/6/2021 1:28 | USDT | 3,025,315.61 |
| 0x264c930559738df7bc94bc953f2627ee5c3fb6a1567e29d0c87ffd53dd3e4265 | 4/6/2021 15:54 | USDT | 2,239,909.04 |
| 0xfb27f950cd3726bc4e7604ce6febabb82b66921b8af70353bf83c92eca189105 | 4/7/2021 15:04 | LINK | 6,000.00 |
| 0xf3434d40fa2f9ca8e59dfdade9b405086ef5fa98544baa984c7fcc401424fd74 | 4/7/2021 15:08 | MATIC | 219,823.44 |
| 0x698ee7dcdb5c6e386931d5522a08d7537e0d7f7ce28794a8c04834778313ca27 | 4/13/2021 15:04 | ALPHA | 575,000.00 |
| 0x5fd98736b650028e4c9883ca2442e5ac963077db5e620a46ccac4b5f1393a8c6 | 4/14/2021 21:12 | USDT | 7,500,000.00 |
| 0x89fde8cfa1f433c2cb1bbe34ea1d0c6d81622092b0a3f65c9600f6a643bbb181 | 4/14/2021 21:14 | USDT | 6,500,000.00 |
| 0x3ff0af7f533ce68b2a768b3205a10d96566f41ded6a9c340fb8468853d8af8f9 | 4/14/2021 21:30 | YFI | 10 |
| 0xb175b96d5b4a20939c297c4cfa2fa2f233bf349256df770c2ba6fd5d8bb04ce0 | 4/15/2021 8:26 | YFI | 10 |
| 0x624cd3c95522fbd9d8acb92026128a36f87afc816aa5671ebc7ee436f949a06e | 4/15/2021 8:28 | LINK | 137,734.00 |
| 0x43c1ce48fbf64887c0a44706cf65388899d6485a5b100951527f9b4a527be268 | 4/15/2021 19:58 | BADGER | 10,000.00 |
| 0x8264b7307f5f597341ae6ef195aa080c65e30a87fbf373c8428760dbb30f33bc | 4/19/2021 22:46 | USDC | 50,000 |
| 0x8b1929cfcd41a26bdcc0b9d2c908173b30fe7c2039e3c777f83d1a5779b3b31f | 4/20/2021 11:38 | USDT | 1,773,240.84 |
| 0x7a646921346d43705f5c1c4e01b4be6dda43ac95fb53e001e0dc738b466efc89 | 4/21/2021 12:44 | USDC | 7,000,000.00 |

b. The Executive Parties' 0x8cc24e59e29a0f9b46f1746b392eaf2483d75096wallet received

21

approximately $1.4 million worth of DAI from Celsius' 0xb1 wallet on or about September 21, 2021 in transaction 0xabc88ccfbf49bc3984a59a84e1637d364563d5f660557d2d4927f5d58a12600 d, which DAI the Executive Parties subsequently converted to ETH and transferred to Tornado cash.

72.     The recipients of the Celsius Indirect Transfers include the following:

a.  Indirect Transfers to Dennis Reichelt:

    i.   On information and belief, Reichelt received approximately 80.83 ETH from Tornado Cash, proceeds of the DAI that had previously been transferred by Executive out of the Celsius 0xb1 wallet and into a wallet owned or controlled by the Executive Parties in transaction 0xabc88ccfbf49bc3984a59a84e1637d364563d5f660557d2d4927f5d58a12 600d before being swapped into ETH and sent to Tornado Cash;

b.  Indirect Transfers to Lukasz Krol

    i.   On February 19, 2022, Krol received approximately 10 ETH in transaction 0xf22917293b0d618e815c2dc04d6c93b2b163f626f0f066bca7b0884943b9 882e, with the transfer coming from the Executive Parties' 0x40c839B831C90173dC7fBCe49A25274a4688ddD9 wallet, which received assets from Defendant Levan Mkheidze's Binance account (opened and at all times relevant herein controlled by the Executive Parties).

c.  Indirect Transfers to Maciej Zaleski

    i.   On information and belief, Zaleski received approximately 80.83 ETH from Tornado Cash, proceeds of the DAI that had previously been transferred by Executive out of the Celsius 0xb1 wallet and into a wallet owned or controlled by the Executive Parties in transaction 0xabc88ccfbf49bc3984a59a84e1637d364563d5f660557d2d4927f5d58a12 600d before being swapped into ETH and sent to Tornado Cash.  On information and belief this transfer occurred within two years of the Petiiton Date.

