**Frances Jones, Jones Asset Protection Trust – Submission on Motion of Australian Corporate Creditors Docket 6892**

**United States Bankruptcy Court**

**New York Division**

**In re Celsius Network LLC et al Case No. 22-10964 (MG)**

**25 July 2024**

**Introduction**

1) My Australian family trust, the Jones Asset Protection Trust, is a creditor of Celsius in these bankruptcy proceedings. I am the sole director and my two sons are the beneficiaries.

2) My claim as at the bankruptcy date of 13 July 2022 is for an amount of approximately $118,000 USD consisting primarily of Bitcoin (**BTC**). I deposited 5.5 Bitcoin into that account, I don't know the exact fiat amount of my claim because I measure it in Bitcoin.

3) Twenty-one Australian corporate creditors (**Australian corporate creditors**) and I lodged the Motion (docket number 6892) (**Motion**) on 8 July 2024. The total value of my and the Australian corporate creditors' claims exceeds USD $1,446,837.

4) Most of our group have Australian self-managed superannuation funds (**SMSF**). As I understand it an Australian SMSF is the equivalent of a 401K retirement fund in the United States. The funds invested in these Superfunds consist only of retirement savings. We have been classified as corporate creditors by Celsius.

5) It is that motion to which these submissions relate.

6) I want to make clear that I represent myself only in these proceedings and cannot speak on behalf of all the Australian corporate creditors but I am aware that the Australian corporate creditors and others have experienced circumstances very similar to mine in trying but failing to obtain their distribution in these proceedings.

7) I hope that my submissions and any representations I make will support the Motion and also benefit the other Australian corporate creditors who are signatories to the Motion.

8) I have been very reluctant to get involved in these proceedings because of the stress, the work required, procedural difficulties and because I had been hoping each month that the matter would soon be resolved. However, to this day, I (and many of the other twenty-one Australian corporate creditors) remain unpaid, some seven months after the Effective Date. This matter is causing me significant emotional and financial stress and I am keen to resolve the matter. I also believe that, for reasons set out below, I and the other twenty-one Australian corporate creditors have been treated unfairly by being offered only fiat payments instead of cryptocurrency.

**The Plan and correspondence with Celsius and attempted payment**

9) On 30 May 2023, I wrote to Celsius and White and Case to say that I only wanted my distribution in Bitcoin. On August 13 2023 and November 10th 2023, I wrote to Kirkland and Ellis to tell them that I wanted my distribution to be in Bitcoin only. They replied to all of my emails, to confirm that they had received my wishes. Please see Doc 4413 to see my screenshots of these emails, their replies and some other communication with the Debtors and lawyers.

10) On 20 October 2023 Celsius filed the Seventh Notice of Filing of Plan Supplement (the **Plan Supplement**, Docket Number 3869) which included the Coinbase agreements (**Coinbase Agreements**) as Exhibit G (at page 230).

11) On 29 January 2024 Celsius filed the modified joint Chapter 11 plan of reorganization (the **Plan**, Docket Number 4289) which amongst other things governs the distribution of proceeds to creditors.

12) Under these documents, Celsius was to distribute the proceeds of the bankruptcy to creditors.

13) On pg 4 of Doc 4298 filed on 1/31/24, the Debtors stated that "on or around January 19, 2024, the Debtors notified the corporate creditors with the largest Claims against the Debtors that, pursuant to the agreement the Debtors have with Coinbase, the Debtors can only make distributions in Liquid Cryptocurrency to 100 corporate creditors. Eligible corporate creditors interested in receiving Liquid Cryptocurrency as part of their distribution on account of their Claims were required to affirmatively request to receive a distribution in Liquid Cryptocurrency by the stated deadline ... If a corporate creditor is not selected, or did not receive the initial notice, such creditor will also receive a communication confirming that it will receive its distribution in Cash". In footnote #5, they defined "Corporate creditor means any entity that is not an individual (for example, a corporation, LLC, partnership, trust, or similar entity) as determined pursuant to Coinbase's policies and protocols."