    ii.  On February 8, 2022, Zaleski received two transfers, approximately 268 ETH and approximately 915,000 USDC, both of which were the property of Celsius or the proceeds of property of Celsius, or an interest in property of Celsius.    The    transaction    hashes    were: 0x7ce119f5ce34cfe0aa094ebfb1c646d843462b8f79781a61b79c1fd30f1d9 cfb    and 0x3d3b9c37d1cd9bfbd6010d8bbbfd026c779b4fb47129afc59fc55e368937 8d7b.

    iii.    On February 21, 2022, Zaleski received two transfers, approximately 160 ETH and approximately 624,100 USDC, both of which were the property of Celsius or the proceeds of property of Celsius, or an interest in property of Celsius. The transaction hashes were: 0x3a6d8770a7160552828f006a07244d19d279ab234858deb00fe9088e9710e0d2 and 0xb43ac38605b802133d0734f0e6de473dd88eebf642ddf0f3878e91734ae82a95.

    iv.    On February 22, 2022, Zaleski received a transfer of approximately 60 ETH that was the property of Celsius or the proceeds of property of Celsius, or an interest in property of Celsius. The transaction hash was 0x31ac1752a9b4062fc0dbbfa87924e994909eaa07658c9ac44e650f3c817f8c5b.

    v.    On February 23, 2022, Zaleski received a transfer of approximately 95 ETH that was the property of Celsius or the proceeds of property of Celsius, or an interest in property of Celsius. The transaction has was 0x8967db913a573d9153c9700baf7db0d3ebffa7c6448330dcec45b068a5bb7c33.

    vi.    On February 24, 2022, Zaleski received approximately 100,050 USDC that was the property of Celsius or the proceeds of property of Celsius, or an interest in property of Celsius.

    vii.    Transfers (ii)–(vi) described above came from or passed through the Executive Parties' 0x872c67dd383db7b7e9bc1800546f1ae715a0bc0c wallet, which came from or passed through Defendant Elene Chkeidze's Binance account (opened and at all times controlled by the Executive Parties) in transactions 0x3744091bc2123402be0d0d7572debd2d080c33aa9d400458929cb0a45a7a2dbe, and 0x9d491402c348d3aeadadf33fef47b17e9b19314d17117fbab85b673d54886145, which came from or passed through Defendant Levan Mkheidze's Binance account (opened and at all times controlled by the Executive Parties) in three internal Binance to Binance transactions with IDs 62739431650, 62739279771, and 62739015520 which was funded by Celsius Wallets;

d.   Indirect Transfers to Contractor Defendants

    i.    On or around March 23, 2021, one or more Contractor Defendants received approximately 50,000 LINK that came from or passed through the Binance account of Levan Mkheidze in transaction 0x6c17c1320b2e652f9ffa19df466464f01a0220e5fa738f237264771513915

18e (opened and at all times relevant herein controlled by the Executive Parties) which was funded by Celsius Wallets;

e.  On information and belief, additional Contractor Defendants received additional Celsius Indirect Transfers as well that Plaintiff will identify in discovery.

73.    Third, assets were sent from or through Executive Wallets to the Contractor Defendants (the "Executive Transfers").  There are two types of such Executive Transfers.  First, as discussed above, the Celsius Indirect Transfers were routed through wallets owned or controlled by the Executive Parties, including the wallets opened in the names of Defendants Levan Mkheidze and Elene Chkeidze (the "Executive Wallets") such that the Defendant transfers in question came from or passed through an Executive Party wallet.  Upon information and believe all such transfers originated from Celsius Wallets.

74.    Second, in certain cases assets were sent from Executive Wallets to Contractor Defendants that Celsius has not yet specifically traced to Celsius Wallets, including the following:

a.  Lukasz Krol received 435 ETH across five (5) transfers between April 23, 2021 and February 19, 2022 (0xf22917293b0d618e815c2dc04d6c93b2b163f626f0f066bca7b0884943b9882e, 0xb3875ad6e959a7226b6e35dfea8753efed8aec03349767d7d8489a5a72aae68f, 0xc08154b1489d90de8bbc00842c9122fdb0714a99476250e6173225aabf0c5e65, 0x0aa71c5e26d94618d42860904d05623f334d6a71ee06b71ccb993ec0110644a7, 0x77e0c33b27c7afb7dc1cbd18a209e8b7707ef63dfb97834c8e518a2fb83bb23c) and 5.26 WBTC on April 30, 2021 (0x1a43f0169cf73f3411de614f54bec9c8540ac37aa9b0c6f1898bd00685453290) from wallets owned or controlled by the Executive Parties.