14) This docket filing failed to disclose to the Court the actual stated deadline they gave to these affected creditors, which was a very short and hard deadline of 1/23/24. The Debtors did not send me an email informing me that I was an affected party until Saturday 1/20/24, a day afterwards from when they claim to have sent out this email-only notification. This late notice gave me even less time to respond (i.e. only 2 business days) when compared to the 3 business days afforded to other Celsius corporate customers. Sydney, Australia is 16 hours ahead of New York, NY, USA. These emails to corporate accounts were sent on or around late Friday afternoon 1/19 and the hard deadline was Tuesday 1/23, New York time. So realistically a businessperson had Monday and Tuesday to read and respond. 2 days. At that time, I was on a vacation in Italy pre-scheduled long in advance of this surprise notification from the Debtors. As such, I did not check my corporate email account and see their change in distribution policy until 1/24/24, the day after their self-imposed and unnecessarily tight deadline. Here is a timeline of the events that transpired:

2

1. I received an email from support@celsius.network sent on 1/20/24 stating the following:

i) 2nd paragraph: "Pursuant to the agreements the Debtors have with their distribution partners Coinbase and PayPal, the Debtors can only make distributions to 100 'corporate' creditors."

ii) 4th paragraph: "You are receiving this notification because you are one of the corporate creditors who has the largest claims against Celsius and, as such, you may have the opportunity to receive a cryptocurrency claim distribution through Coinbase".

iii) 5th paragraph: "Celsius is reaching out to the corporate creditors with the largest claims to determine how to allocate these 100 slots. In order to be eligible to receive cryptocurrency, a corporate creditor must ... Affirmatively request to receive a distribution in cryptocurrency ... by no later than January 23, 2024".

iv) There was no indication how many corporate customers had received this email or how the 100 limited slots would be allocated (e.g. first-come-first-serve, largest-accounts-demanding-crypto-distribution, random lottery, etc). However, there is a reference in the 7th paragraph to "one of the top 100 22-10964-mg Doc 4413 Filed 03/04/24 Entered 03/04/24 15:42:17 Main Document Pg 2 of 17 3 corporate creditors that will receive a claim distribution in cryptocurrency".

15) When I heard about this email via Twitter whilst on vacation on 1/24/24 and read that email for the first time, I promptly responded to Kirkland, saying that I had already informed them on numerous prior occasions of my insistence on receiving liquid crypto distributions instead of USD. Therefore, whether I missed their new deadline or not should be a moot point.

16) After my initial 1/24/24 email to Kirkland, I spent the next 2 weeks stuck in customer support limbo. I did not hear anything back from the Debtors or their distribution agents until 2/8/24, when Stretto contacted me and said, "You are receiving this email because you will be receiving your Celsius Claim Distribution in US Dollars. Claim distributions made in US Dollars will be distributed by issuing and mailing you a check," despite my previously conveyed wishes.

17) I contacted Stretto to inquire about this decision, but only received a vaguely worded 2nd email from them on 2/17/24 which stated, "Please take this as a notice that a limited number of corporate creditors have been allocated to receive their claim distribution in cryptocurrency and you are not one of those selected." It did not indicate any specific reason why I may not have been chosen. My subsequent efforts to glean more information about my specific case from either the UCC, White & Case, or CEO Chris Ferraro yielded no results.

18) Two weeks later on 3/1/24, Kirkland finally sent me a response acknowledging that "We recorded that you would prefer a BTC distribution on November 13, 2023 and January 2, 2024 ... Specifically, because your account is considered a corporate account, you still needed to be eligible to receive a distribution as one of the largest 100 creditors. According to our records, you were contacted as one of the largest 250 corporate accounts. However, ... your account would not have been in the top 100 corporate accounts who responded requesting a distribution in cryptocurrency."