b.  Maciej Załęski received 583 ETH and 1,639,150 USDC across seven (7) transfers between February 8, 2022 and February 24, 2022 from wallets owned or controlled by the Executive Parties(0x8967db913a573d9153c9700baf7db0d3ebffa7c6448330dcec45b068a5bb7c33, 0x31ac1752a9b4062fc0dbbfa87924e994909eaa07658c9ac44e650f3c817f8c5b, 0x3a6d8770a7160552828f006a07244d19d279ab234858deb00fe9088e9710e0d2, 0x7ce119f5ce34cfe0aa094ebfb1c646d843462b8f79781a61b79c1fd30f1d9cfb, 0x881756f8815032ec4e4fdc09105298f890f816b123c2a9e137a2df5b879682e8, 0xb43ac38605b802133d0734f0e6de473dd88eebf642ddf0f3878e91734ae82a95, 0x3d3b9c37d1cd9bfbd6010d8bbbfd026c779b4fb47129afc59fc55e3689378d7b).

75.     Discovery or other information may demonstrate that these transfers also originate from Celsius wallets.  Whether deemed transfers from CNL, Celsius KeyFi, Vehicle, or Executive these transfers all were fraudulent, avoidable, and subject to recovery by Celsius from the Contractor Defendants.

**I.     CNL, Celsius KeyFi, and the Executive Parties Were Each Insolvent at the Time of the Transfers to the Defendants**

76.     Each of CNL, Celsius KeyFi, Vehicle, and Executive were insolvent at the time of the transfers to the Defendants set forth above.

77.     CNL (along with its successor, Celsius LLC) was insolvent at the time of each transfer made to Defendants because the value of CNL/Celsius LLC's liabilities exceeded the value of its assets at all relevant times.

78.     As the *Final Report of Shoba Pillay, Examiner*, *In re Celsius Network LLC*, No. 22 10964 (Bankr. S.D.N.Y. Jan. 31, 2023), Docket No. 1956 (the "Examiner Report") stated: "Celsius's problems did not start in 2022.  Rather, serious problems dated back to at least 2020, after Celsius started using customer assets to fund operational expenses and rewards.  To fund operations, Celsius posted customer deposits as collateral to take out loans in stablecoin.  And to fund CEL buybacks for rewards, Celsius exchanged BTC and ETH for CEL on the secondary market.  But prior to the creation of the Freeze Report, Celsius did not adequately track or reconcile customer assets and liabilities on a coin-by-coin basis.  Celsius was therefore caught off guard when it recognized a shortfall in BTC and ETH (which it had been using to fund those CEL buybacks)."

79.     Celsius' consolidated balance sheet as of September 30, 2020 showed negative equity.  On December 31, 2020, Celsius' consolidated balance sheet purported to show positive equity, but the value of CEL tokens on the asset side of Celsius' balance sheet exceeded the amount

of positive equity.  But CEL tokens were essentially worthless, including because they depended

solely on CNL's market-making techniques and were completely correlated to the value of, and

totally dependent on the continued operations of, Celsius—just as an airline rewards program is

completely dependent on the underlying airline continuing to operate.

80.     Additionally, there was never a real market in which to deploy CEL.  Instead, CNL,

as the only purchaser of CEL tokens, propped up CEL's value by engaging in calculated buying

sprees of CEL tokens.  While this caused the value of CEL prices to appreciate at first, CNL

eventually ran out of the funds from its crypto asset deployments necessary to fund its own CEL

buybacks, and in 2020, CNL began using customer-deposited Bitcoin ("BTC") and Ether ("ETH")

to fund its CEL purchases.

81.     When BTC and ETH rapidly appreciated in value in early 2021, the shortfall in

BTC and ETH, which CNL had been using to fund those CEL buybacks, significantly increased

CNL's liabilities.

82.     Additionally, Celsius suffered other losses of over $800 million that further

decreased the asset side of its balance sheet, including based on activities of the Executive Parties,

keys lost by Fireblocks for tens of thousands of ETH tokens that Celsius provided to StakeHound,

collateral posted with Equities First Holdings that was not returned, and losses in Grayscale Bitcoin

Trust.

83.     Celsius was also insolvent based on other mismatches between its liabilities and as-

sets.  At any given time between 2020 and 2022, Celsius was susceptible to collapsing at any

moment if its customers started to withdraw their assets, which Celsius was relying on to fund its

own CEL buybacks to artificially pump up its CEL assets.  Indeed, this scenario finally occurred

in 2022, when CNL could no longer bridge its deficits and its customers began to withdraw their assets from CNL *en masse*.

84.    Throughout the time period during which Executive effected the Fraudulent Transfers, Celsius KeyFi, Vehicle, and Executive were likewise insolvent due to—among other things—staggering liabilities owed to CNL related to the loss, mismanagement, and theft of its coins.