3

19) Based upon both my numerous direct email communications with Kirkland since August 2023 and the Plan Disclosure Statement they put forth, it was never made clear there was a non-trivial chance that I would not receive part of my recovery in the form of liquid cryptocurrency. The Debtors and Kirkland went to great lengths to assure all creditors that except in the very rarest of circumstances, they would return as much of the estate assets to unsecured creditors in the form of cryptocurrency, even if it might not match the original mix that each creditor had in their accounts. Therefore, this undisclosed and sudden change greatly shocked me (as well as similarly situated peers) to the core.

20) I applied for a Coinbase Prime Business account on the 22nd of March 2024 and was pleasantly surprised when I reached the next stage in my application process within 8 hours of submitting my application. I was asked to pay an upfront onboarding fee of $1,000 USD via wire transfer. The reason that I asked for the fee to be waived is because I know that many of the 100 corporate creditors who got their Coinbase Prime Business accounts, had their $1000 fee waived; including some Australian Corporate Creditors chosen for the 100 slots, who I have communicated with.

I did not pay the $1000 because the Debtors, Kirkland, Stretto and Coinbase Prime who I wrote to to ask for permission to get my distribution through a Coinbase Prime Account, said that I was not allowed to have one of the 100 Coinbase Prime Accounts for my distribution. They asked if I wanted to cancel my application, I said no, please wait for the outcome of Judge Glenn's decision, but they cancelled my application some time after.

On July the 19th, I applied again for a Coinbase Prime Business Application and heard back from them that I had again, easily passed that Business Stage within 8 hours. They asked for the $1000 fee which I again asked to be waived. I have made every effort to make it easy for Celsius to send my distribution to me. I have come up against a brick wall every time.

21) Liquid cryptocurrency distributions to corporate creditors are not far more complex than individual creditors. The only difference should be that KYC requires more documents. This can easily be accommodated by Celsius paying Coinbase a fee to onboard the corporate creditors who wish to receive their distribution through Coinbase Prime. Right now today I could have a Coinbase Prime account for my organisation if I was willing to pay the USD $1,000 fee. I have on boarded my organisation to numerous cryptocurrency exchanges without problems. The process sometimes took time and required the submission of more documents than for individual accounts but it was not difficult.

That fee would be less than the foreign exchange fees a few Australian corporate creditors have paid when they received their wire transfers. The exchange rate into AUD is never to our advantage compared with the market rate. For large accounts, a 3% difference in exchange rates can mean thousands of dollars.

22) On 17 February 2024 I received an email from Stretto advising that I would be receiving my distribution in USD through a wire transfer and inviting me to complete the Wire Distribution Form.

23) I never wanted to receive my distribution in fiat. When we were told to fill in Wire Transfer Forms, I did not. It was only when Stretto made a hard deadline to fill in a wire transfer form by

4

16th April 2024,  or we would be sent a check, that I filled it in. Checks cannot be cashed by Australian banks. My bank is the Commonwealth Bank of Australia.

My father used to use checks. He was born in 1930 and is no longer alive.
Cryptocurrency was designed to avoid this exact disaster that we have experienced in this bankruptcy.

24) I completed the Wire Transfer Form with information from my bank, the Commonwealth Bank, which is the largest Australian bank by market capitalization ($211.7 billion), it is very well established and conducts numerous international transactions daily. The wire transfer information provided by the Commonwealth Bank was correct.
I have copies of all of my wire transfer forms.

25) There is only one Jones Asset Protection Trust in Australia and only one Commonwealth Bank account under that name.

26) I set up a telegram group of Celsius Corporate Creditors which now has over 100 members. We all shared the information that we received from our banks and helped each other. Our banks provided the details and we entered them.

Every single one of us used the name of our Corporate accounts on our Wire Transfer Forms. Chris Ferraro's suggestion that we wrote our personal names on our forms is wrong.

27) We all consulted with one another and tried to understand what could be wrong with our wire transfer information as we were all receiving differing reasons from Stretto as to why our wire transfers had not been successfully processed even when we had submitted the same information. We submitted a letter asking for the MT103s, to identify precisely what is causing the failed transfers. Doc 4837.