85.    Celsius KeyFi was formed for the singular purpose of deploying CNL coins in DeFi and staking investments and had no other business or sources of revenue.  While in theory, under the Service Agreement, Celsius KeyFi could have earned a "profit share" based on profits it was able to generate through its investment of CNL's assets, its trading activities never generated any profits, only massive losses.  What Celsius KeyFi did have in abundance was liabilities, including not only liabilities related to operating expenses like payments to contractors, but also liabilities to CNL related to the gross mismanagement and/or theft of hundreds of millions of dollars' worth of CNL's coins.  As such, Celsius KeyFi was insolvent pursuant to any relevant standard.

86.    Executive and Vehicle were likewise insolvent due (at least) to the massive liabilities they owed to Celsius.  During the time during which Vehicle was temporarily authorized to deploy CNL's coins between on or around October 1, 2020 and December 31, 2020, it had no material assets.  By contrast, Vehicle accrued millions in liabilities to Celsius during that same time period related to the Executive Parties' misappropriation of Celsius' property, including certain of the Fraudulent Transfers at issue here, as well as their gross mismanagement of Celsius' property.  Upon information and belief, Vehicle's financial condition only deteriorated from there as it continued to incur massive liabilities related to the Executive Parties' theft and mismanagement of Celsius' assets with no corresponding increase in its assets.  So too for

Executive, whose liability related to his misappropriation of tens of millions of dollars' worth of Celsius' coins and gross mismanagement undoubtedly dwarfed his assets at all relevant times.

## **FIRST CAUSE OF ACTION**
### **(Turnover Under Section 542 of the Bankruptcy Code)**

87.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

88.    At all times, Celsius had legal ownership and right to possession over the property and interests in property comprising both the Celsius Direct Transfer and Celsius Indirect Transfers (such property and interests in property together, the "Celsius Transfers") and all of the proceeds, rents or profits thereof.

89.    Upon information and belief, the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze had possession, custody or control of the Celsius Transfers or its proceeds at the time Celsius filed its chapter 11 petition on July 13, 2022, and/or had possession, custody and control of the Celsius Transfers or its proceeds during the pendency of Celsius' chapter 11 cases.

90.    The Celsius Transfers are or were property that the trustee may use, sell, or lease under section 363 of the Bankruptcy Code.

91.    The Celsius Transfers are not of inconsequential value or benefit to the Debtors' estates.

92.    The Defendants are not custodians of the Celsius Transfers.

93.    Pursuant to section 542 of the Bankruptcy Code, Plaintiff is entitled to a judgment ordering the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze to turn over the Celsius Transfers, and all proceeds, rents or profits thereof, or recovery of an equivalent judgment for the value of the property of the estate.

94.     It is possible that certain Celsius Transfers may come into the Contractor Defendants, Defendant Chkeidze, and/or Defendant Mkheidze's possession, custody or control in the future, including, without limitation, as the result of automated smart contract transfers associated with deployments of Celsius Transfers.  Celsius therefore requests that the turnover judgment be continuing in nature, requiring the turnover (or satisfaction of judgment) of any such Celsius Transfers that may come into the Contractor Defendants, Defendant Chkeidze, and/or Defendant Mkheidze's possession, custody or control in the future.

## SECOND CAUSE OF ACTION
### (11 U.S.C. § 542(e):  Turnover and Accounting of Documents)

95.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

96.     Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze are in possession of and hold recorded information including books, documents, records or papers relating to Celsius' property or financial affairs.  Among other things, Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze are in the possession of information concerning the amount and location of the Celsius Transfers, including any wallet addresses containing Celsius property and proceeds thereof.

97.     Celsius is entitled to turnover from Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze of such recorded information including books, documents, records and papers.

98.     Celsius is entitled to an award of damages, costs and attorneys' fees arising from Contractor Defendants, Defendant Chkeidze, and/or Defendant Mkheidze's refusal to immediately turnover such information.

## THIRD CAUSE OF ACTION
### (Fraudulent Transfer – Celsius Direct Transfers)

99.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

100.     As stated above, the Executive Parties caused certain fraudulent transfers of Celsius assets to be made from Celsius wallets directly into wallets over which the Defendants had possession, custody or control (i.e., the Celsius Direct Transfers) and for the benefit of the Executive Parties.

101.     The Executive Parties effected the Celsius Direct Transfers through their dominion and control over the Celsius Wallets and the Subject Property in those wallets by virtue of their access to the Celsius Wallets' private keys and their direction of the activities of Celsius KeyFi and Vehicle, including through Executive's position as CEO of Vehicle and then Celsius KeyFi.