28) I firmly believe that Celsius has the correct wire transfer information to process the distributions. For instance, I am aware that another creditor Mark Vozzo on behalf of M Vozzo Super Pty Ltd did receive his USD fiat distribution into his bank account only for the transaction to be reversed by the sender, that is Celsius (see his Joinder to the Faller Motion Docket Number 4985 which sets outs a timeline of events). This shows that Celsius is being provided with the correct wire transfer information. I am also aware that 4 other Australian corporate creditors have received their wire transfers in the past week which affirms this point.

29) I have not received any correspondence from Celsius for months and as far as I am aware Celsius has never made an attempt to pay my wire transfer. I have given up on them.

30) I understand that the many of the other twenty-one signatories to the Motion also remain unpaid and have had similar difficulties receiving their wire transfers. I am aware that four Australian corporate creditors have received their wire transfers this week presumably in response to us lodging the Motion.

**The Plan and Distribution Agreement**

31) Under the Plan and Coinbase Agreement I contend that I should have received cryptocurrency. I, and as far as I am aware, the other twenty-one Australian corporate creditors did not elect to receive fiat. This should be made very clear. Fiat has been forced upon us.

32) Article IV "Means of Implementation of the Plan" clauses G and K of the Plan deal with distributions under the Plan.

33) Article IV clause G "Distribution Mechanics" states amongst other things:

> **Distributions shall generally commence on, or as soon as reasonably practicable after, the Effective Date.** The Post-Effective Date Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agent agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Post-Effective Date Debtors.
>
> …
>
> After the Deactivation Date, the Post-Effective Date Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agent agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Post-Effective Date Debtors. Such distributions may be in Liquid Cryptocurrency or fiat currency, but in no circumstances will any Distribution Agent make distributions in Cryptocurrency other than Liquid Cryptocurrency. On the Deactivation Date, the Allowed Custody Claims of Holders that did not retrieve their Plan distributions from the Celsius platform by the Deactivation Date shall be valued in accordance with the Deactivation Date Cryptocurrency Conversion Table and shall receive such distribution in the amount calculated based on the Deactivation Date Cryptocurrency Conversion Table in Liquid Cryptocurrency or fiat. For the avoidance of any doubt, the Debtors or Post-Effective Date Debtors, as applicable, may elect in their reasonable discretion to make any distribution in fiat if no Distribution Agent is reasonably available to make a Liquid Cryptocurrency distribution to any particular creditor.
>
> …" [Emphasis added.]

34) Article IV clause K "Plan Administrator" states amongst other things:

> "…
> **The Debtors (and, following the Effective Date, the Plan Administrator) shall use commercially reasonable efforts to make distributions of Liquid Cryptocurrency as provided for in this Plan to Account Holders in Liquid Cryptocurrency (as opposed to fiat) to the greatest extent possible.** For the avoidance of doubt, if the Debtors or the Plan Administrator cannot make a distribution of Liquid Cryptocurrency to a particular creditor (including because no Distribution Agent is available to make such distribution), such creditor will receive a distribution of fiat. If an Account Holder's Claim is not Allowed as of the Effective Date or the associated distributions are otherwise retained on account of such Claim being subject to Withdrawal Preference Exposure, the Liquid Cryptocurrency that