102.     Upon information and belief, the Executive Parties effected each of the Celsius Direct Transfers with the intent to hinder, delay, or defraud the creditors of CNL, Celsius KeyFi, and Vehicle.

103.     The Celsius Direct Transfers are marked by numerous badges of fraud:  (1) CNL, Celsius KeyFi, and Vehicle each received less than reasonably equivalent value for the transferred Subject Property; (2) the Executive Parties were closely associated with the Contractor Defendants; (3) the transfers were made while CNL, Celsius KeyFi, and Vehicle were insolvent or else the transfers caused CNL, Celsius KeyFi, and Vehicle to become insolvent; and (4) the transfers were part of a broader scheme in which the Executive Parties improperly misappropriated tens of millions of dollars' worth of Celsius assets.

104.     The Celsius Direct Transfers, in addition to being intentional fraudulent transfers, are constructive fraudulent transfers because each of the Celsius Direct Transfers was made for

less than reasonably equivalent value at a time when CNL, Celsius KeyFi, and Vehicle were insolvent, or else because CNL, Celsius KeyFi, and Vehicle became insolvent as a result of such transfer.

105.    At the time of each of the Celsius Direct Transfers, CNL, Celsius KeyFi, and Vehicle were each engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with them was unreasonably small capital.

106.    At the time of each of the Celsius Direct Transfers, CNL, Celsius KeyFi, and Vehicle intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

107.    Celsius is therefore entitled to a judgment avoiding the Celsius Direct Transfers and recovering the fraudulently transferred assets or their value from the Defendants (other than the Executive Defendants).

### FOURTH CAUSE OF ACTION
### (Fraudulent Transfer – Celsius Indirect Transfers)

108.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

109.    As stated above, the Executive Parties caused certain fraudulent transfers of Celsius assets to be made from wallets owned by Celsius to or through other mediate wallets, persons or entities (including wallets owned or controlled by the Executive Parties, including the wallets under the names of Defendants Levan Mkheidze and Elene Chkeidze) en route to the Contractor Defendants, and to or for the benefit of the Contractor Defendants and/or the Executive Parties (*i.e.*, the Celsius Indirect Transfers).

110.    The Executive Parties effected the Celsius Indirect Transfers through their dominion and control over the Celsius Wallets and the Subject Property in those wallets by virtue

of their access to the Celsius Wallets' private keys and their direction of the activities of Celsius KeyFi and Vehicle, including through Executive's position as CEO of Vehicle and then Celsius KeyFi.

111.   Upon information and belief, the Executive Parties effected each of the Celsius Indirect Transfers with the intent to hinder, delay, or defraud the creditors of CNL, Celsius KeyFi, and Vehicle.

112.   The fraudulent transfer scheme was designed in a manner to conceal many of the transfers and to mask the ultimate destination of much of the Celsius Indirect Transfers.  The Executive Parties masked their actions through a complex web of transactions, including routing transactions through anonymous exchange accounts and through the anonymity of the recipient wallets.  The Executive Parties also relied on now-banned cryptocurrency mixers like Tornado Cash to cover their tracks and hide the ultimate destination of Celsius assets.

113.   Numerous other badges of fraud likewise marked the Executive Parties' actions: (1) CNL, Celsius KeyFi, and Vehicle each received less than reasonably equivalent value for the transferred Subject Property; (2) the Executive Parties were closely associated with the Defendants; (3) the transfers were made while CNL, Celsius KeyFi, and Vehicle were insolvent or else the transfers caused CNL, Celsius KeyFi, and Vehicle to become insolvent; and (4) the transfers were part of a broader scheme in which the Executive Parties improperly misappropriated tens of millions of dollars' worth of CNL, Celsius KeyFi, and Vehicle's assets.

114.   The Celsius Indirect Transfers, in addition to being intentional fraudulent transfers, are constructive fraudulent transfers because each of the Celsius Indirect Transfers was made for less than reasonably equivalent value (and, in many cases, for no value) at a time when CNL,

Celsius KeyFi, and Vehicle were insolvent, or else because each of CNL, Celsius KeyFi, and Vehicle became insolvent as a result of such transfer.

115.    At the time of each of the Celsius Indirect Transfers, each of CNL, Celsius KeyFi, and Vehicle was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with them was unreasonably small capital.

116.    At the time of each of the Celsius Indirect Transfers, each of CNL, Celsius KeyFi, and Vehicle intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

117.    Celsius is therefore entitled to a judgment avoiding each of the initial transfers comprising the Celsius Indirect Transfers and recovering the fraudulently transferred assets or their value from the Defendants (other than the Executive Defendants).