6

would otherwise be distributed on account of such Account Holder's Claim shall be held in the Disputed and Contingent Claims Reserve in the form of Liquid Cryptocurrency. The Plan Administrator, as a fiduciary for parties entitled to receive distributions under the Plan, shall exercise his business judgment regarding whether to continue to hold such Liquid Cryptocurrency or convert to other Liquid Cryptocurrency or fiat, including, without limitation, market forces and whether there is a Distribution Agent capable of making distributions to creditors at a particular time. If there is no Distribution Agent capable of making a distribution to the Account Holder in Liquid Cryptocurrency at the time such Account Holder's Claim becomes an Allowed Claim or is otherwise made available for distribution and the Plan Administrator has not otherwise converted such Liquid Cryptocurrency to fiat, the Debtors, Post-Effective Date Debtors or Plan Administrator, as applicable, shall convert the Liquid Cryptocurrency that would otherwise be distributed to the Account Holder to fiat currency as close to the anticipated date of distribution as reasonably practical under the circumstances, and shall distribute such fiat currency to the Account Holder. Additionally, if a creditor's AML/KYC Compliance Information results in a change in the form of consideration to be paid to such creditor (i.e., a creditor will receive fiat currency instead of Liquid Cryptocurrency, or vice versa, due to a change in the applicable Distribution Agent), then the Plan Administrator will convert the Liquid Cryptocurrency that would otherwise be distributed to the creditor to fiat currency (or vice versa) as close to the anticipated date of distribution as reasonably practical under the circumstances, and shall distribute such fiat currency or Liquid Cryptocurrency, as applicable, to the Account Holder.4 If the Debtors, Post-Effective Date Debtors or Plan Administrator determine, in the exercise of their fiduciary duties and in their business judgment, that it is no longer commercially reasonable to continue to hold Liquid Cryptocurrency in the Disputed and Contingent Claims Reserve, the Debtors, Post-Effective Date Debtors, or Plan Administrator, as applicable, shall provide notice, Filed on the docket, of the intent to sell the Liquid Cryptocurrency." [Emphasis added.]

35) It is clear from the above that the Debtors and Plan Administrator were supposed to make distributions in cryptocurrency "*as opposed to fiat*". It is my submission that the Debtors and Plan Administrator did not "*use commercially reasonable efforts to make distributions of Liquid Cryptocurrency as provided for in The Plan to Account Holders in Liquid Cryptocurrency (as opposed to fiat) to the greatest extent possible*". They managed to make distributions via liquid cryptocurrency to the top 100 corporate creditors without apparent issues. They managed to make distributions to hundreds of thousands of individual creditors via liquid cryptocurrency. There is no reason why all corporate creditors (within Coinbase's jurisdiction) could not have been paid in liquid cryptocurrency. Any additional KYC / AML requirements for corporate accounts over individual accounts are marginal and would not prevent the making of payments to corporate creditors. The fact that Coinbase was able to process accounts for the top 100 corporate creditors demonstrates that there is no great obstacle and that they should have been able for all corporate creditors. I have created several corporate accounts on behalf of the Jones Asset Protection Trust with other centralised exchanges like Coinbase and have had no difficulty in doing so. Companies like Coinbase do KYC / AML procedures all the time for their businesses and I suggest would be very experienced and adept at doing so.

36) Nowhere in the Plan does it say that corporate creditors outside the top 100 will be distributed fiat. Creditors voted in favour of the Plan on the basis of the wording contained in it and Celsius should not be able to arbitrarily add limitations outside the scope of the Plan. I, and as I understand it the Australian corporate creditors, believed that we would be receiving cryptocurrency under the Plan.
I voted no to the plan with my personal account and forfeited 5%. I did not want to lose another 5% of my crypto by voting no under my family trust account. I have followed this bankruptcy closely for the past two years and have seen gross negligence since the beginning. It has been extremely frustrating to watch. I wanted to get out of bankruptcy early but a certain Celsius UCC member who was a CEL whale was more concerned about "our CEL stack." That makes me extremely angry. That particular CEL whale and his family had 3 corporate accounts in the 100 list of Coinbase Prime accounts. It is obvious that they looked after themselves, which I would assume is illegal. I will mention Ionic Digital board members and leave it there. Richard Phillips has covered that ground and I support him.
We now see that Gemini Earn who kept all their creditors' crypto and didn't sell any, has given back creditors 100% of their crypto. That is what I wanted with Celsius and campaigned for on Twitter under #depositorsfirst . It fell on deaf ears.

37) Exhibit G "Coinbase Agreements" of the Plan Supplement contained the Coinbase Agreements including the Coinbase Prime Agreement between Celsius and Coinbase Inc which established the relationship between Celsius and Coinbase. For our purposes there is the Coinbase Distribution Addendum on page 262 of the Plan Supplement (Docket number 3869). It deals with the agreement between Celsius and Coinbase for the making of distributions through Coinbase.