### FIFTH CAUSE OF ACTION
### (Fraudulent Transfer – Executive Transfers)

118.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

119.    As stated above, the Executive Parties repeatedly effected fraudulent transfers of property out of wallets over which they exercised control (including the wallets in the names of Defendants Levan Mkheidze and Elene Ckheidze), and transferred such property to the Defendants (i.e., the Executive Transfers).  To the extent any Executive Transfers are deemed to originate from the Executive Parties, they are subject to this Count.

120.    The Executive Transfers were made at a time when the Executive Parties had substantial and overwhelming liability to Celsius as a result of their poor investment strategies leading to massive investment losses and their active misappropriation of assets from Celsius, and they were made long after Celsius had demanded the Executive parties return all such assets.  The

Executive Parties had accrued tens of millions of dollars of liability to Celsius as a result of such mismanagement and misappropriation. Thus, the Executive Transfers were made with the actual intent to hinder, delay or defraud Celsius – upon information and belief, the Executive Parties' single largest creditor, as it held substantial litigation claims against the Executive Parties.

121. Numerous other badges of fraud mark the Executive Transfers: (1) the transfers were made to Executive Parties' insiders and associates; (2) the Executive Parties received less than reasonably equivalent value (if any value at all) for the transferred Subject Property; (3) the Executive Parties and the Defendants were closely associated; (4) the transfers were made while the Executive Parties were insolvent or else the transfers caused the Executive Parties to become insolvent; (5) the transfers were concealed from Celsius; (6) the transfers were made to remove or conceal the Executive Parties' assets and the Celsius assets that Executive purloined; (7) the transfers were made while the Executive Parties were aware of a significant risk of litigation with Celsius at the time of the transfers; and (8) the transfers were made at a time when the Executive Parties faced substantial financial liabilities to Celsius.

122. The Executive Transfers, in addition to being intentional fraudulent transfers, are constructive fraudulent transfers because each of the Executive Transfers was made for less than reasonably equivalent value (or, more often, for no value) at a time when the Executive Parties were insolvent.

123. At the time of each of the Executive Transfers, the Executive Parties were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Executive Parties was unreasonably small capital.

124.    At the time of each of the Executive Transfers, the Executive Parties intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

125.    Celsius is therefore entitled to a judgment avoiding the Executive Transfers and recovering the fraudulently transferred assets or their value from the Contractor Defendants.

### SIXTH CAUSE OF ACTION
**(Unjust Enrichment)**

126.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

127.    No Defendant had a contract with Celsius, aside from the Contractor Defendants (discussed *infra*) or the Executive Parties (who are not defendants on this claim).

128.    The Celsius Transfers conveyed to the Contractor Defendants were not conveyed pursuant to or in connection with any contract, but instead constituted the extra-contractual misappropriation of assets, including the receipt of assets stolen from Celsius and laundered through Tornado Cash.

129.    The Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze were enriched by receiving the Celsius Transfers.

130.    The Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze's enrichments were gained at Celsius' expense.

131.    This enrichment was unjust because the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze provided nothing of value to Celsius, and their enrichment has come at the expense of Celsius' legitimate creditors and customers.

132.     It would be inequitable for the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze to retain the benefit of Celsius' property, including any proceeds of such property, without payment for its value.

133.     Because no contractual remedy exists, the Plaintiff has no adequate remedy at law for Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze's unjust enrichment.

134.     Plaintiff is entitled to a money judgment in the amount of value by which the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidz were unjustly enriched in an amount to be proved at trial.

135.     Plaintiff is entitled to recovery of the Subject Property and any and all proceeds thereof.

136.     Plaintiff is entitled to the remedy of a constructive trust upon the Subject Property and any and all proceeds thereof.

137.     Plaintiff is entitled to an equitable lien upon the Subject Property and any and all proceeds thereof.

### SEVENTH CAUSE OF ACTION
#### (Accounting)

138.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

139.     The transfer of assets from Celsius and into the hands of the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze is of a complicated character.  The assets at issues were transferred through many wallets, cryptocurrency exchanges and, in some instances, Tornado Cash, an app banned by OFAC.

140.    Celsius has only limited visibility into these transfers given the often opaque and anonymous nature of the crypto industry.  And Celsius has no visibility into any further use or proceeds of the assets transferred to the Contractor Defendants following their transfer.

141.    Celsius requires an accounting to enable it to properly trace its property into the hands of the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze, and perhaps others, as well as to support the claims and causes of action asserted herein and enable a complete recovery to Celsius.