38) Clause 2 of the Coinbase Distribution Addendum provides amongst other things as follows:

"**Services**. Pursuant to the process described in Schedule 1 hereto, Client may provide CB Custody with written instructions ("Instructions") to distribute to one or more Claimants a portion or all of, the payment owed to such Claimant(s) under the Reorganization Plan (each such distribution under this Distribution Addendum, a "Distribution"). Each such Instruction shall be provided in accordance with the terms set forth in the Agreement. CB Custody shall, directly or through one of its affiliates, including the In-Transit Account or any other internal ledger account, make Distributions as set forth in Schedule 1 hereto and in accordance with Instructions provided by Client (the "Distribution Services"). Client agrees that CB Custody may act on an Instruction by transferring the relevant Supported Cryptocurrency to CB Inc. with instructions that CB Inc. credit such Supported Cryptocurrency to an account on the books and records of CB Inc. (the "In-Transit Account") in the name of Client, and further distribute such Supported Cryptocurrency to Claimants. CB Inc. may, for operational purposes, reflect the In-Transit Account as either an "Institutional Prime Exchange Account" or a "Retail Exchange Account." Such account shall be subject to the terms and conditions of this Agreement, except that such account can only be used, and the only instruction that Client may provide in respect of such account is a standing instruction, to perform the Distribution Services pursuant the Instructions; provided however that the modality of accessing and using such Retail Exchange Account, where it differs from such Institutional Prime Exchange Account, shall be communicated to Client in a timely fashion.

**Instructions for Distribution**. **If the Instructions from Client state that a certain Claimant's Distribution shall be in the form of Supported Cryptocurrency and such Claimant Resides in a Supported Jurisdiction, all Distributions to that Claimant shall be in the form of the applicable Supported Cryptocurrency.** If the Instructions from Client state that a certain Claimant's Distribution shall be in the form of Supported Cryptocurrency and such Claimant Resides in a jurisdiction that is not a Supported Jurisdiction, Coinbase shall (i) provide prompt notice to Client that such Instruction cannot be followed as provided and (ii) not act on such Instruction until Client, in its sole and absolute discretion, provides revised Instructions. No Distributions shall be made to Claimants who Reside in a jurisdiction that is not a Supported Jurisdiction. If Coinbase rejects Client's Instructions for any reason, fails to make or cannot make a Distribution as set forth in Client's Instructions for any Claimant, Coinbase shall provide prompt notice to Client that such Instruction is not followed and Client reserves the right, in its sole and absolute discretion, to use another service provider to make Distributions to such Claimant.

…" [Emphasis added]

39) Australia is a Supported Jurisdiction according to Schedule 2 of the Coinbase Distribution Addendum (page 269 of the Plan Supplement Docket Number 3869).

40) Clause 3 of the Coinbase Distribution Addendum provides amongst other things as follows:
"…

**Account Process**. Client shall identify for Coinbase all Claimants for which Client wishes to use Coinbase to make a Distribution and provide information to Coinbase on all such Claimants as set forth in Schedule 1 hereto, including to identify which custody account should be used for such Distribution. Client shall notify Claimants that they may be eligible to receive Distributions in respect of their Claim (as defined in the Reorganization Plan) through Coinbase. Client shall ensure all Digital Assets to be distributed are made available in the applicable Celsius Custody Account prior to any Distribution, and will inform Coinbase that Claimants may be eligible to receive Distributions in respect of their Claim.

…"

41) Schedule 1 to the Coinbase Distribution Agreement "Distribution Services" sets out the account creation process and provides amongst other things as follows:

"Account Creation:

All retail creditors must create a CB Inc. retail account to ensure CB Inc. can complete transfers to the respective creditor.

**All institutional creditors (the "Institutional Creditors") shall establish a Coinbase prime institutional account.**

Existing Coinbase retail accounts and existing Coinbase institutional accounts can be used by eligible creditors.

All creditors will be subject to and must complete the Coinbase AML/KYC onboarding requirements prior to Coinbase making any transfer.