142.    Absent enforcement of this accounting right, the Plaintiff has no adequate remedy at law.

143.    Accordingly, the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze's are obligated to provide a complete accounting of all assets they have received directly or indirectly from Celsius, including any interest earned or accrued thereupon, the proceeds of any and all such transfers, any assets purchased by profits they received, the locations of the various assets, and all activities in which the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze's engaged in connection with their possession, custody, and control of the Subject Property.

### EIGHTH CAUSE OF ACTION
**(Conversion)**

144.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

145.    At all times relevant herein, Celsius had the right to possession, custody or control of the Subject Property.

146.    The Contractor Defendants that received Celsius Direct Transfers, acting in concert with Executive, assumed control over the Subject Property, thereby interfering with Celsius' rights in that property in a manner inconsistent with those rights.

147.    This interference with Celsius' rights in the Subject Property is tortious conversion.

148.    Contractor Defendants' conversion of Celsius property has resulted in damages to Celsius in an amount to be proven at trial.

149.    Plaintiff is also entitled to the remedy of replevin and the proceeds thereof in an amount to be proved at trial.

150.    Alternatively, Plaintiff is entitled to trover in an amount to be proved at trial.

151.    Alternatively, Plaintiff is entitled to damages in an amount to be proved at trial.

### NINTH CAUSE OF ACTION
**(Aiding and Abetting Executive's Breach of Fiduciary Duty)**

152.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

153.    Executive owed fiduciary duties to Celsius as CEO of Celsius KeyFi, which he breached.

154.    At all relevant times herein, Executive owed fiduciary duties of loyalty, care, and good faith to Celsius, including based on his role as CEO and chief fiduciary of Celsius KeyFi.

155.    Executive breached his fiduciary duties by, among other things (i) in bad faith coopting and converting Celsius' coins for purposes outside those authorized by Celsius—including the purchase of NFTs and other property, (ii) wrongfully and without authorization transferring Celsius property to himself and his associates, (iii) ignoring lawful directions from Celsius, (iv) intentionally and repeatedly misrepresenting material facts to Celsius and (v) engaging in staking and DeFi activities using Celsius-owned coins in a grossly negligent manner,

including by failing to hedge against the risk of loss in connection with AMM liquidity pools and other deployments, and failing to take action to protect Celsius assets posted as collateral for Executive-initiated loans.

156.     Executive's breaches of fiduciary duty were intentional, willful, and committed in bad faith, and have caused direct injury to Celsius.

157.     The Contractor Defendants were hired by Celsius KeyFi to deploy the Subject Property for authorized staking and DeFi purposes.  They worked closely with Executive and were deeply knowledgeable at all times about the investment activities and deployment of Celsius coins directed by Executive.  These defendants aided and abetted Executive's breaches of fiduciary duty by facilitating and/or failing to stop the misappropriation of such assets, facilitating and/or failing to stop Executive's gross mismanagement of Celsius' coins and the massive losses associated therewith, permitting the deployment of Celsius coins inconsistent with the scope of authority granted to Celsius KeyFi, and intentionally and willfully misappropriating Celsius assets for themselves.

158.     By reason of the foregoing, Celsius has been damaged in an amount to be proven at trial.

### TENTH CAUSE OF ACTION
**(Racketeer Influenced and Corrupt Organizations ("RICO") Act Violations)**

159.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

160.     Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

161.    Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze each violated 18 U.S.C. § 1962(c) by their respective acts described in this Complaint.

162.    Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged herein.

163.    Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze each committed at least two predicate acts of racketeering as alleged herein.

164.    The acts of racketeering were not isolated but were related in that they had the same or similar purpose and result, participants, victims, or method of commission.  Further, the acts of racketeering have been continuous spanning from at least 2020–2023.

### The RICO Enterprise

165.    There existed one or more enterprises within the meaning of 18 U.S.C. § 1964(4) (the "RICO Enterprise") that was or is engaged in, and its activities affected, interstate or foreign commerce.

166.    Vehicle is an "enterprise" within the meaning of 18 U.S.C. § 1961(4)

167.    Alternatively, Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze and their known and unknown agents and co-conspirators, including the Executive Parties, are an association in fact such that they are an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

168.    The enterprise had a common and continuing purpose of formulating and implementing a common scheme to defraud Celsius and its creditors through a pattern of theft, unlawful turnover, and fraudulent transfers aimed at defrauding Celsius and its creditors through

this pattern of activities.  This common purpose came into existence no later than 2020 when Executive represented to Alex Mashinsky that he wanted to deploy and invest assets of the Debtors.