…" [Emphasis added.]

9

42) In addition to there being nothing in the Plan about excluding corporate creditors outside the top 100 from cryptocurrency distributions, there is nothing in the Coinbase Agreements which states that corporate creditors outside the top 100 would be excluded. Indeed, amongst other things, Schedule 1 to the Coinbase Distribution Agreement states that "*All institutional creditors… shall establish a Coinbase prime institutional account*". I am not aware of any document approved by the Court in which it was established that Celsius would pay corporate creditors outside the top 100 in fiat.

**My requests for cryptocurrency and cryptocurrency markets**

43) As noted above, I wrote to White and Case, Celsius and Kirkland several times stating that I wanted to receive cryptocurrency but they either refused or did not reply.

44) I did not think there was anything I could do and, since the Plan provided for payments to be made on or reasonably after the Effective Date, I resigned myself to receiving fiat and considered that, as long as I received it quickly, I could reinvest it in cryptocurrency and get the benefit of being in cryptocurrency as soon as possible.

45) Many commentators and many of us investors believe that the cryptocurrency market generally runs on a four year cycle in which cryptocurrency increases in value for approximately 18 months around and after each Bitcoin halving event. In addition, a major catalyst occurred for cryptocurrency in early January 2024 with the approval of spot ETFs for Bitcoin. As a result of these matters I, and many others, strongly believed that Bitcoin and cryptocurrency would accelerate in value from January onwards after the spot ETF and with the 19 April 2024 Bitcoin halving upcoming. These matters would be squarely within the realm of Celsius and its advisers' understanding.

46) For these reasons I was very keen to receive liquid cryptocurrency because I believe in the cryptocurrency market which is why I had my cryptocurrency invested with Celsius. At all times I wanted to stay exposed to the cryptocurrency market. This is why I was so against receiving fiat.

47) You can see my insistence on receiving Bitcoin only was my preference and I wrote to White and Case stating this on 30 May 2023. I am well educated about Bitcoin and its value. I do not measure my claim value in fiat.

**Summary of status**

48) At every stage I have held off taking action in these proceedings because of the procedural difficulty of getting involved, the time and effort and because there was always a hint from Celsius that the distribution was around the corner.

49) However, it is now apparent that in seven months, there is no clear end in sight for receiving my cryptocurrency or fiat distribution.

10

50) Upon further reviewing this matter in the last several weeks I realised that it was improper for Celsius to propose to pay me in fiat for the reasons mentioned above in relation to the Plan and Coinbase Agreement. These reasons include:

   a) It is extremely unfair to distinguish between creditors of the same class by paying the top 100 creditors in cryptocurrency and the rest in fiat;
   b) It is not permitted by the Plan for which we voted to exclude corporate creditors outside the top 100 from receiving cryptocurrency;
   c) I believed in cryptocurrency hence why I held funds with Celsius in cryptocurrency; and
   d) If I am paid in fiat I will miss out on the increase in value of cryptocurrency since my distribution was fixed at 16 January 2024 prices.

**Faller motion and compensation**

51) With respect to par 50(d) I note that I and many Australian corporate creditors have filed joinders to the Faller Motion (Docket Number 4911). My Joinder is Docket Number 4918. As is set out in the Faller Motion and my and others' Joinders, cryptocurrency has increased in price since the distribution price was fixed and because of the delay in being paid designated fiat, we are suffering loss.

52) If I am unsuccessful in my claim to be paid in cryptocurrency or elect to receive fiat instead of cryptocurrency I claim compensation for the difference in value of my distribution between the 16 January 2024 prices and the value as at the date I receive my distribution (as set out in the Faller Motion and my Joinder).