169.    The repeated and continuous violations of federal law alleged in this Complaint constitute a pattern of racketeering activity in violation of RICO, 18 U.S.C § 1961, *et seq.*

### The Pattern of Racketeering Activity

170.    The Defendants conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering that are interrelated, not isolated, and perpetuated for the same or similar purposes by the same persons (the "RICO Pattern").

171.    The RICO Pattern included numerous acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

172.    Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze voluntarily and intentionally devised and participated in one or more criminal schemes to perpetuate unlawful transfers of Celsius' assets during the relevant period, including without limitation, the Fraudulent Transfers.

173.    In furtherance of the scheme, the Executive Parties and the other Defendants willfully and knowingly transmitted or caused to be transmitted by means of causing matters and things to be sent or delivered by (1) a private or commercial interstate carrier or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds.

174.    The use of interstate or international mail or wires to perpetuate these transfers and to connect this racketeering conspiracy was foreseeable.

175.    Accordingly, the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze committed numerous violations of mail or wire fraud in violation of 18 U.S.C. §§ 1341 & 1343.

176.    The Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze's violations of 18 U.S.C. §§ 1341 & 1343 directly and proximately caused injury to the Defendants by unjustifiably and irrevocably depleting their assets or their value in the amount of such transfers.

### Continuity of Conduct

177.    The Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze's violations of law as set forth herein, each of which directly and proximately injured Celsius, constituted a continuous course of conduct in the United States beginning in no later than 2020 and continuing at least through 2023, which was intended to obtain economic gain through fraud, deceit and other improper and unlawful means.  Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) & (5).

### The RICO Pattern Caused Injury to Celsius

178.    Celsius has been injured in their business or property as a direct and proximate result of the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze's above-described violations of 18 U.S.C. § 1962(c) including any injury by reason of the predicate acts constituting the RICO Pattern.

179.    The Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze's violations of law in furtherance of their scheme to use the Debtors' assets through a series of unlawful transfers resulted in Celsius' assets being unjustifiably and irrevocably depleted in the amount of the value of the assets.

### Plaintiff Is Entitled to Treble Damages

180. As a result of the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze's violations of 18 U.S.C. § 1962(c), Celsius have suffered substantial damages in an amount to be proved at trial.

181. Plaintiff has standing to bring all claims alleged in this Complaint.

182. Under 18 U.S.C. § 1964(c), Plaintiff is entitled to judgment and to recover treble its general and special damages plus interests, costs and attorneys' fees caused by reason of Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze's violations of 18 U.S.C. § 1962(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests as follows:

(a)    Judgment in favor of Plaintiff and against Defendants on all causes of action;

(b)    Directing Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze to turn over the Subject Property and any and all proceeds thereof to Celsius, together with any other Subject Property and any and all proceeds thereof that may come into the Defendants' possession, custody or control in the future;

(c)    Avoiding the Celsius Direct, Celsius Indirect, and Executive Transfers;

(d)    Recovery against the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze of the avoided transfer of property or interest in property, or its money equivalent;

(e)    Imposing a constructive trust, replevin, trover, or money damages upon all Celsius Transfers or its proceeds in favor of Plaintiff to remedy Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze's otherwise wrongful conduct, resulting in their unjust enrichment;

(f)     Requiring the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze to disgorge the Subject Property and any and all proceeds and profits generated from the Subject Property to Celsius;

(g)     Requiring the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze to provide an accounting of the Subject Property and any and all proceeds and profits thereof in their control;

(h)     Requiring the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze to turnover any recorded information, including books, documents, records, and papers, relating to the Subject Property;

(i)     Awarding Plaintiff actual damages against the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze in an amount to be determined at trial;

(j)     Awarding Plaintiff pre-and post-judgment interest against the Contractor Defendants, Defendant Chkeidze, and Defendant Mkheidze at the maximum amount permitted by law; and

(k)     Awarding such other and further relief as this Court deems just and proper.

Dated:    July 13, 2024
        New York, New York

AKIN GUMP STRAUSS HAUER & FELD LLP

By:   */s/ Mitchell P. Hurley*
      Mitchell P. Hurley
      Dean L. Chapman Jr.
      One Bryant Park
      New York, New York 10036
      Telephone: (212) 872-1000
      Facsimile: (212) 872-1002
      mhurley@akingump.com
      dchapman@akingump.com

      Elizabeth D. Scott (admitted *pro hac vice*)
      Nicholas R. Lombardi (admitted *pro hac vice*)
      2300 N. Field Street, Suite 1800
      Dallas, TX 75201
      Telephone: (214) 969-2800
      Facsimile: (214) 969-4343
      edscott@akingump.com
      nlombardi@akingump.com

      *Counsel for Plaintiff*