**Action sought**

53) To resolve these matters, I suggest:

   a) I and the other Australian corporate creditors be given the option to receive our distribution in either cryptocurrency at 16 January 2024 prices **or** in fiat. If we elect to receive cryptocurrency, that any fee for establishing an account with any cryptocurrency distributor, such as Coinbase Prime, be waived (I note that the fee was waived for many of the 100 corporate creditors);
   b) That I be provided any fiat distribution by wire transfer and not USD check;
   c) That I and the other Australian corporate creditors be provided with a personal contact by Celsius or the Distribution Agent to liaise with in terms of making our distributions, so that they are done in an effective and timely fashion;
   d) That I and the other Australian corporate creditors be provided with the MT103 Swift transfer form for any failed attempted wire transfer to establish what is causing the failure.

**Further matters**

54) I understand that Celsius argues that there is no practical way to distribute cryptocurrency to all corporate creditors. I am sure there is some way to resolve this matter. I fail to believe that a company cannot be found that can distribute to all corporate creditors. One simple mechanism to effect the payment would be to pay the distribution agent, eg Coinbase, a fee to distribute to all corporate creditors. Let's say that cost is the Coinbase account opening fee of $1,000 per customer. Celsius has stated that there are approximately 1800 total corporate creditors and let

11

us estimate that 10% of them remain unpaid (Celsius has previously stated that 90% of distributions have been completed) then it would cost $180,000 to make cryptocurrency distributions to the remaining 180 corporate creditors. That would be entirely reasonable that Celsius would pay money to a distribution agent to make distributions. There is ample money set aside for distributions and contingencies (as I understand it some $165 million for contingencies) and the $180,000 in fees would be minimal in proportion.

55) I understand that Celsius also argues that because they have sold down the relevant portions of the cryptocurrency to cash on 16 January 2024 that it would eat into a significant portion of the remaining funds if they were then required to compensate all creditors in a similar situation. Firstly, it was the responsibility of Celsius to ensure proper treatment of creditors which we have not received. Secondly, if they are required to eat into the retained funds to compensate me and other corporate creditors then these such circumstances are the exact type of purpose for which such funds were retained. To date we have been treated disproportionately and to even up our treatment would only be fair and reasonable and could not therefore be said to be disadvantageous to other creditors who received full value by being paid in cryptocurrency. Thirdly, I have seen no evidence that our cryptocurrency was ever sold.

56) Another example of the disparate treatment between creditors is that Celsius has stated that creditors who were earmarked cryptocurrency (not fiat) and cannot receive their distributions in cryptocurrency and so will need to be paid fiat, will receive liquid cryptocurrency at the prevailing market prices as close to the expected date of the fiat distribution as possible. This means that I and the other Australian corporate creditors will receive our fiat at 16 January 2024 prices some seven or more months later while creditors who were earmarked cryptocurrency but cannot receive their distribution in cryptocurrency, would receive their distribution at prevailing cryptocurrency prices at the time they receive their fiat.

57) I have also seen assertions by Celsius that the distribution process has been a resounding success and that some 90% of 400,000 creditors have been paid and that where wire transfers haven't gone through it is the fault of the creditor for failing to provide correct wire transfer information or the creditor's bank rejecting payment. By their own figures that still leaves 40,000 creditors unpaid after some 6 months. And I strongly object to the assertion that it is the creditors' fault that payment hasn't gone through particularly in my and the Australian corporate creditors' case. As you can see in my situation, and I'm aware it is the same for the other Australian corporate creditors, that I provided all the correct information and it is Celsius who has failed to effect my distribution or to communicate at all.

58) Corporate accounts were established with the same intentions as individual accounts, reflecting a belief in fair treatment and equal opportunity, and a desire to own cryptocurrency. Just like individual account holders, I and the Australian corporate creditors trusted our assets to Celsius. The majority of the accounts are sole operators which hold retirement funds, family trusts, wills, and non-traditional corporate accounts aimed at safeguarding our financial futures. It's important to note that these types of corporate accounts do not have trade credit insurance, meaning losses cannot be claimed via insurance. Corporate accounts have never had an advantage over individual accounts. Hence, we assert that all creditors, regardless of account type, have the right to be treated the same. The current disparity in distribution methods undermines the principles of fairness and equality.

s/ Frances Jones

_____

Frances Jones

25 July 2024